**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BOOKENDS & BEGINNINGS LLC, on behalf of itself and all others similarly situated,<br><br><div align="right">Plaintiff,</div><br>v.<br><br>AMAZON.COM, INC.; HACHETTE BOOK GROUP, INC; HARPERCOLLINS PUBLISHERS L.L.C.; MACMILLAN PUBLISHING GROUP, LLC; PENGUIN RANDOM HOUSE LLC; SIMON & SCHUSTER, INC.,<br><br><div align="right">Defendants.</div> | No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

010888-12/1449198 V2

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................................... 3

II.    JURISDICTION ..................................................................................................... 6

III.   VENUE ................................................................................................................. 8

IV.   PARTIES ............................................................................................................... 8

     A.     Plaintiff ...................................................................................................... 8

     B.     Defendants ................................................................................................. 8

          1.     Amazon ......................................................................................... 8

          2.     Hachette ........................................................................................ 9

          3.     HarperCollins ............................................................................... 9

          4.     Macmillan ..................................................................................... 9

          5.     Penguin ....................................................................................... 10

          6.     Simon & Schuster ...................................................................... 10

V.     STATEMENT OF FACT .................................................................................... 11

     A.     Defendants' agreements raise wholesale prices and prevent any meaningful competition in the sale of trade books. .................................... 11

     B.     Courts and enforcement agencies have repeatedly found that Defendants' MFNs harm competition. ....................................................... 15

     C.     Defendants' MFNs harm competition and hurt consumers. ...................... 19

VI.   INTERSTATE TRADE AND COMMERCE ...................................................... 23

VII.  DEFENDANTS' MARKET POWER IN THE RELEVANT MARKET ................. 23

     A.     The online market for print trade books is the relevant product market. ...................... 23

          1.     Trade books are not interchangeable with other books. .................................. 23

          2.     Print books are not reasonably interchangeable with eBooks or audio books. ................................................................................. 24

010888-12/1449198 V2

3.      The online market for sale of print trade books is a well-defined submarket, representing a distinct group of competitors that do not overlap significantly with brick-and-mortar booksellers...........................26

B.      The United States is the relevant geographic market...................................33

C.      The Big Five dominate the production and sale at wholesale of print trade books in the U.S. market. ...................................................34

D.      Amazon dominates the retail market for print books...................................35

VIII.    CLASS ACTION ALLEGATIONS ...........................................................35

IX.      ANTITRUST INJURY ..........................................................................38

X.       CAUSES OF ACTION ..........................................................................39

VIOLATION OF THE SHERMAN ACT.........................................................39

FIRST CAUSE OF ACTION VIOLATION OF 15 U.S.C. § 1................................39

SECOND CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION (15 U.S.C. § 2) ...........................................................43

THIRD CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – CONSPIRACY TO MONOPOLIZE  (15 U.S.C. § 2) ................................44

JURY TRIAL DEMANDED.......................................................................45

PRAYER FOR RELIEF...........................................................................45

010888-12/1449198 V2

Plaintiff alleges the following upon personal knowledge as to itself and its own acts, and as to all other matters upon information and belief, based upon the investigation made by and through its attorneys.

## I.    INTRODUCTION

1.      Plaintiff is a bookseller that operates online and as a physical store. Plaintiff directly purchases print books[1] published and sold at wholesale by the five largest publishers in the United States: Defendant Hachette Book Group, Inc. ("Hachette"); Defendant HarperCollins Publishers L.L.C. ("HarperCollins"); Defendant Macmillan Publishing Group, LLC ("Macmillan"); Defendant Penguin Random House LLC ("Penguin"); and Defendant Simon & Schuster, Inc. ("Simon & Schuster"), otherwise known collectively as the "Big Five." The Big Five publish and sell "trade books," a term of art referring to "general interest fiction and non-fiction books," as "distinguished from 'non-trade' books such as academic textbooks, reference materials, and other texts."[2] Collectively, the Big Five account for about 80% of the trade books sold in the United States.[3]

2.      Plaintiff also competes with Defendant Amazon.com, Inc. ("Amazon"), the largest retail bookseller in the United States. Amazon sells over half of all books purchased at

---

[1] This lawsuit concerns the sale of print books (hardbacks, paperbacks, and mass produced). Defendants' conduct with respect to the sale of electronic books is the subject of a separate lawsuit. *In Re Amazon.com, Inc. eBook Antitrust Litigation.* Case Number: 1:21-cv-351-GHW-DCF (S.D.N.Y.).

[2] *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 648 n.4 (S.D.N.Y. 2013).

[3] Constance Grady, *Milo Yiannopoulos's book deal with Simon & Schuster, explained*, Vox (Jan. 3, 2017), https://www.vox.com/culture/2017/1/3/14119080/milo-yiannopoulos-book-deal-simon-schuster-dangerous-boycott; Thad McIlroy, *What the Big 5's Financial Reports Reveal About the State of Traditional Book Publishing*, Book Business (Aug. 5, 2016), https://www.bookbusinessmag.com/post/big-5-financial-reports-reveal-state-traditional-book-publishing/.

010888-12/1449198 V2

retail in the United States,[4] including about 90% of all print books sold online.[5] Plaintiff alleges that Amazon and the Big Five restrain competition in the sale of print trade books through highly restrictive most favored nation clauses (MFNs) in their distribution agreements. These anticompetitive provisions ensure that no rival bookseller can differentiate itself from, or otherwise compete with, Amazon on price or product availability in the sale of print trade books.

3.      In general, MFNs entitle the buyer to the lowest price or best terms that the supplier offers to any other buyer,[6] but combined with Amazon's market dominance, they serve an anticompetitive purpose that controls the wholesale price of print trade books, destroys Amazon's retail competition, reduces consumer choices, and creates a disincentive among booksellers to compete on price or non-price promotions in the sale of print trade books.

4.      It would increase the Big Five's book distribution and therefore be in their economic self-interest to let Amazon's rival booksellers gain market share by offering them lower wholesale prices or exclusive early releases. But Amazon's contracts with publishers cover practically all the potential avenues a competing bookseller may attempt to use in order to differentiate itself against Amazon.[7] To control wholesale prices, the Big Five agree to

---

[4] House Judiciary Committee, Investigation of Competition in Digital Markets, Oct. 5, 2020 at 295, https://judiciary.house.gov/uploadedfiles/investigation_of_competition_in_digital_markets_majority_staff_report_and_recommendations.pdf ("House Report").

[5] *Id.* at 255 n.1562.

[6] *See Apple*, 952 F. Supp. 2d at 662.

[7] European Commission's Directorate General for Competition, Case AT.40153 EBook MFNs and related matters (Amazon), https://ec.europa.eu/competition/antitrust/cases/dec_docs/40153/40153_4392_3.pdf ("5.4.2017 DG Comp. Decision") at 38.

010888-12/1449198 V2

anticompetitive restraints that prevent Plaintiff and other booksellers from competing with Amazon.

5.     Despite multiple investigations and censure for the use of anticompetitive MFNs, Amazon and the Big Five have employed and continue to employ this device to fix wholesale prices, create a barrier to market entry for new competitors, and hinder the expansion of existing competitors in the retail market for the sale of print trade books. The harm caused by Defendants' supracompetitive wholesale prices and attendant injuries to the retail sale of print trade books persists and will not abate unless Amazon and the Big Five are stopped. Plaintiff seeks a nation-wide injunction under Section 16 of the Clayton Act to enjoin Defendants Amazon and the Big Five from enforcing this restraint.

6.     By entering into agreements that fix the wholesale price of books and prevent Amazon's competitors from competing on price or product availability, Defendant Amazon has willfully acquired its monopoly power in the U.S. online retail trade book market, where it accounts for roughly 90% of all print book sales. Such conduct is an abuse of monopoly power in violation of Section 2 of the Sherman Act.

7.     Plaintiff and members of the proposed Bookseller and Online Bookseller Classes (defined below) seek monetary recovery, including treble damages, for all overcharges incurred by the Classes as defined herein. Plaintiff and the proposed Classes have standing to recover damages under Section 4 of the Clayton Act because Defendants' anticompetitive use of MFNs and similar provisions materially and proximately cause injury to and have caused Plaintiff and Class members to pay supracompetitive wholesale prices for books.

8.     Further, Plaintiff and the proposed Classes seek injunctive relief that terminates the ongoing violations alleged in this Complaint. They have standing under Section 16 of the

Clayton Act because they are threatened with impending future harm in the form of additional overcharges.

## II.     JURISDICTION

9.      This Court has federal question jurisdiction pursuant to the federal antitrust laws invoked herein, including the Sherman Act and Clayton Antitrust Act, *e.g.*, 28 U.S.C. § 1331, 28 U.S.C. § 1337(a), and 15 U.S.C. § 15(a).

10.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from Defendants, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

11.     Plaintiff Bookends & Beginnings LLC operates a bookstore in Evanston, Illinois. Plaintiff purchases books at wholesale prices directly from the Big Five and directly competes with Amazon in the U.S. market for the retail sale of print trade books and in the submarket for online sales of print trade books. Plaintiff was harmed and injured financially because of Defendants' conduct, as described further herein.

12.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, because Defendants reside in this District or may be found or transact business in this District. Each of the Big Five Defendants have headquarters and operate their businesses in this District. Amazon likewise may be found or transacts business in this District. Amazon has over 8,000 employees in its New York City work force, including many who work at its

Manhattan office space.[8] It has five warehouses in New York, including two in Manhattan.[9] It also owns and operates four Amazon Books stores and eight cashier-free Go-stores in locations throughout Manhattan.[10] Amazon has eight office properties in Manhattan, most of which are clustered in Midtown, including the iconic Lord & Taylor building on Fifth Avenue.[11] Amazon has engaged in an illegal, anticompetitive scheme to monopolize the eBooks market that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business in this District.

13.     Exercising personal jurisdiction over Amazon is also appropriate under Section 302(a) of New York's long-arm statute because Amazon transacts business in the State of New York, directly or through agents, such that it has sufficient minimum contacts with New York. Plaintiff further avers on information and belief that Amazon's online sales to its customers in New York State represent at least 5% of Amazon's U.S. sales and therefore rise to the level of

---

[8] Ed Shanahan, *Amazon Grows in New York, Reviving Debate Over Abandoned Queens Project*, NYT (Dec. 9, 2019), https://ww, w.nytimes.com/2019/12/06/nyregion/amazon-hudson-yards.html.

[9] https://en.wikipedia.org/wiki/List_of_Amazon_locations#United_States ; Ben Fox Rubin, *Why Amazon built a warehouse inside a Midtown Manhattan office tower*, CNET (Dec. 21, 2015), https://www.cnet.com/news/why-amazon-built-a-warehouse-inside-a-midtown-manhattan-office-tower/.

[10] Where are Amazon Go stores located in New York?, Bing, https://www.bing.com/maps?q=where+are+amazon+go+stores+in+new+york&qs=NW&pq=where+are+amazon+go+stores+in+new+&sc=5-34&cvid=29EA099E9F8E4797A844A8DCA5842069&FORM=QBLH&sp=1&ghc=1; Where are Amazon Books stores located in New York?, Bing, https://www.bing.com/maps?q=where+are+amazon+books+stores+located+in+new+york%3F&cvid=1f533e8508ec4a378125b0ed5e3fc0cb&FORM=ANAB01&PC=U531.

[11] Matthew Haag, *Manhattan Emptied Out During the Pandemic. But Big Tech Is Moving In*. NYT (Nov. 9, 2020), https://www.nytimes.com/2020/10/13/nyregion/big-tech-nyc-office-space.html.

substantial solicitation necessary to satisfy the minimum contacts required to support this Court's

exercise of personal jurisdiction over Amazon.

### III.    VENUE

14.      Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside

in this judicial district and a substantial part of the events or omissions giving rise to the claims

occurred in this judicial district.

### IV.    PARTIES

**A.    Plaintiff**

15.      Bookends & Beginnings LLC is an Illinois limited liability company that operates

a bookstore in Evanston, Illinois selling physical books in its store and online through its

website: www.bookendsandbeginnings.com. Bookends & Beginnings purchases books directly

from each of the Big Five Publishers.

**B.    Defendants**

**1.    Amazon**

16.      Amazon is an online retailer giant with its principal headquarters in Seattle,

Washington and with facilities and employees scattered throughout the United States, including

in this District. Amazon is vertically integrated and is active upstream as a publisher, with its

own imprints (*i.e.*, publishing labels), and downstream as an eBook retailer. Amazon sells

eBooks and offers eBook reading subscription services to its retail customers in New York and

throughout the United States from the Amazon.com platform. Amazon also operates Amazon

Publishing, a division of Amazon that publishes books and competes with the Big Five

Defendants.

### 2. Hachette

17.     Defendant Hachette is a leading U.S. trade publisher, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. Hachette has been publishing books since 1837, and its publishing brands currently include Little, Brown and Company; Little, Brown Books for Young Readers; Grand Central Publishing; Basic Books; Public Affairs; Orbit; FaithWords; and Center Street. Hachette's books and authors have garnered major awards including Pulitzer Prizes, National Book Awards, Newbery Medals, Caldecott Medals, and Nobel Prizes. Hachette's bestselling authors have been published all over the world and include David Baldacci, Michael Connelly, Malcolm Gladwell, Elin Hilderbrand, N. K. Jemisin, Stephenie Meyer, James Patterson, J.K. Rowling, Nicholas Sparks, Rick Steves, Donna Tartt, and Malala Yousafzai.

### 3. HarperCollins

18.     Defendant HarperCollins is a leading U.S. trade publisher, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. With over two hundred years of history and more than 120 branded imprints around the world, HarperCollins publishes approximately 10,000 new books every year in 16 languages, and has a print and digital catalog of more than 200,000 titles. Writing across dozens of genres, HarperCollins' authors are winners of the Nobel Prize, the Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Man Booker Prize.

### 4. Macmillan

19.     Defendant Macmillan is a leading U.S. trade publisher, having its principal place of business in New York City, and is qualified to do business and is doing business in the State

- 9 -

of New York and in this District. Macmillan is part of a global trade-publishing group operating worldwide, with trade publishing companies in the United States, Germany, the United Kingdom, Australia, South Africa, and India. Macmillan operates eight divisions in the US: Celadon Books; Farrar, Straus and Giroux; Flatiron Books; Henry Holt and Company; Macmillan Audio; Macmillan Children's Publishing Group; St. Martin's Press and Tor/Forge. Its writers, including, among others, Jeff VanderMeer, Senator Elizabeth Warren, James Comey, Orson Scott Card, and Paul Beatty, come from a vast array of literary backgrounds and have won awards including the Caldecott Medal, the Nobel Prize, the Man Booker Prize, the Pulitzer Prize, the National Book Award, and the Printz Award.

### 5.    Penguin

20.    Defendant Penguin is a leading U.S. trade publisher, organized under the laws of Delaware, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. With a rich history dating back to the 1800s, Penguin's expansive publishing portfolio includes nearly 275 independent publishing imprints and brands on five continents and contains books and products for readers of all ages at every stage of life. Penguin publishes 15,000 new titles annually and sells close to 800 million print, audio, and eBooks annually. Penguin's many authors include more than 80 Nobel Laureates and hundreds of the world's most widely read authors.

### 6.    Simon & Schuster

21.    Defendant Simon & Schuster is a leading U.S. trade publisher, organized under the laws of New York, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. It publishes 2000 titles annually in numerous well-known imprints and divisions such as Simon & Schuster,

Scribner, Atria Books, Gallery Books, Pocket Books, Adams Media, Simon & Schuster

Children's Publishing and Simon & Schuster Audio and international companies in Australia,

Canada, India and the United Kingdom. Simon & Schuster proudly brings the works of its

authors, which include, among others, Dale Carnegie, Sharon Draper, Jennifer Egan, Joseph

Heller, Ernest Hemingway and Stephen King, to more than 200 countries and territories. Its

books and authors have been winners of the Pulitzer Prize, National Book Award, National Book

Critics Circle Award, Newbery Medal, and Caldecott Medal. On November 25, 2020, Penguin

announced plans to acquire Simon & Schuster; the proposed merger would create a single

publishing house with approximately 50% of all trade books published.[12]

## V.      STATEMENT OF FACT

**A.      Defendants' agreements raise wholesale prices and prevent any meaningful competition in the sale of trade books.**

22.      Defendants employ a comprehensive set of unreasonably restrictive MFNs that

cover virtually all aspects of competition between booksellers to ensure that no rival bookseller

can differentiate itself from, or otherwise compete with, Amazon in the sale of trade print books

at retail. These provisions include price and product availability. They have the intent and effect

of controlling wholesale prices of print trade books and preventing competition with Amazon in

the retail sale of print trade books.

23.      **Wholesale price parity**: Publishers typically rely on a wholesale model to sell

trade print books to booksellers, who then sell to the public at retail.[13] Defendants control

---

[12] John Maher, *PRH Purchase of S&S Draws Objections*, Publishers Weekly (Nov. 30, 2020), https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/85005-first-reactions-to-s-s-sale.html.

[13] Constance Grady, *The 2010s were supposed to bring the ebook revolution*, Vox (Dec. 23, 2019), https://www.vox.com/culture/2019/12/23/20991659/ebook-amazon-kindle-ereader-department-of-justice-publishing-lawsuit-apple-ipad.

wholesale prices by eliminating the factors that would lead to competitive wholesale pricing. Amazon's MFN ensures that the publisher cannot offer Amazon the same title on the same date for a higher wholesale price than it offers to any other bookseller.[14]  This agreement hinders competing retailers from offering their consumers lower book prices than Amazon.[15] Publishers have an incentive to diversify the distribution of their books and prevent any one bookseller from having a stranglehold over the distribution of their books. In a competitive market to encourage diversification, competing booksellers may be able to obtain lower wholesale prices from publishers than Amazon, which would enable them to gain market share by offering lower prices to consumers. Because publishers cannot offer lower wholesale prices to competing booksellers, this reduces the booksellers' incentives to undercut Amazon's prices at retail to improve their market position, reduces consumer choices, and leads to higher consumer prices.[16] And it ensures that Amazon obtains access to books at the best wholesale terms in scenarios where publisher otherwise would have a preference not to offer a given book to Amazon.[17]

24.     **Selection parity**: Because of Amazon's market dominance, its retail competitors need to provide additional value to consumers, for example in the form of differentiated content or early releases because even temporarily offering content that is unavailable on Amazon would increase competition in the retail distribution of books.[18] In a competitive market, publishers would have a financial incentive to incur the added investment cost of developing innovative products for exclusive release by Amazon's retail competitors or to offer them exclusive early

---

[14] 5.4.2017 DG Comp. Decision at 30 n.48.

[15] *Id.* at 37.

[16] *Id.*

[17] *Id.* at 38.

[18] *Id.* at 30.

010888-12/1449198 V2

releases, so that Amazon's competitors would gain market share and weaken Amazon's bargaining power over the publishers.[19] But Amazon's MFN requires publisher to provide their books for sale on Amazon.com at the earliest date available to other booksellers and include all the same features as the books available through Amazon's retail competitors.[20] Amazon's selection parity clause harms the retail competition because it forecloses a significant avenue for retailers to compete with Amazon by differentiating the product or making it available earlier.[21]

26. **Promotion Parity Clause**: This clause forecloses even temporary competition, by requiring publishers to offer Amazon any promotional wholesale price, or promotional content that they offer to any other bookseller.[22] This prohibition on price and non-price promotions is anticompetitive because it undermines competing booksellers' incentives to invest in price and non-price related promotional activities.[23] Booksellers lose incentive because they anticipate that some additional sales triggered by their price and non-price related promotional activities would also be made by Amazon, leaving less additional sales for them and, hence, reducing their incentives to engage in promotional activities in the first place.[24]

26. Amazon benefits from this agreement because regardless of the wholesale prices, it faces no meaningful competition from any rival bookseller. The Big Five Defendants benefit from this agreement because they have no incentive to lower wholesale prices and therefore can maintain them as supracompetitive levels.

---

[19] *Id.* at 29-30.

[20] *Id.* at 10, 27.

[21] *Id.* at 31.

[22] *Id.* at 10 and 32 n.49.

[23] *Id.* at 31.

[24] *Id.* at 30.

27.     Acting individually, none of the Big Five Defendants would have an incentive to enter into restrictive agreements that consolidate power in Amazon and cede substantial control over the distribution of their books, unless the agreements granted them the power to control wholesale prices of print trade books. For example, Macmillan's CEO John Sargent warned that Amazon's large market share is "one of the big problems in the digital marketplace" and as "publishers, authors, illustrators, and agents, we need broader channels to reach our readers."[25] And recent statement from the Association of American Publishers, to which all of the Big Five belong,[26] called "for government officials to step in quickly and decisively to exercise corrective measures" to address Amazon's "dominant position in the publishing industry."[27]

28.     But the Big Five did not act in isolation. During the *Apple* conspiracy, they were in constant communication regarding their negotiations with both Apple and Amazon.[28] And in their negotiations at the conclusion of the terms of the consent decrees imposed by the *Apple* court, Defendants publicly signaled that Amazon was offering the same basic terms in their book distribution agreements and that each of the Big Five was accepting those terms.[29]

---

[25] Brian Stelter, *Amazon, HarperCollins avert public Fight*, CNN (Apr. 14, 2015), https://money.cnn.com/2015/04/14/media/amazon-harpercollins-deal/index.html.

[26] Our Members - AAP, https://publishers.org/who-we-are/our-members/

[27] Statement from Maria A. Pallante, President and CEO, Association of American Publishers, https://publishers.org/news/association-of-american-publishers-comments-on-american-booksellers-association-whitepaper-american-monopoly-amazons-anti-competitive-behavior-is-in-violation-of-antitrust-laws/.

[28] *United States v. Apple, Inc*., 791 F.3d 290, 318 (2d Cir. 2015).

[29] *S&S, Amazon Agree on 'Version' of Agency Pricing*, Publishers Weekly (Oct. 21, 2014), https://www.publishersweekly.com/pw/by-topic/industry-news/industry-deals/article/64461-s-s-amazon-agree-on-version-of-agency-pricing.html.; Megan Guess, *Amazon and Hachette resolve dispute with multi-year agreement*, Ars Technica (Nov. 13, 2014), https://arstechnica.com/information-technology/2014/11/amazon-and-hachette-resolve-dispute-with-multi-year-agreement/; Macmillan Strikes Deal with Amazon, but "Irony Prospers in the Digital Age" - The Authors Guild (Dec. 19, 2014), https://www.authorsguild.org/industry-

- 14 -

29.     Knowing that each of the Big Five agreed to the same restrictions, gave the individual Big Five Defendants the necessary assurance that their principal publishing rivals would not gain a special advantage in a niche market or generate price wars at the wholesale level by offering better terms to Amazon's rivals.

30.     Defendants' anticompetitive conduct has caused and continues to cause Plaintiff and the proposed Classes to overpay for books purchased from the Big Five at wholesale without any offsetting competitive benefit for the high price, *e.g.*, exclusive sales, special editions, or early releases.

**B.     Courts and enforcement agencies have repeatedly found that Defendants' MFNs harm competition.**

31.     Amazon's and the Big Five's continued anticompetitive use of MFNs to restrain competition for trade books prices is astonishingly brazen in light of repeated investigations into Defendants' practices. A decade ago, the Big Five conspired with Apple to raise trade eBook prices via MFNs.[30] This conduct led to concurrent investigations by federal and state prosecutors in the United States and by the European Commission's Directorate General for Competition (the "DG Comp"), which resulted in orders prohibiting the publishers from entering into MFNs

---

advocacy/macmillan-strikes-deal-with-amazon-but-irony-prospers-in-the-digital-age/; *No Authors Held Hostage as HarperCollins and Amazon Come to Terms*, The Authors Guild (Apr. 16, 2015), https://www.authorsguild.org/industry-advocacy/no-authors-held-hostage-as-harpercollins-and-amazon-come-to-terms/; Jillian D'Onfro, *Another major publisher is going to war with Amazon*, Business Insider (Mar. 31, 2015), https://www.businessinsider.com/harpercollins-amazon-contract-expiring-2015-3; *For the Big Five, Agency Now Holds Sway Across the Board*, The Authors Guild (Sep. 9, 2015), https://www.authorsguild.org/industry-advocacy/for-the-big-five-agency-now-holds-sway-across-the-board/.

[30] *Id.*

in connection with the sale of eBooks on either continent for a period of five years.[31]

Defendants' MFNs not only mirror but expand the illegal price restraints used in the *Apple*

conspiracy and ensure that no rival retail platform can differentiate itself from, or otherwise

compete with, Amazon.

32.     In 2012, U.K. regulators at the Office of Fair Trading (OFT) and German

regulators at the Bundeskartellamt concurrently investigated the anticompetitive effect of MFNs

in Amazon's agreements with third-party retailers to sell on its platform.[32] Concerned that

Amazon's clause could drive up online prices for consumers, OFT opened a formal investigation

after receiving "numerous complaints" that Amazon prohibited its third-party sellers from selling

their products at lower prices through other online outlets, including their own websites.[33]  The

Bundeskartellamt found that Amazon's "horizontal price-fixing" agreement acts as a "barrier[] to

market entry for new competitors and hinder[s] the expansion of existing competitors in the

market."[34] It further found that the MFN is "a hardcore restriction in that it limits price-setting

behaviour, [which] cannot be seen either as an indispensable restriction, or as an appropriate way

of involving consumers with regard to its price-raising effect." Instead, the MFN "results in

safeguarding Amazon's large own-account share of sales as a competitor and the extensive reach

---

[31] *U.S. v. Apple, Inc., et al.*, Department of Justice, https://www.justice.gov/atr/case/us-v-apple-inc-et-al.; *see*, *e.g.*, Final Judgment Penguin at 11 and 18; 5.4.2017 DG Comp. Decision at 8.

[32] Dan Prochilo, UK May Drop Antitrust Probe into Amazon Pricing Policy, Law360(Aug. 29, 2013), https://www.law360.com/articles/468842/uk-may-drop-antitrust-probe-into-amazon-pricing-policy.

[33] *Id.*

[34] Bundeskartellamt, Amazon removes price parity obligation for retailers on its Marketplace platform (Dec. 9, 2013) ("12.3.13 Bundeskartellamt decision"), https://www.bundeskartellamt.de/SharedDocs/Entscheidung/EN/Fallberichte/Kartellverbot/2013/B6-46-12.pdf?__blob=publicationFile&v=2.

of amazon.de, which cannot be attacked by competing platforms." [35] Faced with these findings, Amazon capitulated and agreed not to employ MFNs in its third-party seller agreements in the European market.[36] Having achieved their goal, OFT and the Bundeskartellamt closed their investigations in November 2013.[37]

33.     Amazon remained unchastened. Tellingly, not long after its concession to European authorities, Amazon presented a slide in a 2014 presentation, entitled "Risk Analysis" that advised company members to "Test the Boundaries of what is allowed by law."[38] And Amazon continued to employ in other markets—including North America—the very MFNs it disavowed in Europe.[39]

34.     European regulators again investigated Defendants' MFNs in 2015, when the European Commission's Directorate General for Competition (the "DG Comp") investigated Amazon's use of MFNs in the sale of the eBooks, including in its agreements with the Big Five.

---

[35] *Id.*

[36] *Id.*

[37] *Id.*; OFT, *Amazon online retailer: investigation into anticompetitive Practices*, https://www.gov.uk/cma-cases/amazon-online-retailer-investigation-into-anti-competitive-practices.

[38] Aditya Kalra, *Amazon documents reveal company's strategy to dodge India's regulators*, Reuters (Feb. 17, 2021), https://www.reuters.com/investigates/special-report/amazon-india-operation/; see also Aditya Kalra, *India antitrust body says Reuters story corroborates evidence in probe of Amazon*, Reuters (March 19, 2021), https://www.reuters.com/article/us-amazon-com-india-idUSKBN2BB1UF.

[39] The harmful effect of Amazon's anticompetitive agreements with its third-party sellers in the United States is the subject of a separate consumer antitrust class action lawsuit. *Frame-Wilson v. Amazon*, Case No. 2:20-CV-00424-RAJ (W.D. Wash) (filed March 19, 2020). In August of 2020, the Competition Bureau Canada announced its own investigation to determine whether any Amazon policies "impact third-party sellers' willingness to offer their products for sale at a lower price on other retail channels, such as their own websites or other online marketplaces." Competition Bureau, https://www.canada.ca/en/competition-bureau/news/2020/08/competition-bureau-seeks-input-from-market-participants-to-inform-an-ongoing-investigation-of-amazon.html.

At the conclusion of its two-year investigation, the DG Comp found that the provisions (including the wholesale parity, the selection parity, and promotion parity clauses) harmed competition in the distribution and sale of eBooks in the European markets.[40] Faced with those findings, Amazon agreed not to enforce those provisions in the European markets, including in its agreements with the Big Five, and the DG Comp closed the investigation.[41] Commissioner Margrethe Vestager praised the resolution, stating that it will increase "choice and competition to the benefit of European consumers."[42]

35.     Here in the United States, the House of Representatives Judiciary Committee's Subcommittee on Antitrust, Commercial and Administrative Law (the "House Antitrust Committee") launched an investigation into Amazon along with other dominant technology platforms. Like the DG Comp, the House Antitrust Committee concluded in its October 2020 report that Amazon's use of MFNs was harmful to competition.[43] "Amazon," the House Antitrust Committee observes, "has a history of using MFN clauses to ensure that none of its suppliers or third-party sellers can collaborate with an existing or potential competitor to make lower-priced or innovative product offerings available to consumers."[44] The Committee further concluded that Amazon "uses its gatekeeper position to maintain its market power and "to further entrench and expand" its dominance, and that MFNs reinforce "Amazon's 'stranglehold' and 'control' over book distribution."[45]   The Committee compared Amazon's monopoly power

---

[40] 5.4.2017 DG Comp. Decision at 37-38.

[41] *Id.* at 39.

[42] European Commission Press Release, May 4, 2017, https://ec.europa.eu/commission/presscorner/detail/en/IP_17_1223.

[43] 5.4.2017 EU Commission Decision at 20-38, 43.

[44] House Report at 295.

[45] House Report at 6, 15.

and abuse of its power to "the kinds of monopolies we last saw in the era of oil barons and railroad tycoons."[46]

36.     Amazon also faces an investigation by the Federal Trade Commission and antitrust scrutiny by state attorneys general offices in California, Washington, New York, and Connecticut.[47] The Connecticut Attorney General's office is specifically investigating Amazon's eBook business.[48]

**C.     Defendants' MFNs harm competition and hurt consumers.**

37.     Amazon sells more books than any other single retail outlet in history.[49] Industry sources estimate that "Amazon has 50% or more of the US print book market" and that it "accounts for roughly 83 percent of all eBook sales, about 90 percent of online print sales, and about 90 percent of digital audiobook sales."[50] This concentration of market power in the sale of books has driven many independent bookstores and large chains alike out of business.

38.     Twenty-five years ago, there were around four thousand independent bookstores in the U.S., and many functioned as local cultural centers, where people browsed and exchanged ideas.[51] Today, there are fewer than two thousand, and the economic power is concentrated in

---

[46] *Id.*

[47] House Report at 253; Press Release, Fed. Trade Comm'n, FTC to Examine Past Acquisitions by Large Technology Companies (Feb. 11, 2020), https://www.ftc.gov/news-events/press-releases/2020/02/ftc-examine-past-acquisitions-large-technology-companies.

[48] Jeffrey A. Trachtenberg and Dana Mattioli, *Connecticut Investigating Amazon's E-Book Business*, Wall Street Journal (Jan. 13, 2021).

[49] Porter Anderson,  *US Publishers, Authors, Booksellers Call Out Amazon's 'Concentrated Power' in the Market,* Publishing Perspectives **(**Aug.17, 2020), https://publishingperspectives.com/2020/08/us-publishers-authors-booksellers-call-out-amazons-concentrated-power-in-thebook-market/.

[50] House Report at 255 n.1562.

[51] George Packer, *Cheap Words*, New Yorker (Feb.17 & 24, 2014), https://www.newyorker.com/magazine/2014/02/17/cheap-words.

the hands of one bookseller.[52] While its brick-and-mortar counterparts crater, Amazon is in talks to convert real estate in vacated malls into additional Amazon distribution centers.[53] Stacy Mitchell, the Co-Director of the Institute for Local Self Reliance warns that the concentration of power in one company has huge impacts on the economy: "Local businesses are disappearing and, with them, a pathway to the middle class. . . . New business formation is down to historic lows."[54]

39.     Unlike other booksellers that are drawn to the world of literary artists and the power of the written word, Amazon founder and former hedge fund manager, Jeff Bezos, did not start an online bookstore out of a love of books. Shel Kaphan, Bezos's former deputy, explains that Mr. Bezo's decision to start Amazon as a bookstore "was totally based on the property of books as a product."[55]  Books are easy to ship, hard to break, and there are far too many of them, in and out of print, to sell even a fraction of them at a physical store.[56]

40.     According to a New York literary agent, books were Amazon's version of "a gateway drug."[57] Long before Google found a way to commoditize consumer data, Amazon recognized that it was the key to the new economy and that selling books was the optimal way to gather detailed, consumer preference data, particularly from affluent, educated shoppers.[58] John Sargent, the former chief executive of Macmillan, noted that Amazon was never just a bookstore:

---

[52] Amy Watson, Number of independent bookstores in the U.S. 2009-2019, Statista (Oct 29, 2019), https://www.statista.com/statistics/282808/number-of-independent-bookstores-in-the-us/.

[53] House Report at 261.

[54] *Id.* at 50.

[55] George Packer, *Cheap Words*, New Yorker (Feb.17 & 24, 2014), https://www.newyorker.com/magazine/2014/02/17/cheap-words.

[56] *Id.*

[57] *Id.*

[58] *Id.*

- 20 -

"Books were going to be the way to get the names and the data. Books were [Amazon's] customer-acquisition strategy." [59] After collecting data on millions of customers, Amazon would figure out how to sell everything else.[60]

41.     According to the market research firm Codex Group, readers browsing in a traditional bookstore discover new books they would like to read at about three times the rate they do while shopping on Amazon.[61] Even though it dominates the book market, Amazon accounts for only 7% of new book discovery, while local bookstores, shunted to the periphery of the book market, account for 20% of new discoveries.[62] This loss impacts consumer choices, and stunts the economy over the long-term.[63]

42.     Amazon's market dominance gives it the unprecedented power to decide what books consumers will encounter, and to pick which publishers, authors, and creators will be the winners and the losers.[64] "Amazon has used retaliation . . . to coerce publishers to accept contractual terms that impose substantial penalties for promoting competition" with Amazon's rivals.[65] Amazon's retaliatory tactics against publishers include removing the pre-set purchase ("BUY") button, which blocks a customer's ability to purchase a publisher's current titles; and removing the "pre-order" button, which eliminates the ability for a consumer to pre-order publishers' forthcoming titles.[66] Another form of retaliation that Amazon reportedly engaged in

---

[59] *Id.*

[60] *Id.*

[61] Stacy Mitchell and Olivia LaVecchia, *Report: Amazon's Monopoly*, ILRS(Nov 29. 2016), https://ilsr.org/amazons-monopoly/at 27.

[62] *Id.*

[63] *Id.*

[64] *Id.* at 27.

[65] *Id.*

[66] House Report at 260.

was showing publishers' titles as out of stock or with delayed shipping times. [67]  Publishers,

authors, and booksellers have "significant fear" because of Amazon's dominance. [68]

43.     "Amazon has the ability to promote or destroy a book in the national marketplace

for any reason it chooses, and nobody outside the company can know why or how—or even that

it was done," observes Authors United.[69] Amazon can, at any moment, remove the buy-button

from a particular title on its site and cause overall sales of that book to plummet by 50% or

more.[70]  It has the power to destroy a book's prospects and has exercised this power on a number

of occasions.[71] For example, to extract more fees from Hatchette, it suspended pre-orders and

delayed the shipping times of thousands of Hatchette books by weeks, and modified its search

and recommendation algorithms to direct shoppers to other books.[72] Amazon's machinations did

not just harm Hatchette. It also suppressed the career prospects and incomes of roughly 3,000

authors for several months. [73]

44.     Defendants' anticompetitive conduct has depressed book sales in the U.S. market.

The net revenue of the U.S. book publishing industry decreased from 2014 through 2018 and has

remained generally flat ever since.[74]

---

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] *Id.* at 11.

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] Statista (Oct. 9, 2012), https://www.statista.com/statistics/271931/revenue-of-the-us-book-publishing-industry/.

45.     In August 2019, publisher net revenue for trade books, including sales to bookstores, wholesalers, direct to consumer, and online retailers, etc., was down 3.6% as compared to the same period to the previous year.[75] Paperback and mass market books decreased by 7.9% and hardback books also decreased by 0.8%.[76] In a more competitive market, where book distribution would be greater dispersed through more sellers, sales would increase.

46.     Defendants' MFNs cement Amazon's dominance and prevent fair competition from other booksellers. The harm they cause to competition and consumer choices is precisely what federal antitrust laws are intended to address.

## VI.     INTERSTATE TRADE AND COMMERCE

47.     Amazon's activities as alleged in this complaint were within the flow of, and substantially affected, interstate commerce. Amazon sells books across, and without regard to, state lines.

## VII.    DEFENDANTS' MARKET POWER IN THE RELEVANT MARKET

48.     The relevant market for purposes of this action is the online retail market for trade books in the United States. Amazon and the Publisher Defendants have market power in this market.

**A.     The online market for print trade books is the relevant product market.**

**1.     Trade books are not interchangeable with other books.**

49.     Trade books represent a distinct product market from non-trade books, such as reference and academic books.[77] They also represent a distinct product market from self-

---

[75] Association of American Publishers Release August 2019 StatShot Report, https://publishers.org/news/association-of-american-publishers-release-august-2019-statshot-report/.

[76] *Id.*

[77] *Apple*, 952 F. Supp. 2d at 648 n.4.

published books. Whereas a self-published author fronts all costs and is responsible for the content and marketing, trade publishers receive the rights to sell an author's book in exchange for covering all aspects of editing, publication, marketing, and distribution.[78] Trade publishers are highly selective. They do not read 95% of the manuscripts they receive and publish only about 1% of the manuscripts they do review.[79] The selection, editing, and promotional process is an expensive undertaking, and trade books represent the publisher's considerable investment in that process.

### 2.   Print books are not reasonably interchangeable with eBooks or audio books.

50.     Within the trade book market, there is also a distinct product market for the retail sale of print trade books that is separate from retail distribution of trade eBooks and trade audio books.[80]

51.     Products' functional interchangeability typically depend on the products' physical characteristics.[81] Courts and economists typically define the boundaries of a market by reference to products' functional substitutability, and products' physical characteristics often determine their functional substitutability.[82] Printed books are physical objects that can be read without any special devices. In comparison, eBooks are digital products that require a special device, such as Amazon's Kindle or Barnes & Noble's Nook, to read them. Printed books also different from

---

[78] Leigh Shine, *Calculating the Odds of Getting a Traditional Publisher*, Medium (Dec. 22, 2016), https://medium.com/publishizer/calculating-the-odds-of-getting-a-traditional-publisher-798b1c7b94b0.

[79] Odds Of Being Published - Fiction Writer's Mentor, http://www.fiction-writers-mentor.com/odds-of-being-published.

[80] *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 694 n.60 (S.D.N.Y. 2013) (defining the relevant market as trade eBooks in the United States); 5.4.2017 DG Comp. Decision at 14.

[81] 2 Federal Antitrust Law § 10.2 (2020).

[82] Philip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 562 (5th Ed.).

audio books, which may be physical or digital but are made for listening, not reading. These distinguishing characteristics affect the substitutability of print books and audiobooks in the supply or demand for eBooks.[83]

52.     From both a demand side and a supply side analysis, trade eBooks and trade audiobooks are also not sufficiently strong substitutes to warrant their inclusion in the product market of which trade print books form a part.[84]

53.     The DG Comp found that, as regards demand-side substitutability, consumers are unlikely to switch from eBooks to print versions in case of a 5-10% increase in the retail price of eBooks because overall, even with a 5-10% increase of their retail price, eBooks would generally be priced significantly lower than print books.[85] Consumer preferences also play an important role in distinguishing the two formats. For example, the DG Comp's investigation of the eBooks market showed that important consumer considerations determine whether the consumers will purchase an eBook instead of a print version of a book.[86]

54.     To find significant supply-side substitutability, print book retailers and eBook retailers would have to be able to enter each other's markets quickly and easily. The DG Comp found that this was not the case. The distribution of print books entails important investments in the distribution, warehousing and logistics, whereas eBooks distribution requires mainly set-up and maintenance of an online distribution platform, which is a very different type of investment.[87] A traditional print bookstore cannot switch from selling print books to eBooks

---

[83] 5.4.2017 DG Comp. Decision at 14.

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Id.*

without acquiring significant tangible and intangible assets, incurring additional investments and making strategic decisions with the immediacy required to allow for a finding of significant supply-side substitutability, and the same holds true for an eBook retailer switching to print sales.[88]

55.     The DG Comp found that audio books are distinct from both print books and eBooks, notably in terms of (i) pricing at wholesale and retail level and (ii) their typical end consumer and mode of consumption.[89] Because print books and audio books are not reasonable substitutes, the retail eBook market is a distinct market.

3.     **The online market for sale of print trade books is a well-defined submarket, representing a distinct group of competitors that do not overlap significantly with brick-and-mortar booksellers.**

56.     Courts, government agencies, economists, customers and retailers alike recognize the retail ecommerce market as a distinct market within the U.S. retail market. Industry recognition of a distinct ecommerce retail market is relevant because economic actors usually have accurate perceptions of economic realities and the parties active in the market understand its function and demarcation.

57.     Courts recognize that product availability alone does not determine the relevant product market.[90] With respect to ecommerce markets, many brick and mortar stores lack the actual or potential ability to deprive online stores of significant levels of business because brick and mortar stores typically serve customers within the immediate geographic area, while an online store typically operates over a broad region, nationally, or internationally.[91] Local retail

---

[88] *Id.*

[89] *Id.*

[90] *See, e.g.*, *FTC v. Whole Foods Mkt., Inc.*, 533 F.3d 869, 881 (D.C. Cir. 2008) ("Of course customers cross-shop," but the "fact that a customer might buy a stick of gum at a supermarket or at a convenience store does not mean there is no definable groceries market.").

[91] *Distance Learning Co. v. Maynard*, 2020 U.S. Dist. LEXIS 99256, at *20 (N.D. Cal. June 4, 2020).

stores also do not serve as reasonable substitutes for customers of online stores because physical stores do not have the same type of electronic ordering efficiency and capability as an online market.[92] And rarely can brick and mortar stores compete with the extensive inventory that an online merchant can provide.[93]

58.     The U.S. Census Bureau identifies ecommerce as a separate market and has collected data on ecommerce sales since 1998.[94] In 2002, it began compiling E-STATS, statistics "devoted exclusively to 'Measuring the Electronic Economy,'"[95] and it publishes quarterly ecommerce reports.[96] More recently, the Census Bureau released a supplemental data table on retail ecommerce by type of retailer to enhance "understanding of where consumers are shopping online" and "provide an overview of trends in retail and e-commerce sales."[97] Census data are also available for ecommerce sales by type of product.[98] Similarly, the Bureau of Labor Statistics Producer Price Index (PPI) program separately tracks the ecommerce industry group, which includes both electronic shopping and auctions.[99]

---

[92] *Origami Owl LLC v. Mayo*, No. CV-15-00110-PHX-DGC, 2015 U.S. Dist. LEXIS 103755, at *8 (D. Ariz. Aug. 7, 2015).

[93] *Thompson v. 1-800 Contacts, Inc.*, 2018 U.S. Dist. LEXIS 83806, at *21-23 (D. Utah May 17, 2018).

[94] https://www.commerce.gov/news/fact-sheets/2017/07/new-insights-retail-e-commerce.

[95] https://www.census.gov/programs-surveys/e-stats.html.

[96] https://www.census.gov/retail/ecommerce/historic_releases.html.

[97] https://www.commerce.gov/news/fact-sheets/2017/07/new-insights-retail-e-commerce.

[98] *Id.*

[99] Lana Borgie, *Trends in producer prices between e-commerce and brick-and-mortar retail trade establishments*, Prices & Spending Vol. 3, No. 18, Aug. 2014, https://www.bls.gov/opub/btn/volume-3/pdf/trends-in-producer-prices-between-e-commerce-and-brick-and-mortar-retail-trade-establishments.pdf.

59.     The manner of distribution also supports a separate market.[100] Economists recognize that an online channel of distribution has distinct characteristics from a physical channel.[101] Ecommerce has a superior method of transmitting information, effective asynchronous communication, greater flexibility in dealing with information, with far greater interactivity and search capability.[102] "Despite the relative inefficiency of delivering goods directly to the home," ecommerce leads to unique cost savings because "supplying direct to the consumer is less expensive than doing so through a store."[103] Ecommerce retail businesses avoid the costs "of handling within the store (unpacking, stocking and maintaining shelves, and such), theft (which can easily account for 3 percent of the sales of a retailer), rent (low-cost distribution centers replace expensive urban or suburban real estate), and selling costs (automated and tele-sales replace relatively expensive in-store salespeople)."[104] Consumers similarly benefit from greater "information about available goods and services, and services; an improvement in access to these goods; and the ability to customize goods to fit the tastes of buyers."[105] Economists also recognize that the physical location of the business operating within ecommerce becomes less relevant because the ecommerce market "facilitates production and distribution across borders ...

---

[100] *See e.g., Henry v. Chloride*, 809 F.2d 1334, 1342 (8th Cir. 1987) (batteries sold by traveling salespersons present a distinct submarket from batteries sold from warehouses or stores).

[101] Katawetawaraks, C., & Wang, C. H. (2011). *Online Shopper Behavior: Influences of Online Shopping Decision*. Asian Journal of Business Research, 1(2), 66-74.

[102] Severin Borenstein and Garth Saloner, *Economics and Electronic Commerce*, JOURNAL OF ECONOMIC PERSPECTIVES, Vol. 15, No.1 (Winter 2001) at 5, https://www.gsb.stanford.edu/sites/gsb/files/publication-pdf/Economics%20and%20Electronic%20Commerce.pdf; *see also* David VanHoose, eCOMMERCE ECONOMICS (Routledge 2nd Ed. 2011); http://cw.routledge.com/textbooks/vanhoose/.

[103] *Id.*

[104] *Id.* at 5-6.

[105] *Id.* at 6-7.

and can assist in opening markets that were previously closed."[106] The lower transaction costs and production costs also facilitate easier entry into the market and increase competition.[107] Demand side preferences also make online retailing unique in terms of certain factors such as convenience and price.[108] Because competing offers are "just a few clicks away on the Internet, online consumers can more easily compare different alternatives before buying with lower search cost than offline consumers."[109] Online shoppers can also more easily put off purchases decisions until they are ready to buy because they have not invested in travel time and do not face the pressure from the salespeople that shoppers in brick and mortar stores experience.[110]

60.     The Stigler Committee on Digital Platforms reports: "Traditional brick-and-mortar stores and online platforms differ greatly in their advertising and personalization capabilities."[111] Online retailers "almost always require account creation for purchasing, verify this information for each transaction, and have direct or easy access to detailed non-shopping information about their customers."[112] This account creates a digital identity, which incorporates

---

[106] Andrew D. Mitchel, *Towards Compatibility: The Future of Electronic Commerce within the Global Trading System*, J Int Economic Law (2001) 4 (4): 683.

[107] *Id.*

[108] Tracey Wallace, The 2018 Omni-Channel Retail Report: Generational Consumer Shopping Behavior Comes Into Focus, https://www.bigcommerce.co.uk/blog/omni-channel-retail/#developing-your-omni-channel-strategy; *see also* Isabel P. Enrique and Sergio Romàn, *The Influence of Consumers' Cognitive and Psychographic Traits on Perceived Deception: A Comparison Between Online and Offline Retailing Contexts*, J Bus Ethics (2014) 119:405–422 (examining the role of several consumers' cognitive and psychographic traits in their perception of retailers' deceptive practices (perceived deception) and the different effects on perceived deception associated with online vis- à-vis in-store shopping, indicating that they need to be considered as distinct experiences for the customer).

[109] *Supra* Isabel P. Enrique and Sergio Romàn at 408.

[110] *Id.*

[111] Stigler Committee on Digital Platforms (Sep. 16, 2019), https://research.chicagobooth.edu/-/media/research/stigler/pdfs/digital-platforms---committee-report---stigler-center.pdf, at 45.

[112] Stigler Committee on Digital Platforms at 45.

select data on age, sex, address, email address, preferences, and, potentially more information.[113] By comparison, physical shops tend not to force shoppers to identify themselves—and indeed consumers who use cash, credit cards with chips or phone payment apps do not identify themselves to the store.[114] Lina M. Khan adds: "The degree to which a firm can tailor and personalize an online shopping experience is different in kind from the methods available to a brick-and-mortar store – precisely because the type of behavior that online firms can track is far more detailed and nuanced."[115]

61.     U.S. retailers recognize the online market as a separate economic entity. Only 28% of small businesses sell online.[116] Established large retailers, *e.g.*, Walmart, Target, and Costco, have an online presence, but focus their efforts overwhelmingly on their physical stores. For example, in 2017, ecommerce accounted for only 5.5% of revenue for Target,[117] 4% for Costco,[118] and 3% for Walmart.[119] Online retailers commonly advertise only online, whereas

---

[113] *Id.* at 54.

[114] *Id.* at 45; *How Does the Chip in My Credit Card Work?* Ascent (Nov 20, 2018), https://www.fool.com/the-ascent/credit-cards/articles/how-does-the-chip-in-my-credit-card-work/.

[115] Lina M. Khan, *Amazon's Antitrust Paradox*, 126 Yale L.J. 710, 764 (2017).

[116] Jia Wertz, *How Brick-And-Mortar Stores Can Compete With E-Commerce Giants*, Forbes, May 17, 2018, https://www.forbes.com/sites/jiawertz/2018/05/17/how-brick-and-mortar-stores-can-compete-with-e-commerce-giants/#4be14a943cc0.

[117] Nat Levy, *Target's digital sales grew 10X faster than in-store sales in 2018, as retailer adjusts to battle Amazon*, Geekwire, Mar. 5, 2019, https://www.geekwire.com/2019/targets-digital-sales-grew-10x-faster-store-sales-2018-retailer-adjusts-battle-amazon/.

[118] *Trefis Team, How Much Of Wal-Mart's Revenue Will Come From E-Commerce In 2020?*, Forbes, Nov. 27, 2017, https://www.forbes.com/sites/greatspeculations/2017/11/27/how-much-of-wal-marts-revenue-will-come-from-e-commerce-in-2020/#454ed14359f2.

[119] Ecommerce accounts for 4% of Costco's sales and is growing 12%, https://www.digitalcommerce360.com/2017/03/06/e-commerce-accounts-4-costcos-sales-growing-12/.

store retailers advertise both on and offline.[120] Unlike brick and mortar stores, ecommerce retailers do not have a way to take payment by cash or checks.[121] Brick and mortar stores typically provide customer service in-store to respond to questions about product offerings, whereas customer service for ecommerce retail is typically less comprehensive or effective.[122]

62.     U.S. consumers distinguish between ecommerce and brick-and-mortar shopping markets. As a practical matter, the ecommerce market requires access, usually through a personal computer, smart phone or tablet, and most, but not all U.S. consumers have access to this market.[123] According to a Pew Research Center study in 2016, 64% of U.S. consumers prefer shopping in physical stores, and when purchasing something for the first time, 84% of U.S. consumers found it important to be able to ask questions about what they are buying or to buy from sellers they are familiar with, and 78% think it is important to be able to try the product out in person, where physical stores have an advantage over ecommerce.[124]

63.     Ecommerce stores have a distinctly different look and feel to customers than markets that rely on a different chain of distribution, *e.g.*, in-store purchases, mail-order or purchases made from traveling sales staff. Typically, with a few clicks or a simple voice command, an ecommerce retailer will send the product directly to the consumers without any interaction with sales staff.

64.     Ecommerce attracts a younger demographic. A 2017 survey by Statista found that 67% of millennial shoppers preferred to search and purchase on ecommerce sites rather than in

---

[120] Anna Johansson, *6 Fundamental Differences Between E-Commerce & Brick-and-Mortar Stores*, RetailNext, https://retailnext.net/en/blog/6-fundamental-differences-between-e-commerce-brick-and-mortar-stores/.

[121] *Id.*

[122] *Id.*

[123] Aaron Smith and Monica Anderson, *Online Shopping and E-Commerce, Pew Research Center*, Dec. 19, 2016, https://www.pewresearch.org/internet/2016/12/19/online-shopping-and-e-commerce/.

[124] *Id.*

store, while only 28% of seniors do.[125] Online retailers offer a broader selection and a larger inventory than offline retailers do. Consumers can shop online 24/7 and locate hard-to-find items more easily than they could by searching physical stores.[126] Online retail provides greater convenience to consumers who can order products from any location without having to find a brick-and-mortar store selling the specific product with the specific desired attributes and the desired quantity.[127] Shopping in physical stores offers more social interaction and socializing with other shoppers and it is faster and easier to return a defective or unwanted product in-store rather than shipping back to an online retailer.[128] The following graphic summarizes the key differences between markets from the consumers' perspective: [129]

---

[125] Clement, J. U.S. online shopping preference 2017, by age group, Aug. 12, 2019, https://www.statista.com/statistics/242512/online-retail-visitors-in-the-us-by-age-group/.

[126] Susan Ward, *Brick and Mortar Stores vs Online Retail Sites*, Jun. 25, 2019, https://www.thebalancesmb.com/compare-brick-and-mortar-stores-vs-online-retail-sites-4571050; https://www.commerce.gov/news/fact-sheets/2017/07/new-insights-retail-e-commerce.

[127] *Id.*

[128] Ward.

[129] Rose Leadem, *67 Fascinating Facts About Ecommerce vs. Brick and Mortar (Infographic)*, Dec. 30, 2017, https://www.entrepreneur.com/article/306678.



**B.      The United States is the relevant geographic market.**

65.     The relevant geographic market is the United States. Like most ecommerce, the retail book market operates on a nationwide basis. Much of the sales activity in that market occurs through nationwide channels, including Amazon's online sales platforms and those of its retail competitors.

010888-12/1449198 V2

66.     The Big Five sell their trade books throughout the United States.

67.     Book retailers located outside of the Unites States are unable to constrain book pricing in the United States.

**C.     The Big Five dominate the production and sale at wholesale of print trade books in the U.S. market.**

68.     A pattern of consolidation has dominated the publishing industry. Between November 1985 and November 1986 alone, there were fifty-seven major publishing acquisitions.[130] By 2006, the six largest U.S. trade book publishers (the current Big Five) accounted for ninety percent of total sales.[131] In 2013, Penguin merged with Random House, producing a combined group that now controls approximately twenty-five percent of the English-language publishing market.[132] Simon and Schuster was founded in 1924, and it has been variously owned by Marshall Field, Gulf + Western, Viacom, and CBS Corporation.[133]

69.     Together, the Big Five publish many of the biggest names in fiction and non-fiction, including the vast majority of the New York Times bestsellers.[134] They represent about 80% of the sales of trade books. Their dominance can be attributed to a long history of mergers and acquisitions that has led to five giant publishing houses, consisting of vast numbers of subsidiary publishers or "imprints. Smaller trade publishers continue to lose business and are unable to compete with the Big Five. For example, Houghton Mifflin Harcourt recently announced that it was exploring a sale of its trade publishing division, potentially with

---

[130] *Supra* Lee.

[131] *Id.*

[132] *Id.*; *Supra* Alter & Lee.

[133] *Id*.; Alexandra Alter and Edmund Lee, *Penguin Random House to Buy Simon & Schuster*, NYT (Nov. 25, 2020), https://www.nytimes.com/2020/11/25/books/simon-schuster-penguin-random-house.html.

[134] *Apple*, 791 F.3d at 298.

Macmillan or Hachette.[135] The Big Five Defendants' sales account for about 80% of the trade publications in the United States.

70.     On November 25, 2020, Penguin announced plans to acquire Simon & Schuster; the proposed merger would create a single publishing house with approximately a third of all trade books published.[136] News Corp Chief Executive Robert Thomson said in a statement. "This literary leviathan would have 70% of the U.S. literary and general fiction market."[137]

**D.     Amazon dominates the retail market for print books.**

71.     A market share as large as Amazon's create an inference of market power. Its market power is durable because barriers to entry make entry by new competitors difficult.[138] Further, effective entry into or expansion in the print trade book market would require competing booksellers to be able to differentiate their products or services, including by offering lower prices, early releases, or exclusive products. As the allegations in this complaint make clear, Defendants' MFNs make such competition impossible.

## VIII.   CLASS ACTION ALLEGATIONS

72.     Plaintiff brings this action on behalf of itself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and injunctive

---

[135] *Supra* Alter & Lee.

[136] AG Statement on Proposed Sale of Simon & Schuster and Its Ramifications for Authors, The Authors Guild, https://www.authorsguild.org/industry-advocacy/ag-statement-on-proposed-sale-of-simon-schuster-and-its-ramifications-for-authors/; Frank Jordans and Hillel Italie, *Penguin to buy Simon & Schuster, create publishing giant*, Associated Press (Nov. 25, 2020, https://apnews.com/article/stephen-king-publishing-john-irving-media-jonathan-karp-89ec475bd7783fea199a378c60261f8b.

[137] Jordans & Italie.

[138] 5.4.2017 DG Comp. Decision at 33 (finding that such barriers exist and exacerbate "the potential foreclosure effect" of the MFN).

relief against Defendants pursuant to federal antitrust law on behalf of the members of the

following Bookseller and Online Bookseller Classes:

> All retail booksellers, which, on or after March 25, 2017,
> purchased print books at wholesale directly from the Big Five
> Publishers.

> All online retail booksellers, which, on or after March 25, 2017,
> purchased print books at wholesale directly from the Big Five
> Publishers.

73.     Excluded from the proposed Classes are the Defendants and their officers,

directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge

or magistrate judge to whom this case is assigned, as well as those judges' immediate family

members, judicial officers and their personnel, and all governmental entities.

74.     **Numerosity:** Members of the proposed Classes are so numerous that joinder is

impracticable.  Plaintiff believes that there are several hundreds of members of the proposed

Classes geographically dispersed throughout the United States, such that joinder of all Class

members is impracticable.

75.     **Typicality:** Plaintiff's claims are typical of the claims of the other members of the

proposed Classes. The factual and legal bases of Defendants' liability are the same and resulted

in injury to Plaintiff and all other members of the proposed Classes.

76.     **Adequate representation:** Plaintiff will represent and protect the interests of the

proposed Classes both fairly and adequately. Plaintiff has retained counsel competent and

experienced in complex class-action litigation. Plaintiff has no interests that are antagonistic to

those of the proposed Classes, and their interests do not conflict with the interests of the

proposed Class members they seek to represent.

010888-12/1449198 V2

77.     **Commonality:** Questions of law and fact common to the members of the proposed Classes predominate over questions that may affect only individual members of the Classes because Defendants have acted on grounds generally applicable to the Classes and because Class members share a common injury. Thus, determining damages with respect to the proposed Classes as a whole is appropriate. The common applicability of the relevant facts to claims of Plaintiff and the proposed Classes are inherent in Defendants' wrongful conduct, because the overcharge injuries incurred by Plaintiff and each member of the proposed Classes arose from the same anticompetitive conduct alleged herein.

78.     There are common questions of law and fact specific to the Classes that predominate over any questions affecting individual members, including:

    i.   Whether Defendants unlawfully contracted, combined, or conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act by agreeing to highly restrictive MFNs that control the wholesale price of print trade books and prevent Amazon's bookseller rivals from competing on price and product availability;

    ii.  Whether Amazon has unlawfully monopolized the U.S. online retail market for the sale of print trade books, including by way of the contractual terms, policies, practices, mandates, and restraints described herein;

    iii. Whether Defendants conspired to confer upon Amazon a monopoly in the U.S. online retail market for the sale of print trade books, including by way of the contractual terms, policies, practices, mandates, and restraints described herein;

    iv.  Whether competition in the U.S. online retail market for the sale of print books has been restrained and harmed by Amazon's monopolization of this market;

    v.   Whether Plaintiff and members of the proposed Classes have been damaged by Defendants' conduct;

    vi.  The amount of any damages; and

    vii. The nature and scope of injunctive relief necessary to restore a competitive market.

79.     **Prevention of inconsistent or varying adjudications:** If prosecution of a myriad of individual actions for the conduct complained of were undertaken, there likely would be

inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for the Defendants. Certification of Plaintiff's proposed Classes would prevent these undesirable outcomes.

80.     **Injunctive relief:** By way of its conduct described in this complaint, Defendants have acted on grounds that apply generally to the proposed Classes. Accordingly, final injunctive relief is appropriate respecting the Classes as a whole.

81.     **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed Classes could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## IX.     ANTITRUST INJURY

82.     Defendants, through their unlawful conduct alleged herein cause Plaintiff and members of the proposed Classes to pay higher wholesale prices for print trade books than they would have paid or would pay in the future in the absence of Defendants' unlawful acts. Further, Defendants' unlawful conduct harms consumers by eliminating booksellers' incentives to compete on price or product availability. Plaintiff and members of the proposed Bookseller and Online Bookseller Classes have sustained, and continue to sustain, significant losses from

overcharges directly caused by Defendants' anticompetitive activity. The full amount of such overcharge damages will be calculated after discovery and upon proof at trial. Unless Defendants' anticompetitive conduct is stopped, Plaintiff and members of the proposed Classes will incur future overcharges in their purchase of print trade books.

## X.     CAUSES OF ACTION

### VIOLATION OF THE SHERMAN ACT

#### FIRST CAUSE OF ACTION
#### VIOLATION OF 15 U.S.C. § 1

83.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

84.     Plaintiff brings this claim on behalf of itself and on behalf of each member of both proposed Classes described above. Plaintiff seeks damages and injunctive relief.

85.     Defendants, by and through their officers, directors, employees, agents and other representatives, have entered into an unlawful agreement, combination and conspiracy in restraint of trade. Through highly restrictive MFNs Defendants agree that no rival bookseller can differentiate itself from, or otherwise compete with, Amazon on price or product availability.

86.     Defendants are liable for the creation, maintenance, and enforcement of the anticompetitive restraints regardless whether a *per se*, "quick look," or rule of reason standard applies.

87.     ***Per se***: Defendants engaged in parallel conduct by knowingly entering into the same anticompetitive agency agreements with MFNs that the court in this District had previously found to be a *per se* violation of Section 1 of the Sherman Act. Defendants' agreement is a *per se* violation because it was formed for the purpose and with the effect of controlling the price of wholesale book prices even if they had not explicitly agreed on the prices to be charged.

- 39 -

88.     Defendants share a common motive to collude. Defendant Amazon has a motive to dominate over its retail competitors which it achieves by including MFNs or similar provisions to ensure that no rival retail platform can differentiate itself from, or otherwise compete with, Amazon. Each of the Big Five Defendants has a motive to control wholesale prices.

89.     Defendants did not act unilaterally or independently, or in their own economic interests, when entering into these anticompetitive agreements, which substantially, unreasonably, and unduly restrain trade in the relevant market, and thereby harmed Plaintiff and the proposed Classes. The Big Five Defendants have indicated a preference to diversify from Amazon, not to become more dependent upon it. They acted against their own self-interest by agreeing to anticompetitive MFNs that restrict their channels of distribution. All Defendants have an interest in generating sales in the trade book market, yet supracompetitive wholesale prices for the Big Five's books and a consolidation of power in the hands of a single bookseller have led to higher retail prices and depressed sales in this market.

90.     Defendants had opportunities to collude. For example, as each of the Big Five Defendants entered into the same agreement with Amazon, they publicly signaled to the others that the agreement provided similar terms. Defendant Amazon also publicly stated that it had offered the same terms to each of the Big Five.

91.     Authorities in the United States and Europe have launched multiple investigations into Defendants' conduct in book sales and have found their agency agreements with MFNs to be anticompetitive. The House Antitrust Commission and the DG Comp also found at the conclusion of their respective investigations into Amazon's MFN and similar anticompetitive

provisions in its agreements with the Big Five, that Amazon's agreements harm consumers and competition in the retail sale of books.

92.     Plaintiff also alleges a hub-and-spoke conspiracy supporting a horizontal price fixing agreement. Defendant Amazon is the dominant retail bookseller, through which the Big Five sell their print trade books. Like Apple before it, Amazon serves as the central, common contractual party (*i.e.*, the hub) through which the Defendants carried out their common scheme to control wholesale trade book prices and ensure that Amazon's retail competitors could not differentiate themselves in terms of price or offerings by entering into agency agreements with MFNs and similar provisions.

93.     Defendant Amazon participated in and facilitated the horizontal agreement among the Big Five Defendants by coordinating a series of substantially identical agreements with the same anticompetitive terms and making clear to each of the Big Five Defendants that it was offering each of them a similar deal.

94.     For purposes of Plaintiff's allegations of a *per se* violation, it is not necessary to prove a relevant market or adverse effects in such market.

95.     **Quick look/rule of reason**: To the extent Defendants' conduct is determined to be a vertical price restraint and the conduct at issue is not a *per se* violation, the relevant product market is the retail market for the sale of print trade books or alternatively the online submarket for the sale of print trade books. The relevant geographic market is the entire United States.

96.     Defendants possess market power within the relevant markets. Amazon controls about 50% of the retail market for the sale of print books in the United States and about 90% of the online submarket. The Big Five Defendants' sales account for about 80% of the trade publications in the United States. That Defendants have market power in the relevant market is

- 41 -

also evident from their power to raise wholesale prices above those that would be charged in a competitive market.

97.     Defendants' agreements have an open and obvious adverse effect on competition. They ensure that Amazon.com faces no competition in the price or availability of print trade books. By preventing Amazon's retailer competitors from offering alternative inventory or superior prices, Defendants increase wholesale price of the Big Five's books and limit the number of meaningful choices consumers have to purchase print trade books at retail.

98.     Defendants' anticompetitive agreements have actual detrimental effects in the relevant market, *i.e.*, less competitive pricing and competition in product availability.

99.     An observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on the sale of print trade books in the relevant markets.

100.     There is no legitimate, pro-competitive business justification for Defendants' anticompetitive agreements or any justification that outweighs their harmful effect. Even if there were some conceivable justification, the agreements are broader than necessary to achieve such a purpose.

101.     **Injury:** Plaintiff and the members of the proposed Classes have been injured and will continue to be injured in their businesses and property by paying higher wholesale prices for the Big Five's print trade books than they would have paid or would pay in the future in the absence of Defendants' unlawful acts. Plaintiff and members of the proposed Classes are entitled to an injunction that terminates the ongoing violations alleged in this Complaint and to recover three times the amount of their overcharge damages directly caused by Defendants' unreasonable restraint of trade.

- 42 -

## SECOND CAUSE OF ACTION
## VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION
## (15 U.S.C. § 2)

102.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

103.    Plaintiff bring this claim on its own behalf and on behalf of the proposed Online Bookseller Class described above. Plaintiff seeks damages and injunctive relief.

104.    The relevant market is the U.S. the online retail market for the sale of print trade books.

105.    Amazon possesses market power in the relevant market, where it controls about 90% of online sales of print books.

106.    Through its anticompetitive agreements with the Big Five, Amazon has willfully acquired and maintained its monopoly power in the relevant market by unlawful and improper means, including preventing Amazon's retailer rivals from gaining market share and dissuading potential rivals from entering the market. Defendants entered into anticompetitive agreements with the intent and effect of 1) controlling trade book wholesale prices; 2) eliminating Amazon's current and potential retailer competitors' ability and incentives to offer superior prices, price promotions, or early releases; 3) eliminating Amazon's current and potential retailer competitors' ability and incentives to develop and differentiate their print book offerings; and 4) eliminating Amazon's current and potential retailer competitors' ability and incentives to offer price and non-price promotions in the sale of print books.

107.    Plaintiff and members of the proposed Class have been injured and will continue to be injured in their businesses and property by paying higher wholesale prices for print trade books than they would have paid or would pay in the future in the absence of Defendants' unlawful acts.

108.    Plaintiff and members of the proposed Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

### THIRD CAUSE OF ACTION
### VIOLATION OF THE SHERMAN ACT – CONSPIRACY TO MONOPOLIZE
### (15 U.S.C. § 2)

109.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

110.    Plaintiff bring this claim on its own behalf and on behalf of the proposed Online Bookseller Class described above. Plaintiff seeks damages and injunctive relief.

111.    The relevant market is the U.S. the online retail market for the sale of print trade books.

112.    Defendants possess market power in the relevant market. As the dominant online retail platform, Amazon controls about 90% of all online print book sales. The Big Five's trade books account for about 80% of all trade book sales in the United States. That Defendants have market power is also evident from their power to raise wholesale prices above that which would be charged in a competitive market. Notably, in the *Apple* case, which addressed a similar market and collusive conduct, the court found that the Big Five and Apple had the power to raise eBook prices above a competitive level even though Apple was a new entrant to the eBook market and never achieved Amazon's market dominance.

113.    Defendants demonstrated a specific intent to confer monopoly power upon Amazon by agreeing to immunize it from competition from any other online booksellers. Defendants acted in concert and took steps in furtherance of their conspiracy by executing and adhering to contracts with highly restrictive MFNs. The purpose and effect of these agreements is to ensure that Defendants control trade wholesale prices for print trade books and that Amazon faces no competition from other online booksellers.

- 44 -

114.    Through Defendants' conspiracy, Amazon has acquired and maintained its monopoly power in the relevant market as the dominant online retailer for print trade books by unlawful and improper means, including preventing Amazon's bookseller rivals from gaining market share and dissuading potential rivals from entering the market. Defendants entered into anticompetitive agreements with the intent and effect of 1) controlling trade book wholesale prices; 2) eliminating Amazon's current and potential retailer competitors' ability and incentives to offer superior prices, price promotions, or early releases; 3) eliminating Amazon's current and potential retailer competitors' ability and incentives to develop and differentiate their print book offerings; and 4) eliminating Amazon's current and potential retailer competitors' ability and incentives to offer price and non-price promotions in the sale of print books.

115.    Plaintiff and members of the Online Bookseller Class have been injured and will continue to be injured in their businesses and property by paying higher wholesale prices for print trade books than they would have paid or would pay in the future in the absence of Defendants' unlawful acts.

116.    Plaintiff and members of Online Bookseller Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint

## JURY TRIAL DEMANDED

117.    Plaintiff hereby demands a trial by jury of all the claims asserted in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A.    The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as a

- 45 -

Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes, once certified;

        B.      Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

        C.      Adjudication that the acts alleged herein constitute monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

        D.      Judgment against Defendants for the damages sustained by Plaintiff and the proposed Classes, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages;

        E.      Pre-judgment and post-judgment interest on such monetary relief;

        F.      Equitable relief requiring that Defendants cease their abusive, unlawful, and anti-competitive practices described and requested herein;

        G.      The costs of bringing this suit, including reasonable attorneys' fees; and

        H.      All other relief to which Plaintiff and members of the proposed Classes may be entitled at law or in equity.

DATED: March 25, 2021              Respectfully submitted,


                           By /s/ Nathaniel Tarnor
                              Nathaniel Tarnor (4742797)
                           HAGENS BERMAN SOBOL SHAPIRO LLP
                           322 8th Avenue, Suite 802
                           New York, NY 10001
                           Telephone: 212-752-5455
                           Facsimile: 917-210-3980
                           Nathant@hbsslaw.com

- 46 -

Steve W. Berman (*pro hac vice* forthcoming)
Barbara A. Mahoney (*pro hac vice* forthcoming)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: 206-623-7292
Facsimile: 206-623-0594
steve@hbsslaw.com
barbaram@hbsslaw.com

SPERLING & SLATER, P.C.
55 W. Monroe Street, Suite 3200
Chicago, IL 60603
Eamon P. Kelly (*pro hac vice* forthcoming)
Joseph M. Vanek (*pro hac vice* forthcoming)
Paul E. Slater (*pro hac vice* forthcoming)
Alberto Rodriguez (*pro hac vice* forthcoming)
Jeffery Bergman (*pro hac vice* forthcoming)
ekelly@sperling-law.com
jvanek@sperling-law.com
pes@sperling-law.com
arodriguez@sperling-law.com
jbergman@sperling-law.com

*Attorneys for Plaintiff and the Proposed Class*