**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BOOKENDS & BEGINNINGS LLC, on behalf of itself and all others similarly situated, | No. 21-cv-02584-GHW-DCF |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT** |
| v. | **REDACTED VERSION** |
| AMAZON.COM, INC.; HACHETTE BOOK GROUP, INC; HARPERCOLLINS PUBLISHERS L.L.C.; MACMILLAN PUBLISHING GROUP, LLC; PENGUIN RANDOM HOUSE LLC; SIMON & SCHUSTER, INC., | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

    A.    Defendants violate the Robinson-Patman Act's prohibition against
discriminatory pricing. ............................................................................ 3

    B.    Defendants' agreed discriminatory pricing scheme allows them to control
the wholesale prices for trade print books in violation of Section 1 of the
Sherman Act. ........................................................................................... 5

    C.    Defendants' agreed price discrimination scheme conferred a monopoly
on Amazon in the print trade book market. ............................................ 11

    D.    Defendants' discriminatory pricing, price fixing, and monopolizing
conduct has directly injured and continues to directly injure Plaintiff and
Class members. ....................................................................................... 13

II.   JURISDICTION ............................................................................................... 14

III.  VENUE ............................................................................................................. 16

IV.   PARTIES .......................................................................................................... 17

    E.    Plaintiff .................................................................................................. 17

    F.    Defendants .............................................................................................. 17

        1.    Amazon ....................................................................................... 17

        2.    Hachette ...................................................................................... 17

        3.    HarperCollins .............................................................................. 18

        4.    Macmillan .................................................................................... 18

        5.    Penguin ....................................................................................... 19

        6.    Simon & Schuster ....................................................................... 19

V.    STATEMENT OF FACT .................................................................................. 20

    A.    Defendants' agreements raise wholesale prices and prevent any
meaningful competition in the sale of trade books. ................................ 20

010888-13/1572953 V1

B.      Courts and enforcement agencies have repeatedly found that Defendants
        engaged in anticompetitive conduct in the sale and distribution of trade
        books. ................................................................................................................. 22

C.      Defendants' discriminatory pricing scheme harms competition and hurts
        consumers. ......................................................................................................... 25

VI.     INTERSTATE TRADE AND COMMERCE ...................................................................... 32

VII.    DEFENDANTS' MARKET POWER IN THE RELEVANT MARKET ................................. 32

A.      The market for print trade books is the relevant product market. ..................... 32

        1.      Trade books are not interchangeable with other books. .................. 32

        2.      Print books are not reasonably interchangeable with eBooks or
                audio books. ..................................................................................... 33

        3.      The online market for sale of print trade books is a well-defined
                submarket, representing a distinct group of competitors that do
                not overlap significantly with brick-and-mortar booksellers. ......................... 35

B.      The relevant geographic markets are the United States and the local and
        regional markets in which Amazon competes with Class members. ............................ 39

C.      The Big Five dominate the production and sale at wholesale of print
        trade books in the U.S. market. ......................................................................... 39

D.      Amazon dominates the retail market for print books. ............................................... 40

VIII.   CLASS ACTION ALLEGATIONS ................................................................................... 41

IX.     ANTITRUST INJURY ................................................................................................... 44

X.      CAUSES OF ACTION ................................................................................................... 44

        FIRST CAUSE OF ACTION VIOLATION OF 15 U.S.C. § 13 ................................. 44

        SECOND CAUSE OF ACTION VIOLATION OF 15 U.S.C. § 1 ......................... 49

        THIRD CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT –
        MONOPOLIZATION (15 U.S.C. § 2) ..................................................................... 53

        FOURTH CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT –
        CONSPIRACY TO MONOPOLIZE  (15 U.S.C. § 2) ................................................ 54

JURY TRIAL DEMANDED ...................................................................................................... 55

PRAYER FOR RELIEF ............................................................................................................. 55

- ii -

Plaintiff alleges the following upon personal knowledge as to itself and its own acts, and as to all other matters upon information and belief, based upon the investigation made by and through its attorneys.

## I.    INTRODUCTION

1.    Plaintiff Bookends & Beginnings is a bookseller that operates online and as a physical store in Evanston, Illinois. Plaintiff directly purchases print books[1] published and sold at wholesale by the five largest publishers in the United States: Defendant Hachette Book Group, Inc. ("Hachette"); Defendant HarperCollins Publishers L.L.C. ("HarperCollins"); Defendant Macmillan Publishing Group, LLC ("Macmillan"); Defendant Penguin Random House LLC ("Penguin"); and Defendant Simon & Schuster, Inc. ("Simon & Schuster"), otherwise known collectively as the "Big Five." The Big Five publish and sell "trade books," a term of art referring to "general interest fiction and non-fiction books," as "distinguished from 'non-trade' books such as academic textbooks, reference materials, and other texts."[2] Collectively, the Big Five account for about 80% of the trade books sold in the United States.[3]

2.    Defendant Amazon.com, Inc. ("Amazon") is the largest retail bookseller in the United States in the sale of print trade books. It sells over half of all books purchased at retail in

---

[1] This lawsuit concerns the sale of print books (hardbacks, paperbacks, and mass-produced). Defendants' conduct with respect to the sale of electronic books is the subject of a separate lawsuit. *In Re Amazon.com, Inc. eBook Antitrust Litigation.* Case Number: 1:21-cv-351-GHW-DCF (S.D.N.Y.).

[2] *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 648 n.4 (S.D.N.Y. 2013).

[3] Constance Grady, *Milo Yiannopoulos's book deal with Simon & Schuster, explained*, Vox (Jan. 3, 2017), https://www.vox.com/culture/2017/1/3/14119080/milo-yiannopoulos-book-deal-simon-schuster-dangerous-boycott; Thad McIlroy, *What the Big 5's Financial Reports Reveal About the State of Traditional Book Publishing*, Book Business (Aug. 5, 2016), https://www.bookbusinessmag.com/post/big-5-financial-reports-reveal-state-traditional-book-publishing/.

- 1 -

the United States, including about 90% of all print books sold online.[4] Plaintiff competes with Amazon for online customers and for customers who shop both online and in Plaintiff's Evanston store. Plaintiff seeks to represent members of the proposed Classes (defined below), who likewise compete with Amazon online or for customers who shop both online and in the locales where class members' physical stores are located.

3.      The Big Five sell their print books under a wholesale model, defined as a discount off the Big Five's published (list) prices.[5] Plaintiff and members of the proposed Classes buy the Big Five's books at wholesale prices based on the Big Five's standard discounts. Shortly after negotiating the print book contracts with Amazon that are the subject of this lawsuit, the Big Five raised their list prices. Higher list prices generally means that booksellers must pay a higher wholesale price to the publishers, but the Big Five sell their books to Amazon at higher discounts and other favorable price terms that are not available to Amazon's retail competitors in the sale of print trade books, like Plaintiff or Powell's Books. Defendants harm competition and directly injure Plaintiff and Class members by raising their wholesale price of print trade books, while protecting Amazon from retail competition through their discriminatory pricing scheme.

---

[4] House Judiciary Committee, Investigation of Competition in Digital Markets, Oct. 5, 2020 at 295 and n.1562, https://judiciary.house.gov/uploadedfiles/investigation_of_competition_in_digital_markets_majority_staff_report_and_recommendations.pdf ("House Report").

[5] *See* ABA Book Buyer's Handbook ("Redbook") (publishing publishers' standard discount); Hachette (Amazon_Rev0000001, Sec. B); HarperCollins (Amazon_Rev0000025, Sec. 1); Macmillan (Amazon_Rev0000057, Ex. 1; AMAZON_REV0000070, Ex. 1); Penguin (Amazon_Rev0000082, Sec. 1); Simon & Schuster (Amazon_Rev0000131, Sec. 1). Citations with the bates prefix "Amazon_Rev" refer to documents which Plaintiff's counsel were permitted to review and take notes (but not copy) for a seven-day window. *See* ECF 44 n.2 and 49.

**A.    Defendants violate the Robinson-Patman Act's prohibition against discriminatory pricing.**

4.    The Big Five sell to Amazon at steep discounts to list prices below the standard

discounts available to other booksellers.[6]



The Big Five's huge price concessions                    [9]—ensure that

Amazon has a significant competitive advantage over its bookseller rivals in the sale of print

trade books. By drastically reducing Amazon's cost of doing business, the Big Five give the

retail giant an unfair advantage. Plaintiff and other booksellers, who pay more to the Big Five for

the same books, cannot afford to compete with Amazon on price. This allows Amazon to gain

market share without ever incurring the same risks as other booksellers.

5.    Congress passed the Robinson-Patman Act to protect "small independent stores,"

like Plaintiff, that lacked the purchasing power to obtain price concessions that large chains

could demand and were thus "at a hopeless competitive disadvantage."[10] Defendants' conduct

violates Section 2 of the Clayton Act, as amended by the Robinson-Patman Act, which prohibits

price discrimination "where the effect of such discrimination may be substantially to lessen

---

[6] HarperCollins (AMAZON_REV0000033, Sec. 1); Macmillan (AMAZON_REV0000057, Ex. 1); Penguin (AMAZON_REV0000082, Appendix A

[7] Macmillan (Amazon_Rev0000057, Ex. 1 (                        ; AMAZON_REV0000065, Ex. 1) (same); Penguin (Amazon_Rev0000082, Appendix B (same)); Simon & Schuster (AMAZON_REV0000131, Ex. 2; AMAZON_REV0000150, Ex.1 (same)).

[8] Hachette (Amazon_Rev0000001, Sec. B; Amazon_Rev0000004, Sec. 2; Amazon_Rev0000014, Sec. 4).

[9] *See infra* § I.B.

[10] *Federal Trade Commission v. Simplicity Pattern Co*., 360 U.S. 55, 69 (1959).

competition or tend to create a monopoly."[11] Under this provision, "publishers must sell a given book to two or more book sellers at the same price, unless the publisher can justify a price difference through actual savings it realizes."[12] The Big Five violate Section 2(a) in that the same books they sell to Amazon, they also contemporaneously sell to Amazon's bookseller rivals (like Plaintiff) at higher wholesale prices and on less favorable terms. For example, along with higher discounts,



[13]

[14]                                                                                                                                                            [15]

[17] The Big Five do not provide the same terms to Plaintiff and Class members on a comparable proportional basis.

6.      Amazon likewise has violated and continues to violate the Act's prohibition under Section 2(f) against buyers, which receive or induce price discrimination from sellers. Amazon knows that its discounts are higher than Defendants' published standard discounts and that the

---

[11] 15 U.S.C. § 13(a).

[12] *American Booksellers Ass'n v. Houghton Mifflin Co.*, 1995 U.S. Dist. LEXIS 2522, at *8 (S.D.N.Y. Mar. 3, 1995).

[13] Hachette, Amazon_Rev0000004, Sec. 4; HarperCollins, AMAZON_REV0000033, Sec. 2; Macmillan, AMAZON_REV0000065, Sec. 3; Penguin, AMAZON_REV0000094, Sec. 3; Simon & Schuster, AMAZON_REV0000142, Sec. 2.

[14] Macmillan, AMAZON_REV0000065, Sec. 5; Macmillan, AMAZON_REV0000160, Ex. A.

[15] Macmillan, AMAZON_REV0000185, Sec. 3.

[16] Simon & Schuster, AMAZON_REV0000131, Sec. 3.

[17] Simon & Schuster, AMAZON_REV0000142, Sec. 4.

- 4 -

Big Five do not ████████████ to other customers as they do to Amazon. Yet it engineered

and knowingly received the benefit of the Big Five's price discrimination. ████████

████████████████████████████████████████████████

████████████████████████████████████████ .

**B.     Defendants' agreed discriminatory pricing scheme allows them to control the wholesale prices for trade print books in violation of Section 1 of the Sherman Act.**

7.     The Big Five are horizontal competitors in the publication and sale (at wholesale)

of print trade books. Amazon is the dominant retailer, through which the Big Five sell their trade

books. Amazon also competes with the Big Five as a publisher of print trade books.

8.     The Big Five knowingly entered into the same price discrimination agreements

with Amazon. ████████████████████████████████████████

████████████████████████████████ , Amazon publicly confirmed at the

time of negotiations that the "contract presented to HarperCollins was the same contract recently

signed by Simon & Schuster, Hachette, and Macmillan."[18] ████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████ .[19] So each Big Five

---

[18] Jillian D'Onfro, *Another major publisher is going to war with Amazon*, Business Insider (Mar. 31, 2015) https://www.businessinsider.com/harpercollins-amazon-contract-expiring-2015-3. Amazon also publicly confirmed that it offered Penguin—the last of the Big Five to sign—the same terms as the other four publishers. Jennifer Rankin, *Amazon and Penguin Random House said to be in dispute*, Guardian (May 25, 2015), https://www.theguardian.com/books/2015/may/25/amazon-and-penguin-random-house-said-to-be-in-dispute.

[19] ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

Defendant has understood at all times relevant to this lawsuit that the specific monetary and

performance terms of its contract reflects its competitors' terms and in fact were conditioned on

their agreement to the same terms.

9.      Terms which the Big Five each agreed to meet include: HarperCollins,

Macmillan, and Penguin's ███████████████████████████████████

████████████████████████████████;[20] Macmillan, Penguin, and Simon & Schuster's

███████████████████████████████████████████████████████████████

████████ [21] and Hachette's agreemen ███████████████████████████████

███████████████ [22]



_____

[20] HarperCollins (AMAZON_REV0000033, Sec. 1); Macmillan (AMAZON_REV0000057, Ex. 1); Penguin (AMAZON_REV0000082, Appendix A ███████████████████).

[21] Macmillan (Amazon_Rev0000057, Ex. 1 (███████████████████████████ ███████████████ AMAZON_REV0000065, Ex. 1) (same): Penguin (Amazon_Rev0000082, Appendix B (same)); Simon & Schuster (AMAZON_REV0000131, Ex. 2; AMAZON_REV0000150, Ex.1 (same)).

[22] Hachette (Amazon_Rev0000001, Sec. B; Amazon_Rev0000004, Sec. 2; Amazon_Rev0000014, Sec. 4).

10.     Defendants' common price discrimination agreement not only ensured that no bookseller could underprice Amazon, it also enabled the Big Five's collective action. By knowingly entering into uniform agreements, Defendants created an economic incentive to raise list prices, which was only attractive to the Big Five to the extent they acted collectively.[23] By the very act of signing the price discrimination agreements with Amazon, each of the Big Five signaled a clear commitment to raise the prices of their print trade books, thereby facilitating their collective action. Defendants' common agreement had the intent and effect of controlling prices of print trade books throughout the U.S. market, while protecting Amazon from competition from its retail rivals.[24]

11.     Knowing that their competitors were poised to do the same, the agreement facilitated the Big Five's common goal of raising wholesale market prices by means of raising their suggested retail or "list" prices. This was also the case when the Big Five conspired with Apple to raise eBook prices in 2010-2012, and "the weighted average price" of the Big Five's eBook "bestsellers increased by 40.4%."[25] Because the conspirators agreed to set eBook prices based on hardcover list prices, their conduct had a significant "ripple effect" on print book prices

---

[23] *See United States v. Apple, Inc.*, 791 F.3d 290, 320 (2d Cir. 2015) (noting that the price restraints the Big Five agreed to in *Apple*, "were only attractive to the Publisher Defendants to the extent they acted collectively"); *id.* at 305 (While "no one Publisher could effect an industry-wide shift in prices or change the public's perception of a book's value, if they moved together they could.") (quoting *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 665 (S.D.N.Y. 2013)).

[24] *See id.* at 317 ("By the very act of signing a Contract with Apple containing [the price restraint], then, each of the Publisher Defendants signaled a clear commitment to move against" competitive pricing, "thereby facilitating their collective action.").

[25] *Id.* at 310.

as the conspirators "increased the prices of their newly released hardcover books to shift the ebook version into a higher price category."[26]

     12.     As shown in the following graph, at the close of the eBook conspiracy with Apple in 2012, the Big Five's weighted average list price for print bestsellers had risen to $19.50. But starting around 2013, when—through judicial intervention—the trade book market briefly became competitive again, the Big Five's weighted average list price for print bestsellers dropped precipitously from $19.50 to $16, where it largely remained until about 2016. Because publishers announce the list prices for print books many months in advance of their release and print them on their book covers, the Big Five could not act immediately to raise print list prices after colluding with Amazon in the first two quarters of 2015. But they did promptly exercise their power to raise prices. By 2016—after a three-year period when list prices hovered around $16—the average weighted list price of Big Five bestsellers jumped to about $17, where it has largely remained:

---

[26] *Id.*



Weighted Average List Price of Big Five Bestsellers, 2012 - 2020

13.     Acting alone, none of the Big Five could have raised the market price of trade

print books or changed public perception about the value of books.[27] The market wide increase in

trade print book prices is a direct consequence of their collusion. In addition to bestsellers, the

Big Five also exercised their power to raise prices of other categories of print trade books. For

example, after three years of holding the list prices of their lowest priced books ("First Quartile"

books) at $16, the Big Five increased them to about $16.50 in 2016, and a couple years later they

increased both the lower priced and medium priced books ("Second Quartile" books) on average

by a dollar:

---

[27] *See id.* at 305 (While "no one Publisher could effect an industry-wide shift in prices or change the public's perception of a book's value, if they moved together they could.") and 310 (noting that acting alone none of the Big Five had the "critical mass" necessary to remove trade books from competitive pricing by retailers).



010888-13/1572953 V1

14.     In a competitive market, consistently low inflation rates would generally result in consistently low prices. Yet despite decade-long low inflation, the Big Five rapidly shifted the share of books they listed at $16.99 or higher from about 25% in 2015 to around 70% currently.



## Price Cluster Analysis
### Share of Books Priced $16.99 or Higher

*Source: Publishers Weekly*

## C.     Defendants' agreed price discrimination scheme conferred a monopoly on Amazon in the print trade book market.

15.     The Big Five understand that Amazon's "outsized position of power" in the book industry endangers the distribution of their books and the long-term health of the publishing industry.[28] For example, the Association of American Publishers, where each of the Big Five's

---

[28] Letter from Maria A. Pallante, Pres. & CEO, Ass'n of Am. Publishers, Mary E. Rasenberger, Exec. Dir., Authors Guild, Allison K. Hill, CEO, Am. Booksellers Ass'n, to Hon. David. N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 3 (Aug. 17, 2020),

CEOs serve as board members,[29] sent a joint letter with other industry groups to the House

Judiciary Committee investigating Amazon, in which they complained of Amazon's conduct:

> As to the publishing industry, we believe that Amazon acts anti-
> competitively in multiple ways, dictating the economic terms of its
> relationships with suppliers so that publishers, their authors, and
> the booksellers who sell on Amazon pay more each year for
> Amazon's distribution and advertising services but receive less
> each year in return. Amazon employs non-transparent data
> algorithms and recommendation engines to steer consumers toward
> Amazon's own products, or even toward infringing products
> without disclosing to consumers that it is doing so. It has required
> suppliers to agree to most-favored-nation provisions (MFNs) that
> stifle the emergence and growth of competitive alternatives in the
> book distribution marketplace. And it manipulates suppliers and
> rivals by tying the purchase of distribution services to the purchase
> of its advertising services.[30]

16.     Given their concerns that Amazon endangers a "robust, diverse, and competitive

publishing industry,"[31] it would be in each of the Big Five publishers' own economic self-

interest not to give Amazon disproportionate discounts or other advantages that allow it to

destroy its competition. Indeed, before entering into their anticompetitive agreements with

Amazon in late 2014, Defendants HarperCollins and Macmillan publicly claimed to be making

"aggressive efforts" to broaden their outlets so that they would not have to depend so heavily on

Amazon.[32]

---

https://publishers.org/wpcontent/uploads/2020/08/Joint-Letter-to-Rep-Cicilline-081720.pdf.
("Maria A. Pallante *et al.* Letter") at 3.

[29] Our Board, AAP, https://publishers.org/who-we-are/our-board/.

[30] Maria A. Pallante *et al.* Letter at 3.

[31] *Id.*

[32] David Streitfeld, *HarperCollins and Amazon in Multiyear Publishing Deal, NYT* (Apr. 13, 2015, https://www.nytimes.com/2015/04/14/business/media/harpercollins-and-amazon-in-multiyear-publishing-deal.html.

17.     The Big Five's discriminatory pricing lessens competition in the retail market for print trade books because it allows Amazon to draw significant sales or profits away from its rivals. By minimizing competition from Amazon's rivals, it also tends to create or maintain Amazon's monopoly share of the print trade book market and the print trade book ecommerce submarket. But the Big Five have set aside these concerns because reaching this same deal with Amazon enables them to raise their list prices (and therefore their wholesale price to Plaintiff and Class members) without suffering any competitive disadvantages within the print trade book publishing market.

18.     By entering into discriminatory price agreements with the Big Five and raising the wholesale price of print trade books paid by its competitors, Defendant Amazon has willfully acquired its monopoly power in the U.S. online retail trade book market, where it accounts for roughly 90% of all print book sales. Such conduct is an abuse of monopoly power in violation of Section 2 of the Sherman Act.

**D.     Defendants' discriminatory pricing, price fixing, and monopolizing conduct has directly injured and continues to directly injure Plaintiff and Class members.**

19.     Plaintiff and Class members have standing to bring their Robinson-Patman Act claims because an "injury to competition may be inferred" when "some purchasers had to pay their supplier substantially more for their goods than their competitors had to pay,"[33] and Plaintiff and Class members did have to pay more than Amazon to each of the Big Five Defendants in their purchases of like commodities (*i.e.*, the same titles and the same paper or hardback format) at different prices. Amazon knew that the prices were discriminatory because it demanded discounts and other concessions that it knew were not available to other booksellers.

---

[33] *Hasbrouck*, 496 U.S. at 559 (quotation omitted).

20.     Because Plaintiff and Class members purchase their books based on the Big

Five's list prices, they are directly injured by Defendants' anticompetitive conduct, which caused

them to overpay for print trade books at artificially inflated wholesale prices.

21.     The harm caused by Defendants' discriminatory treatment in favor of Amazon,

their agreement to fix wholesale prices, and the attendant injuries to the print trade books market

persists and will not abate unless Amazon and the Big Five are stopped. Plaintiff seeks a nation-

wide injunction under Section 16 of the Clayton Act to enjoin Defendants Amazon and the Big

Five from engaging in this conduct.

22.     Plaintiff and Class members seek monetary recovery, including treble damages,

for all overcharges they have incurred. Plaintiff and the proposed Classes have standing to

recover damages under Section 4 of the Clayton Act because Defendants' anticompetitive

agreements materially and proximately cause injury to and have caused Plaintiff and Class

members to pay supracompetitive wholesale prices for books.

23.     Further, Plaintiff and the proposed Classes seek injunctive relief that terminates

the ongoing violations alleged in this Complaint. They have standing under Section 2 of the

Clayton Act because the effect of Defendants' price discrimination may substantially lessen

competition or tend to create a monopoly, and under Section 16, they have standing because they

are threatened with impending future harm in the form of additional overcharges.

## II.     JURISDICTION

24.     This Court has federal question jurisdiction pursuant to the federal antitrust laws

invoked herein, including the Sherman Act and Clayton Antitrust Act, *e.g.*, 28 U.S.C. § 1331, 28

U.S.C. § 1337(a), and 15 U.S.C. § 15(a).

- 14 -

25.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from Defendants, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

26.     Plaintiff Bookends & Beginnings LLC operates a bookstore in Evanston, Illinois and online, where it operates nationally. Plaintiff purchases books at wholesale prices directly from the Big Five and directly competes with Amazon in the U.S. market for the retail sale of print trade books and in the submarket for online sales of print trade books. Plaintiff was harmed and injured financially because of Defendants' conduct, as described further herein.

27.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, because Defendants reside in this District or may be found or transact business in this District. Each of the Big Five Defendants have headquarters and operate their businesses in this District. Amazon likewise may be found or transacts business in this District. Amazon has over 8,000 employees in its New York City work force, including many who work at its Manhattan office space.[34] It has five warehouses in New York, including two in Manhattan.[35] It also owns and operates four Amazon Books stores and eight cashier-free Go-stores in locations throughout Manhattan.[36] Amazon has eight office properties in Manhattan, most of which are

---

[34] Ed Shanahan, *Amazon Grows in New York, Reviving Debate Over Abandoned Queens Project*, NYT (Dec. 9, 2019), https://ww, w.nytimes.com/2019/12/06/nyregion/amazon-hudson-yards.html.

[35] https://en.wikipedia.org/wiki/List_of_Amazon_locations#United_States; Ben Fox Rubin, *Why Amazon built a warehouse inside a Midtown Manhattan office tower*, CNET (Dec. 21, 2015), https://www.cnet.com/news/why-amazon-built-a-warehouse-inside-a-midtown-manhattan-office-tower/.

[36] Where are Amazon Go stores located in New York?, Bing, https://www.bing.com/maps?q=where+are+amazon+go+stores+in+new+york&qs=NW&pq=where+are+amazon+go+stores+in+new+&sc=5-34&cvid=29EA099E9F8E4797A844A8DCA5842069&FORM=QBLH&sp=1&ghc=1; Where

- 15 -

clustered in Midtown, including the iconic Lord & Taylor building on Fifth Avenue.[37] Amazon

has engaged in an illegal, anticompetitive scheme to monopolize the print trade book market that

was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of

causing injury to the business or property of persons and entities residing in, located in, or doing

business in this District.

28.     Exercising personal jurisdiction over Amazon is also appropriate under Section

302(a) of New York's long-arm statute because Amazon transacts business in the State of New

York, directly or through agents, such that it has sufficient minimum contacts with New York.

Plaintiff further avers on information and belief that Amazon's online sales to its customers in

New York State represent at least 5% of Amazon's U.S. sales and therefore rise to the level of

substantial solicitation necessary to satisfy the minimum contacts required to support this Court's

exercise of personal jurisdiction over Amazon.

### III.   VENUE

29.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §

22, because Defendants reside, transact business, are found, or have agents in this District.

Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendants

are subject to the Court's personal jurisdiction with respect to the civil action in question and

therefore reside in this District and under 28 U.S.C. § 1391(b)(2) because a substantial portion of

---

are Amazon Books stores located in New York?, Bing,
https://www.bing.com/maps?q=where+are+amazon+books+stores+located+in+new+york%3F&
cvid=1f533e8508ec4a378125b0ed5e3fc0cb&FORM=ANAB01&PC=U531.

[37] Matthew Haag, *Manhattan Emptied Out During the Pandemic. But Big Tech Is Moving In*.
NYT (Nov. 9, 2020), https://www.nytimes.com/2020/10/13/nyregion/big-tech-nyc-office-
space.html.

the affected interstate trade and commerce described in this Complaint was carried out in this District.

## IV.    PARTIES

**E.    Plaintiff**

30.    Bookends & Beginnings LLC is an Illinois limited liability company that operates a bookstore in Evanston, Illinois selling print trade books in its store and online through its website: www.bookendsandbeginnings.com. Bookends & Beginnings purchases print trade books directly from each of the Big Five.

**F.    Defendants**

**1.    Amazon**

31.    Amazon is an online retailer giant (currently valued at $1.7 trillion) with its principal headquarters in Seattle, Washington and with facilities and employees scattered throughout the United States, including in this District. Amazon is vertically integrated and is active upstream as a print trade book publisher, with its own imprints (*i.e.*, publishing labels), and downstream as a print trade book retailer. Amazon sells print trade books to its retail customers in New York and throughout the United States. Amazon also operates Amazon Publishing, a division of Amazon that publishes print trade books that compete with the Big Five Defendants' print trade books.

**2.    Hachette**

32.    Defendant Hachette is a leading U.S. trade publisher, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. Hachette has been publishing books since 1837, and its publishing brands currently include Little, Brown and Company; Little, Brown Books for Young Readers; Grand Central Publishing; Basic Books; Public Affairs; Orbit; FaithWords; and Center Street.

- 17 -

Hachette's books and authors have garnered major awards including Pulitzer Prizes, National

Book Awards, Newbery Medals, Caldecott Medals, and Nobel Prizes. Hachette's bestselling

authors have been published all over the world and include David Baldacci, Michael Connelly,

Malcolm Gladwell, Elin Hilderbrand, N. K. Jemisin, Stephenie Meyer, James Patterson, J.K.

Rowling, Nicholas Sparks, Rick Steves, Donna Tartt, and Malala Yousafzai.

### 3.      HarperCollins

33.      Defendant HarperCollins is a leading U.S. trade publisher, having its principal

place of business in New York City, and is qualified to do business and is doing business in the

State of New York and in this District. With over two hundred years of history and more than

120 branded imprints around the world, HarperCollins publishes approximately 10,000 new

books every year in 16 languages, and has a print and digital catalog of more than 200,000 titles.

Writing across dozens of genres, HarperCollins' authors are winners of the Nobel Prize, the

Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Man

Booker Prize.

### 4.      Macmillan

34.      Defendant Macmillan is a leading U.S. trade publisher, having its principal place

of business in New York City, and is qualified to do business and is doing business in the State

of New York and in this District. Macmillan is part of a global trade-publishing group operating

worldwide, with trade publishing companies in the United States, Germany, the United

Kingdom, Australia, South Africa, and India. Macmillan operates eight divisions in the US:

Celadon Books; Farrar, Straus and Giroux; Flatiron Books; Henry Holt and Company;

Macmillan Audio; Macmillan Children's Publishing Group; St. Martin's Press and Tor/Forge. Its

writers, including, among others, Jeff VanderMeer, Senator Elizabeth Warren, James Comey,

- 18 -

Orson Scott Card, and Paul Beatty, come from a vast array of literary backgrounds and have won

awards including the Caldecott Medal, the Nobel Prize, the Man Booker Prize, the Pulitzer Prize,

the National Book Award, and the Printz Award.

### 5.     Penguin

35.     Defendant Penguin is a leading U.S. trade publisher, organized under the laws of

Delaware, having its principal place of business in New York City, and is qualified to do

business and is doing business in the State of New York and in this District. With a rich history

dating back to the 1800s, Penguin's expansive publishing portfolio includes nearly 275

independent publishing imprints and brands on five continents and contains books and products

for readers of all ages at every stage of life. Penguin publishes 15,000 new titles annually and

sells close to 800 million print, audio, and eBooks annually. Penguin's many authors include

more than 80 Nobel Laureates and hundreds of the world's most widely read authors.

### 6.     Simon & Schuster

36.     Defendant Simon & Schuster is a leading U.S. trade publisher, organized under

the laws of New York, having its principal place of business in New York City, and is qualified

to do business and is doing business in the State of New York and in this District. It publishes

2000 titles annually in numerous well-known imprints and divisions such as Simon & Schuster,

Scribner, Atria Books, Gallery Books, Pocket Books, Adams Media, Simon & Schuster

Children's Publishing and Simon & Schuster Audio and international companies in Australia,

Canada, India and the United Kingdom. Simon & Schuster proudly brings the works of its

authors, which include, among others, Dale Carnegie, Sharon Draper, Jennifer Egan, Joseph

Heller, Ernest Hemingway and Stephen King, to more than 200 countries and territories. Its

books and authors have been winners of the Pulitzer Prize, National Book Award, National Book

- 19 -

Critics Circle Award, Newbery Medal, and Caldecott Medal. On November 25, 2020, Penguin announced plans to acquire Simon & Schuster; the proposed merger would create a single publishing house with approximately 50% of all trade books published.[38]

## V.      STATEMENT OF FACT

**A.      Defendants' agreements raise wholesale prices and prevent any meaningful competition in the sale of trade books.**

37.      Defendants employ a discriminatory pricing scheme that has the intent and effect of controlling wholesale prices of print trade books and preventing competition with Amazon in the retail sale of print trade books.

38.      Amazon benefits from this agreement because regardless of the wholesale prices, it faces no meaningful competition from any rival bookseller. The Big Five Defendants benefit from this agreement because they have no incentive to lower wholesale prices and therefore maintain them at supracompetitive levels.

39.      Acting individually, none of the Big Five Defendants would have an incentive to enter into restrictive agreements that consolidate power in Amazon and cede substantial control over the distribution of their books. For example, Macmillan's CEO John Sargent warned that Amazon's large market share is "one of the big problems in the digital marketplace" and as "publishers, authors, illustrators, and agents, we need broader channels to reach our readers."[39] And a recent statement from the Association of American Publishers, to which all of the Big

---

[38] John Maher, *PRH Purchase of S&S Draws Objections*, Publishers Weekly (Nov. 30, 2020), https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/85005-first-reactions-to-s-s-sale.html.

[39] Brian Stelter, *Amazon, HarperCollins avert public Fight*, CNN (Apr. 14, 2015), https://money.cnn.com/2015/04/14/media/amazon-harpercollins-deal/index.html.

Five belong,[40] called "for government officials to step in quickly and decisively to exercise corrective measures" to address Amazon's "dominant position in the publishing industry."[41]

40.     But the Big Five did not act in isolation, and by acting collectively, the agreements granted them the power to control wholesale prices of print trade books. From 2010 through 2012, the Big Five actively colluded with each other to raise the prices of trade eBooks, and were in constant communication regarding their negotiations with both Apple and Amazon.[42] The Big Five paid $166 million in settlements to the consumer class action that initiated proceedings against them, and Apple, with whom they had colluded, paid an additional $450 million to the class in 2015 after the Second Circuit affirmed its liability.[43] When the Big Five and Amazon renewed their contracts in late 2014 and the first two quarters of 2015, Defendants publicly signaled that Amazon was offering the same basic terms in their book distribution agreements and that each of the Big Five was accepting those terms.[44]

---

[40] Our Members - AAP, https://publishers.org/who-we-are/our-members/.

[41] Statement from Maria A. Pallante, President and CEO, Association of American Publishers, https://publishers.org/news/association-of-american-publishers-comments-on-american-booksellers-association-whitepaper-american-monopoly-amazons-anti-competitive-behavior-is-in-violation-of-antitrust-laws/.

[42] *United States v. Apple, Inc*., 791 F.3d 290, 318 (2d Cir. 2015).

[43] *In re Electronic Books Antitrust Litig.*, 639 F. App'x 724, 726-27 (2d Cir. 2016).

[44] *S&S, Amazon Agree on 'Version' of Agency Pricing*, Publishers Weekly (Oct. 21, 2014), https://www.publishersweekly.com/pw/by-topic/industry-news/industry-deals/article/64461-s-s-amazon-agree-on-version-of-agency-pricing.html.; Megan Guess, *Amazon and Hachette resolve dispute with multi-year agreement*, Ars Technica (Nov. 13, 2014), https://arstechnica.com/information-technology/2014/11/amazon-and-hachette-resolve-dispute-with-multi-year-agreement/; Macmillan Strikes Deal with Amazon, but "Irony Prospers in the Digital Age" - The Authors Guild (Dec. 19, 2014), https://www.authorsguild.org/industry-advocacy/macmillan-strikes-deal-with-amazon-but-irony-prospers-in-the-digital-age/; *No Authors Held Hostage as HarperCollins and Amazon Come to Terms*, The Authors Guild (Apr. 16, 2015), https://www.authorsguild.org/industry-advocacy/no-authors-held-hostage-as-harpercollins-and-amazon-come-to-terms/; Jillian D'Onfro, *Another major publisher is going to war with Amazon*, Business Insider (Mar. 31, 2015), https://www.businessinsider.com/harpercollins-amazon-contract-expiring-2015-3; *For the Big*

- 21 -

41.     Knowing that each of the Big Five agreed to the same restrictions, gave the individual Big Five Defendants the necessary assurance that their principal publishing rivals would not gain a special advantage in a niche market or generate price wars at the wholesale level by offering better terms to Amazon's rivals.

42.     Defendants' anticompetitive conduct has caused and continues to cause Plaintiff and the proposed Classes to overpay for books purchased from the Big Five at wholesale without any offsetting competitive benefit for the high price, *e.g.*, exclusive sales, special editions, or early releases.

**B.     Courts and enforcement agencies have repeatedly found that Defendants engaged in anticompetitive conduct in the sale and distribution of trade books.**

43.     Amazon's and the Big Five's continued anticompetitive agreements to restrain competition for trade books prices is astonishingly brazen in light of repeated investigations into Defendants' practices. Only a decade ago, the Big Five conspired with Apple to raise trade eBook prices via most favored nations clauses (MFNs).[45] As a consequence of that price-fixing agreement, the Big Five also drastically increased the price of their print trade books between 2010 and 2013.[46] This conduct led to concurrent investigations by federal and state prosecutors in the United States and by the European Commission's Directorate General for Competition (the "DG Comp"), which resulted in orders prohibiting the publishers from entering into MFNs

---

*Five, Agency Now Holds Sway Across the Board*, The Authors Guild (Sep. 9, 2015), https://www.authorsguild.org/industry-advocacy/for-the-big-five-agency-now-holds-sway-across-the-board/.

[45] *Id.*

[46] *Apple*, 791 F.3d at 310; *supra* § I.B.

- 22 -

in connection with the sale of eBooks on either continent for a period of five years.[47]
Defendants' common discriminatory price agreement provides a different mechanism that, like
the conspiracy with Apple, concurrently ensures that no rival bookseller can compete with
Amazon on price and simultaneously allows Defendants to control the wholesale prices of print
trade books.

44.     In 2012, U.K. regulators at the Office of Fair Trading (OFT) and German
regulators at the Bundeskartellamt concurrently investigated the anticompetitive effect of
Amazon's agreements with third-party retailers that prevented them from selling their products at
lower prices through other online outlets, including their own websites. [48/49] The
Bundeskartellamt found that Amazon's "horizontal price-fixing" agreement acts as a "barrier[] to
market entry for new competitors and hinder[s] the expansion of existing competitors in the
market."[50] It further found that the agreement "safeguard[s] Amazon's large own-account share
of sales as a competitor and the extensive reach of amazon.de, which cannot be attacked by
competing platforms."[51] Faced with these findings, Amazon capitulated and agreed not to

---

[47] *U.S. v. Apple, Inc., et al.*, Department of Justice, https://www.justice.gov/atr/case/us-v-apple-inc-et-al.; *see, e.g.*, Final Judgment Penguin at 11 and 18; 5.4.2017 DG Comp. Decision at 8.

[48] Dan Prochilo, UK May Drop Antitrust Probe into Amazon Pricing Policy, Law360(Aug. 29, 2013), https://www.law360.com/articles/468842/uk-may-drop-antitrust-probe-into-amazon-pricing-policy.

[49] *Id.*

[50] Bundeskartellamt, Amazon removes price parity obligation for retailers on its Marketplace platform (Dec. 9, 2013) ("12.3.13 Bundeskartellamt decision"), https://www.bundeskartellamt.de/SharedDocs/Entscheidung/EN/Fallberichte/Kartellverbot/2013/B6-46-12.pdf?__blob=publicationFile&v=2.

[51] *Id.*

enforce this provision in its third-party seller agreements in the European market.[52] Having

achieved their goal, OFT and the Bundeskartellamt closed their investigations in November

2013.[53]

45.    European regulators again investigated Defendants' book distribution agreements

in 2015. At the conclusion of its two-year investigation, the DG Comp found that Defendants'

contractual agreements to provide Amazon better pricing and contractual terms than its

competitors harmed competition in the distribution and sale of eBooks in the European

markets.[54] Faced with those findings, Amazon agreed not to enforce those provisions in the

European markets, including in its agreements with the Big Five, and the DG Comp closed the

investigation.[55] Commissioner Margrethe Vestager praised the resolution, stating that it will

increase "choice and competition to the benefit of European consumers."[56]

46.    Here in the United States, the House of Representatives Judiciary Committee's

Subcommittee on Antitrust, Commercial and Administrative Law (the "House Antitrust

Committee") launched an investigation into Amazon along with other dominant technology

platforms. Like the DG Comp, the House Antitrust Committee concluded in its October 2020

report that Amazon "has a history" of employing anticompetitive agreements "to ensure that

none of its suppliers or third-party sellers can collaborate with an existing or potential competitor

---

[52] *Id.*

[53] *Id.*; OFT, *Amazon online retailer: investigation into anticompetitive Practices*, https://www.gov.uk/cma-cases/amazon-online-retailer-investigation-into-anti-competitive-practices.

[54] 5.4.2017 DG Comp. Decision at 37-38.

[55] *Id.* at 39.

[56] European Commission Press Release, May 4, 2017, https://ec.europa.eu/commission/presscorner/detail/en/IP_17_1223.

to make lower-priced or innovative product offerings available to consumers."[57] The Committee further concluded that Amazon "uses its gatekeeper position to maintain its market power and "to further entrench and expand" its "'stranglehold' and 'control' over book distribution."[58] The Committee compared Amazon's monopoly power and abuse of its power to "the kinds of monopolies we last saw in the era of oil barons and railroad tycoons."[59]

47.     Amazon also faces an investigation by the Federal Trade Commission and antitrust scrutiny by state attorneys general offices in California, Washington, New York, and Connecticut.[60] The Connecticut Attorney General's office is specifically investigating Amazon's eBook business.[61]

**C.    Defendants' discriminatory pricing scheme harms competition and hurts consumers.**

48.     Amazon sells more books than any other single retail outlet in history.[62] Industry sources estimate that "Amazon has 50% or more of the US print book market" and roughly "90 percent of online print sales," and that it similarly dominates the sale of eBooks and

---

[57] House Report at 295.

[58] House Report at 6, 15.

[59] *Id*.

[60] House Report at 253; Press Release, Fed. Trade Comm'n, FTC to Examine Past Acquisitions by Large Technology Companies (Feb. 11, 2020), https://www.ftc.gov/news-events/press-releases/2020/02/ftc-examine-past-acquisitions-large-technology-companies.

[61] Jeffrey A. Trachtenberg and Dana Mattioli, *Connecticut Investigating Amazon's E-Book Business*, Wall Street Journal (Jan. 13, 2021).

[62] Porter Anderson,  *US Publishers, Authors, Booksellers Call Out Amazon's 'Concentrated Power' in the Market,* Publishing Perspectives **(**Aug.17, 2020), https://publishingperspectives.com/2020/08/us-publishers-authors-booksellers-call-out-amazons-concentrated-power-in-thebook-market/.

- 25 -

audiobooks.[63] This concentration of market power in the sale of books has driven many

independent bookstores and large chains alike out of business.

49.     Twenty-five years ago, there were around four thousand independent bookstores

in the U.S., and many functioned as local cultural centers, where people browsed and exchanged

ideas. [64] Today, there are fewer than two thousand, and the economic power is concentrated in

the hands of one bookseller.[65] While its brick-and-mortar counterparts crater, Amazon is in talks

to convert real estate in vacated malls into additional Amazon distribution centers.[66] Stacy

Mitchell, the Co-Director of the Institute for Local Self Reliance, warns that the concentration of

power in one company has huge impacts on the economy: "Local businesses are disappearing

and, with them, a pathway to the middle class. . . . New business formation is down to historic

lows."[67]

50.     According to the market research firm Codex Group, readers browsing in a

traditional bookstore discover new books they would like to read at about three times the rate

they do while shopping on Amazon.[68] Even though it dominates the book market, Amazon

accounts for only 7% of new book discovery, while local bookstores, shunted to the periphery of

---

[63] House Report at 255 n.1562.

[64] George Packer, *Cheap Words*, New Yorker (Feb.17 & 24, 2014),
https://www.newyorker.com/magazine/2014/02/17/cheap-words.

[65] Amy Watson, Number of independent bookstores in the U.S. 2009-2019, Statista (Oct 29,
2019), https://www.statista.com/statistics/282808/number-of-independent-bookstores-in-the-us/.

[66] House Report at 261.

[67] *Id.* at 50.

[68] Stacy Mitchell and Olivia LaVecchia, *Report: Amazon's Monopoly*, ILRS(Nov 29. 2016),
https://ilsr.org/amazons-monopoly/.

- 26 -

the book market, account for 20% of new discoveries.[69] This loss impacts consumer choices and

stunts the economy over the long-term.[70]

51.     Amazon's market dominance gives it the unprecedented power to decide what

books consumers will encounter, and to pick which publishers, authors, and creators will be the

winners and the losers.[71] "Amazon has the ability to promote or destroy a book in the national

marketplace for any reason it chooses, and nobody outside the company can know why or how—

or even that it was done," observes Authors United.[72] "Amazon has used retaliation . . . to coerce

publishers to accept contractual terms that impose substantial penalties for promoting

competition" with Amazon's rivals.[73] Amazon's retaliatory tactics against publishers include

removing the pre-set purchase ("BUY") button, which blocks a customer's ability to purchase a

publisher's current titles; and removing the "pre-order" button, which eliminates the ability for a

consumer to pre-order publishers' forthcoming titles.[74] Another form of retaliation that Amazon

reportedly engaged in was showing publishers' titles as out of stock or with delayed shipping

times.[75] Publishers, authors, and booksellers have "significant fear" because of Amazon's

dominance.[76]

---

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] House Report at 260.

[75] *Id.* at 269.

[76] *Id.*

- 27 -

52.     Amazon can, at any moment, remove the buy-button from a particular title on its site and cause overall sales of that book to plummet by 50% or more.[77] It has the power to destroy a book's prospects and has exercised this power on a number of occasions.[78] For example, to extract more fees from Defendant Hachette, it suspended pre-orders and delayed the shipping times of thousands of Hachette books by weeks, and modified its search and recommendation algorithms to direct shoppers to other books.[79] Amazon's machinations did not just harm Hachette. It also suppressed the career prospects and incomes of roughly 3,000 authors for several months.[80] As alleged herein, Amazon has created or maintained its monopoly power in the print trade book market through anticompetitive agreements with the Big Five.

53.     Among the anticompetitive effects of the Big Five's agreement are higher wholesale prices, higher consumer prices, depressed book sales, and stagnant deductions that make it difficult for smaller retailers to compete with Amazon. Higher list prices raise the price Amazon pays as well as the price by its rival booksellers (like Plaintiff or Barnes & Noble). The increased wholesale price paid by all booksellers results in higher retail prices paid by consumers and lower total market output of books. The reduction in total book market output, however, does not harm Amazon. As list prices rise, book consumers look more aggressively for comparatively lower retail book prices and switch to Amazon, which due to its discriminatory discounts to list can sell at significantly lower prices that its rival book sellers. Thus, as the list price rises, cross-elasticity of demand (*i.e.*, customers switching to Amazon from competing booksellers to obtain comparatively lower price) causes Amazon sales volume to go up or at

---

[77] *Id.*

[78] *Id.*

[79] Mitchell & LaVecchia.

[80] *Id.*

least stay the same. Competing booksellers, however, suffer a loss of sales volume due to 1)
market elasticity of demand (*i.e.*, total book market output going down as market list price goes
up) and 2) due to consumers switching to Amazon as market list price goes up (*i.e.*, cross-
elasticity of demand). In other words, the full amount of the lost sales volume and market output
of books is born by Amazon's rivals. For Amazon, the beneficial effects of cross-elasticity of
demand outweigh the impact of market elasticity of demand and its sales volume stays the same
or goes up and its market share goes up as consumers switch to Amazon from rivals. The impact
on the market, however, is that list price is higher and total output lower than it otherwise would
be.

54.     And in turn, booksellers use list price as the basis for pricing their books. The full
list price of trade books is the price at which a substantial number of sellers sell trade books,
including in some cases the Big Five through their direct online sales.  In fact, when selling the
Big Five's print trade books, Amazon commonly lists both its own sales price and the publisher's
list price as the crossed out price, as illustrated by the following current displays for books sold
by Amazon:



Spy School at Sea
Book 9 of 9: Spy School   |   by Stuart Gibbs   |   Aug 31, 2021

**Hardcover**                                    Ages: 8 - 12 years
$15⁹⁹ $17.99
Pre-order Price Guarantee.

✓**prime** Get it as soon as **Tue, Aug 31**
FREE Shipping on orders over $25 shipped
by Amazon
This title will be released on August 31,
2021.



Defendants know that higher list prices means higher consumer prices. To comply with Amazon's mandatory reference pricing policies, the list price supplied by the Big Five must be the "price at which [the seller] or other retailers or sellers have recently made substantial sales of the product in question."

55.     And indeed, Plaintiff currently sells the above examples at their list prices:

## Search results

Spy School at Sea (Hardcover)



By Stuart Gibbs

**$17.99**

ISBN-13: 9781534479432

Availability: Coming Soon - Available for Pre-Order Now

Published: Simon & Schuster Books for Young Readers, August 31st, 2021

- 30 -

Our Time Is Now: Power, Purpose, and the Fight for a Fair America (Paperback)

By Stacey Abrams



$18.00

ISBN-13: 9781250798466

Availability: On Our Shelves Now

Published: Picador, June 8th, 2021

56.    Defendants' anticompetitive conduct has depressed book sales in the U.S. market. In August 2019, publisher net revenue for trade books, including sales to bookstores, wholesalers, direct to consumer, and online retailers, etc., was down 3.6% as compared to the same period to the previous year.[81] Paperback and mass market books decreased by 7.9% and hardback books also decreased by 0.8%.[82] In a more competitive market, where book distribution would be greater dispersed through more sellers, sales would increase.

57.    Defendants' discriminatory pricing scheme locks in Amazon's dominance as a retailer of print trade books and prevents fair competition from other booksellers. The harm Defendants cause to competition and consumer choices is precisely what federal antitrust laws are intended to address.

---

[81] Association of American Publishers Release August 2019 StatShot Report, https://publishers.org/news/association-of-american-publishers-release-august-2019-statshot-report/.

[82] *Id.*

## VI.   INTERSTATE TRADE AND COMMERCE

58.   Amazon's activities as alleged in this complaint were within the flow of, and substantially affected, interstate commerce. Amazon sells books across, and without regard to, state lines.

## VII.   DEFENDANTS' MARKET POWER IN THE RELEVANT MARKET

59.   The relevant markets for purposes of this action are the retail market for print trade books in the United States and the online submarket for such sales. Defendants have market power in these markets.

### A.   The market for print trade books is the relevant product market.

#### 1.   Trade books are not interchangeable with other books.

60.   Trade books represent a distinct product market from non-trade books, such as reference and academic books.[83] They also represent a distinct product market from self-published books. Whereas a self-published author fronts all costs and is responsible for the content and marketing, trade publishers receive the rights to sell an author's book in exchange for covering all aspects of editing, publication, marketing, and distribution.[84] Trade publishers are highly selective. They do not read 95% of the manuscripts they receive and publish only about 1% of the manuscripts they do review.[85] The selection, editing, and promotional process is an expensive undertaking, and trade books represent the publisher's considerable investment in that process.

---

[83] *Apple*, 952 F. Supp. 2d at 648 n.4.

[84] Leigh Shine, *Calculating the Odds of Getting a Traditional Publisher*, Medium (Dec. 22, 2016), https://medium.com/publishizer/calculating-the-odds-of-getting-a-traditional-publisher-798b1c7b94b0.

[85] Odds Of Being Published - Fiction Writer's Mentor, http://www.fiction-writers-mentor.com/odds-of-being-published.

2.      **Print books are not reasonably interchangeable with eBooks or audio books.**

61.     Within the trade book market, there is also a distinct product market for the retail sale of print trade books that is separate from retail distribution of trade eBooks and trade audio books.[86]

62.     Products' functional interchangeability typically depend on the products' physical characteristics.[87] Courts and economists typically define the boundaries of a market by reference to products' functional substitutability, and products' physical characteristics often determine their functional substitutability.[88] Printed books are physical objects that can be read without any special devices. In comparison, eBooks are digital products that require a special device, such as Amazon's Kindle or Barnes & Noble's Nook, to read them. Printed books also different from audio books, which may be physical or digital but are made for listening, not reading. These distinguishing characteristics affect the substitutability of print books and audiobooks in the supply or demand for eBooks.[89]

63.     From both a demand side and a supply side analysis, trade eBooks and trade audiobooks are also not sufficiently strong substitutes to warrant their inclusion in the product market of which trade print books form a part.[90]

64.     The DG Comp found that, as regards demand-side substitutability, consumers are unlikely to switch from eBooks to print versions in case of a 5-10% increase in the retail price of

---

[86] *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 694 n.60 (S.D.N.Y. 2013) (defining the relevant market as trade eBooks in the United States); 5.4.2017 DG Comp. Decision at 14.

[87] 2 Federal Antitrust Law § 10.2 (2020).

[88] Philip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 562 (5th Ed.).

[89] 5.4.2017 DG Comp. Decision at 14.

[90] *Id.*

eBooks because overall, even with a 5-10% increase of their retail price, eBooks would generally be priced significantly lower than print books.[91] Consumer preferences also play an important role in distinguishing the two formats. For example, the DG Comp's investigation of the eBooks market showed that important consumer considerations determine whether the consumers will purchase an eBook instead of a print version of a book.[92]

65.     To find significant supply-side substitutability, print book retailers and eBook retailers would have to be able to enter each other's markets quickly and easily. The DG Comp found that this was not the case. The distribution of print books entails important investments in the distribution, warehousing and logistics, whereas eBooks distribution requires mainly set-up and maintenance of an online distribution platform, which is a very different type of investment.[93] A traditional print bookstore cannot switch from selling print books to eBooks without acquiring significant tangible and intangible assets, incurring additional investments and making strategic decisions with the immediacy required to allow for a finding of significant supply-side substitutability, and the same holds true for an eBook retailer switching to print sales.[94]

66.     The DG Comp found that audio books are distinct from both print books and eBooks, notably in terms of (i) pricing at wholesale and retail level and (ii) their typical end consumer and mode of consumption.[95] Because print books and audio books are not reasonable substitutes, the retail eBook market is a distinct market.

---

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *Id.*

**3.      The online market for sale of print trade books is a well-defined submarket, representing a distinct group of competitors that do not overlap significantly with brick-and-mortar booksellers.**

67.      Courts, government agencies, economists, customers and retailers alike recognize the retail ecommerce market as a distinct market within the U.S. retail market. Industry recognition of a distinct ecommerce retail market is relevant because economic actors usually have accurate perceptions of economic realities and the parties active in the market understand its function and demarcation.

68.      Courts recognize that product availability alone does not determine the relevant product market, for example, "fact that a customer might buy a stick of gum at a supermarket or at a convenience store does not mean there is no definable groceries market."[96] A core group of particularly dedicated, "distinct customers," paying "distinct prices," may constitute a recognizable submarket.[97] A core group of customers may define the relevant submarket because their particular circumstances dictate that a product is the only realistic choice, or because they find a particular product uniquely attractive, *e.g.*, core customers dedicated to office supply superstores due to their unique combination of size, selection, depth, and breadth of inventory.[98] The ecommerce market provides the only realistic choice for consumers who cannot easily shop in physical stores, such as the disabled and elderly people, people without reliable transportation, people who live in remote areas where few physical stores are located, and people who purchase goods that are only available on the internet (*i.e.*, where the vast online inventories are no match for physical stores in their area). Many physical bookstores lack the actual or potential ability to deprive online stores of significant levels of business because brick and mortar stores typically

---

[96] *FTC v. Whole Foods Market*, 548 F.3d 1028, 1040 (2008).

[97] *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

[98] *Whole Foods Market*, 548 F.3d at 1037.

serve customers within the immediate geographic area, while an online store typically operates over a broad region, nationally, or internationally.[99]

69.     Other consumers find online book shopping uniquely attractive because of the convenience, broad selection, and price, or because they hate shopping in-person. Local bookstores do not serve as reasonable substitutes for dedicated online shoppers because physical stores do not have the same type of electronic ordering efficiency and capability as an online store.[100] Typically, with a few clicks or a simple voice command, an ecommerce retailer will send the product directly to the consumers without any interaction with sales staff. Consumers can shop online 24/7 and locate hard-to-find items more easily than they could by searching physical stores.[101] And as Amazon itself recognized early on, rarely can brick and mortar bookstores compete with the extensive inventory that an online bookseller can provide.[102] Online retail provides greater convenience to consumers who can order products from any location without having to find a brick-and-mortar store selling the specific product with the specific desired attributes and the desired quantity.[103] Demand side preferences also make online retailing unique in terms of certain factors such as convenience and price.[104] Online shoppers can also

---

[99] *Distance Learning Co. v. Maynard*, 2020 U.S. Dist. LEXIS 99256, at *20 (N.D. Cal. June 4, 2020).

[100] *Origami Owl LLC v. Mayo*, No. CV-15-00110-PHX-DGC, 2015 U.S. Dist. LEXIS 103755, at *8 (D. Ariz. Aug. 7, 2015).

[101] Susan Ward, *Brick and Mortar Stores vs Online Retail Sites*, Jun. 25, 2019, https://www.thebalancesmb.com/compare-brick-and-mortar-stores-vs-online-retail-sites-4571050; https://www.commerce.gov/news/fact-sheets/2017/07/new-insights-retail-e-commerce.

[102] George Packer, *Cheap Words*, New Yorker (Feb.17 & 24, 2014), https://www.newyorker.com/magazine/2014/02/17/cheap-words; *Thompson v. 1-800 Contacts, Inc.*, 2018 U.S. Dist. LEXIS 83806, at *21-23 (D. Utah May 17, 2018).

[103] *Thompson*, 2018 U.S. Dist. LEXIS 83806, at *21-23.

[104] Tracey Wallace, The 2018 Omni-Channel Retail Report: Generational Consumer Shopping Behavior Comes Into Focus, https://www.bigcommerce.co.uk/blog/omni-channel-retail/#developing-your-omni-channel-strategy; *see also* (examining the role of several consumers' cognitive and psychographic traits in their perception of retailers' deceptive practices (perceived deception) and the different effects on perceived deception associated with online vis-

- 36 -

more easily put off purchases decisions until they are ready to buy because they have not

invested in travel time and do not face the pressure from the salespeople that shoppers in brick

and mortar stores experience.[105]

70.     The manner of distribution also supports a separate market.[106] "In the cases where

the court has identified the method of sale as a peculiar characteristic of the market, that method

of sale has been integral to the business of the defendant itself."[107] Here, too, the distinct

"product" that online bookstores provide is the presentation and delivery of books, which

features, as alleged here, 24/7 access, easy search functions (often assisted by consumer data

gathered online), vast inventory, quick checkout, and products that will be delivered in due

course as opposed to immediately surrendered to the customer. These features are wholly

distinguishable from physical stores, which typically are not open 24/7, rely on the layout of the

store and the store personnel to help customers locate products, and rely on personnel to process

customers' payment, requiring travel to the stores and wait times to be served.

71.     The Stigler Committee on Digital Platforms reports: "Traditional brick-and-

mortar stores and online platforms differ greatly in their advertising and personalization

capabilities."[108] Online retailers "almost always require account creation for purchasing, verify

this information for each transaction, and have direct or easy access to detailed non-shopping

---

à-vis in-store shopping, indicating that they need to be considered as distinct experiences for the
customer).

[105] *Id.*; *see also* Rose Leadem, *67 Fascinating Facts About Ecommerce vs. Brick and Mortar
(Infographic)*, Dec. 30, 2017, https://www.entrepreneur.com/article/306678.

[106] *PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 254-55 (S.D.N.Y. 2000), *aff'd*, 315
F.3d 101 (2d Cir. 2002). *See, e.g., Henry v. Chloride*, 809 F.2d 1334, 1342 (8th Cir. 1987)
(batteries sold by traveling salespersons present a distinct submarket from batteries sold from
warehouses or stores).

[107] *Id.*

[108] Stigler Committee on Digital Platforms (Sep. 16, 2019),
https://research.chicagobooth.edu/-/media/research/stigler/pdfs/digital-platforms---committee-
report---stigler-center.pdf, at 45.

information about their customers."[109] This account creates a digital identity, which incorporates select data on age, sex, address, email address, preferences, and, potentially more information.[110] FTC Chair, Lina M. Khan, adds: "The degree to which a firm can tailor and personalize an online shopping experience is different in kind from the methods available to a brick-and-mortar store – precisely because the type of behavior that online firms can track is far more detailed and nuanced."[111]

72.     Supple side preferences also make online retailing unique. "Despite the relative inefficiency of delivering goods directly to the home," ecommerce leads to unique cost savings because "supplying direct to the consumer is less expensive than doing so through a store."[112] Ecommerce retail businesses can avoid the costs "of handling within the store (unpacking, stocking and maintaining shelves, and such), theft (which can easily account for 3 percent of the sales of a retailer), rent (low-cost distribution centers replace expensive urban or suburban real estate), and selling costs (automated and tele-sales replace relatively expensive in-store salespeople)."[113] The physical location of the business operating within ecommerce becomes less relevant because the ecommerce market "facilitates production and distribution across borders ... and can assist in opening markets that were previously closed."[114]

---

[109] Stigler Committee on Digital Platforms at 45.

[110] *Id.* at 54.

[111] Lina M. Khan, *Amazon's Antitrust Paradox*, 126 Yale L.J. 710, 764 (2017).

[112] Severin Borenstein and Garth Saloner, *Economics and Electronic Commerce*, JOURNAL OF ECONOMIC PERSPECTIVES, Vol. 15, No.1 (Winter 2001) at 5, https://www.gsb.stanford.edu/sites/gsb/files/publication-pdf/Economics%20and%20Electronic%20Commerce.pdf; *see also* David VanHoose, ECOMMERCE ECONOMICS (Routledge 2nd Ed. 2011); http://cw.routledge.com/textbooks/vanhoose/.

[113] *Id.* at 5-6.

[114] Andrew D. Mitchel, *Towards Compatibility: The Future of Electronic Commerce within the Global Trading System*, J Int Economic Law (2001) 4 (4): 683.

- 38 -

**B.** **The relevant geographic markets are the United States and the local and regional markets in which Amazon competes with Class members.**

73.     The relevant geographic markets are the United States, where Amazon competes with Plaintiff and other members nationally in the online sales of print trade books, and in the local and regional markets where Amazon's online sales compete with Plaintiff and the Class members' physical stores in the sale of print trade books.

74.     The Big Five sell their trade books throughout the United States.

75.     Book retailers located outside of the Unites States are unable to constrain book pricing in the United States.

**C.** **The Big Five dominate the production and sale at wholesale of print trade books in the U.S. market.**

76.     A pattern of consolidation has dominated the publishing industry. Between November 1985 and November 1986 alone, there were fifty-seven major publishing acquisitions.[115] By 2006, the six largest U.S. trade book publishers (the current Big Five) accounted for ninety percent of total sales.[116] In 2013, Penguin merged with Random House, producing a combined group that now controls approximately twenty-five percent of the English-language publishing market.[117] Simon and Schuster was founded in 1924, and it has been variously owned by Marshall Field, Gulf + Western, Viacom, and CBS Corporation.[118]

---

[115] *Supra* Lee.

[116] *Id.*

[117] *Id.*; *supra* Alter & Lee.

[118] *Id.*; Alexandra Alter and Edmund Lee, *Penguin Random House to Buy Simon & Schuster*, NYT (Nov. 25, 2020), https://www.nytimes.com/2020/11/25/books/simon-schuster-penguin-random-house.html.

77.     Together, the Big Five publish many of the biggest names in fiction and non-fiction, including the vast majority of the New York Times bestsellers.[119] They represent about 80% of the sales of trade books. Their dominance can be attributed to a long history of mergers and acquisitions that has led to five giant publishing houses, consisting of vast numbers of subsidiary publishers or "imprints. Smaller trade publishers continue to lose business and are unable to compete with the Big Five. For example, Houghton Mifflin Harcourt recently announced that it was exploring a sale of its trade publishing division, potentially with Macmillan or Hachette.[120] The Big Five Defendants' sales account for about 80% of the trade publications in the United States.

78.     On November 25, 2020, Penguin announced plans to acquire Simon & Schuster; the proposed merger would create a single publishing house with approximately a third of all trade books published.[121] News Corp Chief Executive Robert Thomson said in a statement. "This literary leviathan would have 70% of the U.S. literary and general fiction market."[122]

**D.      Amazon dominates the retail market for print books.**

79.     A market share as large as Amazon's create an inference of market power. Its market power is durable because barriers to entry make entry by new competitors difficult. Further, effective entry into or expansion in the print trade book market would require competing

---

[119] *Apple*, 791 F.3d at 298.

[120] *Supra* Alter & Lee.

[121] AG Statement on Proposed Sale of Simon & Schuster and Its Ramifications for Authors, The Authors Guild, https://www.authorsguild.org/industry-advocacy/ag-statement-on-proposed-sale-of-simon-schuster-and-its-ramifications-for-authors/; Frank Jordans and Hillel Italie, *Penguin to buy Simon & Schuster, create publishing giant*, Associated Press (Nov. 25, 2020, https://apnews.com/article/stephen-king-publishing-john-irving-media-jonathan-karp-89ec475bd7783fea199a378c60261f8b.

[122] Jordans & Italie.

booksellers to be able to differentiate themselves by offering lower prices. As the allegations in this complaint make clear, Defendants' discriminatory pricing agreements make such competition impossible.

80.     Amazon dominates the submarket for the online sales of print trade books, where it accounts for around 90% of all sales.

## VIII.   CLASS ACTION ALLEGATIONS

81.     Plaintiff brings this action on behalf of itself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and injunctive relief against Defendants pursuant to federal antitrust law on behalf of the members of the following Bookseller and Online Bookseller Classes:

> All retail booksellers, which, on or after March 25, 2017, purchased print books at wholesale directly from the Big Five Publishers.

> All online retail booksellers, which, on or after March 25, 2017, purchased print books at wholesale directly from the Big Five Publishers.

82.     Excluded from the proposed Classes are the Defendants and their officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities.

83.     **Numerosity:** Members of the proposed Classes are so numerous that joinder is impracticable.  Plaintiff believes that there are several hundreds of members of the proposed Classes geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

84.    **Typicality:** Plaintiff's claims are typical of the claims of the other members of the proposed Classes. The factual and legal bases of Defendants' liability are the same and resulted in injury to Plaintiff and all other members of the proposed Classes.

85.    **Adequate representation:** Plaintiff will represent and protect the interests of the proposed Classes both fairly and adequately. Plaintiff has retained counsel competent and experienced in complex class-action litigation. Plaintiff has no interests that are antagonistic to those of the proposed Classes, and their interests do not conflict with the interests of the proposed Class members they seek to represent.

86.    **Commonality:** Questions of law and fact common to the members of the proposed Classes predominate over questions that may affect only individual members of the Classes because Defendants have acted on grounds generally applicable to the Classes and because Class members share a common injury. Thus, determining damages with respect to the proposed Classes as a whole is appropriate. The common applicability of the relevant facts to claims of Plaintiff and the proposed Classes are inherent in Defendants' wrongful conduct, because the overcharge injuries incurred by Plaintiff and each member of the proposed Classes arose from the same anticompetitive conduct alleged herein.

87.    There are common questions of law and fact specific to the Classes that predominate over any questions affecting individual members, including:

    i.    Whether Defendants' discriminatory pricing violated the Robinson-Patman Act;

    ii.   Whether Defendants unlawfully contracted, combined, or conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act by agreeing to provide the same discriminatory pricing to Amazon and whether that agreement prevents bookseller rivals from competing on price and allows Defendants to increase the market price of print trade books;

- 42 -

iii.  Whether Amazon has unlawfully monopolized the U.S. online retail market for the sale of print trade books, including by way of the contractual terms, policies, practices, mandates, and restraints described herein;

iv.  Whether Defendants conspired to confer upon Amazon a monopoly in the U.S. online retail market for the sale of print trade books, including by way of the contractual terms, policies, practices, mandates, and restraints described herein;

v.  Whether competition in the U.S. online retail market for the sale of print books has been restrained and harmed by Amazon's monopolization of this market;

vi.  Whether Plaintiff and members of the proposed Classes have been damaged by Defendants' conduct;

vii.  The amount of any damages; and

viii.  The nature and scope of injunctive relief necessary to restore a competitive market.

88.  **Prevention of inconsistent or varying adjudications:** If prosecution of a myriad of individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for the Defendants. Certification of Plaintiff's proposed Classes would prevent these undesirable outcomes.

89.  **Injunctive relief:** By way of its conduct described in this complaint, Defendants have acted on grounds that apply generally to the proposed Classes. Accordingly, final injunctive relief is appropriate respecting the Classes as a whole.

90.  **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed Classes could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer

- 43 -

management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## IX.    ANTITRUST INJURY

91.    Defendants, through their unlawful conduct alleged herein, cause Plaintiff and members of the proposed Classes to pay higher wholesale prices for print trade books than they would have paid or would pay in the future in the absence of Defendants' unlawful acts. Further, Defendants' unlawful conduct harms consumers by raising retail prices and driving Amazon's bookseller competitors out of business. Plaintiff and members of the proposed Bookseller and Online Bookseller Classes have sustained, and continue to sustain, significant losses from overcharges directly caused by Defendants' anticompetitive activity. The full amount of such overcharge damages will be calculated after discovery and upon proof at trial. Unless Defendants' anticompetitive conduct is stopped, Plaintiff and members of the proposed Classes will incur future overcharges in their purchase of print trade books.

## X.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF 15 U.S.C. § 13

92.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

93.    Plaintiff brings this claim on behalf of itself and on behalf of each member of both proposed Classes described above. Plaintiff seeks damages and injunctive relief.

94.    **Two or more contemporaneous sales by the same seller to the plaintiff and a competing buyer**: Plaintiff has purchased numerous books, often repeatedly,  from each of the Big Five at her standard discount price of up to 46%, including:

- 44 -

| Publisher | Title | Format | List price | Date |
|-----------|-------|--------|-----------|------|
| Penguin | *Becoming* | hardback | $32.50 | Nov. 29, 2018 |
| Penguin | *Crazy Rich Asians* | paperback | $16.00 | May 4, 2018 |
| Macmillan | *A Higher Loyalty* | hardback | $29.99 | Mar. 22, 2018 |
| Macmillan | *Fire and Fury* | hardback | $30.00 | Jan. 12, 2018 |
| Simon & Schuster | *Fear* | hardback | $30.00 | Sep. 14, 2018 |
| Simon & Schuster | *Milk and Honey* | paperback | $14.99 | Sep. 24, 2018 |
| Hachette | *Lethal White* | hardback | $29.00 | Oct. 11, 2018 |
| Hachette | *Russian Roulette* | hardback | $30.00 | Mar. 22, 2018 |
| HarperCollins | *Sapiens* | paperback | $24.99 | Feb. 24, 2018 |
| HarperCollins | *The Woman in the Window* | hardback | $26.99 | Jun. 26, 2018 |

Amazon competed concurrently with Plaintiff and Class members in the retail sales of these and many other Big Five books, from which Plaintiff reasonably infers that wholesale purchases of these books by Amazon from the Big Five were reasonably contemporaneous with wholesale purchases of the same books from the Big Five by Plaintiff and Class members.

95. **At different prices**: Each Big Five Defendant engaged in contemporaneous sales of the same books to Amazon, Plaintiff and members of the Proposed Classes at different prices. Amazon received a higher discount and ███████████████████████ from the Big Five that were not equally available to Plaintiff and Class members.

96. **Of commodities of like grade and quality**: Each Big Five Defendant sells its own commodities of like grade and quality (like hardback copies of the same title). Each Big Five Defendant has sold and continues to sell such commodities to Amazon at a lower price than it sells to Plaintiff and members of the proposed Classes. The books the Big Five contemporaneously sold at different prices are the same titles in the same format (like hardback) and therefore are commodities of like grade and quality.

97. **Where at least one of the sales was made in interstate commerce**: Each of the Big Five operates nationally and each sold their books to Plaintiff, Amazon, and Class members

without regard to state lines. These sales have occurred and continue to occur therefore in interstate commerce.

98.     **The price discrimination had the requisite effect upon competition generally**: An injury to competition may be inferred from the fact that Plaintiff and Class members had to pay the Big Five substantially more for their goods over time than their competitor, Amazon, had to pay.[123]

99.     **The competing buyer knew the price discrimination was unlawful**: Amazon knew that it received a higher discount and ████████████████████ from the Big Five that were not equally available to Plaintiff and Class members, as evidenced by its demand from the Big Five ████████████████. That Amazon knowingly received the benefit of the Big Five's price discrimination is also supported by Defendants' ████████████████████████████████████ ████████████████

100.     **The price discrimination caused injury to the plaintiff**: Plaintiff and Class members lost sales to price-sensitive consumers as a direct result of Defendants' discriminatory pricing.

101.     **The Functional Discount Defense is unavailable**: The significant difference between the discounts offered to Amazon versus Plaintiff and members of the proposed Classes exceeds any cost savings achieved by selling to Amazon. In fact, Amazo ████████████ ████████████ increase the cost of selling to Amazon as compared to other Booksellers.

---

[123] *Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 559 (1990) (explaining the *Morton Salt* inference).

102. For example, the Big Five contracts already



---

[124] Hachette, Amazon_Rev0000004, Sec. 4; HarperCollins, AMAZON_REV0000033, Sec. 2; Macmillan, AMAZON_REV0000065, Sec. 3; Penguin, AMAZON_REV0000094, Sec. 3; Simon & Schuster, AMAZON_REV0000142, Sec. 2.

[125] Macmillan, AMAZON_REV0000065, Sec. 5; Macmillan, AMAZON_REV0000160, Ex. A.

[126] Macmillan, AMAZON_REV0000185, Sec. 3.

[127] Simon & Schuster, AMAZON_REV0000131, Sec. 3.

[128] AMAZON_REV0000131, Sec. 2 (Simon & Schuster).

[129] Hachette, AMAZON_REV0000004, Sec. 5; HarperCollins, AMAZON_REV0000042, Sec. 7; Simon & Schuster, AMAZON_REV0000142, Sec. 4 and Ex. 1.

[130] Simon & Schuster, AMAZON_REV0000142, Sec. 4.

[131] Hachette, AMAZON_REV0000004, Sec. 5; HarperCollins, AMAZON_REV0000042, Sec. 7; Simon & Schuster, AMAZON_REV0000142, Ex. 1.

[132] Hachette, AMAZON_REV0000004, Sec. 8; Macmillan, AMAZON_REV0000065, Sec. 4; Penguin, AMAZON_REV0000094, Sec. 8.

010888-13/1572953 V1

■■■■[4] These provisions, which the Big Five do not offer to Plaintiff and Class members on a comparable proportional basis, does not satisfy "cost efficient defense" under the Robinson Patman Act and also violate Sections 2(d) and 2(e)'s prohibition against discriminatory provision of promotional and advertising allowances.[135]

103.    Likewise, the value of any distributional or marketing services Amazon provides that the Big Five would otherwise undertake themselves and/or Amazon is separately compensated for these services, the Big Five's discriminatory pricing does not fall within the "functional discount" exceptions to the Robinson-Patman Act. Functional discounts are permissible price differences only "to the extent that a buyer actually performs certain functions, assuming all the risk, investment, and costs involved[.]"[136] If a seller separately compensates the buyer for a service, that service does not qualify as a basis for a functional discount.[137]

104.    **Meeting the Competition Defense is unavailable**: The Big Five Defendants may not rely on the "meeting competition" defense to justify their inter-firm agreement to provide Amazon with the same discriminatory discounts. The Robinson-Patman Act applies only to "commodities of like grade and quality."[138] Where "there are substantial physical differences in products affecting consumer use, preference or marketability, such products are not of 'like

---

[133] Hachette, AMAZON_REV0000001, Sec. D; HarperCollins, AMAZON_REV0000033, Sec. 6; Macmillan, AMAZON_REV0000160, Sec. 1 & 2; Penguin, AMAZON_REV0000189, Sec. 1 & 2 & Appendix B.

[134] HarperCollins, AMAZON_REV0000033, Sec. 3.

[135] 15 U.S.C. §§ 13(d) & 13(e).

[136] *Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 561-62 (1990).

[137] *Id.* at 562.

[138] 15 U.S.C. § 13(a)

grade and quality' regardless of manufacturing costs."[139] Physically, *i.e.*, in terms of the written content and appearance, each work the Big Five publishes is completely distinct from another and from any work that its competitor publishes. Consumer demand and preference for different titles and different authors is not the same. Because different book titles are not commodities of like grade and quality, competition in the sale of different titles does not fall within the meeting the competition exception of the Robinson-Patman Act. Moreover, even if the goods were of the same like "grade and quality," the pricing could not qualify as a "good faith" meeting of competition, as required by the Robinson-Patman Act. On the contrary, because the Big Five Defendants jointly agreed to the discriminatory discounts, and ███████████████████ ██████████████████████████████████████████████████████████ ███████████████ .

## SECOND CAUSE OF ACTION
## VIOLATION OF 15 U.S.C. § 1

105.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

106.    Plaintiff brings this claim on behalf of itself and on behalf of each member of both proposed Classes described above. Plaintiff seeks damages and injunctive relief.

107.    Defendants, by and through their officers, directors, employees, agents and other representatives, have entered into an unlawful agreement, combination and conspiracy in restraint of trade. Through price discrimination agreements, Defendants ensure that no rival bookseller can compete with Amazon on the price of print trade books.

---

[139] *Checker Motors Corp. v. Chrysler Corp.*, 283 F. Supp. 876 (S.D.N.Y. 1968), *aff'd*, 405 F.2d 319 (2d Cir.), *cert. denied*, 394 U.S. 999 (1969); *accord Reeder-Simco GMC, Inc. v. Volvo GM Heavy Truck Corp.*, 374 F.3d 701, 710 (8th Cir. 2004), *rev'd on other grounds*, 546 U.S. 164 (2006).

108.     Defendants are liable for the creation, maintenance, and enforcement of the anticompetitive restraints regardless whether a *per se*, "quick look," or rule of reason standard applies.

109.     ***Per se***: All Defendants are publishers of print trade books. Amazon is a vertically integrated company that is active upstream as a print trade book publisher and downstream as a print trade book retailer. Defendants' agreement is a *per se* violation because it was formed for the purpose and with the effect of controlling wholesale prices for print trade books even if Defendants did not explicitly agree on the prices to be charged.

110.     Defendants share a common motive to collude. As print trade book publishers, each Defendant has a motive to control wholesale prices. Defendant Amazon also has a motive to dominate over its retail competitors, which it achieves by obtaining a substantially lower wholesale price and more favorable contractual terms than its rivals, thereby ensuring that they cannot compete with Amazon on price.

111.     Defendants did not act unilaterally or independently, or in their own economic interests, when entering into these anticompetitive agreements, which substantially, unreasonably, and unduly restrain trade in the relevant market, and thereby harmed Plaintiff and the proposed Classes. All Defendants have an interest in generating sales in the print trade book market, yet supracompetitive wholesale prices for the Big Five's books and a consolidation of power in the hands of a single bookseller have led to higher consumer prices and depressed sales in this market. Publicly, the Big Five Defendants are diametrically opposed to Amazon's consolidation of market power and their dependence on Amazon as their principle distributer of their books. But by agreeing to discriminatory pricing, the Big Five actively increased Amazon's market power.

112.    Defendants had opportunities to collude. For example, when they raised trade eBook prices marketwide, the Big Five colluded with each other and with Apple as they entered into substantially identical eBook distribution agreements in 2010 and 2011. And in 2014 and 2015, as each of the Big Five Defendants entered into new negotiations with Amazon regarding the distribution of their trade books, Defendants publicly signaled that Amazon had offered the same terms to each of the Big Five and that each of the Big Five had accepted those terms.

113.    Authorities in the United States and Europe have launched multiple investigations into Defendants' conduct in book sales. Here in the United States, the House Antitrust Commission found that Amazon had anticompetitive provisions in both the sale of print and eBooks, which harm consumers and competition in the retail sale of books.

114.    Plaintiff also alleges a hub-and-spoke conspiracy supporting a horizontal price fixing agreement. Defendant Amazon is the dominant retail bookseller, through which the Big Five sell their print trade books. Like Apple before it, Amazon serves as the central, common contractual party (*i.e.*, the hub) through which the Defendants carried out their common scheme to control wholesale trade book prices and ensure that Amazon's retail competitors could not compete with Amazon on price.

115.    Defendant Amazon participated in and facilitated the horizontal agreement among the Big Five Defendants by coordinating a series of substantially identical agreements with the same anticompetitive terms and making clear to each of the Big Five Defendants that it was offering each of them the same deal.

116.    For purposes of Plaintiff's allegations of a *per se* violation, it is not necessary to prove a relevant market or adverse effects in such market.

010888-13/1572953 V1

117.    **Quick look/rule of reason**: To the extent Defendants' conduct is determined to be a vertical price restraint and the conduct at issue is not a *per se* violation, the relevant product market is the retail market for the sale of print trade books or alternatively the online submarket for the sale of print trade books. The relevant geographic market is the entire United States.

118.    Defendants possess market power within the relevant markets. The Big Five Defendants' sales account for about 80% of the trade publications in the United States. Amazon controls about 50% of the retail market for the sale of print books in the United States (inclusive of physical stores) and about 90% of the online submarket. That Defendants have market power in the relevant market is also evident from their power to raise wholesale prices above those that would be charged in a competitive market.

119.    Defendants' agreements have an open and obvious adverse effect on competition. An "injury to competition may be inferred" when "some purchasers had to pay their supplier substantially more for their goods than their competitors had to pay."[140] Discriminatory pricing gives Amazon an unfair advantage over its rival booksellers, which limits the number of meaningful choices consumers have to purchase print trade books at retail. And increased wholesale prices lead to higher consumer prices.

120.    Defendants' anticompetitive agreements have actual detrimental effects in the relevant market, *i.e.*, less competitive pricing and a concentration of market power in the hands of one retailer.

121.    An observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on the sale of print trade books in the relevant markets.

---

[140] *Hasbrouck*, 496 U.S. at 559 (quotation omitted).

122.    There is no legitimate, pro-competitive business justification for Defendants'
anticompetitive agreements or any justification that outweighs their harmful effect. Even if there
were some conceivable justification, the agreements are broader than necessary to achieve such a
purpose.

123.    **Injury:** Plaintiff and the members of the proposed Classes have been injured and
will continue to be injured in their businesses and property by paying higher wholesale prices
for the Big Five's print trade books than they would have paid or would pay in the future in the
absence of Defendants' unlawful acts. Plaintiff and members of the proposed Classes are entitled
to an injunction that terminates the ongoing violations alleged in this Complaint and to recover
three times the amount of their overcharge damages directly caused by Defendants' unreasonable
restraint of trade.

**THIRD CAUSE OF ACTION**
**VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION**
**(15 U.S.C. § 2)**

124.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

125.    Plaintiff bring this claim on its own behalf and on behalf of the proposed Online
Bookseller Class described above. Plaintiff seeks damages and injunctive relief.

126.    The relevant market is the U.S. the online retail market for the sale of print trade
books.

127.    Amazon possesses market power in the relevant market, where it controls about
90% of online sales of print books.

128.    Through its anticompetitive agreements with the Big Five, Amazon has willfully
acquired and maintained its monopoly power in the relevant market by unlawful and improper

010888-13/1572953 V1

means, including Defendants' discriminatory pricing agreements and agreement to control the

wholesale prices of print trade books.

129.    Plaintiff and members of the proposed Class have been injured and will continue

to be injured in their businesses and property by paying higher wholesale prices for print trade

books than they would have paid or would pay in the future in the absence of Defendants'

unlawful acts.

130.    Plaintiff and members of the proposed Class are entitled to an injunction that

terminates the ongoing violations alleged in this Complaint.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF THE SHERMAN ACT – CONSPIRACY TO MONOPOLIZE**
**(15 U.S.C. § 2)**

131.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

132.    Plaintiff bring this claim on its own behalf and on behalf of the proposed Online

Bookseller Class described above. Plaintiff seeks damages and injunctive relief.

133.    The relevant market is the U.S. the online retail market for the sale of print trade

books.

134.    Defendants possess market power in the relevant market. As the dominant online

retail platform, Amazon controls about 90% of all online print book sales. The Big Five's trade

books account for about 80% of all trade book sales in the United States. That Defendants have

market power is also evident from their power to raise wholesale prices above that which would

be charged in a competitive market. Notably, in the analogous *Apple* case, which addressed a

similar market and collusive conduct, the court found that the Big Five and Apple had the power

to raise eBook prices above a competitive level even though Apple was a new entrant to the

eBook market and never achieved Amazon's market dominance.

- 54 -

135.     Defendants demonstrated a specific intent to confer monopoly power upon Amazon by agreeing to immunize it from competition from any other online booksellers. Defendants acted in concert and took steps in furtherance of their conspiracy by executing and adhering to contracts with discriminatory pricing. The purpose and effect of these agreements is to ensure that Defendants control trade wholesale prices for print trade books and that Amazon faces no competition from other online booksellers.

136.     Through Defendants' conspiracy, Amazon has acquired and maintained its monopoly power in the relevant market as the dominant online retailer for print trade books by unlawful and improper means, including preventing Amazon's bookseller rivals from gaining market share and dissuading potential rivals from entering the market.

137.     Plaintiff and members of the Online Bookseller Class have been injured and will continue to be injured in their businesses and property by paying higher wholesale prices for print trade books than they would have paid or would pay in the future in the absence of Defendants' unlawful acts.

138.     Plaintiff and members of Online Bookseller Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint

## JURY TRIAL DEMANDED

139.     Plaintiff hereby demands a trial by jury of all the claims asserted in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.     The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as a

Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes, once certified;

B.      Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C.      Adjudication that the acts alleged herein constitute monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

D.      Judgment against Defendants for the damages sustained by Plaintiff and the proposed Classes, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages;

E.      Pre-judgment and post-judgment interest on such monetary relief;

F.      Equitable relief requiring that Defendants cease their abusive, unlawful, and anti-competitive practices described and requested herein;

G.      The costs of bringing this suit, including reasonable attorneys' fees; and

H.      All other relief to which Plaintiff and members of the proposed Classes may be entitled at law or in equity.

DATED: July 9, 2021                              Respectfully submitted,


                                                By /s/ Steve Berman
                                                     Steve W. Berman (*pro hac vice*)
                                                HAGENS BERMAN SOBOL SHAPIRO LLP
                                                Barbara A. Mahoney (*pro hac vice*)
                                                1301 Second Avenue, Suite 2000
                                                Seattle, WA 98101
                                                Telephone: 206-623-7292
                                                Facsimile: 206-623-0594
                                                steve@hbsslaw.com
                                                barbaram@hbsslaw.com

- 56 -

SPERLING & SLATER, P.C.
55 W. Monroe Street, Suite 3200
Chicago, IL 60603
Eamon P. Kelly (*pro hac vice*)
Joseph M. Vanek (*pro hac vice*)
Paul E. Slater (*pro hac vice*)
Alberto Rodriguez (*pro hac vice*)
Jeffery Bergman (*pro hac vice*)
ekelly@sperling-law.com
jvanek@sperling-law.com
pes@sperling-law.com
arodriguez@sperling-law.com
jbergman@sperling-law.com

*Attorneys for Plaintiff and the Proposed Classes*

010888-13/1572953 V1