UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
BOOKENDS & BEGINNINGS LLC, on behalf
of itself and all others similarly situated,

                              Plaintiff,


                                                    **REPORT AND**
                                                    **RECOMMENDATION**

AMAZON.COM, INC.; HACHETTE BOOK            21-cv-02584 (GHW) (VF)
GROUP, INC., HARPERCOLLINS
PUBLISHERS L.L.C.; MACMILLAN
PUBLISHING GROUP, LLC; PENGUIN
RANDOM HOUSE LLC; SIMON &
SCHUSTER, INC.,

                              Defendants.
-------------------------------------------------------X


**VALERIE FIGUEREDO, United States Magistrate Judge**

**TO THE HONORABLE GREGORY H. WOODS, United States District Judge**

       Plaintiff Bookends & Beginnings LLC ("Bookends") brings this putative antitrust class-

action lawsuit against Defendants Amazon.com, Inc. ("Amazon"), and the five largest book

publishers in the United States—Hachette Book Group, Inc. ("Hachette"), HarperCollins

Publishers LLC ("HarperCollins"), Macmillan Publishing Group, LLC ("Macmillan"), Penguin

Random House LLC ("Penguin"), and Simon & Schuster, Inc. ("Simon & Schuster," and

collectively with the other publisher-defendants, the "Publishers"). Plaintiff asserts claims, on

behalf of itself and all other similarly situated retail and online booksellers (the putative class),

for (1) discriminatory pricing in violation of the Robinson-Patman Act, 15 U.S.C. § 13; (2)

1

unlawful restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1; (3)

monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, against only Amazon; and

(4) conspiracy to monopolize under Section 2 of the Sherman Act. Amazon and the Publishers

separately moved to dismiss the Amended Class Action Complaint ("CAC").[1] See ECF Nos. 75,

77. For the reasons that follow, I respectfully recommend that Defendants' motions to dismiss be

**GRANTED**.

## BACKGROUND

A. Factual Background[2]

Amazon is the largest retail bookseller in the sale of "print trade books," accounting for

"over half of all books purchased at retail in the United States, including about 90% of all print

books sold online."[3] See ECF No. 65 ("CAC") ¶¶ 2, 18, 31, 48, 80, 118, 134. Bookends is a

bookseller that sells print trade books online and at its brick-and-mortar store in Evanston,

Illinois. CAC ¶¶ 1, 30. The Publishers are the five largest publishers in the United States and

together account for about "80% of the trade books sold in the United States." Id. ¶¶ 1, 77.

Collectively, the Publishers are responsible for many of the biggest titles in fiction and non-

fiction, including the vast majority of New York Times Bestsellers. Id. ¶ 77.

---

[1] Amazon separately moved to strike the class allegations in the CAC. See ECF No. 79. The Publishers include an argument to strike the class allegations in their brief in support of their motion to dismiss. See ECF No. 76 (Publisher's Br.) at 23-25. Plaintiff filed a separate opposition to Amazon's motion to strike. See ECF No. 98. I will issue a separate report and recommendation addressing Defendants' motions to strike the class allegations.

[2] The factual allegations recounted herein are taken from the Amended Class Action Complaint and documents integral to it. Because the case is before the Court on Defendants' motion to dismiss, I accept the well-pled factual allegations of the complaint as true and draw all reasonable inferences in Plaintiff's favor. ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

[3] "Trade books" is a term of art referring to "general interest fiction and non-fiction books," distinguished from "non-trade books" like academic textbooks or reference materials. CAC ¶ 1.

This lawsuit concerns the sale of print trade books (hardbacks, paperbacks, and mass-produced). Id. ¶¶ 1 n.3, 60. The Publishers are "horizontal competitors" in the publication of print trade books and in the sale, at the wholesale level, of print trade books. Id. ¶ 7. The Publishers sell print books to retailers, like Plaintiff and Amazon, under a wholesale model—which is defined as a discount from the list price of a book. Id. ¶ 3. A publisher's "list price" is the suggested retail price for a book; it is the price at which "a substantial number of sellers sell trade books" to consumers. Id. ¶¶ 11, 54-55. The list price is also used to determine the wholesale price for a book. Id. ¶ 3. Higher list prices generally mean that booksellers, like Plaintiff, pay a higher wholesale price and consumers pay a higher "retail price[ ]." Id. ¶¶ 3, 53. Higher wholesale prices also lead to "lower total market output of books." Id. ¶ 53; see also id. ¶ 56. Plaintiff purchases books from the Publishers at Plaintiff's "standard discount price of up to 46%" off of the list price. Id. ¶ 94.

The CAC alleges that Defendants acted collectively to "control wholesale prices of print trade books" by "knowingly" entering into "the same price discrimination agreements with Amazon," the "dominant retailer" through which the Publishers "sell their trade books." Id. ¶¶ 7-8, 40. In 2014 and 2015, the Publishers executed "book distribution agreements" with Amazon, wherein the Publishers collectively agreed to sell their books to Amazon at prices that were "steep[ly]" discounted and below the standard discounts available to other booksellers, like Plaintiff. Id. ¶¶ 4, 40-41, 112. The "significant difference" between the discounts offered to Amazon and Plaintiff exceeded any cost savings achieved by the Publishers from selling to Amazon. Id. ¶ 101.

The agreement for ▮▮▮ Publisher, ▮▮▮▮▮▮▮▮▮▮, expressly stated that ▮▮▮ publisher would "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████—a provision known as a "meeting competition" clause. Id.

¶¶ 8-9, 99. Additionally, HarperCollins, Macmillan, and Penguin committed to sell to Amazon at

████████████████████████████; Macmillan, Penguin,

and Simon & Schuster ████████████████████████████

████████████████; and Hachette agreed to ████████████████████

████████████████ Id. ¶¶ 4, 9. Each Publisher understood that the monetary

and performance terms of its contract with Amazon reflected its competitors' terms and

conditioned their pricing "on agreement" by the other Publishers. Id. ¶ 8.[4] The insertion of the

meeting-competition clause in ████████████████████████

████████████████████████. Id. ¶ 6.

By "the very act of signing" the agreements with Amazon, each Publisher "signaled a

clear commitment to raise the prices of their print trade books, thereby facilitating collective

action." Id. ¶¶ 10, 112. Thus, after negotiating the distribution agreements with Amazon, the

Publishers raised the list prices of their print trade books. Id. ¶¶ 3, 11-14. Acting alone, none of

the Publishers could have raised the list price of trade print books or changed public perception

about the value of books. Id. ¶ 13. "By 2016—after a three-year period when list prices hovered

around $16—the average weighted list price" of the Publishers' bestsellers rose to $17, where it

has "largely remained." Id. ¶ 12; see also id. ¶ 14. The market-wide increase in the price of print

trade books is "a direct consequence" of the Publishers' collusion. Id. ¶ 13.

---

[4] Although ████████████ distribution agreement ████████████████████
████████████████, Amazon publicly confirmed at the time of the
contract's negotiation, that the agreement was the same contract recently signed by the other
Publishers. CAC ¶ 8. To support its allegations, the CAC includes references to specific
provisions in the agreements between each of the Publishers and Amazon. See, e.g., CAC ¶¶ 8-9
nn. 19-22.

The Publishers recognize that Amazon's "outsized position of power" in the book industry "endangers the distribution of their books and the long-term health of the publishing industry." Id. ¶ 15. Publicly, the Publishers are "diametrically opposed to Amazon's consolidation of market power and their dependence on Amazon as their principle distributor of their books." Id. ¶ 111. Acting individually, none of the Publishers would have had an incentive to enter into "restrictive agreements" with Amazon that consolidated power in Amazon and ceded substantial control over the distribution of their books. Id. ¶¶ 15-16, 39, 111. By knowingly entering into "uniform agreements" with Amazon, the Publishers "created an economic incentive to raise list prices, which was only attractive to the [Publishers] to the extent they acted collectively." Id. ¶¶ 10-12, 17, 38, 40-41, 53, 110.

For its part, Amazon participated and facilitated the "horizontal agreement" among the Publishers by "coordinating a series of substantially identical agreements with the same anticompetitive terms" and making clear to each Publisher that it was offering each of them the same terms. Id. ¶¶ 8, 115. Amazon "engineered and knowingly received the benefit" of the Publishers' "price discrimination," thereby willfully acquiring its monopoly power in the online, retail trade-book market. Id. ¶¶ 6, 18, 48-50, 80. By securing a "substantially lower wholesale price and more favorable contractual terms" than its rivals, Amazon "dominate[s] over its retail competitors" and "gain[s] market share," because regardless of the list price set by the Publishers, Amazon "faces no meaningful competition from any rival bookseller." Id. ¶¶ 4, 17, 38, 110.

The Publishers also pay Amazon ███████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████

███████████████████████████████████████████████████

Id. ¶¶ 5, 102. These additional discounts and charges "increase the cost of selling to Amazon as compared to other Booksellers." Id. ¶ 101.

The Publishers sell their books to Amazon at "higher discounts and other favorable price terms that are not available to Amazon's retail competitors in the sale of print trade books, like Plaintiff." Id. ¶¶ 3-5, 9. The "huge price concessions ██████████████████████ ████ ensure that Amazon has a significant competitive advantage" over other booksellers, like Plaintiff, by guaranteeing that another bookseller cannot "underprice" Amazon. Id. ¶¶ 4, 10, 110. Amazon knows that the discounts it receives are higher than the Publishers' "published standard discounts," and that the Publishers "do not ████████████ to other customers as they do to Amazon." Id. ¶¶ 6, 99.

The Publishers had "opportunities to collude," and have colluded in the past. Id. ¶ 112. From 2010 to 2012, the Publishers conspired with Apple to raise the prices of trade eBooks. Id. ¶¶ 40, 43, 112. That conduct led to an investigation by the European Commission's Directorate General for Competition, as well as to substantial sums of money paid in settlement fees by the Publishers as a result of consumer class actions and an action commenced by the United States against the Publishers and Apple. Id. ¶¶ 40, 43-45, 113.

Amazon has a "history" of using "anticompetitive agreements," and its "market dominance" gives it the "ability to promote or destroy a book in the national marketplace for any reason it chooses." Id. ¶¶ 46, 51. For example, "to extract more fees" from Hachette, during its negotiations of a distribution agreement, Amazon "suspended pre-orders and delayed the shipping times of thousands of Hachette books by weeks, and modified its search and recommendation algorithms to direct shoppers to other books." Id. ¶ 52.

Defendants' price discrimination has caused Plaintiff to "overpay for books," requiring it to pay "higher wholesale prices for print trade books" without any offsetting competitive benefit, such as exclusive sales. Id. ¶¶ 20, 42, 91. It has also resulted in higher retail prices paid by consumers and depressed book sales. Id. ¶¶ 12-14, 53, 56, 91, 119. The discriminatory pricing also lessens competition in the retail market for print trade books by allowing Amazon to draw significant sales or profits away from rival booksellers. Id. ¶¶ 17, 37. Moreover, "by minimizing competition from Amazon's rivals," the discriminatory pricing agreements also tend to create or maintain Amazon's monopoly share of the market for print trade books and the submarket for online sales of print trade books. Id. ¶ 17, 111.

B. Procedural Background

Plaintiff commenced this action on March 25, 2021. See ECF No. 1. ("Compl."). The initial complaint alleged that the wholesale prices for print trade books were artificially inflated by Most Favored Nation ("MFN") clauses in the agreements between the Publishers and Amazon, which prevented other booksellers, like Plaintiff, from negotiating for better wholesale prices and competing to gain market share. Compl. ¶¶ 2-4, 22-23, 26. The print distribution agreements between the Publishers and Amazon, however, did not contain an MFN clause; a fact Plaintiff discovered when Defendants made the agreements available to Plaintiff's counsel for review. See ECF No. 43 at 1; ECF No. 44 at 1-2 n.2.

On July 13, 2021, Plaintiff filed an amended class action complaint. See ECF No. 65 (CAC). The CAC asserts four causes of action: (1) a claim under the Robinson-Patman Act, 15 U.S.C. § 13, alleging that Defendants entered into discriminatory pricing agreements (CAC ¶¶ 92-104); (2) a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, alleging that Defendants conspired to raise the wholesale price of print trade books (CAC ¶¶ 105-23); (3) a claim against

only Amazon under Section 2 of the Sherman Act, 15 U.S.C. § 2, alleging that, through its discriminatory pricing agreements with the Publishers, Amazon willfully acquired and maintained its monopoly power in the U.S. retail market for print trade books (CAC ¶¶ 124-30); and (4) a claim for conspiracy to monopolize, 15 U.S.C. § 2, alleging that Defendants conspired to confer a monopoly on Amazon (CAC ¶¶ 131-38).

On September 7, 2021, the Publishers and Amazon separately moved to dismiss the amended complaint. See ECF Nos. 75, 77. Plaintiff opposed the motions (see ECF Nos. 94, 95), and the motions were fully submitted on November 22, 2021 (see ECF Nos. 112, 114). The Court held oral argument on the motions on July 27, 2022. See ECF No. 136.

## DISCUSSION

A. Motion to Dismiss

Rule 8 of the Federal Rules of Civil Procedure provides that a complaint seeking relief "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "This Rule does not countenance pleadings that are conclusory; it requires factual allegations that are sufficient to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Anderson News, LLC v. Am. Media, Inc., 680 F.3d 162, 182 (2d Cir. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Where the well-pleaded facts in a complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that 'the pleader is entitled to relief.'" Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2) (alteration in original)).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. A claim has "facial plausibility when the plaintiff pleads factual

8

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Twombly, 550 U.S. at 556.

In considering a motion to dismiss, a district court must "accept[ ] all factual claims in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." Lotes Co. v. Hon Hai Precision Indus. Co., 753 F.3d 395, 403 (2d Cir. 2014) (quoting Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108 (2d Cir. 2010)) (internal quotation marks omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Iqbal, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. "[R]ather, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, i.e., enough to make the claim plausible." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 555, 570) (internal quotation marks, alteration, and citation omitted).

B. Sherman Act Section 1 Claim

In Count II of the CAC, Plaintiff alleges that Defendants conspired to raise the wholesale prices of print trade books in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. CAC ¶¶ 105-123. The Publishers and Amazon contend that the Section 1 claim should be dismissed because Plaintiff has failed to allege direct or circumstantial evidence of the existence of a conspiracy among the Publishers and Amazon to raise wholesale prices. Publisher's Br. at 4-8; Amazon's Br. at 25. For the reasons discussed below, I agree that Plaintiff has not plausibly

alleged the existence of a conspiracy either among the Publishers or between the Publishers and Amazon.

Section 1 of the Sherman Act outlaws "[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. To state a claim under Section 1, a plaintiff must allege (1) "a combination or some form of concerted action between at least two legally distinct economic entities," and (2) "that the agreement constituted an unreasonable restraint of trade either *per se* or under the rule of reason." Meyer v. Kalanick, 174 F. Supp. 3d 817, 822 (S.D.N.Y. 2016) (quoting Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 542 (2d Cir. 1993)). An antitrust conspiracy in violation of Section 1 of the Sherman Act requires proof of joint or concerted action as opposed to unilateral action. Anderson News, 680 F.3d at 183.

When a Section 1 claim is made, the "crucial question" is "whether the challenged conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Theatre Enters., Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540 (1954)) (alteration in original); see also Capital Imaging Assocs., 996 F.2d at 542 ("Unilateral conduct on the part of a single . . . enterprise falls outside the purview" of Section 1 of the Sherman Act.). To establish a conspiracy in violation of Section 1, the circumstances of the alleged conspiracy "must reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764 (1984) (internal citation and quotation marks omitted). "No formal agreement is required to constitute an antitrust conspiracy." Ross v. Am. Express Co., 35 F. Supp. 3d 407, 437 (S.D.N.Y. 2014), aff'd sub nom. Ross v. Citigroup, Inc., 630 F. App'x 79 (2d Cir. 2015), as corrected (Nov. 24, 2015). Rather, the

"essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words." Am. Tobacco Co. v. United States, 328 U.S. 781, 809-10 (1946). Courts examine the existence of a conspiracy "as a whole," taking into consideration the totality of the evidence, as opposed to "dismembering it and viewing its separate parts." Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962); see also In re Publ'n Paper Antitrust Litig., 690 F.3d 51, 65 (2d Cir. 2012).

In order to prove the existence of a conspiracy, a plaintiff must come forth with "direct *or circumstantial evidence* that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." Anderson News, 680 F.3d at 184 (quoting Monsanto Co., 465 U.S. at 764) (emphasis and alteration in original). Because conspiracies, by their nature, tend to form in secret, such unlawful agreements "nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." Anderson News, 680 F.3d at 183 (citation omitted).

"Under Twombly, parallel conduct, such as competitors adopting similar policies around the same time in response to similar market conditions, may constitute circumstantial evidence of anticompetitive behavior." In re Musical Instruments & Equip. Antitrust Litig., 798 F.3d 1186, 1193 (9th Cir. 2015) (citing Twombly, 550 U.S. at 553-54). But a complaint that merely alleges parallel conduct among defendants—even consciously parallel conduct—does not state a claim under Section 1. See Twombly, 550 U.S. at 553-54. That is because "parallel conduct or interdependence, without more," is behavior that is "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." Id. at 554; Mayor & City Council of Baltimore, Md. v.

Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013) (explaining that "alleging parallel conduct alone is insufficient, even at the pleading stage" to state a Section 1 claim); In re Musical Instruments, 798 F.3d at 1193-94 ("Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a § 1 violation.") (internal quotation marks and citations omitted); Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, 985 F. Supp. 2d 612, 619 (S.D.N.Y. 2013). Instead, allegations of parallel conduct "gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief." Twombly, 550 U.S. at 557 (internal quotation marks, alteration, and citation omitted); see also Iqbal, 556 U.S. at 678.

At the pleading stage, "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement." Twombly, 550 U.S. at 557; Starr, 592 F.3d at 323; In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007). This standard does not require a plaintiff to show that the allegations suggesting agreement "are more likely than not true or that they rule out the possibility of independent action." Anderson News, 680 F.3d at 184. A court ruling on a motion to dismiss need not choose among plausible interpretations of the evidence. Id. at 189-90. But a statement of facts that is "merely consistent" with an agreement will not suffice. Twombly, 550 U.S. at 557; Anderson News, 680 F.3d at 184. A complaint must contain "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Twombly, 550 U.S. at 556.

1. Concerted Action

a. *Direct Evidence of a Conspiracy*

As direct evidence of a conspiracy, Plaintiff points to the existence of the vertical distribution agreements between each Publisher and Amazon. ECF No. 94 (Pl.'s Br.) at 5. Those

contracts, Plaintiff argues, demonstrate that the Publishers agreed to sell their print trade books to Amazon at "highly discounted prices not available to other booksellers, and only on the condition that the other Publisher Defendants also participated in the pricing scheme." Id.

The CAC alleges that the Publishers, all of whom are "horizontal competitors in the publication and sale (at wholesale) of print trade books," knowingly entered into the "same price discrimination agreements with Amazon" in 2014 and 2015. CAC ¶¶ 7-8, 40. Each publisher "understood" that "the specific monetary and performance terms of its contract reflect[ed] its competitors' terms and in fact were conditioned on their agreement to the same terms." Id. ¶ 8. ███ of the agreements ███████████████████████ contained a meeting-competition clause, where the Publisher agreed that it would ████████████████████ ███████████████████████████████████████████ Id. ███████ ████████████████████████████████████ the CAC alleges that "Amazon publicly confirmed at the time of negotiations that the contract presented to HarperCollins was the same contract recently signed by Simon & Schuster, Hachette, and Macmillan." Id. ¶ 8 (internal quotation marks omitted).

An agreement that contains lawful contractual terms, standing alone, is not direct evidence of a conspiracy. See PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy, 530 F. Supp. 3d 301, 333 (S.D.N.Y. 2021) ("Direct evidence of a conspiracy is explicit and requires no inferences to establish the proposition or conclusion being asserted.") (internal quotation marks and citation omitted); see also Relevant Sports, LLC v. Federation Internationale de Football Ass'n, 551 F. Supp. 3d 120, 131-32 (S.D.N.Y. 2021) (reasoning that FIFA policy itself was not direct evidence of a conspiracy and explaining that direct evidence of concerted activity by the members of the FIFA Council required plausible allegations concerning

"an antecedent agreement" among those members "to vote a particular way to adopt such a policy") (citation and internal quotation marks omitted). Instead, direct evidence of a conspiracy "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level." Mayor & City Council, 709 F.3d at 136; see also In re Tether & Bitfinex Crypto Asset Litig., 576 F. Supp. 3d 55, 101-02 (S.D.N.Y. 2021) (noting that direct evidence of a conspiracy includes such evidence as "recorded phone call or email in which competitors agreed to fix prices") (citation and internal quotation marks omitted).

There is nothing inherently unlawful about a distribution agreement between a publisher and a retailer. And Plaintiff does not claim otherwise. Nor was it unlawful for each Publisher, acting alone, to enter into the same distribution agreement with Amazon, even if it knew that its competitors were also doing the same. Such behavior is simply parallel conduct which is not itself unlawful absent some preceding agreement to act collectively. See Twombly, 550 U.S. at 553-54 (explaining that "parallel conduct or interdependence, without more," is behavior that is "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market").

b.  *Circumstantial Evidence of a Conspiracy*

Where, as here, there is no direct evidence of an agreement to conspire, parallel conduct can be probative evidence of unlawful collusion. Apex Oil Co. v. DiMauro, 822 F.2d 246, 253 (2d Cir. 1987). "The line separating conspiracy from parallelism is indistinct[.]" Gelboim v. Bank of Am. Corp., 823 F.3d 759, 781 (2d Cir. 2016). But a conspiracy "may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001); see also Apex Oil, 822 F.2d at 253 ("[A] plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the

14

parallel acts, can serve to allow a fact-finder to infer a conspiracy."). "These 'plus factors' may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." Mayor & City Council, 709 F.3d at 136 (quoting Twombly v. Bell Atl. Corp., 425 F.3d 99, 114 (2d Cir. 2005), rev'd on other grounds, Twombly, 550 U.S. 544). Such plus factors are "neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might [lead a court to] infer the existence of an agreement." Id. at 136, n. 6.

The CAC alleges that the Publishers knowingly entered into the same distribution agreement with Amazon, which contained a meeting-competition clause, and whereby the Publishers agreed to provide Amazon "huge price concessions" for the purchase of print trade books. See CAC ¶¶ 4, 8-10. The CAC further alleges that following execution of those agreements, the Publishers each raised the list price of their print trade books, causing a market-wide increase in the list price of print books. See CAC ¶¶ 11-13.

To place that parallel conduct in a context that raises a plausible inference that the Publishers were not acting independently, Plaintiff relies on the following plus factors: (1) without collective action, "none of the [Publishers] would have an incentive to enter into restrictive agreements that consolidate power in Amazon" (CAC ¶¶ 10, 16, 39-41, 111); (2) Defendants share a common motive to collude (CAC ¶ 110); (3) Defendants "had opportunities to collude," including, most recently, during the Publishers' conspiracy with Apple to fix the price of eBooks (CAC ¶¶ 40, 43, 112); and (4) Amazon has been the subject of prior government investigations (CAC ¶¶ 43-47). For the reasons discussed below, these plus factors do not support a plausible inference that the Publishers were not acting independently. Plaintiff thus has

not plausibly alleged the existence of concerted action, either among the Publishers or between the Publishers and Amazon.

### Action against Self-Interest

The CAC alleges that the Publishers acted against their own self-interest in entering into the distribution agreements with Amazon. As the CAC explains, it would have been in each Publisher's own self-interest "not to give Amazon disproportionate discounts or other advantages that allow it to destroy its competition," because Amazon "acts anti-competitively in multiple ways." CAC ¶¶ 15-16; see also id. ¶ 111. The CAC further alleges that "[a]cting individually" none of the Publishers would have had an "incentive to enter into restrictive agreements that consolidate power in Amazon and cede substantial control over the distribution of their books." CAC ¶ 39. Plaintiff thus claims that in the absence of concerted action, the Publishers "cannot explain why" it would have been in their individual self-interest to contract with Amazon. ECF No. 94 (Pl.'s Br.) at 8.

"An action that is contrary to a firm's apparent economic self-interest is one that is implausible if undertaken alone, without the guarantee of cooperation by competitors." SourceOne Dental, Inc. v. Patterson Companies, Inc., 310 F. Supp. 3d 346, 360 (E.D.N.Y. 2018); accord PharmacyChecker.com, 530 F. Supp. 3d at 335. Here, Plaintiff's own allegations readily explain why each Publisher would have independently decided to distribute print books through Amazon, even without a guarantee that the other Publishers would follow. The CAC provides a natural explanation for such unilateral action by a Publisher because Amazon's market dominance made it an indispensable bookselling partner for each Publisher.

According to the CAC, the Publishers "have an interest in generating sales in the print trade book market." CAC ¶ 111. Amazon, by itself, accounts for "50% or more of the US print

book market" and "90% of online print sales." CAC ¶¶ 18, 48-49, 80, 118. As the CAC explains, Amazon is a "dominant" online retailer in the U.S. market for print trade books, selling "more books than any other single retail outlet in history." CAC ¶¶ 7, 39, 48, 114, 134. Its "market dominance" nationwide gives Amazon the ability to "promote or destroy a book in the national marketplace." CAC ¶ 51. For instance, if Amazon removes the "buy-button from a particular title," overall sales of that book can drop by "50% or more." CAC ¶ 52.[5] Collectively, these allegations demonstrate that the Publishers were dealing with a retailer who had an "outsized position of power" (CAC ¶ 15) and accounted for "over half of all books purchased at retail in the United States" (CAC ¶ 2). Although the CAC also alleges that acting alone, none of the Publishers would have had an incentive to "cede substantial control over the distribution of their books" (CAC ¶ 39), the CAC itself explains why a Publisher, acting alone, would have sought to distribute books through Amazon: it could not afford to lose a retailer that accounted for more than 50% of the retail market and 90% of the online retail market for print books. CAC ¶ 118.

To bolster its argument that collective action was necessary for an agreement with Amazon to be in each Publisher's own self-interest, Plaintiff points to the conspiracy in Apple, where the Publishers colluded with Apple to raise the price of eBooks. ECF No. 94 (Pl.'s Br.) at 8; see also United States v. Apple, 791 F.3d 290 (2d Cir. 2015); In re Electronic Books Antitrust Litig. ("eBooks"), 859 F. Supp. 2d 671 (S.D.N.Y. 2012). Plaintiff argues that the arrangement with Apple "represented a significant financial loss" to each Publisher if they did not act collectively, and Plaintiff contends that "the same conclusion follows here." ECF No. 94 (Pl.'s

---

[5] See also CAC ¶ 40 n. 44 (citing For the Big Five, Agency Now Holds Sway Across the Board, Author's Guild (Sep. 9, 2015) (available at https://www.authorsguild.org/industryadvocacy/for-the-big-five-agency-now-holds-sway-across-the-board/) which explains that Hachette sales plummeted when Amazon "disfavored" Hachette books in search results).

Br.) at 8. It does not. Unlike in Apple, the CAC here does not allege the existence of the same industry conditions that motivated the Publishers conduct in that case.

In Apple, the Publishers were attempting to force Amazon to abandon its pricing model and adopt agency pricing, but "[n]o single publisher would have had the leverage to force Amazon to make the switch." eBooks, 859 F. Supp. 2d at 684. Moreover, because Amazon, and the rest of the industry, was using the wholesale model to price eBooks, a single Publisher's switch to agency pricing would not have "compel[ed] Amazon to abandon" wholesale pricing, but it would have led to "decreased revenue per sale" and lost market share for the Publisher that made the switch to agency pricing alone. Id. at 683-84; Apple, 791 F.3d at 316-17. As the district court explained, the cost to a Publisher from "a unilateral switch to the agency model would be substantial," because the Publisher "would be selling its eBooks" through the Apple store "at a higher price than its competitors"—thereby losing market share—and would also be "taking in less revenue per sale because of Apple's 30 percent commission." eBooks, 859 F. Supp. 2d at 683-84. For that reason, the contracts proposed to each Publisher by Apple would not have been "attractive" to any Publisher without their collective action. Apple, 791 F.3d at 316. And the Publishers and Apple all knew that. See United States v. Apple, 952 F. Supp. 2d 638, 662 (S.D.N.Y. 2013) ("It was apparent to the Publishers as it was to Apple that Apple's proposal would only allow the Publishers to raise the consumer prices for e-book[s] . . . if they moved Amazon and their other e-tailers to agency."); Apple, 791 F.3d at 317 ("Apple was fully aware that its proposed Contracts would entice a critical mass of publishers only if these publishers perceived an opportunity collectively to shift Amazon to agency."). Because of that unanimous awareness, and the understanding that a lone Publisher's switch to agency pricing would have significant costs for that Publisher, eBooks, 859 F. Supp. 2d at 683-84, the Publishers "signaled a

clear commitment to move against Amazon" when each Publisher signed the agency contract with Apple. Apple, 791 F.3d at 317.

Here, the CAC does not allege the existence of similar market conditions. There are no allegations that the Publishers were attempting to force Amazon to adopt a new pricing model. Nor are there any allegations from which to infer that a Publisher would have lost market share or revenues if it unilaterally entered into a distribution agreement with Amazon using wholesale pricing. To the contrary, the allegations make plain that given Amazon's significant share of retail shares (CAC ¶ 2), the Publishers could not afford losing Amazon as a retailer, if, as the CAC alleges, the Publishers had an interest in "generating sales in the print trade book market." CAC ¶ 111. It thus does not follow, as Plaintiff alleges (CAC ¶ 10), that an individual Publisher's agreement with Amazon signaled the Publishers' intent to act collectively to raise list prices.

In short, the allegations in the CAC provide ample reasons why a Publisher would want to distribute its print books through a retailer that accounts for 90% of online print sales. For this reason, each Publisher could have rationally concluded that it was in its own self-interest to reach a distribution agreement with Amazon—even if it meant offering Amazon a large discount—because it needed to preserve its ability to distribute print books through a retailer that "sells more books than any other single retail outlet in history." CAC ¶ 48. And because the Publishers compete in a market where power is "concentrated in the hands" of a single "dominant" bookseller (CAC ¶¶ 7, 48-49), each Publisher could have rationally expected that the other Publishers would follow suit, without any need for a preceding agreement to do so. The Publishers' similar response to "market pressure"—entering into distribution agreements with Amazon which offered the online retailer discounted wholesale prices—"is the hallmark of

independent parallel conduct—not collusion." In re Musical Instruments, 798 F.3d at 1196; see also In re Elevator Antitrust Litig., 502 F.3d at 51 ("Similar contract terms can reflect similar bargaining power and commercial goals.").

### Motive to Collude

The CAC alleges that the Publishers have an interest in controlling and raising the wholesale price of their book titles. CAC ¶¶ 17, 110. Stated otherwise, the Publishers have an interest in maximizing their potential profits—an interest universally shared by all businesses. See In re Musical Instruments, 798 F.3d at 1194-95 n.8 ("Common motive for increased profits always exists."). Accepting that motive as true, however, the CAC itself demonstrates that the Publishers could have achieved their interest in controlling print book prices without a preceding agreement. See supra pp. 16-20. As the CAC explains, the list price, which is set by the Publishers under the wholesale pricing model, is the price at which a "substantial number of sellers sell trade books." CAC ¶¶ 3, 54. Even without any agreement amongst themselves, each Publisher already controlled the list price of its book titles.

Moreover, the CAC alleges that each Publisher sells its "own commodities"—that is, the book titles of one Publisher are "completely distinct" from the book titles of another Publisher. CAC ¶¶ 96, 104. Thus, for example, if a consumer wants Stephen King's new book, it will not matter if a competing publisher sold another author's book at a lower list price, because the consumer is not going to consider that book a substitute for Stephen King's book. Indeed, the CAC alleges that "[c]onsumer demand and preference for different titles and different authors is not the same." CAC ¶ 104. Yet, the CAC does not plausibly explain why a single Publisher could not raise the list price of its own book titles without suffering a competitive disadvantage. Nor does the CAC explain why, given the concentrated nature of the publishing market, a single

20

Publisher could not have anticipated that if it raised its own list price, a competing Publisher would do so as well. In re Musical Instruments, 798 F.3d at 1195 (explaining that interdependence "does not entail collusion, as interdependent firms may engage in consciously parallel conduct through observation of their competitors' decisions, even absent an agreement"). And, although the CAC alleges that the Publishers had an "economic incentive to raise list prices" only if they acted collectively (CAC ¶ 10), Plaintiff points only to the Apple conspiracy to support that allegation. See id. n.23; see also id. ¶ 13 n.27. As already discussed, the market circumstances in Apple, that required collective action, are not alleged to exist here.

The CAC also alleges that Amazon "has a motive to dominate over its retail competitors, which it achieves by obtaining a substantially lower wholesale price and more favorable contractual terms than its rivals." CAC ¶¶ 38, 110. But it is hardly unusual for a business to be motivated to beat its competition and obtain more favorable pricing from its suppliers. See Twombly, 550 U.S. at 556 n.4 (noting that parallel conduct that would result from "independent responses to common stimuli" does not state a § 1 claim); Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1049 (9th Cir. 2008) ("Allegations of fact that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead" a § 1 violation.). In any event, Amazon could have achieved its goals without collusion, because it could have leveraged its dominant position to bargain for lower wholesale prices. CAC ¶¶ 2, 15, 18, 48, 51-52.

Finally, Plaintiff has not offered any plausible reason why the Publishers would have colluded with Amazon now in a conspiracy that would have only further cemented Amazon's market dominance. It was "Amazon's growing power in the book distribution business" that the Publishers "feared" and had fueled their decision to conspire with Apple. Apple, 952 F. Supp. 2d

at 649; id. at 650 (noting that the Publishers "feared that if they did not act as a group, Amazon would use its ever-growing power in the book distribution business to retaliate against them"). Here, the CAC plausibly alleges that the same "fears" of Amazon's dominance would still exist. For example, the CAC alleges that the Association of American Publishers, "where each of the [Publisher's] CEOs serve as board members," had complained to the House Judiciary Committee that Amazon's "anti-competitive[ ]" conduct "endangers a robust, diverse, and competitive publishing industry." CAC ¶¶ 15-16 (internal quotation marks and citations omitted). The CAC provides other examples, too, of Amazon's market dominance, explaining that it leveraged its power to "extract more fees" from Hachette by suspending book pre-orders and delaying the shipment of Hachette's books to consumers. CAC ¶¶ 51-52. Even while the Publishers were complaining about Amazon's "outsized position of power" and anticompetitive conduct, the CAC nevertheless alleges that the Publishers colluded with Amazon to help it "lock[ ] in" its dominance as a retailer in the print trade book market. CAC ¶¶ 15-16, 51-52, 57. Those allegations are contradictory and nothing else in the CAC plausibly alleges why it would have been in any of the Publishers' own interest to collude with Amazon.

### *Opportunities to Collude and the Publishers' Prior Conspiracy with Apple*

Plaintiff contends that "Defendants had opportunities to collude" and to support that allegation, the CAC points to (1) the conspiracy in Apple, where the Publishers colluded with Apple to raise the price of eBooks; and (2) "public[ ] signal[s]" that Amazon "had offered the same terms to each" Publisher and each Publisher had accepted those terms. CAC ¶ 112; see also id. ¶¶ 8, 40, 43. The "public signals" referenced in the CAC are from various news articles published between October 2014 and September 2015. CAC ¶¶ 8 n.18, 40 n.44. According to Plaintiff, these articles "were confirmation" of the Publishers' "commitment to price fixing

through collective action, and assurance that Amazon no longer obstructed that goal." ECF No.

94 (Pl.'s Br.) at 8. The articles also support the allegation that each Publisher understood that it

was entering into the same agreement with Amazon as the other Publishers. CAC ¶¶ 8, 40-41.

First, Plaintiff's reliance (ECF No. 94 (Pl.'s Br.) at 5) on the conspiracy in Apple does

not help it here. A "prior conspiracy is not alone probative of present collusion." Phillip E.

Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and their

Application, ¶ 1421b(1) (4th ed. 2022); see also id. ¶ 1421a ("Illegal behavior elsewhere in time

or place does not generally allow the inference of an immediate conspiracy."). Further, "[t]he

mere opportunity to conspire does not by itself support the inference that such an illegal

combination actually occurred." Gamm v. Sanderson Farms, Inc., 944 F.3d 455, 466 (2d Cir.

2019) (quoting Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, Inc.,

996 F.2d 537, 545 (2d Cir. 1993)).

More importantly, however, the existence of a conspiracy here cannot plausibly be

inferred from the Publishers' collusive conduct in Apple, because, as already discussed, see

supra pp. 17-19, the market circumstances in Apple presented the Publishers with a starkly

different economic scenario. Nothing in the CAC plausibly demonstrates that the distribution

agreements with Amazon would not have been attractive to the Publishers without collective

action. That was not so in Apple and explained why each Publisher's act of entering into an

agreement with Amazon there signaled collective action. Apple, 791 F.3d at 316-17. Conversely,

the CAC provides ample reasons to explain why a Publisher would have independently sought to

do business with Amazon. See supra pp. 16-20. For this reason, each Publishers' execution of a

distribution agreement with Amazon does not plausibly signal a commitment to price fixing, as it

did in Apple (CAC ¶ 10 n.24).

23

Moreover, as compared to the circumstances alleged in <u>Apple</u>, the circumstances here are notable for what is missing: any allegations of interfirm communications among the Publishers or the Publishers and Amazon. The complaint in <u>eBooks</u> was replete with allegations of communications among the Publishers and the Publishers and Apple.[6] <u>See</u> 859 F. Supp. 2d at 675-76, 682-83; <u>Apple</u>, 791 F.3d at 300, 302; <u>see also</u> <u>Anderson News</u>, 680 F.3d at 187-88 (reciting detailed allegations in the complaint concerning various meetings and communications among the defendants that occurred in the preceding two-week period prior to the alleged unlawful agreement in restraint of trade). The CAC acknowledges that in <u>Apple</u> there were allegations that the Publishers were "in constant communication regarding their negotiations with both Apple and Amazon." CAC ¶ 40. Here, by contrast, there are no allegations concerning any communications among the Publishers or between the Publishers and Amazon. Instead, the CAC contains a conclusory allegation that Defendants had an opportunity to collude (CAC ¶ 112), but it pleads no factual support for that allegation.

Turning to the public signals, none of the articles, whether viewed individually or collectively, support Plaintiff's allegation that a Publisher would have "understood" or known, based on those reports, that it was receiving the same "monetary and performance terms" as the other Publishers in its agreement with Amazon for print trade books. CAC ¶ 8. Although the CAC alleges that the Publishers sell print books under a wholesale pricing model (CAC ¶ 3), none of the articles discuss or even allude to any Publisher executing an agreement involving wholesale pricing. Instead, the only pricing model discussed in any of the articles is agency

---

[6] Plaintiff argues that Defendants are improperly contrasting the allegations here with the "fully developed trial record in the <u>Apple</u> litigation." ECF No. 94 (Pl.'s Br.) at 7. But Plaintiff ignores that the *complaint* in <u>Apple</u> included allegations of communications between the Publishers and between the Publishers and Apple.

pricing—a pricing model used for the sale of eBooks, not print books. In fact, the articles focus

primarily on the distribution agreements for eBooks and the use of agency pricing with Amazon.

Only three reports even mention an agreement concerning print books and, in those articles, the

writer only mentions that an agreement for the distribution of print books was reached between

Amazon and a particular Publisher. CAC ¶ 40 n.44.[7] The articles do not mention or discuss any

specific pricing model or any terms of the agreement, such as the meeting-competition clause

which is at the heart of Plaintiff's allegation of a price-fixing conspiracy.

    Further, the CAC cites to two articles as support for the allegation that Amazon had

"publicly confirmed" that the terms of the agreement between each Publisher and Amazon were

the same. CAC ¶ 8 n. 18. But neither article supports that allegation. One article says that

HarperCollins was presented "the same contract recently signed by Simon & Schuster, Hachette,

and Macmillan," but that information is attributed to "a source"; it is not a public statement by a

spokesperson for Amazon or HarperCollins.[8] The other article does include a quote from an

Amazon spokesperson, who announced that Amazon had "long-term deals in place with the

other four major publishers and [Amazon] would accept any similar deal with Penguin Random

---

[7] No Authors Held Hostage as HarperCollins and Amazon Come to Terms, The Authors
Guild (Apr. 16, 2015), available at https://www.authorsguild.org/industry-advocacy/no-authors-
held-hostage-asharpercollins-and-amazon-come-to-terms/; Macmillan Strikes Deal with
Amazon, but "Irony Prospers in the Digital Age," The Authors Guild (Dec. 19, 2014), available
at https://www.authorsguild.org/industryadvocacy/macmillan-strikes-deal-with-amazon-but-
irony-prospers-in-the-digital-age/; S&S, Amazon Agree on 'Version' of Agency Pricing,
Publishers Weekly (Oct. 21, 2014), available at https://www.publishersweekly.com/pw/by-
topic/industry-news/industry-deals/article/64461-s-samazon-agree-on-version-of-agency-
pricing.html.

[8] See Jillian D'Onfro, Another major publisher is going to war with Amazon, Business
Insider (Mar. 31, 2015), available at https://www.businessinsider.com/harpercollins-amazon-
contract-expiring-2015-3.

House UK."[9] The statement plainly refers to the UK division of Penguin Random House and says nothing about the contract offered to Penguin Random House in the United States. And because the statement refers to Penguin Random House UK, it is not even apparent that the reference to "other four major publishers" was referring to the domestic entities of those Publishers as opposed to their foreign affiliates.

To Plaintiff, the articles serve as "confirmation" by the Publishers of their "commitment to price fixing through collective action, and assurance that Amazon no longer obstructed that goal." ECF No. 94 (Pl.'s Br.) at 8. But that conclusion simply does not follow from these articles which primarily discussed distribution agreements for a different category of books (eBooks) and a different pricing model (agency pricing); contained no discussion whatsoever of any terms of the distribution agreements for print books; and included no statement, by Amazon itself, that the agreements for all of the Publishers were identical.

One other important distinction exists between the circumstances alleged here and the conspiracy in Apple. In Apple, there were allegations in the complaint from which one could plausibly infer that Amazon had "made clear to its vertical partners that it was offering each of them a similar deal." eBooks, 859 F. Supp. 2d at 685. Similarly, in Interstate Circuit v. United States, the defendants, a group of film distributors, were each sent identical letters by Interstate; each letter included the names of all eight companies as addressees and proposed identical deal terms. 306 U.S. 208, 215-17 (1939). Each film distributor was thus simultaneously made aware that its competitor was considering an identical proposal by Interstate. Id. at 222 ("[E]ach of the

---

[9] See Jennifer Rankin, Amazon and Penguin Random House said to be in dispute, Guardian (May 25, 2015), available at https://www.theguardian.com/books/2015/may/25/amazon-and-penguin-random-house-said-tobe-in-dispute.

distributors knew that the proposals were under consideration by the others."); id. at 226 ("Each distributor was advised that the others were asked to participate."); see also Toys "R" Us, Inc. v. F.T.C., 221 F.3d 928, 931-32, 935 (7th Cir. 2000) (affirming finding of conspiracy where evidence showed that Toys R Us had sent the same memo to each of its suppliers announcing the new policy which represented an "abrupt shift from the past"). Here, there are no allegations that the Publishers were simultaneously presented with identical, or even similar, agreements and that each was aware that all had received the same agreements. For the reasons already discussed, the news articles relied on simply do not support that inference.

### *Government Investigations*

As an additional plus factor, the CAC points to government investigations into Amazon and the "anticompetitive effect" of its agreements. CAC ¶¶ 44-47. The existence of government investigations into *Amazon's* conduct (CAC ¶¶ 46-47) cannot raise a plausible inference that the *Publishers* colluded because the investigations concerned conduct by Amazon, not the Publishers. See Starr, 592 F.3d at 319, 324 (citing fact of government investigations as a plus factor, but where the investigations concerned all of the defendants).[10] Nor does the existence of a government investigation into the Publishers' conduct concerning the sale of eBooks raise a plausible inference of a conspiracy here. CAC ¶ 45. As already discussed, the eBook market and the circumstances surrounding the conspiracy in Apple are distinct, and not alleged to be present here.

In sum, the plus factors alleged in the CAC do not raise a plausible inference that the Publishers acted collectively because, viewed collectively, they do not describe the existence of

---

[10] See In re Digital Music Antitrust Litig., 06-MD-1780 (LAP), Second Consolidated Amended Complaint, ¶¶ 106-07 (complaint in Starr alleging existence of investigations into all defendants' conduct).

an environment that required collective action for the Publishers and Amazon to fulfil their respective goals. Accordingly, because Plaintiff has not adequately alleged that Defendants conspired to violate Section 1 of the Sherman Act, I recommend that Count II be dismissed.

C.  Plaintiff's Sherman Act Section 2 Claims

In Counts III and IV of the CAC, Plaintiff alleges violations of Section 2 of the Sherman Act, as against Amazon for having used its market power to facilitate a horizontal agreement among the Publishers to raise wholesale prices, and as against Amazon and the Publishers for conspiring to confer a monopoly on Amazon in the online retail market for print trade books. CAC ¶¶ 7, 18, 38, 114-15, 124-38; see also ECF No. 95 (Pl.'s Br.) at 22, 25. The crux of Plaintiff's Section 2 claims is that Amazon used its market power to extract agreements from the Publishers to engage in a horizontal price-fixing conspiracy. See ECF No. 95 (Pl.'s Br.) at 22-25. Because Plaintiff has not alleged the existence of a price-fixing conspiracy among the Publishers, its Section 2 claim as against Amazon, premised on Amazon having participated and facilitated in that conspiracy, necessarily fails. Similarly, Plaintiff's Section 2 conspiracy to monopolize claim against Defendants requires the existence of a conspiracy. See Electronics Communications Corp. v. Toshiba Am. Consumer Products, Inc., 129 F.3d 240, 246 (2d Cir. 1997) (listing "concerted action" as an element of a Section 2 conspiracy to monopolize claim). Having failed to allege facts from which to infer that a conspiracy existed, the Section 2 claim against Defendants also fails.

D.  Antitrust Standing for the Sherman Act Claims

"Section 4 of the Clayton Act establishes a private right of action for violations of the federal antitrust laws, and entitles '[a]ny person who [is] injured in his business or property by reason of anything forbidden in the antitrust trust laws' to treble damages for those injuries."

Gatt Commc'ns, Inc. v. PMC Assocs., LLC, 711 F.3d 68, 75 (2d Cir. 2013) (quoting 15 U.S.C.

§ 15) (alteration in original). To plead a claim under Section 1 or Section 2 of the Sherman Act, a

plaintiff must sufficiently allege antitrust standing.[11] See George Haug Co., Inc. v. Rolls Royce

Motor Cars Inc., 148 F.3d 136, 139-40 (2d Cir. 1998) (addressing standing requirement for

Section 1 and Section 2 claims under the Sherman Act); Gatt, 711 F.3d at 75-76; Somosky v.

Consumer Data Industry Assoc., 2022 WL 596480, at *4 (S.D.N.Y. Feb. 28, 2022). "[A]ntitrust

standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to

establish this requirement we must dismiss it as a matter of law." Gatt, 711 F.3d at 75.

Assuming the existence of an antitrust violation, to establish antitrust standing a private

plaintiff must plausibly allege that it suffered an (1) injury-in-fact to its business or property

caused by the antitrust violation; (2) that it suffered an antitrust injury; and (3) that it is an

"efficient enforcer"—meaning, an acceptable plaintiff to assert a private antitrust claim.[12] In re

Aluminum Warehousing Antitrust Litig., 833 F.3d 151, 157-58 (2d Cir. 2016); Arista Records

LLC v. Lime Group LLC, 532 F. Supp. 2d 556, 567-68 (S.D.N.Y. 2007); see also Gatt

Commc'ns, Inc., 711 F.3d at 76; In re Tether, 576 F. Supp. 3d at 92-94. An antitrust injury "is an

injury attributable to the anticompetitive aspect of the practice under scrutiny." Port Dock &

Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 122 (2d Cir. 2007) (citation omitted).

Determining whether a plaintiff has suffered an antitrust injury involves a three-step

process:

> (1) the plaintiff "must 'identify[ ] the practice complained of and the reasons such
> a practice is or might be anticompetitive'"; then (2) the court must "identify the

---

[11] Defendants challenge Plaintiff's antitrust standing only as it relates to the Sherman Act claims. See Publisher's Br. at 10. Defendants do not raise any argument concerning Plaintiff's standing to assert a claim for violation of the Robinson-Patman Act Claim, Count I of the SAC.
[12] The "efficient enforcer" prong is not challenged by Defendants here. I thus only address whether Plaintiff has adequately alleged that it suffered an antitrust injury.

'actual injury the plaintiff alleges'" by "look[ing] to the ways in which the plaintiff claims it is in a 'worse position' as a consequence of defendant's conduct"; and finally, (3) the court compares the "'anticompetitive effect of the specific practice at issue' to 'the actual injury the plaintiff alleges.'"

Gatt, 711 F.3d at 76 (quoting Port Dock, 507 F.3d at 122 and Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 486, 489 (1977)). At the third step of the analysis, the "comparison requires more than an allegation that the practice and injury are 'causally linked.'" In re Inclusive Access Course Materials Antitrust Litig., 2021 WL 2419528, at *7 (S.D.N.Y. June 14, 2021). "Rather, in order to establish antitrust injury, the plaintiff must demonstrate that its injury is of the type the antitrust laws were intended to prevent and that [it] flows from that which makes or might make defendants' acts unlawful." Id. (quoting Gatt, 711 F.3d at 76) (citation omitted). "The notion of 'antitrust injury' grew from the recognition that a competitor may be injured not only by prohibited anticompetitive activity, but also by competition itself, and that the antitrust laws were not intended to afford the latter injuries a remedy." Arista Records, 532 F. Supp. 2d at 568 (citing Balaklaw v. Lovell, 14 F.3d 793, 797 (2d Cir. 1994)). As such, a plaintiff "must plead that its injury 'stems from a competition-reducing aspect or effect of the defendant's behavior.'" In re Inclusive Access, 2021 WL 2419528, at *7 (quoting Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990) (emphasis in original)).

Plaintiff alleges that the anticompetitive practice engaged in by the Publishers was their conspiracy to raise and control the list prices of print trade books in the United States executed by means of raising the wholesale prices of those books. CAC ¶¶ 10-11. For purposes of determining whether Plaintiff has alleged an antirust injury, I assume that this practice is anticompetitive. See In re Inclusive Access, 2021 WL 2419528, at *7. At the wholesale level, the Publishers' conduct caused Plaintiff, and other retailers, to overpay for "print trade books at artificially inflated wholesale prices." CAC ¶¶ 20, 91. At the retail level, the alleged consequence

of the Publishers' conduct was that Plaintiff lost sales to price sensitive consumers and consumers paid "higher retail prices." CAC ¶¶ 53, 91, 100.

Plaintiff alleges that the Publishers raised their "list price" (CAC ¶ 12), and the list price is "the price at which a substantial number of sellers sell trade books" (CAC ¶ 54). But Plaintiff also alleges that booksellers can and do sell books at prices below list price. CAC ¶ 54. Significantly, there are no allegations in the CAC that any bookseller was required by the Publishers to sell books at list price. Plaintiff was free to charge consumers a price lower than list price, and it was also free to match Amazon's discounted price and sell to consumers at that price. See Arista Records, 532 F. Supp. 2d at 570 (finding no antitrust injury alleged in part because the price-fixing agreement did not constrain party from "setting its own prices or offering its own level of services").

Further, booksellers, like Plaintiff, do not pay list price to buy books from the Publishers. CAC ¶¶ 4, 94. Instead, Plaintiff purchased print trade books from the Publishers at a "standard discount price of up to 46%" off of list price. CAC ¶ 94. Plaintiff was thus not constrained to sell books at list price, because having bought them at a substantial discount off of list price, it could have sold them to consumers for less than list price and still have made a profit on each sale. That Plaintiff may have had to charge a retail price that was lower than the list price, to compete with Amazon's lower price, does not amount to antitrust injury. Indeed, "[a] firm complaining about the harm it suffers from nonpredatory price competition is really claiming that it [is] unable to raise prices," which "is not *antitrust* injury." See Atl. Richfield Co., 495 U.S. at 337-38 (internal quotation marks and citations omitted, alteration and emphasis in original); see also Port Dock, 507 F.3d at 122 ("Despite their actual injury from price competition, the competitors would not have antitrust injury, for it is axiomatic that the antitrust laws do not protect a

competitor against competition.") (citation omitted); <u>Brunswick Corp.</u>, 429 U.S. at 488

(explaining that evidence of harm to an individual competitor will not suffice because the

antitrust laws "were enacted for the protection of competition, not competitors") (citation and

internal quotation marks omitted).

     At bottom, Plaintiff's complaint is that Amazon was given a lower wholesale price,

allowing it to charge a lower retail price to consumers without jeopardizing its profit margin. But

the "antitrust laws were enacted for 'the protection of *competition*, not *competitors*.' <u>Atl.</u>

<u>Richfield</u>, 495 U.S. at 338 (emphasis in original, citation omitted). And, here, no conduct by the

Publishers or Amazon barred Plaintiff from charging a lower price to consumers in order to

better compete with Amazon. Moreover, even if Plaintiff lost sales to Amazon, the "business lost

by [Plaintiff] cannot be viewed as an 'anticompetitive' consequence" of the alleged unlawful

conduct, because there are no allegations that the list price, or wholesale price charged to

Amazon, was set at "predatory levels." <u>Atl. Richfield</u>, 495 U.S. at 337 ("When a firm, or even a

group of firms adhering to a vertical agreement, lowers prices but maintains them above

predatory levels, the business lost by rivals cannot be viewed as an 'anticompetitive'

consequence of the claimed violation").

     Plaintiff contends that it established a "classic antitrust injury under the Sherman Act"

because it was required to "pay inflated wholesale prices" for books. ECF No. 94 (Pl.'s Br.) at

12-13. But the cases it relies on are all distinguishable because none concerned inflated prices

paid by an intermediary in the distribution chain, as opposed to the consumer, or end user, of the

product in the relevant market. For instance, in <u>Gelboim v. Bank of Am. Corp.</u>, 823 F.3d 759,

770-71 (2d Cir. 2016), the plaintiffs were consumers of financial products who alleged that the

defendants' practices had unlawfully caused them to pay more for certain financial instruments.

Similarly, in In re Crude Oil Commodity Futures Litig., 913 F. Supp. 2d 41, 48, 57 (S.D.N.Y. 2012), the plaintiffs were investors who purchased and traded in certain commodity futures contracts in a market that was "tainted by price manipulation." Further, Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977), did not concern a practice of price manipulation or price inflation. Rather, Brunswick addressed whether antitrust damages were appropriate where the sole injury was not price manipulation, but that "competitors" were allowed to continue in business, "thereby denying [the plaintiffs] an anticipated increase in market share" that would have occurred if its competitors had been allowed to go out of business. Id. at 484.

In short, Plaintiff has not pled violations of Section 1 or Section 2 of the Sherman Act. For that reason alone, I recommend dismissal of Counts II, III, and IV of the CAC. Nevertheless, even if Plaintiff's allegations did give rise to a plausible inference of concerted action, Plaintiff's claims would fail for a separate and independent reason: Plaintiff has not alleged that it suffered an antitrust injury and thus has not shown antitrust standing. I thus recommend dismissing the Sherman Act claims for this reason as well.

E.   Plaintiff's Price Discrimination Claim under the Robinson-Patman Act

In Count I of the CAC, Plaintiff asserts a price-discrimination claim against the Publishers and Amazon under Section 2(a) of the Robinson-Patman Act, alleging that Amazon received a better wholesale price from the Publishers that was not equally available to Plaintiff and other booksellers.[13] See CAC ¶¶ 92-104. For the reasons discussed below, I recommend that this claim be dismissed as well. Plaintiff has not adequately pled injury to competition, as required to state a prima facie claim under Section 2(a). Further, Plaintiff has not alleged facts

---

[13] Section 4 of the Clayton Act, 15 U.S.C. § 15(a), authorizes private suits for treble damages for violations of Section 2(a) of the RPA. See Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 218 (2d Cir. 2004).

from which to plausibly infer that the lower price offered to Amazon was not the result of a functional discount or based on materially different terms of contract. Lastly, even if Plaintiff had alleged a prima facie claim, the allegations in the CAC plausibly suggest that Defendants have a complete defense under Section 2(b) of the RPA.

The Robinson-Patman Act ("RPA"), 15 U.S.C. § 13, was enacted by Congress "to afford antitrust protection to small and independent businesses from unfair competition by chain stores." American Booksellers Ass'n v. Houghton Mifflin Co., 1995 WL 92270, at *2 (S.D.N.Y. Mar. 3, 1995). Congress was concerned that "large chain stores were exercising economic power to obtain anticompetitive discounts on large purchases of goods." Coalition for a Level Playing Field, LLC v. AutoZone, Inc. ("Coalition I"), 737 F. Supp. 2d 194, 209 (S.D.N.Y. 2010) (citation omitted). The RPA responds to this harm to competition by prohibiting "sellers from granting favored buyers unequal prices or access to promotional programs." Id. Congress, however, "did not intend to outlaw price differences that result from or further the forces of competition." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 220 (1993).

1. Section 2(a) claim as against all Defendants

Section 2(a) of the Robinson–Patman Act provides, in pertinent part, as follows:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a).

In order to establish a claim for secondary-line price discrimination[14] under section 2(a), a plaintiff has the burden of proving four elements: (1) "a commodity was sold in interstate commerce to at least two buyers"; (2) "the commodity sold to the disfavored purchaser was of like grade and quality to that sold to the favored purchaser"; (3) "the seller discriminate[d] in price between the favored and disfavored purchaser"; and (4) "that discrimination had a prohibited effect on competition." Coalition I, 737 F. Supp. 2d at 209 (quoting 15 U.S.C. § 13(a)) (internal quotation marks omitted, alteration in original); see also Texaco Inc. v. Hasbrouck, 496 U.S. 543, 556 (1990); Cash & Henderson Drugs, Inc. v. Johnson & Johnson, 799 F.3d 202, 209-10 (2d Cir. 2015) (discussing "secondary line injury"). A plaintiff attempting to establish competitive injury (the fourth prong of a Section 2(a) claim) has two options: the plaintiff can show "substantial discounts to a competitor over a significant period of time, known as the Morton Salt inference, or proof of sales lost to favored purchasers." Cash & Henderson Drugs, 799 F.3d at 210; see also FTC v. Morton Salt Co., 334 U.S. 37, 46, 50-51 (1983) (under Section 2(a), injury to competition is established prima facie by proof of a substantial price discrimination between competing purchasers over time).

Amazon attacks Plaintiff's allegations as they concern two of the four elements of a prima facie Section 2(a) claim: discriminatory pricing (third element) and competitive injury (fourth element). See Amazon's Br. at 8-10, 20-21. The Publishers also challenge the sufficiency of Plaintiff's allegations concerning competitive injury, and separately attack Plaintiff's

---

[14] Price discrimination claims under Section 2(a) of the RPA generally fall into three categories: primary-line price discrimination, secondary-line price discrimination, and tertiary-line price discrimination. See George Haug, 148 F.3d at 141 n.2. Plaintiff alleges a secondary-line price discrimination claim, which can arise "when a seller's discrimination impacts competition among the seller's customers; i.e. the favored purchasers and disfavored purchasers." Id. (citing F.T.C. v. Sun Oil Co., 371 U.S. 505 (1963)).

allegations as to the first and second elements of a Section 2(a) claim, arguing that Plaintiff has not adequately pled "reasonably contemporaneous sales" (first element) of goods that are "of like grade and quality" (second element). See Publishers' Br. at 16, 20-22.

*Commodities Sold in Interstate Commerce to Two Buyers*

The CAC alleges that Plaintiff "purchased numerous books, often repeatedly, from each of the [Publishers]," who operate nationally and thus sell their books in interstate commerce. CAC ¶¶ 94, 97. As examples of book titles that Plaintiff purchased from the publishers, the CAC includes a list of 10 books (two books from each Publisher), with the date Plaintiff purchased the books. CAC ¶ 94. The CAC further alleges that "Amazon competed concurrently with Plaintiff and Class Members in the retail sales of these and many other [of the Publishers'] books, from which Plaintiff reasonably infers that wholesale purchases of these books by Amazon from the [Publishers] were reasonably contemporaneous with wholesale purchases of the same books from the [Publishers] by Plaintiff and Class members." CAC ¶ 94; see also id. ¶ 95. Contrary to the Publishers' argument (Br. at 20-21; Reply Br. at 9 n.9), these allegations are sufficient to satisfy the first element of an RPA claim. See Am. Booksellers Ass'n, Inc. v. Random House, Inc., 1996 WL 499520, at *4 (S.D.N.Y. Sept. 4, 1996); Nat'l Ass'n of College Bookstores, Inc. v. Cambridge University Press, 990 F. Supp. 245, 247-48, 252-53 (S.D.N.Y. 1997) (reasoning that to plead this element, plaintiff was not required to "include allegations of particular transactions involving particular book titles").

While the sales must be "reasonably contemporaneous in time," they do not need to be "made at precisely the same time or place." Reeder-Simco GMC Inc. v. Volvo GM Heavy Truck Corp., 374 F.3d 701, 710-11 (8th Cir. 2004). What's more, Amazon is alleged to "sell[ ] more books than any other single retail outlet in history" and accounts for 90% of online print book

sales. CAC ¶ 48. The large volume of books Amazon sells and the fact that Plaintiff "competed concurrently" with Amazon permits a plausible and reasonable inference that the Publishers engaged in reasonably contemporaneous sales of the same book titles to Amazon and Plaintiff. Although the Publishers argue that <u>Twombly</u> does not permit the Court to infer a fact, the Publishers acknowledge that such an inference is impermissible only when the complaint does not "plead[ ] supporting facts." Publishers' Reply Br. 9, n.9. Amazon's significant retail volume provides the requisite factual support to allow a plausible inference that the Publishers made reasonably contemporaneous sales of the same book titles to Amazon and Plaintiff.

<u>*Commodities of Like Grade and Quality*</u>

The second element of a Section 2(a) claim requires factual allegations from which to infer that the commodities were of "like grade and quality." The CAC also satisfies this requirement. Plaintiff alleges that each of the Publishers "sells its own commodities of like grade and quality (like hardback copies of the same title)," and that Amazon purchased these books "at a lower price" than offered to Plaintiff. CAC ¶ 96. Further, throughout the CAC, Plaintiff makes clear that the commodities at issue are print trade books. <u>See</u> CAC ¶¶ 3-4, 19-20, 37, 59, 91. These allegations suffice to allege that the book titles sold to Amazon and Plaintiff were of "like grade and quality." <u>See</u> <u>Nat'l Ass'n of College Bookstores</u>, 990 F. Supp. at 252.

The Publishers briefly contend that these allegations do not give it adequate notice under Rule 8 of which category of books are at issue in Plaintiff's claim. Publishers' Br. at 21. The Publishers' argument is meritless. All that Rule 8 requires is "fair notice of what the plaintiff's claim is and the grounds upon which it rests." <u>National Ass'n of College Bookstores</u>, 990 F. Supp. at 252 (quoting <u>Chahal v. Paine Webber, Inc.</u>, 725 F.2d 20, 23 (2d Cir. 1984)). The allegations in the CAC are more than sufficient to satisfy that requirement. They identify the

specific goods at issue—print trade books—and plaintiff was not required to "include allegations of particular transactions involving particular book titles" to satisfy the pleading requirement imposed by Rule 8. Id. at 252.

*Discriminatory Pricing*

To plead the third element of a Section 2(a) claim, the CAC alleges that (1) Plaintiff buys print books from the Publishers at a "standard discount" of up to 46%; (2) the Publishers sell to Amazon at "steep discounts to list prices below the standard discounts available to other booksellers," while they simultaneously sell to Amazon's competitors, like Plaintiff, at "higher wholesale prices and on less favorable terms;" and (3) the Publishers give Amazon "a higher discount and ███████████████████████" that are "not equally available to Plaintiff." CAC ¶¶ 3-5, 19-20, 94-95. To support those allegations, Plaintiff cites to certain provisions in the distribution agreements between the Publishers and Amazon.[15] See CAC nn. 6-8, 13-17, 19-22.

Amazon argues that Plaintiff was required to allege factual details concerning the specific wholesale price the Publishers offered it, or otherwise the allegations that Amazon received "steep discounts," "huge price concessions," and discounts that were "substantially more" are conclusory (CAC ¶¶ 4, 98). Amazon's Br. at 9-10. Plaintiff disagrees, arguing that it pointed to specific contractual provisions in the agreements with the Publishers to support its allegation that Amazon received better pricing—all that it was required to do to plausibly allege the existence of discriminatory pricing. ECF No. 95 (Pl.'s Br.) at 11-12. As explained below, I agree with Plaintiff that it has adequately alleged the existence of a price differential. But Plaintiff has not

---

[15] Amazon gave Plaintiff's counsel an opportunity to review redacted versions of those agreements. See ECF No. 43 at 1; ECF No. 44 at 1-2 n.2

offered any factual support for its allegations that the price differential was steep, huge, or substantial. That may not prevent Plaintiff from pleading the existence of discriminatory pricing, even post-Twombly, but it is fatal to Plaintiff's ability to allege a competitive injury—the fourth element of a Section 2(a) claim.

No party disputes that Plaintiff does not know the discount at which any of the Publishers sold their print trade books to Amazon. The distribution agreements that Plaintiff reviewed in preparing the CAC had the discount amount redacted. Plaintiff infers from certain provisions in those agreements that the discount offered by the Publishers to Amazon was larger than Plaintiff's 46% discount ██████████████████████████████████

████████████████████████████████████████████████████

██████████████████████ CAC ¶ 9 n.20. From that contractual provision, Plaintiff presumably infers that Plaintiff's "standard discount of 46%" (CAC ¶ 94) must be less than the discount Amazon received. ████████████████████████████████

████████████████████████████████████████████████████

████████████████ CAC ¶ 8 n.19. From that provision, Plaintiff necessarily infers that ████████

████████████████ also offered a greater discount to Amazon than they offered to Plaintiff,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ CAC ¶ 9 n.21. From this, Plaintiff

presumably infers ████████████████████████████████████

████████████ CAC ¶ 9.

The terms of the distribution agreements between the Publishers and Amazon lend the factual detail necessary to support Plaintiff's allegation that Amazon received a discount greater

than the discount offered to Plaintiff. But to the extent Plaintiff alleges that the discounts offered

to Amazon were "steep," amounted to "huge price concessions," or were "substantially more"

than the discount offered to Plaintiff (CAC ¶¶ 4, 98), those allegations are conclusory and

unsupported by any factual detail. Cf. Coalition for a Level Playing Field, LLC v. Autozone, Inc.

("Coalition II"), 813 F. Supp. 2d 557, 567 (S.D.N.Y. 2011). Although Plaintiff may plausibly

infer that Amazon received a discount greater than 46%, there are no facts from which to infer

the size of the discount. Any allegation that Amazon received a "steep" or "huge" discount is

based on pure conjecture.

Under the plain text of the statute, it is unlawful "to discriminate in price between

different purchasers." 15 U.S.C. § 13(a). As the Supreme Court stated in Hasbrouck, "price

discrimination within the meaning of § 2(a) is *merely* a price difference." 496 U.S. at 559

(internal quotation marks omitted, emphasis added). The extent or amount of the price

discrimination shows whether "the effect of such discrimination" substantially injured,

destroyed, or prevented competition. 15 U.S.C. § 13(a). This distinction is reflected in the

elements of a Section 2(a) claim, which differentiate between having to show discriminatory

pricing and competitive injury, with competitive injury requiring allegations that the

discriminatory price "had a prohibited effect on competition." See, e.g., Coalition I, 737 F. Supp.

2d at 209 (listing elements of RPA claim). Logically, then, the extent or amount of the price

discrimination should be relevant to showing the existence of a competitive injury (not the

existence of discriminatory pricing), because the size of the discount would be necessary to

determine whether the discriminatory pricing "substantially" injured competition.

In cases where courts have concluded that a Section 2(a) claim was adequately pled, the

complaint included specific factual content about the amount of the discount. For instance, in

Dayton Superior Corp. v. Marjam Supply Co., Inc., 2011 WL 710450 (E.D.N.Y. Feb. 22, 2011), where the court denied a motion to dismiss a Section 2(a) counterclaim, the counterclaim alleged a specific discriminatory price. Id. at 10. The counterclaim there alleged that the plaintiff "sold the Product . . . at a price that was approximately \$3 per bag less than the price" charged to defendant for the same product. Id.; see also Intimate Bookshop, Inc. v. Barnes & Noble, Inc., 88 F. Supp. 2d 133, 135 (S.D.N.Y. 2000) (in pleading RPA claim, plaintiff alleged that it received a "41% to 46% discount" whereas the retailer defendants received "a 60% to 65% discount from publishers").

Similarly, in National Ass'n of College Bookstores, a case that predated Twombly, the complaint alleged the specific discounts at issue: the discount offered by one publisher defendant ranged "from 20 to 45%" but it was only 20% when the books were purchased for "classroom use;" a different publisher defendant typically offered a 37% discount which dropped to 20% when the same books were ordered for use as classroom texts; and a final publisher defendant offered a "'reverse'" volume discount," under which "[t]he price it charge[d] per book" rose as the number of books purchased increased. 990 F. Supp. at 247. The plaintiffs, an association of college retail bookstores who bought books for classroom use, alleged an RPA claim, arguing that the publishers' pricing policies resulted in plaintiffs being "charged more than their competitors for identical books." Id. at 247. The court reasoned that the discriminatory pricing element of a Section 2(a) claim could be pled "largely by reference to the defendants' pricing policies," because the policies "appl[ied] to all retailers and indicate[d] on their face that different purchasers pay different prices for the same books." Id. at 249.

In all of these cases the complaint included factual detail about the discriminatory discount charged to the favored purchaser. But it is not apparent from any of these cases that the

absence of such information would have required dismissal of the complaint, particularly where, as here, the complaint plausibly alleges the existence of a discriminatory price (but not the amount).[16] The cases Amazon relies on are distinguishable. Amazon's Br. at 9-10.

In New Albany Tractor, Inc. v. Louisville Tractor, Inc., 650 F.3d 1046 (6th Cir. 2011), New Albany, a retailer of Scag equipment, alleged "a discriminatory pricing scheme" between defendant Scag, a manufacturer of that equipment, and defendant Louisville Tractor, a retailer of Scag equipment and an exclusive wholesale distributor of that equipment to retailers, like New Albany. Id. at 1049. New Albany's RPA claim relied on the indirect-purchaser doctrine, because it contended that Scag, the manufacturer, controlled the terms upon which a buyer could purchase the equipment from Louisville Tractor, its exclusive wholesaler. Stated differently, New Albany claimed that Louisville Tractor was a "dummy" wholesaler and that the price of the equipment it had purchased from Louisville Tractor was in fact controlled by Scag. See New Albany Tractor, Inc., v. Louisville Tractor, Inc., 2009 WL 3672918, at *2-3 (W.D. Ky. Nov. 2, 2009). The complaint alleged that New Albany bought equipment and parts from defendant Scag at a "discriminatory" price "in that [defendant] Louisville Tractor does not pay the same amount for Scag commodities that [New Albany] does and Louisville Tractor is able to offer lower

---

[16] To the extent cases like Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp., 312 F. Supp. 2d 379 (E.D.N.Y. 2004), and George Haug Co. concluded that a Section 2(a) claim was adequately pled based on a bare recitation that the defendant seller charged the favored purchaser a lower price, without indication as to the amount of the discount or factual support for the existence of the discount, it is not clear that such RPA claims could survive a motion to dismiss post-Twombly. Cf. Flash Elec. Inc., 312 F. Supp. 2d at 398-99 (concluding, based on Haug, that plaintiff had pled a Section 2(a) claim where it alleged that "Universal sold its product to wholesale distributors at a cheaper price than sold to the plaintiffs," even though the "pleadings [were] thin" and included no details about the amount of the lower price); Haug, 148 F.3d at 144 (concluding that Section 2(a) claim had been adequately pled where it did "not detail the amount and degree of the price discrimination" and only alleged that plaintiff had been "injured during the 4 years prior to its termination").

prices to its retail customers and/or to keep a greater share of the sale price as profit." See 08 Civ. 664 (JGH), Compl. (ECF No. 1) at ¶¶ 13-14. There were no other allegations in the complaint concerning the price charged by Scag or Louisville Tractor. Nor were there any factual allegations to support an inference that Scag controlled the price at which Louisville Tractor sold the equipment to New Albany. The district court dismissed New Albany's RPA claim because the complaint "did not allege sufficient facts as to pricing to indicate that Scag 'set or controlled'" the "'resale price'" charged by Louisville Tractor. 650 F.3d at 1050. The district court reasoned that, without such factual allegations, the complaint did not sufficiently plead that Louisville Tractor was a "dummy" corporation for application of the indirect-purchaser doctrine. See 2009 WL 3672918, at *3; see also New Albany Tractor, Inc. v. Louisville Tractor, Inc., 2010 WL 59206, at *1 (W.D. Ky. Jan. 5, 2010) (decision on motion for reconsideration).

Citing Twombly, the Sixth Circuit affirmed the district court's dismissal of the RPA claim, reasoning that New Albany had to "allege specific facts of price discrimination even if those facts are only within the head or hands of the defendants." 650 F.3d at 1051. The Court explained that "[t]his pricing information [was] necessary in order for New Albany to allege that it pays a discriminatory price for the same Scag equipment." Id. at 1050. At first glance, that statement by the Sixth Circuit appears to lend support to Amazon's argument, that Plaintiff was required to allege specific facts about the exact price paid by Amazon to the Publishers. But New Albany is distinguishable for at least two reasons.

First, New Albany asserted an RPA claim that required application of the indirect-purchaser doctrine and it therefore had to alleges facts from which to infer that Scag controlled the price at which Louisville Tractor sold the equipment. The complaint had no allegation whatsoever concerning Scag's control over the prices charged by Louisville Tractor. The Sixth

Circuit's statement concerning the necessary "pricing information" required to plead a Section

2(a) claim could thus have concerned, more narrowly, the requirement that a plaintiff plead

factual details from which to infer that a defendant "exercise[d] control over the terms and

conditions" of the sales by the dummy retailer defendant. Id. at 1050-51. Second, the complaint

in New Albany did not contain any factual detail to support even the existence of a

discriminatory price. New Albany instead appeared to infer the existence of a discriminatory

price from a single conclusory allegation that Louisville Tractor was "able to offer lower prices

to its retail customers." See 08 Civ. 664 (JGH), Compl. (ECF No. 1) at ¶ 14. Given those

distinctions, it is not evident that the Sixth Circuit's reasoning in New Albany would apply here,

where Plaintiff has provided factual support to plausibly allege that a discriminatory price

existed.

Amazon also relies on Coalition for a Level Playing Field, LLC v. Autozone, Inc.

("Coalition II"), 813 F. Supp. 2d 557 (S.D.N.Y. 2011). The court there applied the reasoning in

New Albany, to conclude that the plaintiffs, a group of auto part stores and a trade association,

had not adequately alleged a Section 2(a) claim against defendants, auto part manufacturers and

chain retailers, for discriminatory pricing in the sale of auto parts. Id. at 568-69. But the proposed

amended complaint conceded that the "existence and extent of price discrimination" could not be

determined "without engaging" in certain calculations outlined in the complaint. Id. at 562-63.

Here, by contrast, Plaintiff has plausibly alleged the existence of a discriminatory price.

Finally, Amazon argues that Plaintiff was required to allege that it "actually sought and

was denied better pricing" from the Publishers to plead the existence of discriminatory pricing.

Amazon's Br. at 8. None of the cases it cites directly support that proposition. In CMS

Volkswagen Holdings, LLC v. Volkswagen Group of America, 25 F. Supp. 3d 432 (S.D.N.Y.

44

2014), the plaintiff did not even raise an RPA claim; the case concerned state-law claims. Id. at 434. And in discussing the RPA generally, the court merely stated that the doctrine of functional availability means that there is no violation of the RPA if the "price concessions and allowances" are "available equally and functionally to all customers." Id. at 439. Lastly, Smith Wholesale Co., Inc. v. R.J. Reynolds Tobacco Co., 477 F.3d 854 (6th Cir. 2007), concerned the grant of summary judgment, where the court concluded that the "various concessions and allowances" had "practically and realistically" been made available to the plaintiff. Id. at 866-68. The court, however, did not discuss what allegations were necessary at the pleading stage to adequately allege that a discount was not available to the plaintiff.

In sum, Plaintiff has adequately alleged the existence of a price differential. It is not clear from the case law, however, that Plaintiff was also required to allege the extent of that price differential in order to satisfy the discriminatory-pricing element of a Section 2(a) claim. Resolution of that issue, however, is not necessary because, as discussed below, factual allegations from which to infer the extent of the price differential are necessary to adequately plead the fourth element of a Section 2(a) claim.

*Competitive Injury*

The final element of a Section 2(a) claim requires a plaintiff to plead that the price discrimination had a prohibited effect on competition. This can be done in one of two ways: a plaintiff can plead "substantial discounts to a competitor over a significant period of time, known as the Morton Salt inference, or "proof of sales lost to favored purchasers." In re Inclusive Access Course Materials, 2021 WL 2419528, at *16; see also Cash & Henderson Drugs, 799 F.3d at 210, 212; Monsieur Touton Selection, Ltd. v. Future Brands, LLC, 2006 WL 2192790 at *4 (S.D.N.Y. Aug. 1, 2006) (noting that the fourth element of a prima facie case of a secondary-

45

line price discrimination case may be pled with an allegation that the plaintiff "was actually competing with the favored purchaser at the time of the price discrimination," and that the price discrimination "was substantial and sustained over time"); Falls City Indus., Inc. v. Vanco Beverage, Inc., 460 U.S. 428, 435 (1983) (explaining that under Morton Salt inference, "injury to competition is established prima facie by proof of a substantial price discrimination between competing purchasers over time"). Plaintiff argues that it has pled competitive injury under the Morton Salt inference and proof of lost sales. ECF No. 95 (Pl.'s Br.) at 13. Neither is adequately alleged in the CAC.

Beginning with Plaintiff's invocation of the Morton Salt inference, the CAC alleges that "injury to competition may be inferred" from the fact that Plaintiff had to pay the Publishers "substantially more for their goods over time than" Amazon. CAC ¶ 98. There are no factual allegations from which to infer that Amazon received a "substantial" discount. As just discussed, the CAC alleges enough to plausibly infer that Amazon received a discount that was greater than the 46% discount received by Plaintiff. But the amount of the actual discount received by Amazon is unknown. And Plaintiff offers no factual support for its conclusory allegations that the discount was "steep," "huge," or "substantial." Instead, Plaintiff's allegation merely recites the standard for applying the Morton Salt inference. See CAC ¶ 98. For this reason, Plaintiff has not adequately alleged sufficient facts to rely on the Morton Salt inference to plead competitive injury.

Plaintiff fares no better with its attempt to plead competitive injury through proof of lost sales to Amazon. The CAC alleges that Plaintiff "lost sales to price-sensitive consumers as a direct result" of the discriminatory pricing. CAC ¶ 100. But that allegation is conclusory, and Plaintiff provides no factual allegations to support the claim that it lost sales to Amazon. See,

 e.g., Dayton Superior Corp., 2011 WL 710450, at *10 (concluding that plaintiff adequately pled lost sales, satisfying competitive injury element at pleading stage, where complaint provided "a specific example" of particular sale that plaintiff lost to defendants); Intimate Bookshop, 88 F. Supp. 2d at 139 (concluding that plaintiff had adequately pled competitive injury, to avoid dismissal, where complaint alleged that plaintiff "lost approximately $11 million in annual sales between fiscal 1995 and 1998 due to the discriminatory pricing" and further alleged that plaintiff had "lost 96% of its sales to the retailer defendants").

In its brief, Plaintiff points to paragraphs 53 through 55 of the CAC to argue that it has plausibly alleged facts from which to infer that it lost sales to Amazon. ECF No. 95 (Pl.'s Br.) at 14. But those paragraphs do not support a plausible inference that Plaintiff itself lost sales to Amazon. Instead, paragraph 53 discusses general economic principles, such as the "cross-elasticity of demand," and the proposition that as prices rise consumers look for "comparatively lower real book prices." CAC ¶ 53. Paragraphs 54 and 55 simply show that Amazon sold two books at a discount off of the list price, and that Plaintiff sold those books at list price. CAC ¶¶ 54-55. None of those paragraphs provide an example of a circumstance where Plaintiff lost a sale to Amazon because of the alleged discriminatory pricing.

Because Plaintiff has not plausibly alleged a competitive injury, a necessary element of a prima facie claim, I recommend that Plaintiff's Section 2(a) claim be dismissed. Further, as discussed below, there are two additional grounds upon which the Section 2(a) claim may be dismissed. First, Plaintiff has not plausibly alleged facts from which to infer that the pricing differential offered to Amazon was not the result of a bona-fide functional discount or the result of materially different contract terms. And second, Plaintiff has not plausibly alleged that Defendants would not be entitled to the meeting-competition defense in Section 2(b) of the RPA.

*Materially Different Contract Terms or Functional Discounts*

"[N]ot all price differentials are unlawful under the [RPA]." Coalition II, 813 F. Supp. 2d at 566. Indeed, "Congress did not intend to outlaw prices differences that result from or further the forces of competition." Brooke Grp., 509 U.S. at 220. A seller is thus "not obligated to charge the same price for a commodity if its sales contracts with different buyers contain materially different terms." Coalition I, 737 F. Supp. 2d at 212 (citing cases). Likewise, a seller is permitted to afford a buyer a discounted price if the price reduction reflects a "bona fide functional discount—in essence, a set-off for the value of services the purchaser performs for the seller." Id. at 210. "[W]here a price differential merely accords due recognition and reimbursement for functions actually performed by a downstream buyer," the price differential is not prohibited by the RPA. Id. at 211 (citing Hasbrouck, 496 U.S. at 562).

"Providing different prices to different purchasers is consistent with both unlawful price discrimination and lawful pricing justified by different terms and conditions of sale or functional discounts." Sw. Paper Co. v. Hansol Paper, 2013 WL 11238487, at *5 (C.D. Cal. Apr. 15, 2013). Consequently, a plaintiff "must allege the illegitimacy of any price differences by pleading facts that plausibly show that the discounts are either excessive or were given with the purpose of passing along a price advantage." Id. Put differently, it is the plaintiff's burden to show that a claimed functional discount is not genuine because "functional pricing negates the probability of competitive injury, an element of a prima facie" Section 2(a) claim. Hasbrouck, 496 U.S. at 561 n.18; Coalition I, 737 F. Supp. 2d at 211; see also Sw. Paper Co., 2013 WL 11238487, at *4 ("[F]unctional discounts are not an affirmative defense that must be pled and proven by the defendant."). Similarly, to survive a motion to dismiss, a plaintiff must allege facts from which to plausibly infer that the price differentials are not the result of materially different contract

terms. Coalition I, 737 F. Supp. 2d at 215-17 (explaining that at pleading stage, "when complicated contracts . . . are alleged, such pleading must refute the inference that parts are not sold subject to materially different contract terms or, separately, that differentials simply reflect non-price terms of sale"). Here, Plaintiff has not alleged facts from which to plausibly infer that the discount offered to Amazon did not result from materially different contract terms or a bona-fide functional discount.

Beginning with materially different contract terms, in Coalition I, for instance, the district court granted a motion to dismiss an RPA claim, in part, because the allegations in the complaint "plausibly allege[d]" price differentials, but the allegations suggested that the supply agreements at issue contained "materially different terms" and the complaint "ignore[d] the possibility that these contract differences" could account "for the lower prices paid" by some buyers. 737 F. Supp. 2d at 215-17. The same is true here.

The CAC alleges that the Publishers entered into distribution agreements with Amazon for the sale of print trade books. CAC ¶¶ 8-9. Those agreements governed the parties' relationship for a period of several years. See CAC ¶ 9. By contrast, the CAC contains no allegation that Plaintiff purchased books from the Publishers under any sort of contractual arrangement, let alone a multi-year contractual arrangement. See CAC ¶ 94 (alleging only that Plaintiff "purchased numerous books, often repeatedly"); see also id. ¶¶ 1, 26 (alleging only that Plaintiff "purchases books at wholesale prices directly" from the Publishers). And although Plaintiff now argues that it does not buy from the Publishers "on a spot market" (ECF No. 94 (Pl.'s Br.) at 18), there are no allegations in the CAC itself to that effect. It is thus not known what, if any, contractual arrangement Plaintiff has with the Publishers for the purchase of its books at wholesale.

As the court in <u>Coalition I</u> recognized, "long-term sales contracts allow both buyer and seller to reduce their exposure to changes in the market price of a commodity." 737 F. Supp. 2d at 212. For that reason, "goods sold under a long-term contract are not 'of like grade or quality' to those sold on the sport market, even though the underlying goods are physically identical." <u>Id.</u>; <u>see also</u> <u>A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc</u>., 881 F.2d 1396, 1408 (7th Cir. 1989) (reasoning that "a seat on the 6:00 a.m. flight from Chicago to New York is not the same as a seat on the 5:00 p.m. flight, and a seat on the 5:00 p.m. flight reserved two weeks in advance is not the same as a seat on the flight for which the passenger had to stand by"). Absent any allegations about the type of buying arrangement Plaintiff has with the Publishers, Plaintiff has not alleged any facts from which to plausibly infer that the price differential offered to Amazon was not the result of differences in the contractual relationship Amazon and Plaintiff had with the Publishers.

Turning to functional discounts, Plaintiff alleges that the exception is inapplicable here because "[t]he significant difference between the discounts offered to Amazon versus Plaintiff . . . exceeds any cost savings achieved by selling to Amazon." CAC ¶ 101. Because the Publishers ████████████████████████████████████████████████ those services, Plaintiff claims, cannot form the basis of a functional discount CAC ¶¶ 102-03.

A functional discount is unlawful only if (1) "the discount is being given for services that are not being performed at all," or (2) "the amount of the discount greatly exceeds the value or cost of the service." <u>Coalition I</u>, 737 F. Supp. 2d at 211. Here, the CAC states that Amazon performed additional services for the Publishers. CAC ¶¶ 5, 102. And Plaintiff acknowledges that if a purchaser performs "certain distribution or marketing functions for the seller," the purchaser may receive "a reasonable discount" that reflects the savings to the seller. ECF No. 94

50

(Pl.'s Br.) at 19. Plaintiff nonetheless argues that "as a matter of law," ██████████ ████████████ "cannot serve as the basis" for a functional discount because the Publishers ████████████████████████████. ECF N. 94 (Pl.'s Br.) at 19-20; <u>see also</u> CAC ¶ 102. But Plaintiff cites to no case that supports its argument that the payment of separate fees necessarily bars application of the functional-discount exception.[17]

Moreover, Plaintiff does not know the amount of the discount offered to Amazon. Nor does Plaintiff know the amount of the separate fees paid by the Publishers to Amazon for the provision of additional services. All of that information was redacted from the contracts Plaintiff reviewed. Plaintiff thus has no factual basis for alleging that Amazon received a "significant" discount; for alleging that the discount was not warranted by any "cost savings" to the Publishers; or for claiming that the additional discounts "increase the cost of selling to Amazon as compared to other Booksellers." CAC ¶ 101. As the Supreme Court indicated in <u>Hasbrouck</u>, a functional discount need only be "reasonable" and cannot be "completely untethered to either the supplier's savings or the wholesaler's costs." 496 U.S. at 561-63; <u>see also</u> <u>Sw. Paper Co.</u>, 2013 WL 11238487, at *5 ("[A] functional discount need not precisely correspond to the costs a seller

---

[17] Plaintiff cites to the Supreme Court's decision in <u>Hasbrouck</u> to support its argument that, "as a matter of law," the additional services performed by Amazon cannot form the basis of a functional discount because ██████████████████████████████████████. ECF No. 94 (Pl.'s Br.) at 19-20. <u>Hasbrouck</u>, however, does not stand for that categorical assertion. In that case, the Supreme Court merely concluded that "there was no substantial evidence indicating that the discounts" by Texaco to the buyers "constituted a reasonable reimbursement for the value to Texaco" of the "actual marketing functions" performed by the buyers. 496 U.S. at 562. The Court, however, made clear that a discount need only be "reasonable" for the functional-discount exception to apply. <u>Id.</u> at 561-62. To be sure, in assessing the reasonableness of the discount, the Court noted that the buyers were "separately compensated for its hauling function." <u>Id.</u> But the Court's discussion makes clear that it considered multiple factors in assessing the reasonableness of the discount (including that the buyers did not maintain "any significant storage facilities"), and it was only the "absence of evidence to connect the discount to any savings enjoyed by Texaco" that rendered the functional-discount exception unavailable in that case. <u>Id.</u> at 561-63.

avoids by receiving services performed by the buyer."). Without any factual detail concerning the amount of the fees paid to Amazon or the amount of the discount received by Amazon, Plaintiff cannot plausibly allege that the discount was unreasonable or untethered to any cost savings to the Publishers. Plaintiff has thus not pled sufficient facts from which to conclude that any price differential was not the result of a bona-fide functional discount.

In short, Plaintiff provides no facts from which to plausibly infer that the discount offered to Amazon was not a commercially reasonable functional discount or the result of materially different contract terms. Plaintiff thus has not met its burden under Twombly of pleading facts that give rise to a plausible inference that the price differential was unlawful under the RPA. For this reason, too, I recommend dismissing the Section 2(a) claim.

### The Meeting-Competition Defense in Section 2(b) of the RPA

The RPA provides two affirmative defenses, only one of which is at issue here—the meeting-competition defense.[18] That defense provides that "a price reduction made [by a seller] to meet in good faith an equally low price of a competitor" does not violate the RPA. Standard Oil v. Fed. Trade Comm'n, 340 U.S. 231, 241, 250 (1951); see also 15 U.S.C. §13(b). To invoke the defense, a seller need only hold a "good-faith belief, rather than absolute certainty, that a price concession is being offered to meet an equally low price offered by a competitor." United States v. U.S. Gypsum Co., 438 U.S. 422, 453 (1978); see also Great Atl. & Pac. Tea Co. v.

---

[18] The meeting-competition defense is not an element of a prima facie case for violation of Section 2(a) of the RPA. See Alan's of Atlanta, Inc. v. Minolta Corp., 903 F.2d 1414, 1420 (11th Cir. 1990) (explaining that meeting-competition defense "allows a seller to rebut a prima facie case of price discrimination"). However, to state a plausible claim of price discrimination under Twombly, a plaintiff must allege facts from which to infer that the discriminatory price was unlawful—i.e., not offered in good faith to meet a competitor's price—because "providing different prices to different purchasers is consistent with both unlawful price discrimination and lawful pricing justified by different terms or conditions of sale." Sw. Paper Co., 2013 WL 11238487, at *5.

F.T.C., 440 U.S. 69, 83 (1979) (explaining that "a seller can assert the defense even if it has

unknowingly made a bid that in fact not only met but beat his competition"). ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████. CAC ¶ 8.

The CAC alleges that the meeting-competition defense is unavailable for two reasons,

neither of which has merit. First, the CAC alleges that each book title sold by a Publisher is

substantially different from any other book title sold by any other Publisher—that is, each

Publisher "sells its own commodities of like grade and quality (like hardback copies of the same

title)." CAC ¶ 96. As such, "[b]ecause different book titles are not commodities of like grade and

quality, competition in the sale of different titles does not fall within the meeting the competition

exception." CAC ¶ 104. Stated differently, Plaintiff alleges that the Publishers are not

competitors for application of the meeting-competition defense because one Publisher's book

titles are "completely distinct" from another Publisher's book titles. CAC ¶ 104.

These allegations, however, are contradicted by other allegations in the CAC. For

instance, the CAC alleges that the Publishers are "horizontal competitors in the publication and

sale (at wholesale) of print trade books." CAC ¶ 7. Plaintiff also alleges that "acting alone, none

of the [Publishers] could have raised the market price of trade print books"; it was only through

"collusion" that the Publishers were able to cause a market-wide rise in prices. CAC ¶¶ 13, 39-

40. Further, the relevant market, as defined by Plaintiff, is the market for all "print trade books."

CAC ¶ 59. As Amazon argues (Br. at 19), the implication of Plaintiff's allegations—indeed,

Plaintiff's entire theory underlying the Sherman Act claims—is that the Publishers acted as

competitors and thus their pricing of an individual book title was constrained by another

Publishers' pricing of its different book titles. Although Plaintiff contends that the assessment of

whether commodities are of "like grade and quality" is different for a Sherman Act claim than

for an RPA claim (ECF No. 95 (Pl.'s Br.) at 20), Plaintiff cites to no case where a court

determined that commodities were of "like grade and quality" for purposes of one statute but not

the other.[19]

Moreover, Plaintiff's argument that application of the defense requires the Publishers to

sell commodities that are of "like grade and quality" (ECF No. 94 (Pl.'s Br.) at 23) finds no

support in the text of the statute or the case law. Section 2(b), where the defense is codified,

contains no reference to goods having to be of "like grade and quality" for the defense to apply.

See Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and their

Application, ¶ 2352b.2. And, as several courts have recognized, even though competitors may

produce goods with different characteristics, that does not preclude application of the meeting-

competition defense. See Callaway Mills Co. v. F.T.C., 362 F.2d 435, 441 (S.D.N.Y. 1966)

(reasoning that application of the defense did not require goods of "like grade and quality," and

defense could be applied where "products at various price levels generate public demand (or

'saleability') substantially equivalent to that of competitors"); Walker v. Hallmark Cards, Inc.,

992 F. Supp. 1335, 1340-42 (M.D. Fla. 1997) (meeting-competition defense could apply to

maker of "Hallmark" greeting cards where evidence showed that it had lowered price to

---

[19] None of the cases Plaintiff cites (ECF No. 94 (Pl.'s Br.) at 23 n.6) support its argument that the meeting-competition defense cannot apply here because the Publishers' book titles are not of "like grade or quality." See Checker Motors Corp. v. Chrysler Corp., 283 F. Supp. 876, 889-90 (S.D.N.Y. 1968) (concluding that defense was not applicable because evidence did not show that rebate plan was offered "in response to a rival's rebate scheme" as the evidence showed that the rebate plan had been introduced several years before competitors introduced their own rebate arrangements); Reeder-Simco GMC, Inc. v. Volvo GM Heavy Truck Corp., 374 F.3d 701 (8th Cir. 2004) (court did not address or discuss meeting-competition defense).

Walgreens in good faith to meet lower price offered by card competitor who made "American Greeting" cards).

Second, Plaintiff argues that the meeting-competition defense is unavailable because Defendants "jointly agreed to a discriminatory pricing system that favored Amazon. ECF No. 94 at 23. In that regard, the CAC alleges that "even if the goods were of the same like 'grade and quality,' the pricing could not qualify as a 'good faith' meeting competition . . . because the [Publishers] jointly agreed to the discriminatory discounts" and the Publishers "expressly conditioned that the discount applies only if the others accepted the same illegally discriminatory price." CAC ¶ 104; see also id. ¶¶ 6, 99. Put differently, Plaintiff relies on the existence of a price-fixing conspiracy among the Publishers and Amazon to support its allegation that the insertion of the meeting-competition clause in certain of the Publishers' agreements with Amazon was pretextual. As already discussed, Plaintiff has not plausibly alleged the existence of a conspiracy. Plaintiff thus has not plausibly alleged that the inclusion of the meeting-competition clause in the Publishers' contracts with Amazon was not done in good faith.

Accordingly, even if Plaintiff had plausibly alleged a prima facie claim under Section 2(a), dismissal would still be required because Plaintiff's allegations do not plausibly allege that Defendants could not avail themselves of the meeting-competition defense in Section 2(b). Moreover, because the meeting-competition defense in Section 2(b) applies to claims brought under Section 2(d) and 2(e), to the extent Plaintiff is raising such claims here (see CAC ¶ 102), those claims would be barred by the defense as well. See George Haug Co., 148 F.3d at 145 (explaining that the Section 2(b) defense for meeting competition is also applicable to claims brought under Section 2(d) and 2(e)).

2.  Section 2(f) claim as against Amazon

Section 2(f) of the RPA makes it unlawful for a favored purchaser "knowingly to induce or receive a discrimination in price which is prohibited" by the Act. 15 U.S.C. § 13(f). Liability under Section 2(f) is entirely derivative of Section 2(a)'s liability and thus a buyer may not be held liable under Section 2(f) if the seller is not liable for violating Section 2(a). See Great Atl. & Pac. Tea Co. v. Federal Trade Comm'n, 440 U.S. 69, 77-78 (1979); Cash & Henderson Drugs, 799 F.3d at 215 ("A buyer cannot be liable unless the seller of the goods is liable under another section of the Act.").

To survive a motion to dismiss a Section 2(f) claim, a plaintiff must allege facts sufficient to establish: "(1) the price discrimination violates Section 2(a) of the Act; (2) the defendant is a buyer engaged in interstate commerce; and (3) the buyer has 'knowingly' induced or received the prohibited discrimination in price." Hygrade Milk & Cream Co. v. Tropicana Prod., Inc., No. 88-CV-2861 (KTD), 1994 WL 38549, at *2 (S.D.N.Y. Feb. 4, 1994). Having failed to adequately plead a section 2(a) claim, Plaintiff's Section 2(f) claim against Amazon necessarily fails. Nevertheless, for the sake of completeness, I address whether Plaintiff has adequately alleged that Amazon knowingly induced or received a discriminatory price from the Publishers.[20]

Plaintiff must plead sufficient facts from which to plausibly allege that Amazon knew that it was receiving a lower price than its competitors. See Automatic Canteen Co. of America v. Federal Trade Commission, 346 U.S. 61, 74 (1953). "The knowledge requirement has been construed to mean that the buyer must have either actual knowledge, i.e., he or she must have known that the price in question was illegal, or constructive knowledge, i.e., he or she must have

---

[20] Amazon does not dispute that it is a buyer engaged in interstate commerce—the second element of a Section 2(f) claim.

been reasonably cognizant of its illegality." <u>Hygrade Milk & Cream Co.</u>, 1994 WL 38549, at *3 (citation omitted); <u>see also</u> <u>Am. News Co. v. Federal Trade Commission</u>, 300 F.2d 104, 110 (2d Cir. 1962) ("Although knowledge must be proved, it need not be by direct evidence; circumstantial evidence, permitting the inference that petitioners knew, or in the exercise of normal care would have known, of the [statutory violation] is sufficient.").

As the Supreme Court explained in <u>Automatic Canteen</u>, requiring evidence that the buyer knew that the discount it received was not based on cost differences comports with the purpose underlying enactment of Section 2(f). 346 U.S. at 73, n.15. The legislative history indicates that Congress intended Section 2(f) to apply in circumstances where a seller, facing a "demand for sacrificial price cuts coming from mass-buyer customers," had resisted that demand by informing the buyer that the discount was "in excess of any" cost differential. <u>Id.</u> There thus must be a plausible basis from which to infer that Amazon not only knew that it received a greater discount but also knew that the discount was not justified by any cost savings to the Publishers from distributing through Amazon. <u>Id.</u> at 74 (concluding that "a buyer is not liable under [§] 2(f) if the lower prices he induces are either within one of the seller's defenses such as the cost justification or not known by him not to be within one of those defenses").

The CAC alleges that Amazon knew it received higher discounts not equally available to other retailers because it "demand[ed]" that the Publishers ███████████████████ ██████ CAC ¶¶ 6, 99; <u>see also</u> <u>id.</u> ¶ 19 (alleging that Amazon "knew that the prices were discriminatory because it demanded discounts and other concessions that it knew were not available to other booksellers"). "The receipt of better-than-published prices, without more, does not satisfy section 2(f)'s knowledge requirement." <u>Gorlick Distr. Ctrs. LLC v. Car Sound Exhaust System, Inc.</u>, 723 F.3d 1019, 1022 (9th Cir. 2013) (explaining that liability under

Section 2(f) requires knowledge by the buyer that "the prices it received likely did not qualify for" a defense under the RPA); accord Automatic Canteen Co., 346 U.S. at 71 (rejecting argument that violation of Section 2(f) occurs "if the buyer knows *only* that the prices are lower than those offered other buyers") (emphasis added). Thus, even assuming that Amazon knew the amount of the standard discount received by Plaintiff (CAC ¶ 6), that alone does not establish liability under Section 2(f), because "a buyer is not precluded from inducing a lower price based on cost differences that would provide the seller with a defense." Automatic Canteen Co., 346 U.S. at 70. For the same reason, allegations that Amazon would have known that it was receiving a better wholesale price than other retailers because of its dominant market position are also insufficient, by themselves, to establish liability under Section 2(f). See CAC ¶¶ 2, 15, 46, 48. Instead, to plead Amazon's knowledge, the CAC must contain some factual detail supporting a plausible inference that Amazon knew or would have known that its discount was not justified by any cost savings to the Publishers. The CAC contains no such factual allegations.

Lastly, Plaintiff also alleges that Amazon "knowingly received the benefit of the [Publishers'] price discrimination" because of the ███████████████████████ ███████████████████████████████ . CAC ¶ 99. A meeting-competition clause, however, is a lawful contractual term and plaintiff does not argue otherwise. And as already discussed, because Plaintiff's factual allegations do not support the existence of a conspiracy among the Publishers and Amazon, Plaintiff has not alleged any facts from which to infer that the use of that lawful contractual provision here was in bad faith.

**CONCLUSION**

For the foregoing reasons, I respectfully recommend that Defendants' Motions to Dismiss

be **GRANTED**. This order is to be filed under seal and viewing levels are restricted to only

Plaintiff, Defendants, and the Court.

Date: August 15, 2022

New York, New York

Respectfully submitted,

_____

VALERIE FIGUEREDO
United States Magistrate Judge

**NOTICE**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court. Any request for an extension of time to file objections or responses must be directed to the Honorable Gregory H. Woods. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).