**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BOOKENDS & BEGINNINGS LLC, on behalf of itself and all others similarly situated, | No. 21-cv-02584-GHW-VF |
| Plaintiff, | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| AMAZON.COM, INC.; HACHETTE BOOK GROUP, INC.; HARPERCOLLINS PUBLISHERS L.L.C.; MACMILLAN PUBLISHING GROUP, LLC; PENGUIN RANDOM HOUSE LLC; SIMON & SCHUSTER, INC., | **DEMAND FOR JURY TRIAL** |
| Defendants. | [REDACTED VERSION] |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................... 1

II.   JURISDICTION ................................................................................................... 10

III.  VENUE ................................................................................................................ 12

IV.  PARTIES ............................................................................................................. 13

    A.    Plaintiff ................................................................................................... 13

    B.    Defendants ............................................................................................. 13

        1.    Amazon ..................................................................................... 13

        2.    Hachette .................................................................................... 13

        3.    HarperCollins ........................................................................... 14

        4.    Macmillan ................................................................................. 14

        5.    Penguin ..................................................................................... 15

        6.    Simon & Schuster .................................................................... 16

V.   STATEMENT OF FACT ..................................................................................... 17

    A.    Horizontal Price-Fixing ........................................................................ 17

        1.    Publisher Defendants reached the same agreement with Amazon. ................................................................................... 17

        2.    The Publisher Defendants knew when they signed their agreements that other Publisher Defendants had agreed to the same discriminatory arrangement. ..................................... 18

        3.    Publisher Defendants would not have agreed to the discriminatory rates unless they knew the others had also agreed to them. ........................................................................ 19

        4.    A horizontal agreement between the Publisher Defendants to raise their list prices can be inferred from their joint agreement to sell their books to their principal distributor at discriminatory rates. ............................................................... 20

a.  Defendants acted in parallel when they raised their list prices. ...................................................................20

b.  Acting alone, it would have been against each Publisher Defendant's individual self-interest to raise its list prices...............................................................23

c.  The Publisher Defendants had an opportunity to conspire and exchange information relative to the conspiracy. ....................................................................24

d.  The Publisher Defendants had a common motive to raise print trade book prices..........................................26

e.  The Publisher Defendants' prior collusive behavior makes it more likely than not that they colluded to raise print trade book prices..........................................26

f.  The District Court for the D.C. Circuit finds continuing collusion among the Big Five publishers...................27

g.  Market concentration makes collusion more likely.......................29

B.  The Defendants' vertical agreements violate the rule of reason.......................... 30

C.  Amazon uses anticompetitive means to maintain its monopoly of the retail market for the sale of print trade books. ................................................. 31

D.  Defendants' agreements support a conspiracy to maintain Amazon's retail monopoly.................................................................. 33

E.  Defendants violate the Robinson-Patman Act's prohibition against discriminatory pricing. .............................................................. 35

1.  Defendants' contracts are a prima facie violation of the RPA.................................................................. 35

F.  Courts and enforcement agencies have repeatedly found that Defendants engaged in anticompetitive conduct in the sale and distribution of trade books. ................................................. 38

G.  Defendants' discriminatory pricing scheme harms competition and hurts consumers. ....................................................................... 41

VI.  INTERSTATE TRADE AND COMMERCE ................................................ 48

VII.  DEFENDANTS' MARKET POWER IN THE RELEVANT MARKET ...................... 48

A.  The market for print trade books is the relevant product market......................... 49

| | | | |
|---|---|---|---|
| | 1. | Trade books are not interchangeable with other books. | 49 |
| | 2. | Print books are not reasonably interchangeable with eBooks or audio books. | 49 |
| | 3. | Wholesale Market | 51 |
| | 4. | The online retail market for sale of print trade books is a well-defined submarket, representing a distinct group of competitors that do not overlap significantly with brick-and-mortar booksellers | 52 |
| | B. | The relevant geographic markets are the United States and the local and regional markets in which Amazon competes with Class members. | 56 |
| | C. | The Big Five dominate the production and sale at wholesale of print trade books in the U.S. market. | 57 |
| | D. | Amazon dominates the retail market for print trade books | 58 |
| VIII. | CLASS ACTION ALLEGATIONS | | 59 |
| IX. | ANTITRUST INJURY | | 61 |
| X. | CAUSES OF ACTION | | 62 |
| | FIRST CAUSE OF ACTION VIOLATION OF 15 U.S.C. § 13 | | 62 |
| | SECOND CAUSE OF ACTION VIOLATION OF 15 U.S.C. § 1 | | 67 |
| | THIRD CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION (15 U.S.C. § 2) | | 72 |
| | FOURTH CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – CONSPIRACY TO MONOPOLIZE  (15 U.S.C. § 2) | | 73 |
| | JURY TRIAL DEMANDED | | 74 |
| | PRAYER FOR RELIEF | | 74 |

010888-12/2077168 V1

Plaintiff alleges the following upon personal knowledge as to itself and its own acts, and as to all other matters upon information and belief, based upon the investigation made by and through its attorneys.

## I.    INTRODUCTION

1.    Plaintiff Bookends & Beginnings ("Bookends") is a bookseller that operates online and as a physical store in Evanston, Illinois. Bookends directly purchases print books[1] published and sold at wholesale by the five largest publishers in the United States: Defendant Hachette Book Group, Inc. ("Hachette"); Defendant HarperCollins Publishers L.L.C. ("HarperCollins"); Defendant Macmillan Publishing Group, LLC ("Macmillan"); Defendant Penguin Random House LLC ("Penguin"); and Defendant Simon & Schuster, Inc. ("Simon & Schuster"), otherwise known collectively as the "Big Five." They publish the biggest titles in general interest fiction and non-fiction books (also known as "trade books").[2]

2.    The Big Five are horizontal competitors and the dominant producers in print trade book market. Their publications account for about 80% of trade books sold in the United States, including 90% of bestsellers.[3] The Big Five primarily distribute their books through retail

---

[1] This lawsuit concerns the sale of print books (hardbacks, paperbacks, and mass-produced). Defendants' conduct with respect to the sale of electronic books is the subject of a separate lawsuit. *In Re Amazon.com, Inc. eBook Antitrust Litigation.* Case Number: 1:21-cv-351-GHW-DCF (S.D.N.Y.).

[2] *See United States v. Apple Inc.*, 952 F. Supp. 2d 638, 648 n.4 (S.D.N.Y. 2013) (defining trade books).

[3] Dorany Pineda, Freddy Brewster, *Stephen King testified against publishing's biggest merger. What you need to know about the antitrust trial*, Los Angeles Times (Aug. 2, 2022) https://www.latimes.com/entertainment-arts/books/story/2022-08-02/stephen-king-testified-against-publishings-biggest-merger-what-you-need-to-know-about-the-antitrust-trial; Thad McIlroy, *What the Big 5's Financial Reports Reveal About the State of Traditional Book Publishing*, Book Business (Aug. 5, 2016), https://www.bookbusinessmag.com/post/big-5-financial-reports-reveal-state-traditional-book-publishing/.

booksellers, which purchase the books at wholesale prices for purposes of reselling them to consumers at retail.

3.      Defendant Amazon.com, Inc. ("Amazon") is Bookends' retail competitor and the largest retail bookseller in the United States market for the sale of print trade books. It sells over half of all trade books purchased by consumers in the United States, including about 90% of all print books purchased online.[4] Amazon is the Big Five's largest distributor of print trade books, potentially distributing 70 to 80% of their sales.[5]

4.      The Big Five print their suggested retail prices ("list prices") on their book covers and publish these prices in their catalogues. For example, it is standard practice for publishers to place a Bookland EAN barcode on their books, which contains the price:[6]

---

[4] House Judiciary Committee, Investigation of Competition in Digital Markets, Oct. 5, 2020 at 295 and n.1562, https://judiciary.house.gov/uploadedfiles/investigation_of_competition_in_digital_markets_majority_staff_report_and_recommendations.pdf ("House Report").

[5] Letter from Maria A. Pallante, Pres. & CEO, Ass'n of Am. Publishers, Mary E. Rasenberger, Exec. Dir., Authors Guild, Allison K. Hill, CEO, Am. Booksellers Ass'n, to Hon. David. N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 3 (Aug. 17, 2020) ("American Publishers Association letter") at 1, https://publishers.org/wpcontent/uploads/2020/08/Joint-Letter-to-Rep-Cicilline-081720.pdf. ("American Publisher Association Letter").

[6] Why do books have prices printed on them?, https://www.marketplace.org/2021/01/21/why-do-books-have-prices-printed-on-them/.



5.      At retail, booksellers sell the Big Five's books at their listed price or at a discount from the listed price.

6.      The Big Five also rely on their list prices to set the wholesale price of their books when they sell them to book retailers for resale to the public. The Big Five's standard wholesale price, which Bookends pays, is their list price less a discount of up to about 46%.[7]

7.      But that is not the price Amazon pays. ████████████████████████████



---

[7] *See* ABA Book Buyer's Handbook ("Redbook") (publishing publishers' standard discount).

[8] Hachette:  HBG-P-0000001 - HIGHLY CONFIDENTIAL.xlsb; Harper Collins: HarperCollins Bookends.zip; Macmillan:  MACMILLAN_BOOKENDS001.zip; Penguin:  PRH-BANDB001.zip; S&S:  SS-PBOOKS-001.zip.

Amazon has enjoyed substantially higher discounts (i.e., lower prices) from the Publisher Defendants than the prevailing rate paid by other print trade book retailers since 2015.

8.     Beginning in late 2014 and 2015 and continuing to this day, the Publisher Defendants contractually agreed in lockstep that they would sell their books to Amazon at prices below those paid by competing print trade book retailers.

9.     Amazon signed its first contract with Simon & Schuster on October 20, 2014.[9] It immediately followed with its agreement with Hachette on November 13, 2014,[10] and with Macmillan on December 18, 2014.[11] These contracts took effect in January 2015. Negotiations with HarperCollins and Penguin took longer. Business Insider reported in March 2015 that HarperCollins was bracing for a battle with Amazon, but whatever resistance it put up was resolved by April 14, 2015.[12] Similarly, after a reported impasse in May 2015, Amazon and Penguin reached agreement on June 17, 2015.[13]

---

[9] *Simon & Schuster's Agreement with Amazon Points the Way Back to Agency Pricing*, The Authors Guild (Oct. 21, 2014), https://authorsguild.org/news/simon-schusters-agreement-with-amazon-points-the-way-back-to-agency-pricing/#:~:text=October%2021%2C%202014%20Simon%20%26%20Schuster%20and%20Amazon,Trachtenberg%20of%20the%20Wall%20Street%20Journal%20%28subscription%20required%29.

[10] Taylor Soper, *Amazon and Hachette settle dispute with multi-year e-book agreement*, GeekWire (Nov. 13, 2014), https://www.geekwire.com/2014/hachette-amazon-reach-multi-year-e-book-agreement/#:~:text=November%2013%2C%202014%20%E2%80%93%20Hachette%20Book%20Group%20and,will%20benefit%20Hachette%20authors%20for%20years%20to%20come.

[11] *Macmillan Strikes Deal with Amazon, but "Irony Prospers in the Digital Age*," The Authors Guild (Dec. 19, 2014), https://authorsguild.org/news/macmillan-strikes-deal-with-amazon-but-irony-prospers-in-the-digital-age/.

[12] Brian Stelter, *Amazon, HarperCollins avert public fight*, CNN (Apr. 14, 2015), https://money.cnn.com/2015/04/14/media/amazon-harpercollins-deal/index.html.

[13] Amazon, PRH Reach Sales Deal, Publishersweekly.com (Jun. 17, 2015), https://www.publishersweekly.com/pw/by-topic/industry-news/industry-deals/article/67166-amazon-prh-reach-sales-deal.html.

10. ███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████.[14] ██████████████████████

████████████████████████████████████████

███████████████████████████ Amazon publicly confirmed to Business Insider during its negotiations with HarperCollins that the "contract [it] presented to HarperCollins was the same contract recently signed by Simon & Schuster, Hachette, and Macmillan."[15] It can also be reasonably inferred that █████████████████████ ████████████████████████████████████████ ██████████████ which it also publicly disclosed to the press.[16]



---

[14] ████████████████████████████████

[15] Jillian D'Onfro, *Another major publisher is going to war with Amazon*, Business Insider (Mar. 31, 2015) https://www.businessinsider.com/harpercollins-amazon-contract-expiring-2015-3.

[16] Jennifer Rankin, *Amazon and Penguin Random House said to be in dispute*, Guardian (May 25, 2015), https://www.theguardian.com/books/2015/may/25/amazon-and-penguin-

11.     The Big Five's interlocking agreements jointly commit them to sell to Amazon at prices below the standard discounts available to other booksellers.[17] Their agreements ███

███████████████████████████████████████████████████████████████████████

██████████████████████████.[19]

12.     The Big Five also provide additional favorable terms to Amazon, not available to Bookends and Class members on a comparable or proportional basis. For example, along with higher discounts, ██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

---

random-house-said-to-be-in-dispute (Amazon spokesman Tarek El-Hawary said, "I can say that we have long-term deals in place already with the other four major publishers and we would accept any similar deal with Penguin Random House U.K."). See also *Amazon, Penguin Random House Agree to New Deal on Book Sales*, WSJ (Jun. 18, 2015), https://www.wsj.com/articles/ amazon-penguin-random-house-agree-to-new-deal-on-book-sales-1434644767 (Amazon and Penguin "have reached terms covering the sale of digital and physical books in the U.S. and U.K.").

[17] HarperCollins (AMAZON_REV0000033, Sec. 1); Macmillan (AMAZON_REV0000057, Ex. 1); Penguin (AMAZON_REV0000082, Appendix A (defining "excluded products")).

[18] Macmillan (Amazon_Rev0000057, Ex. 1 (redacted, but showing different, presumably larger percentages each year); AMAZON_REV0000065, Ex. 1) (same); Penguin (Amazon_Rev0000082, Appendix B (same)); Simon & Schuster (AMAZON_REV0000131, Ex. 2; AMAZON_REV0000150, Ex.1 (same)).

[19] Hachette (Amazon_Rev0000001, Sec. B; Amazon_Rev0000004, Sec. 2; Amazon_Rev0000014, Sec. 4).

[20] Hachette, Amazon_Rev0000004, Sec. 4; HarperCollins, AMAZON_REV0000033, Sec. 2; Macmillan, AMAZON_REV0000065, Sec. 3; Penguin, AMAZON_REV0000094, Sec. 3; Simon & Schuster, AMAZON_REV0000142, Sec. 2.

[21] Macmillan, AMAZON_REV0000065, Sec. 5; Macmillan, AMAZON_REV0000160, Ex. A.

[22] Macmillan, AMAZON_REV0000185, Sec. 3.



increase the cost of selling to Amazon as compared to other retail booksellers. For example, in 2014 Forbes reported that "to receive promotion on the site," the Big Five pay Amazon at least "5% to 7% of the previous year's gross sales" on top of their agreed discount, so that even before Defendants agreed to give Amazon better discounts than the standard discount available to other retail booksellers, their effective discount was already around 53%.[25]

13.     By any measure the Publisher Defendants charge Bookends and members of the proposed Classes substantially higher prices to acquire print trade books than they charge Amazon.

14.     The Association of American Publishers, where each of the Big Five's CEOs serve as board members,[26] not only confirmed that Amazon is a costly and inefficient distributor of their books, but it forcefully denounced Amazon as an anticompetitive threat to the entire book industry and to democratic society.[27]

---

[23] Simon & Schuster, AMAZON_REV0000131, Sec. 3.

[24] Simon & Schuster, AMAZON_REV0000142, Sec. 4.

[25] Jeff Bercovici, Amazon vs. Book Publishers, By the Numbers, Forbes (Feb 10, 2014), https://www.forbes.com/sites/jeffbercovici/2014/02/10/amazon-vs-book-publishers-by-the-numbers/?sh=754f9b544ef9.

[26] Our Board, AAP, https://publishers.org/who-we-are/our-board/.

[27] American Publisher Association Letter.

15.     The Association sent a joint letter with other industry groups to the House Judiciary Committee investigating Amazon, confirming that publishers "who sell on Amazon pay more each year for Amazon's distribution and advertising services but receive less each year in return."[28]  The letter explains that despite the costly and ineffective method of book distribution that Amazon provides relative to other book retailers, Amazon's market dominance "forc[es] publishers to predominantly use its platform," with some relying on the retail giant "for more than 70 to 80 percent" of their sales.[29]

16.     The Association's letter reveals that "Amazon has aggressively exercised its market power against both suppliers and [its] customers,"[30] including practices "that appear to be well outside of fair and transparent competition," *e.g.,* steering "customers to sellers of infringing books, deceptive summaries, counterfeits, and unauthorized copies that compete with legitimate sales,"[31] and "manipulat[ing] discovery tools to make a supplier's books difficult to find without the purchase of advertising or refus[ing] distribution unless the supplier also purchases advertising."[32] By "mak[ing] a supplier's books difficult to find without the purchase of advertising or refus[ing] distribution unless the supplier also purchases advertising, Amazon can extract the purchases of unwanted services and supracompetitive prices for those services from suppliers. It also disadvantages rivals by directing valuable advertising dollars to its own dominant business."[33]

---

[28] *Id.* at 2.

[29] *Id.* at 1.

[30] *Id.* at 1.

[31] *Id.* at 2.

[32] *Id.* at 3.

[33] *Id.* at 3.

17.     The letter denounces these "tactics" as "anticompetitive because they allow Amazon to control its suppliers and prevent the emergence and growth of would-be rivals."[34] It concludes that because the publishing industry is "uniquely intertwined with our democracy," Amazon's unprecedented control of this market is "dangerous to a democratic society."[35]

18.     As an expected and intended consequence of the Big Five's interrelated agreements to sell print trade books to Amazon at discriminatory prices by granting Amazon greater discounts off list price than granted to competing retailers, the Big Five, shortly after negotiating their print book contracts with Amazon, raised their list prices. (*See infra* Section V.A.4.a.) The resulting market-wide increase in the list prices of print trade books directly injure Bookends and members of the proposed Classes (defined below), who must pay a substantially higher wholesale price, which is inflated by Defendants' collective agreement. The Publisher Defendants' inflated list prices also harm consumers, who are charged either the Big Five's listed price or a modest discount off that price.

19.     This result was not just expected; it was the bargain the Big Five made. If they agreed to provide to Amazon steep discounts to list price that are not available to other book retailers, they could set higher list prices—with Amazon effecting the market wide price increase they could not achieve on their own.

20.     Amazon, however, remains unscathed because it pays less than other booksellers. By drastically reducing Amazon's cost of doing business as compared to its competitors while raising its competitors' costs, Defendants' discriminatory pricing gives the retail giant an unfair and increasing advantage over retail competitors that prevents meaningful retail competition with

---

[34] *Id.*

[35] *Id.* at 4.

Amazon. Bookends and other booksellers, who pay at wholesale to the Big Five ███████ ████████████████████████████████████████████████████████ more than Amazon for the same books, cannot afford to compete with Amazon on retail prices. This allows Amazon to gain market share without ever incurring the same risks as other booksellers. As set forth below, this conduct violates several antitrust laws: horizontal price-fixing and vertical price fixing of print trade book wholesale prices in violation of Section 1 of the Sherman Act; monopolization by Amazon of the retail trade book market and a conspiracy between Defendants to ensure that Amazon maintained this market monopoly; and discriminatory prices in violation of the Robinson-Patman Act.

21.     The Court ruled that Plaintiffs' First Amended Complaint failed to state a claim on each of the counts alleged.[36] The complaint pleads additional facts that cure pleading deficiencies identified by the Court, including allegations relevant to standing and injury. For example, Bookends pleads additional facts regarding the amount of Amazon's discriminatory discounts, as well as regarding Bookends' and class members' competition against (and lost sales to) Amazon. Bookends also alleges further details regarding publisher market share, a wholesale print trade book market, and the Big Five's history of collusion.

## II.     JURISDICTION

22.     This Court has federal question jurisdiction pursuant to the federal antitrust laws invoked herein, including the Sherman Act and Clayton Antitrust Act, *e.g.*, 28 U.S.C. § 1331, 28 U.S.C. § 1337(a), and 15 U.S.C. § 15(a).

---

[36] *In re Bookends & Beginnings LLC*, No. 21-cv-02584 (GHW) (VF), 2022 U.S. Dist. LEXIS 152596 (S.D.N.Y. Aug. 15, 2022).

23.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from Defendants, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

24.     Bookends operates a bookstore in Evanston, Illinois and online, where it operates nationally. Bookends purchases books at wholesale prices directly from the Big Five and directly competes with Amazon in the U.S. market for the retail sale of print trade books and in the submarket for online sales of print trade books. Bookends was harmed and injured financially because of Defendants' conduct, as described further herein.

25.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, because Defendants reside in this District or may be found or transact business in this District. Each of the Big Five Defendants have headquarters and operate their businesses in this District. Amazon likewise may be found or transacts business in this District. Amazon has over 8,000 employees in its New York City work force, including many who work at its Manhattan office space.[37] It has five warehouses in New York, including two in Manhattan.[38] It also owns and operates four Amazon Books stores and eight cashier-free Go-stores in locations throughout Manhattan.[39] Amazon has eight office properties in Manhattan, most of which are

---

[37] Ed Shanahan, *Amazon Grows in New York, Reviving Debate Over Abandoned Queens Project*, NYT (Dec. 9, 2019), https://ww, w.nytimes.com/2019/12/06/nyregion/amazon-hudson-yards.html.

[38] https://en.wikipedia.org/wiki/List_of_Amazon_locations#United_States; Ben Fox Rubin, *Why Amazon built a warehouse inside a Midtown Manhattan office tower*, CNET (Dec. 21, 2015), https://www.cnet.com/news/why-amazon-built-a-warehouse-inside-a-midtown-manhattan-office-tower/.

[39] Where are Amazon Go stores located in New York?, Bing, https://www.bing.com/maps?q=where+are+amazon+go+stores+in+new+york&qs=NW&pq=where+are+amazon+go+stores+in+new+&sc=5-

clustered in Midtown, including the iconic Lord & Taylor building on Fifth Avenue.[40] Amazon

has engaged in an illegal, anticompetitive scheme to monopolize the retail distribution market for

print trade books that was directed at, and had a direct, substantial, reasonably foreseeable and

intended effect of causing injury to the business or property of persons and entities residing in,

located in, or doing business in this District.

26.     Exercising personal jurisdiction over Amazon is also appropriate under Section

302(a) of New York's long-arm statute because Amazon transacts business in the State of New

York, directly or through agents, such that it has sufficient minimum contacts with New York.

Bookends further avers on information and belief that Amazon's online sales to its customers in

New York State represent at least 5% of Amazon's U.S. sales and therefore rise to the level of

substantial solicitation necessary to satisfy the minimum contacts required to support this Court's

exercise of personal jurisdiction over Amazon.

### III.    VENUE

27.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §

22, because Defendants reside, transact business, are found, or have agents in this District.

Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendants

are subject to the Court's personal jurisdiction with respect to the civil action in question and

therefore reside in this District and under 28 U.S.C. § 1391(b)(2) because a substantial portion of

---

34&cvid=29EA099E9F8E4797A844A8DCA5842069&FORM=QBLH&sp=1&ghc=1; Where
are Amazon Books stores located in New York?, Bing, https://www.bing.com/maps?q=where
+are+amazon+books+stores+located+in+new+york%3F&cvid=1f533e8508ec4a378125b0ed5e3
fc0cb&FORM=ANAB01&PC=U531.

[40] Matthew Haag, *Manhattan Emptied Out During the Pandemic. But Big Tech Is Moving In*.
NYT (Nov. 9, 2020), https://www.nytimes.com/2020/10/13/nyregion/big-tech-nyc-office-
space.html.

the affected interstate trade and commerce described in this Complaint was carried out in this District.

## IV.    PARTIES

### A.    Plaintiff

28.    Bookends is an Illinois limited liability company that operates a bookstore in Evanston, Illinois selling print trade books in its store and online through its website: www.bookendsandbeginnings.com. Bookends & Beginnings purchases print trade books directly from each of the Big Five.

### B.    Defendants

#### 1.    Amazon

29.    Amazon is an online retailer giant (currently valued at $1.7 trillion) with its principal headquarters in Seattle, Washington and with facilities and employees scattered throughout the United States, including in this District. Amazon is vertically integrated and is active upstream as a print trade book publisher, with its own imprints (*i.e.*, publishing labels), and downstream as a print trade book retailer. Amazon sells print trade books to its retail customers in New York and throughout the United States. Amazon also operates Amazon Publishing, a division of Amazon that publishes print trade books that compete with the Big Five Defendants' print trade books.

#### 2.    Hachette

30.    Defendant Hachette is a leading U.S. trade publisher, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. Hachette has been publishing books since 1837, and its publishing brands currently include Little, Brown and Company; Little, Brown Books for Young Readers; Grand Central Publishing; Basic Books; Public Affairs; Orbit; FaithWords; and Center Street.

Hachette's books and authors have garnered major awards including Pulitzer Prizes, National Book Awards, Newbery Medals, Caldecott Medals, and Nobel Prizes. Hachette's bestselling authors have been published all over the world and include David Baldacci, Michael Connelly, Malcolm Gladwell, Elin Hilderbrand, N. K. Jemisin, Stephenie Meyer, James Patterson, J.K. Rowling, Nicholas Sparks, Rick Steves, Donna Tartt, and Malala Yousafzai. Hatchette's estimated share of the U.S. print trade book publishing revenue is 9%.[41]

### 3. HarperCollins

31.      Defendant HarperCollins is a leading U.S. trade publisher, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. With over two hundred years of history and more than 120 branded imprints around the world, HarperCollins publishes approximately 10,000 new books every year in 16 languages, and has a print and digital catalog of more than 200,000 titles. Writing across dozens of genres, HarperCollins' authors are winners of the Nobel Prize, the Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Man Booker Prize. HarperCollins' estimated share of the U.S. print trade book publishing revenue is 17.5%.[42]

### 4. Macmillan

32.      Defendant Macmillan is a leading U.S. trade publisher, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. Macmillan is part of a global trade-publishing group operating worldwide, with trade publishing companies in the United States, Germany, the United

---

[41] Thad McIlroy.

[42] Thad McIlroy.

Kingdom, Australia, South Africa, and India. Macmillan operates eight divisions in the US: Celadon Books; Farrar, Straus and Giroux; Flatiron Books; Henry Holt and Company; Macmillan Audio; Macmillan Children's Publishing Group; St. Martin's Press and Tor/Forge. Its writers, including, among others, Jeff VanderMeer, Senator Elizabeth Warren, James Comey, Orson Scott Card, and Paul Beatty, come from a vast array of literary backgrounds and have won awards including the Caldecott Medal, the Nobel Prize, the Man Booker Prize, the Pulitzer Prize, the National Book Award, and the Printz Award. Macmillan's estimated share of the U.S. print trade book publishing revenue is 5%.[43]

### 5. Penguin

33.     Defendant Penguin is a leading U.S. trade publisher, organized under the laws of Delaware, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. With a rich history dating back to the 1800s, Penguin's expansive publishing portfolio includes nearly 275 independent publishing imprints and brands on five continents and contains books and products for readers of all ages at every stage of life. Penguin publishes 15,000 new titles annually and sells close to 800 million print, audio, and eBooks annually. Penguin's many authors include more than 80 Nobel Laureates and hundreds of the world's most widely read authors. The publishing house accounts for about 40 percent of all consumer book titles sold worldwide.[44] Penguin's estimated share of the U.S. print trade book publishing revenue is 37%.[45]

---

[43] Thad McIlroy.

[44] Jason Del Rey, Amazon's U.K. Contract With Top Book Publisher Penguin Random House Set to Expire, Vox (May 22, 2015), https://www.vox.com/2015/5/22/11562900/amazons-u-k-contract-with-top-book-publisher-penguin-random-house-set.

[45] Thad McIlroy.

### 6.  Simon & Schuster

34.   Defendant Simon & Schuster is a leading U.S. trade publisher, organized under the laws of New York, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. It publishes 2000 titles annually in numerous well-known imprints and divisions such as Simon & Schuster, Scribner, Atria Books, Gallery Books, Pocket Books, Adams Media, Simon & Schuster Children's Publishing and Simon & Schuster Audio and international companies in Australia, Canada, India and the United Kingdom. Simon & Schuster proudly brings the works of its authors, which include, among others, Dale Carnegie, Sharon Draper, Jennifer Egan, Joseph Heller, Ernest Hemingway and Stephen King, to more than 200 countries and territories. Its books and authors have been winners of the Pulitzer Prize, National Book Award, National Book Critics Circle Award, Newbery Medal, and Caldecott Medal. Simon and Schuster's estimated share of the U.S. print trade book publishing revenue is 11.7%.[46] On November 25, 2020, Penguin announced plans to acquire Simon & Schuster; the proposed merger, which the District Court for the D.C. Circuit blocked, would have created a single publishing house with approximately 50% of all trade books published.[47]

---

[46] Thad McIlroy.

[47] John Maher, *PRH Purchase of S&S Draws Objections*, Publishers Weekly (Nov. 30, 2020), https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/85005-first-reactions-to-s-s-sale.html.

## V.      STATEMENT OF FACT

### A.      Horizontal Price-Fixing

35.      Defendants employ a discriminatory pricing scheme that has the intent and effect of controlling wholesale prices of print trade books and preventing competition with Amazon in the retail sale of print trade books.

36.      Defendants' interlocking and lockstep agreements constitute a horizontal price-fixing agreement in violation of Section 1 of the Sherman Act.[48] Defendants engaged in a classic hub-and-spoke conspiracy in which Amazon (the "hub") coordinates a horizontal agreement among the Publisher Defendants (the "spokes") to provide Amazon a discriminatory discount on print trade books and to raise list price and, therefore, the wholesale price paid to the Publisher Defendants by book retailers. Amazon demanded uniform price restraints from its suppliers that had the purpose and effect of restraining competition by increasing its retail competitor's acquisition costs. The Publisher Defendants agreed to the uniform price restraints with knowledge that the others were doing the same, as well as the knowledge that without the Publisher Defendants' substantially unanimous agreement there was risk of a substantial loss of the business and good will from the retail booksellers that compete with Amazon, but with such agreement, there was the prospect of increased profits.

### 1.      Publisher Defendants reached the same agreement with Amazon.

37.      Amazon facilitated the conspiracy by offering each Publisher Defendant that same agreement. Amazon publicly confirmed that the "contract [it] presented to HarperCollins was the same contract recently signed by Simon & Schuster, Hachette, and Macmillan,"[49] and once all

---

[48] *Interstate Circuit v. United States*, 306 U.S. 208, 230-32 (1939).

[49] D'Onfro.

"four major publishers" had signed the agreement, it also publicly stated that it "would accept any similar deal with Penguin[.]"[50] Defendants' data confirms that all five Publisher Defendants provide substantially better discounts to Amazon than the standard discount they make available to Bookends, so that it costs Bookends ███████████████████████████████ ███████████████████████████ to acquire the same books from the Publisher Defendants as it does Amazon.

> **2.     The Publisher Defendants knew when they signed their agreements that other Publisher Defendants had agreed to the same discriminatory arrangement.**

38.     Since Amazon *publicly* confirmed that it had made the same deal with all five Publisher Defendants, it can reasonably be inferred that Amazon conveyed that information directly to each of the Publisher Defendants during their negotiations with Amazon.

39.     But Bookends does not rely solely on inferences to establish the existence of Defendants' horizontal price-fixing agreement. Defendants' own contracts provide direct evidence of the Publisher Defendants' horizontal conspiracy to sell their print trade books to Amazon at discriminatory prices below those paid by competing retailers. ██████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████ █████████████████████████████████████████████ ██████████████████. These provisions demonstrate the Publisher Defendants, including the ████ █████████████████████████████████████ agreed to the same discriminatory terms and knew that horizontal competitors had done or would do the same. ████

---

[50] Rankin; *see also Amazon, Penguin Random House Agree to New Deal on Book Sales* (confirming that the agreement included both the U.S. and U.K. markets).

███████████████████████████████████████████████ Amazon publicly confirmed

that the agreement it "presented to HarperCollins was the same contract recently signed" by the

three Publisher Defendants, whose negotiations preceded HarperCollins.[51]

40.     Thus, each Publisher Defendant knew at the time it signed the agreemen ███████

████████████████████████████████████████████████████████████████████

███████ . And as more agreements were publicly announced, it became clear that all five

Publisher Defendants had agreed.

**3.     Publisher Defendants would not have agreed to the discriminatory rates unless they knew the others had also agreed to them.**

41.     It can be easily inferred that such favorable treatment of a monopolist retail

bookseller that the Publisher Defendants describe as an existential threat to the publishing

industry, would have been against its individual self-interest absent collective action required for

them to raise list price.

42.     Acting individually, none of the Big Five Defendants would have had an

incentive to enter into the discriminatory agreements that consolidate power in Amazon and cede

substantial control over the distribution of their books to Amazon.  To the contrary, if only one

of the Big Five gave discriminatorily lower prices to Amazon, it would suffer significant revenue

loss as Amazon purchases a high percentage of its print trade books, and it would be unable to

recoup that revenue loss by raising its list price.  If it tried to raise its list price, it would lose

sales and market share to competing publishers who would have no incentive to also raise their

list price.  But if the other members of the Big Five also agreed to give discriminatory discounts

off of list price to Amazon, then all of them would have an incentive to raise list price so as to

---

[51] D'Onfro.

recoup the lost revenue; none of them would lose market share to the others; and all of them would increase their profit margin and profitability because their list price to Amazon's competitors would go up while the discount rate to those retailers would remain the same.

43.     But an inference is not necessary ████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

**4.      A horizontal agreement between the Publisher Defendants to raise their list prices can be inferred from their joint agreement to sell their books to their principal distributor at discriminatory rates.**

44.     But the Big Five did not act in isolation to raise trade book prices, and by acting collectively, the interlocking agreements enabled them to control wholesale prices of print trade books.

45.     Amazon, which distributes 50% of all books sold in the U.S., is the Publisher Defendants' primary distributor, potentially distributing as much as 70 to 80% of their inventory.[52] Selling as much as 80% of their books at discriminatorily low rates cuts severely into the Publisher Defendants' profits.

46.     Raising list prices was the obvious and intended way to offset the significant losses the Publisher Defendants incurred under their horizontal discriminatory pricing scheme. Multiple factors support this inference.

**a.      Defendants acted in parallel when they raised their list prices.**

47.     In a competitive market, consistently low inflation rates would generally result in consistently low prices. Yet despite decade-long low inflation, the Big Five raised print trade

---

[52] American Publisher Association Letter at 1.

book prices after negotiating their 2015 contracts with Amazon. Previously in 2010-12, "the two-year period," in which the Publisher Defendants sold eBooks at conspiratorially inflated prices, they also "increased their average prices for hardcovers[.]"[53] As the following graph shows, the Big Five's weighted average list price for print bestsellers rose to nearly $19.50 during the eBooks conspiracy, but in 2013, when—through judicial intervention in the eBooks market—the trade book market briefly became competitive again, it dropped precipitously from about $19.50 to $16, where it remained during Defendants' negotiations of the contracts that are the subject of this lawsuit. By 2016—after three years of hovering around $16—the average weighted list price of Big Five bestsellers jumped to just under $17, where it has largely remained:



48.   Because the Big Five announce their list prices for print books many months in advance of their release and print them on their book covers, the Publisher Defendants could not

---

[53] *United States v. Apple*, 791 F.3d 290, 310 (2d Cir. 2015).

act immediately to raise print list prices after negotiating their 2015 agreements with Amazon. But as the previous graph shows, they did promptly exercise their power to raise prices.

49.     In addition to bestsellers, the Big Five also exercised their power to raise prices of other categories of print trade books. For example, after three years of holding the list prices of their lowest priced books ("First Quartile" books) at $16, the Big Five increased them to about $16.50 in 2016, and a couple years later they increased both the lower priced and medium-priced books ("Second Quartile" books) on average by a dollar:



First and Second Quartiles of List Prices, 2012 - 2020

50.     As a further step to raise list prices, the Big Five shifted the share of books they

listed at $16.99 or higher from about 25% in 2015 to around 70% currently.



**Price Cluster Analysis**

**Share of Books Priced $16.99 or Higher**

b.      **Acting alone, it would have been against each Publisher Defendant's individual self-interest to raise its list prices.**

51.     Acting alone, none of the Big Five could have raised the market price of print

trade books.[54] The Publisher Defendants' agreement to collectively raise list prices can be

inferred because it would be against the individual economic self-interest of any individual

---

[54] *Apple*, 791 F.3d at 305 (While "no one Publisher could effect an industry-wide shift in prices or change the public's perception of a book's value, if they moved together they could.") and 310 (noting that acting alone none of the Big Five had the "critical mass" necessary to remove trade books from competitive pricing by retailers).

Publisher Defendant to raise its list prices (and therefore raise wholesale prices) unless it understood that the other publishers would do the same.

52. For example, in 2010, when each of the Big Five except Random House (then separate from Penguin) colluded to raise eBook prices, the conspiring publishers sold 12.9% fewer eBooks,[55] whereas concurrent sales of the lone holdout, Random House, increased by 41%.[56] The colluding Publisher Defendants could sustain those losses because they faced competition from only one of their primary competitors. But if only one Publisher Defendant raised its print book prices, it could expect to lose even greater sales and market share to the remaining four, competitively priced Publisher Defendants.

53. And there is another factor in the print market that makes it even less likely that a Publisher Defendant would attempt this price move on its own. The Publisher Defendants announce their list prices many months in advance of the book's release and print them on their book covers, so they have little flexibility to modify their list prices if they have overpriced their print books.

        **c.**      **The Publisher Defendants had an opportunity to conspire and exchange information relative to the conspiracy.**

54. From 2010 through 2012, the Big Five actively colluded with each other to raise the prices of trade eBooks, and were in constant communication regarding their negotiations with both Apple and Amazon.[57] The Big Five paid $166 million in settlements to the consumer class action that initiated proceedings against them, and Apple, with whom they had colluded, paid an

---

[55] *Apple*, 791 F.3d at 310.

[56] *Apple*, 952 F. Supp. 2d at 684-85.

[57] *Apple*, 791 F.3d at 318.

010888-12/2077168 V1

additional $450 million to the class in 2015 after the Second Circuit affirmed its liability.[58] When

the Big Five and Amazon renewed their contracts in late 2014 and the first two quarters of 2015,

Defendants publicly signaled that Amazon was offering the same basic terms in their book

distribution agreements and that each of the Big Five was accepting those terms.[59]

55.     Knowing that each of the Big Five agreed to the same discriminatory terms, gave

the individual Big Five Defendants the necessary assurance that their principal publishing rivals

would not gain a special advantage in a niche market or generate price wars at the wholesale

level by offering better terms to Amazon's rivals.

56.     

allows the Publisher Defendants to infer their

competitors' financial condition and to predict their responses to an increase in price and their

ability to initiate or sustain significant price increases. Whereas pricing is inherently risky in a

---

[58] *In re Electronic Books Antitrust Litig.*, 639 F. App'x 724, 726-27 (2d Cir. 2016).

[59] *S&S, Amazon Agree on 'Version' of Agency Pricing*, Publishers Weekly (Oct. 21, 2014), https://www.publishersweekly.com/pw/by-topic/industry-news/industry-deals/article/64461-s-s-amazon-agree-on-version-of-agency-pricing.html.; Megan Guess, *Amazon and Hachette resolve dispute with multi-year agreement*, Ars Technica (Nov. 13, 2014), https://arstechnica.com/information-technology/2014/11/amazon-and-hachette-resolve-dispute-with-multi-year-agreement/; Macmillan Strikes Deal with Amazon, but "Irony Prospers in the Digital Age" - The Authors Guild (Dec. 19, 2014), https://www.authorsguild.org/industry-advocacy/macmillan-strikes-deal-with-amazon-but-irony-prospers-in-the-digital-age/; *No Authors Held Hostage as HarperCollins and Amazon Come to Terms*, The Authors Guild (Apr. 16, 2015), https://www.authorsguild.org/industry-advocacy/no-authors-held-hostage-as-harpercollins-and-amazon-come-to-terms/; Jillian D'Onfro; *For the Big Five, Agency Now Holds Sway Across the Board*, The Authors Guild (Sep. 9, 2015), https://www.authorsguild.org/industry-advocacy/for-the-big-five-agency-now-holds-sway-across-the-board/.

truly competitive market, communicating this otherwise highly confidential information allows the Publisher Defendants to gauge accurately the list prices that would be sustainable in this price-fixed market.

### d. The Publisher Defendants had a common motive to raise print trade book prices.

57.     Publisher Defendants have a common motive to raise print trade book prices. Since the advent of eBooks, they feared that the lower price point for eBooks "would erode prices for all books, thereby threatening the business model for the publishing industry."[60] Conspiring to raise print trade book prices allows them to recover revenue lost under their interdependent agreements to sell their books to Amazon at discriminatorily low prices.[61]

### e. The Publisher Defendants' prior collusive behavior makes it more likely than not that they colluded to raise print trade book prices.

58.     There is a direct, logical relationship between the Big Five's prior eBook price-fixing conspiracy facilitated by Apple and the current conspiracy to raise print trade books facilitated by Amazon. In both cases, the Publisher Defendants conspired with each other by entering into the same vertical agreement with a particular retailer, which allowed them to increase and fix the price at which they sold their books, in competition with each other. And further, the Publisher Defendants' willingness to engage in a price-fixing conspiracy only a few years earlier, makes it more likely that they did so here, too, particularly when the Publisher Defendants were not subject to a consent decree with respect to their distribution of print trade books, nor were they required to submit their print trade book agreements to the Department of Justice or Attorneys General for review.

---

[60] *Apple*, 952 F. Supp. 2d at 649.

[61] *Apple*, 791 F.3d at 305.

f.   **The District Court for the D.C. Circuit finds continuing collusion among the Big Five publishers.**

59.   On October 31, 2022, the District Court for the District of Columbia ruled in favor of the DOJ in the DOJ's civil antitrust lawsuit to block Penguin Random House's proposed $2.2 billion acquisition of Simon & Schuster.[62] The court's decision followed a thirteen-day trial in August 2022 after the DOJ, in November 2021, sued to stop the merger under Section 7 of the Clayton Act.

60.   With the benefit of a full record, the court observed that "[t]he Big Five have achieved their market dominance in part by acquiring other publishers, contributing to a trend toward consolidation in the industry."[63] The court found that "[i]n the publishing market for anticipated top-selling books, the Big Five publishers hold 91 percent of the market share, while smaller publishers collectively hold only 9 percent."[64]

61.   The court concluded that there was "an undeniable trend in consolidation in the publishing industry," observing that "[c]oordinated effects are likelier in concentrated markets."[65]

62.   This market concentration is unlikely to change because "barriers to entry are high in the publishing business."[66] As the court observed: "The best proof that would-be new competitors face formidable barriers to entry is the stability of market shares in the industry: No

---

[62] *United States v. Bertelsmann SE & Co.*, No. CV 21-2886-FYP, 2022 WL 16748157 (D.D.C. Nov. 7, 2022).

[63] *Id.* at *2.

[64] *Id.* at *13.

[65] *Id.* at *27.

[66] *Id.* at *33.

010888-12/2077168 V1

publisher has entered the market and become a strong competitor against the Big Five in the past thirty years."[67]

63.     Based on the conspiracy uncovered in Apple, the court found that as between the Big Five, "history of successful cooperation establishes a precondition to effective collusion — mutual trust and forbearance."[68] According to the court, "[t]he [Apple] case portrays an industry already 'prone to collusion.'"[69]

64.     The court validated that the Big Five consistently choose collusion over acting in their unilateral self-interests: "Thus, in an industry where the competition to acquire anticipated top sellers is intense, the competing publishers nevertheless choose, almost always, not to gain advantage by offering more favorable contract terms. This phenomenon bespeaks a tacit agreement among the publishers to compete only on the basis of advance level because it collectively benefits them not to yield on other contract terms."[70]

65.     The court followed established law, which explains that "a highly persuasive historical act of cooperation between competition supports the theory that coordination would likely take the form of mutual recognition that neither firm has an interest in an overall race to free."[71] (internal quotations omitted).

---

[67] *Id.*

[68] *Id.* at *27.

[69] *Id.*

[70] *Id.*

[71] *Id.* (internal quotations omitted).

66.     In enjoining the merging publishers, the court held that "[t]he Apple case provides the backdrop for trends in the industry that appear to demonstrate that the Big Five are already engaging in tacit collusion or parallel accommodating conduct when acquiring books."[72]

67.     The Court ruled that "the Big Five publishers have engaged in tacit coordination that is profitable for those involved" and that "coordinated conduct already appears to be rampant."[73]

### g.     Market concentration makes collusion more likely.

68.     The Publisher Defendants account for 80% of the supply of print trade books, including 90% of bestsellers; Amazon makes 50% to 80% of the retail sales of print trade books[74] and 90% of such sales in the online submarket. The high concentration in the publishing market for print trade books coupled with Amazon's dominant share of the retail distribution of the Publisher Defendants' books mean that both the publishing market and the retail market for print trade books are susceptible to collusion.

69.     As set forth above, the Publisher Defendants' interdependent contracts and Amazon's public statement provide direct evidence of the Publisher Defendants' horizontal conspiracy to sell their print trade books to Amazon at discriminatory prices below those paid by competing retailers. The Publisher Defendants also raised their list prices soon after they negotiated their discriminatory pricing agreements with Amazon. Their parallel conduct plus other relevant circumstances—opportunities to exchange information relative to the conspiracy, actions against self-interest, common motive, prior collusive conduct, current collusion, as found

---

[72] *Id.*

[73] *Id.*

[74] American Publishers Association letter at 1; House Report at 295.

by the District Court for the District of Columbia, and market concentration—support a plausible

inference that Amazon facilitated a horizontal price-fixing agreement between the Publisher

Defendants to raise the wholesale price to print trade books. Defendants' horizontal agreement is

a *per se* violation of § 1 of the Sherman Act.

**B.     The Defendants' vertical agreements violate the rule of reason.**

70.     Even setting aside the Publisher Defendants' horizontal agreement to raise prices,

the series of vertical agreements between Amazon and the Publisher Defendants are subject to

antitrust scrutiny under the rule of reason. Defendants' agreements harmed both the wholesale

and the retail markets for print trade books.

71.     Higher consumer prices are the chief indicator of an adverse effect on

competition. The foreseeable aggregate effect of Amazon's vertical agreements to obtain

discriminatory prices lower than those obtained from the Big Five by competing retailers was to

increase both retail and wholesale prices of 80% of print trade books, including 90% of

bestsellers to anticompetitive levels. As described in the previous section (*supra* Section V.4.a.),

from 2015 through the present, Publisher Defendants steadily raised the percentage of books they

priced at a suggested retail price of $16.99 or higher, increasing from about 25% in 2015 to

about 60% in the last few years. By 2016—after a three-year period when list prices hovered

around $16—the average weighted list price of Publisher Defendants' bestsellers jumped to

about $17. And the Publisher Defendants continued to raise the list prices of their lowest-priced

and medium-priced books in 2017 and 2018 after several years of stable prices.

72.     The Publisher Defendants separately publish both their standard discount and

their list prices. Higher list prices for print trade books with no corresponding change in the

standard discount demonstrates harm to the wholesale market for print trade books, where

booksellers paid a supracompetitive price. And typically consumers buy print trade books at the

Publisher Defendants' list prices or based on that price. Higher consumer prices also provide direct evidence of the adverse effect of Defendants' vertical agreements.

73.     Additionally, Amazon's 50%-80% share of the retail sale of print trade books and 90% share of the sale of print books sold online, and the Publisher Defendants' collective 80% share of the supply of trade books, including 90% of bestsellers, provide indirect evidence that plausibly supports the inference of anticompetitive harm caused by Defendants' serial agreements to provide Amazon discriminatory prices not available to competing retailers.

74.     Alternatively, if adverse effects of the agreements were treated individually, the individual market shares of Amazon (50%-80% of the distribution of print trade books overall and 90% of the online distribution) and Penguin (37% of the supply of print trade books), support an inference that their agreement had an adverse effect on competition. This inference is further supported by, in the words of the Publisher Defendant's trade association, Amazon's "insurmountable lead over any would-be distribution rivals—a lead so daunting that, at this point, absent government intervention, there is no possibility of meaningful competition from . . . booksellers, or emerging platforms."[75]

**C.     Amazon uses anticompetitive means to maintain its monopoly of the retail market for the sale of print trade books.**

75.     Amazon's 50% to 80% share of the retail market for print trade books and its 90% share of the online retail submarket for print trade books supports its monopoly power, as does its "insurmountable lead over any would-be distribution rivals."[76] Publisher Defendants and their trade association claim that Amazon "threaten[s] the financial well-being of authors, publishers, and booksellers," that it refuses to distribute publishers' books unless the publisher "also

---

[75] American Publisher Association letter at 2.

[76] *Id.* at 1.

purchases advertising," and that it undermines publishers' distribution through other retailers "by directing valuable advertising dollars to its own dominant business," and steers their customers to Amazon's own books or "to sellers of infringing books, deceptive summaries, counterfeits, and unauthorized copies" of the publishers' books are all further marks of its market dominance.[77] The fact that the Publisher Defendants continue to rely on Amazon as their principal distributer despite persistent complaints about Amazon confirms its market power.

76.     As further explained by the Publisher Defendant's trade association, to maintain its monopoly, "Amazon acts anti-competitively in multiple ways," including reaching agreements with publishers that "eliminate the ability of [Amazon's] rivals or new entrants to gain any meaningful competitive advantage relative to Amazon."[78] Amazon's agreements with the Publisher Defendants are further examples of anticompetitive agreements that "impose[] conditions that affect wholesale . . . prices" and prevent meaningful competition from Amazon's retail rivals.[79]

77.     Amazon's intent to monopolize can be inferred from the design of its agreements with the Publisher Defendants. As previously described (*supra* Section V.A.4), Amazon's interlocking agreements with the Publisher Defendants are designed to increase the wholesale price of print trade books paid by Bookends and Class members, while protecting Amazon from the price increases in this market by providing it discriminatory discounts. Amazon's intent to increase its rivals' costs as a tool for suppressing competition can be reasonably inferred.

---

[77] *Id.* at 1-3.

[78] *Id.* at 3.

[79] *Id.*

78.     And their contracts functioned as designed. After years of price stability, the Publisher Defendants increased their list prices soon after their negotiation with Amazon were completed, first by increasing the price of their bestsellers and then by raising the list prices of their remaining books. (*Supra* Section V.A.4.a.)

79.     These agreements injure Bookends and Class members, who pay more for trade print books than they would absent the anticompetitive agreements described herein, and they harm the retail market for print trade books by securing Amazon's monopoly and preventing meaningful competition on retail prices. In the absence of these restraints, Bookends and Class members would have lower acquisition costs and could provide more retail competition in this dangerously restrained market.

**D.     Defendants' agreements support a conspiracy to maintain Amazon's retail monopoly.**

80.     The Publisher Defendants well understood Amazon's dominance and the threat it posed to the industry. (*See supra* Sections I and V.C.) They also understood that discriminating against Amazon's retail rivals—increasing their acquisition costs while giving Amazon such deep discounts that it was insulated from the effects of the Publisher Defendants' list-price increases—would further cement Amazon's monopoly power. As a result of their interlocking agreements, the Publisher Defendants did in fact raise the acquisition costs for Amazon's retail rivals, while protecting Amazon from the impact of the inflated list prices. From these facts, it can easily be inferred that the Publisher Defendants condoned or acquiesced in Amazon's efforts to sustain its monopoly power through anticompetitive means and the Publisher Defendants took steps in support of securing it: entering into the discriminatory pricing agreement and raising list prices.

81.     But even aside from the interlocking nature of the Publisher Defendants'
agreements, each Publisher Defendant combined or conspired with Amazon so as to sustain
Amazon's monopoly by knowingly assenting to individual vertical agreements with Amazon that
were intended to and had the effect of further entrenching Amazon's monopoly.

82.     The intended purpose of the agreements each Publisher Defendants signed is to
increase the disparity in acquisition costs between what Amazon pays and what its rivals pay.
By ensuring not only that Amazon gets the lowest wholesale prices and best terms, but that no
other retail booksellers get the same prices, the Publisher Defendants give Amazon an unfair
edge over its retail competitors, like Bookends and Class members. By inserting this formidable
obstacle in a retail market Amazon already dominates, the Publisher Defendants ensure that there
is no meaningful competition in the price of print trade books, including 90% of bestsellers.

83.     These interlocking agreements also made clear to each Publisher Defendant the
complicity of the other Publisher Defendants in that scheme, so that every Defendant understood
the general nature of the conspiracy and agreed to it. By executing the agreements and raising
trade print book list prices, Defendants took steps in furtherance of the conspiracy.

84.     Amazon's specific intent to maintain its monopoly can be inferred from its
compelling the Publisher Defendants to sell at discriminatory wholesale prices and inducing
them to raise the wholesale prices they charge its competitors. And the Publisher Defendants'
specific intent to help Amazon maintain its monopoly can be inferred from raising their list
prices and agreeing to this scheme with full knowledge that their compliance further cements
Amazon's market dominance.

85.     Amazon benefits from this agreement because regardless of the wholesale prices,
it faces no meaningful competition from any rival bookseller. The Big Five Defendants benefit

from this agreement because they have no incentive to lower wholesale prices and therefore can maintain them at supracompetitive levels.

**E.     Defendants violate the Robinson-Patman Act's prohibition against discriminatory pricing.**

86.     Congress passed the Robinson-Patman Act (RPA) to protect "small independent stores," like Bookends, that lacked the purchasing power to obtain price concessions that behemoths like Amazon could demand and were thus "at a hopeless competitive disadvantage."[80] The RPA prevents a large buyer, like Amazon, from securing "a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability."[81] Amazon is the largest seller of print trade books in the United States and leveraged its dominance to secure discounts to the benchmark list price that the Publisher Defendants do not make available to other book retailers. The Publisher Defendants agreed to provide the discriminatory discounts to Amazon, because coordinating the discounts allowed them to increase the list prices of print trade books—an increase that, to Amazon's disproportionate benefit, resulted in increased prices to all other booksellers, which received smaller discounts than Amazon. This violates the RPA.

**1.     Defendants' contracts are a prima facie violation of the RPA.**

87.     The Big Five are national publishers and suppliers of print trade books, which they sell in interstate commerce to retail booksellers throughout the United States, including Amazon, Bookends, and Class members. The same books sold by the Big Five to Bookends and to Amazon (*see infra* XI, First Cause of Action) are goods of like grade and quality. The statutory prohibition against discriminatory pricing means that "publishers must sell a given

---

[80] *Federal Trade Commission v. Simplicity Pattern Co.*, 360 U.S. 55, 69 (1959).

[81] *FTC v. Morton Salt Co.*, 334 U.S. 37, 43 (1948).

book to two or more book sellers at the same price, unless the publisher can justify a price difference through actual savings it realizes."[82] The Big Five violate Section 2(a) in that the same books they sell to Amazon, they also contemporaneously sell to Amazon's bookseller rivals (like Bookends) at higher wholesale prices and on less favorable terms, (*see supra* Section I) and the effect of such discrimination may be to injure, destroy or prevent competition to the advantage of Amazon, *i.e.*, the one who received the benefit of such discrimination.[83]

88.     Bookends and Class members have standing to bring RPA claims because Defendants' discriminatory pricing scheme diverts sales and profits from them as the disfavored purchasers to Amazon as the favored purchaser.[84] Amazon's lower and discriminatory cost of acquiring print trade books allows it to sell at prices below the price of other retailers and thereby divert sales to itself from the other retailers. This diversion of sales and profits is further demonstrated by showing substantial discounts to Amazon "over a significant period of time, known as the *Morton Salt* inference, or proof of sales lost" to Amazon.[85]

89.     Seven years is a significant period. Defendants have employed discriminatory discounts since 2015. These discounts are substantial and have ██████████████████ ████████████████ higher than the standard discounts available to Bookends and other retail booksellers. (*See supra* Section I.)

90.     Moreover, the Publisher Defendants ████████████████████████  ████████████████████████████████████████████ The

---

[82] *American Booksellers Ass'n v. Houghton Mifflin Co.*, 1995 U.S. Dist. LEXIS 2522, at *8 (S.D.N.Y. Mar. 3, 1995).

[83] *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 177 (2006).

[84] *Id.*

[85] *Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202, 210 (2d Cir. 2015).

agreements between Amazon and the Publisher Defendants ███████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ And as set forth

in Defendants' contracts, these ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

91.     Nor did any Publisher Defendant offer Amazon discriminatory discounts as a

good faith effort to meet the lawful price of a competitor. ██████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.

92.     Because both Amazon and Bookends purchase trade books at set discounts to list

price, the discriminatory pricing agreements that Defendants rely on to sell to Amazon at

discriminatory rates lower than those charged to competing retailers are not materially different

from the contracts through which Bookends and members of the proposed Classes purchase books from the Publisher Defendants. The discounts thus provide more than "due allowances for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered."[86]

## F.     Courts and enforcement agencies have repeatedly found that Defendants engaged in anticompetitive conduct in the sale and distribution of trade books.

93.     Amazon's and the Big Five's continued anticompetitive agreements to restrain competition for trade books prices is astonishingly brazen in light of repeated investigations into Defendants' practices. Only a decade ago, the Big Five conspired with Apple to raise trade eBook prices via most favored nations clauses (MFNs).[87] As a consequence of that price-fixing agreement, the Big Five also drastically increased the price of their print trade books between 2010 and 2013.[88] This conduct led to concurrent investigations by federal and state prosecutors in the United States and by the European Commission's Directorate General for Competition (the "DG Comp"), which resulted in orders prohibiting the publishers from entering into MFNs in connection with the sale of eBooks on either continent for a period of five years.[89] Defendants' common discriminatory price agreement provides a different mechanism that, like the conspiracy with Apple, concurrently ensures that no rival bookseller can compete with Amazon on retail price and simultaneously allows Defendants to control the wholesale prices of print trade books.

---

[86] *Hasbrouck*, 496 U.S. at 555–56.

[87] *Id.*

[88] *Apple*, 791 F.3d at 310; *supra*  Section V.A.4.a.

[89] *U.S. v. Apple, Inc., et al.*, Department of Justice, https://www.justice.gov/atr/case/us-v-apple-inc-et-al.; *see, e.g.*, Final Judgment Penguin at 11 and 18; 5.4.2017 DG Comp. Decision at 8.

94.     In 2012, U.K. regulators at the Office of Fair Trading (OFT) and German regulators at the Bundeskartellamt concurrently investigated the anticompetitive effect of Amazon's agreements with third-party retailers that prevented them from selling their products at lower prices through other online outlets, including their own websites. [90/91] The Bundeskartellamt found that Amazon's "horizontal price-fixing" agreement acts as a "barrier[] to market entry for new competitors and hinder[s] the expansion of existing competitors in the market."[92] It further found that the agreement "safeguard[s] Amazon's large own-account share of sales as a competitor and the extensive reach of amazon.de, which cannot be attacked by competing platforms."[93] Faced with these findings, Amazon capitulated and agreed not to enforce this provision in its third-party seller agreements in the European market.[94] Having achieved their goal, OFT and the Bundeskartellamt closed their investigations in November 2013.[95]

95.     European regulators again investigated Defendants' book distribution agreements in 2015. At the conclusion of its two-year investigation, the DG Comp found that Defendants' contractual agreements to provide Amazon better pricing and contractual terms than its

---

[90] Dan Prochilo, UK May Drop Antitrust Probe into Amazon Pricing Policy, Law360(Aug. 29, 2013), https://www.law360.com/articles/468842/uk-may-drop-antitrust-probe-into-amazon-pricing-policy.

[91] Id.

[92] Bundeskartellamt, Amazon removes price parity obligation for retailers on its Marketplace platform (Dec. 9, 2013) ("12.3.13 Bundeskartellamt decision"), https://www.bundeskartellamt.de/SharedDocs/Entscheidung/EN/Fallberichte/Kartellverbot/2013/B6-46-12.pdf?__blob=publicationFile&v=2.

[93] Id.

[94] Id.

[95] Id.; OFT, Amazon online retailer: investigation into anticompetitive Practices, https://www.gov.uk/cma-cases/amazon-online-retailer-investigation-into-anti-competitive-practices.

competitors harmed competition in the distribution and sale of eBooks in the European markets.[96] Faced with those findings, Amazon agreed not to enforce those provisions in the European markets, including in its agreements with the Big Five, and the DG Comp closed the investigation.[97] Commissioner Margrethe Vestager praised the resolution, stating that it will increase "choice and competition to the benefit of European consumers."[98]

96.     Here in the United States, the House of Representatives Judiciary Committee's Subcommittee on Antitrust, Commercial and Administrative Law (the "House Antitrust Committee") launched an investigation into Amazon along with other dominant technology platforms. Like the DG Comp, the House Antitrust Committee concluded in its October 2020 report that Amazon "has a history" of employing anticompetitive agreements "to ensure that none of its suppliers or third-party sellers can collaborate with an existing or potential competitor to make lower-priced or innovative product offerings available to consumers."[99] The Committee further concluded that Amazon "uses its gatekeeper position to maintain its market power and "to further entrench and expand" its "'stranglehold' and 'control' over book distribution."[100] The Committee compared Amazon's monopoly power and abuse of its power to "the kinds of monopolies we last saw in the era of oil barons and railroad tycoons."[101]

97.     Amazon also faces an investigation by the Federal Trade Commission and antitrust scrutiny by state attorneys general offices in California, Washington, New York, and

---

[96] 5.4.2017 DG Comp. Decision at 37-38.

[97] *Id.* at 39.

[98] European Commission Press Release, May 4, 2017, https://ec.europa.eu/commission/presscorner/detail/en/IP_17_1223.

[99] House Report at 295.

[100] House Report at 6, 15.

[101] *Id.*

Connecticut.[102] The Connecticut Attorney General's office is specifically investigating Amazon's eBook business.[103]

98.     And the District Court for the D.C. Circuit recently held that "the Big Five are already engaging in tacit collusion or parallel accommodating conduct when acquiring books" and "coordinated conduct already appears to be rampant."[104]

## G.     Defendants' discriminatory pricing scheme harms competition and hurts consumers.

99.     Amazon sells more books than any other single retail outlet in history.[105] Industry sources estimate that "Amazon has 50% or more of the US print book market" and roughly "90 percent of online print sales," and that it similarly dominates the sale of eBooks and audiobooks.[106] This concentration of market power in the sale of books has driven many independent bookstores and large chains alike out of business.

100.     Twenty-five years ago, there were around four thousand independent bookstores in the U.S., and many functioned as local cultural centers, where people browsed and exchanged ideas. [107] Today, there are fewer than two thousand, and the economic power is concentrated in

---

[102] House Report at 253; Press Release, Fed. Trade Comm'n, FTC to Examine Past Acquisitions by Large Technology Companies (Feb. 11, 2020), https://www.ftc.gov/news-events/press-releases/2020/02/ftc-examine-past-acquisitions-large-technology-companies.

[103] Jeffrey A. Trachtenberg and Dana Mattioli, *Connecticut Investigating Amazon's E-Book Business*, Wall Street Journal (Jan. 13, 2021).

[104] *Bertelsmann*, 2022 WL 16748157, at *28.

[105] Porter Anderson, *US Publishers, Authors, Booksellers Call Out Amazon's 'Concentrated Power' in the Market,* Publishing Perspectives (Aug.17, 2020), https://publishingperspectives .com/2020/08/us-publishers-authors-booksellers-call-out-amazons-concentrated-power-in-thebook-market/.

[106] House Report at 255 n.1562.

[107] George Packer, *Cheap Words*, New Yorker (Feb.17 & 24, 2014), https://www.newyorker .com/magazine/2014/02/17/cheap-words.

the hands of one bookseller.[108] While its brick-and-mortar counterparts crater, Amazon is in talks to convert real estate in vacated malls into additional Amazon distribution centers.[109] Stacy Mitchell, the Co-Director of the Institute for Local Self Reliance, warns that the concentration of power in one company has huge impacts on the economy: "Local businesses are disappearing and, with them, a pathway to the middle class. . . . New business formation is down to historic lows."[110]

101.    According to the market research firm Codex Group, readers browsing in a traditional bookstore discover new books they would like to read at about three times the rate they do while shopping on Amazon.[111] Even though it dominates the book market, Amazon accounts for only 7% of new book discovery, while local bookstores, shunted to the periphery of the book market, account for 20% of new discoveries.[112] This loss impacts consumer choices and stunts the economy over the long-term.[113]

102.    Amazon's market dominance gives it the unprecedented power to decide what books consumers will encounter, and to pick which publishers, authors, and creators will be the winners and the losers.[114] "Amazon has the ability to promote or destroy a book in the national marketplace for any reason it chooses, and nobody outside the company can know why or how—

---

[108] Amy Watson, Number of independent bookstores in the U.S. 2009-2019, Statista (Oct 29, 2019), https://www.statista.com/statistics/282808/number-of-independent-bookstores-in-the-us/.

[109] House Report at 261.

[110] *Id.* at 50.

[111] Stacy Mitchell and Olivia LaVecchia, *Report: Amazon's Monopoly*, ILRS(Nov 29. 2016), https://ilsr.org/amazons-monopoly/.

[112] *Id.*

[113] *Id.*

[114] *Id.*

or even that it was done," observes Authors United.[115] "Amazon has used retaliation . . . to coerce publishers to accept contractual terms that impose substantial penalties for promoting competition" with Amazon's rivals.[116] Amazon's retaliatory tactics against publishers include removing the pre-set purchase ("BUY") button, which blocks a customer's ability to purchase a publisher's current titles; and removing the "pre-order" button, which eliminates the ability for a consumer to pre-order publishers' forthcoming titles.[117] Another form of retaliation that Amazon reportedly engaged in was showing publishers' titles as out of stock or with delayed shipping times.[118] Publishers, authors, and booksellers have "significant fear" because of Amazon's dominance.[119]

103.    Amazon can, at any moment, remove the buy-button from a particular title on its site and cause overall sales of that book to plummet by 50% or more.[120] It has the power to destroy a book's prospects and has exercised this power on a number of occasions.[121] For example, to extract more fees from Defendant Hachette, it suspended pre-orders and delayed the shipping times of thousands of Hachette books by weeks, and modified its search and recommendation algorithms to direct shoppers to other books.[122] Amazon's machinations did not just harm Hachette. It also suppressed the career prospects and incomes of roughly 3,000 authors

---

[115] *Id.*

[116] *Id*.

[117] House Report at 260.

[118] *Id*. at 269.

[119] *Id*.

[120] *Id.*

[121] *Id.*

[122] Mitchell & LaVecchia.

for several months.[123] As alleged herein, Amazon has created or maintained its monopoly power in the print trade book market through anticompetitive agreements with the Big Five.

104.    Among the anticompetitive effects of the Big Five's agreement are higher wholesale prices, higher consumer prices, depressed book sales, and stagnant deductions that make it difficult for smaller retailers to compete with Amazon. Higher list prices raise the price Amazon pays as well as the price by its rival booksellers (like Bookends or Barnes & Noble). The increased wholesale price paid by all booksellers results in higher retail prices paid by consumers and lower total market output of books.

105.    The reduction in total book market output does not harm Amazon. To the contrary, as list prices rise, book consumers look more aggressively for comparatively lower retail book prices and switch to Amazon, which due to its discriminatory discounts to list can and does sell at significantly lower prices than its rival book sellers. Indeed, Bookends frequently has customers browse its books and then buy the books on Amazon. That customer practice, known as "showrooming," is endemic in bookstores,[124] and Amazon even has an app for that. In Amazon's shopping app there is feature called Amazon Lens, a barcode scanner that allows customers to scan the books they find while browsing in bookstores and immediately buy them from Amazon with one click. Noting the widespread nature of this practice, a commentator called it the "biggest threat to the industry."[125]

---

[123] *Id.*

[124] Sian Cain, *'I'd love to scream at them': how showroomers became the No 1 threat to bookshops*, The Guardian (Dec. 17, 2018), https://www.theguardian.com/books/shortcuts/2018/dec/17/id-love-to-scream-at-them-how-showroomers-became-the-no-1-threat-to-bookshops.

[125] *Id.*

106.     In short, as the list price rises, cross-elasticity of demand (*i.e.*, customers switching to Amazon from competing booksellers to obtain comparatively lower price) causes Amazon sales volume to go up or at least stay the same. Competing booksellers, however, suffer a loss of sales volume due to 1) market elasticity of demand (*i.e.*, total book market output going down as market list price goes up) and 2) due to consumers switching to Amazon as market list price goes up (*i.e.*, due to cross-elasticity of demand between the competing retailers and Amazon). In other words, the full amount of the lost sales volume and market output of books is born by Amazon's rivals. For Amazon, the beneficial effects of cross-elasticity of demand outweigh the impact of market elasticity of demand and its sales volume stays the same or goes up and its market share goes up as consumers switch to Amazon from rivals. The impact on the market, however, is that list price is higher and total output lower than it otherwise would be.

107.     And in turn, booksellers use list price as the basis for pricing their books. The full list price of print trade books is the price at which a substantial number of sellers sell print trade books, including in some cases the Big Five through their direct online sales.  In fact, when selling the Big Five's print trade books, Amazon commonly lists both its own sales price and the publisher's list price as the crossed-out price, as illustrated by the following current displays for books sold by Amazon:



**Spy School at Sea**
Book 9 of 9: Spy School  |  by Stuart Gibbs  |  Aug 31, 2021

**Hardcover**                                           Ages: 8 - 12 years
$15⁹⁹ $17.99
Pre-order Price Guarantee.

✓prime Get it as soon as **Tue, Aug 31**
FREE Shipping on orders over $25 shipped
by Amazon
This title will be released on August 31,
2021.



Defendants know that higher list prices mean higher consumer prices. To comply with Amazon's mandatory reference pricing policies, the list price supplied by the Big Five must be the "price at which [the seller] or other retailers or sellers have recently made substantial sales of the product in question."

108.    And indeed, Bookends currently sells the above examples at their list prices:



Search results

**Spy School at Sea** (Hardcover)
By Stuart Gibbs

**$17.99**
ISBN-13: 9781534479432
Availability: Coming Soon - Available for Pre-Order Now
Published: Simon & Schuster Books for Young Readers, August 31st, 2021

Our Time Is Now: Power, Purpose, and the Fight for a Fair America (Paperback)
By Stacey Abrams

$18.00
ISBN-13: 9781250798466
Availability: On Our Shelves Now
Published: Picador, June 8th, 2021

109.    Defendants' anticompetitive conduct has depressed print trade book sales in the U.S. market.  In August 2019, publisher net revenue for print trade books, including sales to bookstores, wholesalers, direct to consumer, and online retailers, etc., was down 3.6% as compared to the same period to the previous year.[126] Paperback and mass market books decreased by 7.9% and hardback books also decreased by 0.8%.[127] In a more competitive market, where book distribution would be greater dispersed through more sellers, sales would increase.

110.    Defendants' discriminatory pricing scheme locks in Amazon's dominance as a retailer of print trade books and prevents fair and vigorous competition from other booksellers who suffer a substantial cost disadvantage in comparison to Amazon, which suppresses retail price competition. The harm Defendants cause to competition and consumer choices is precisely what federal antitrust laws are intended to address.

---

[126] Association of American Publishers Release August 2019 StatShot Report, https://publishers.org/news/association-of-american-publishers-release-august-2019-statshot-report/.

[127] *Id.*

010888-12/2077168 V1

## VI.   INTERSTATE TRADE AND COMMERCE

111.   Amazon's activities as alleged in this complaint were within the flow of, and substantially affected, interstate commerce. Amazon sells books across, and without regard to, state lines.

## VII.   DEFENDANTS' MARKET POWER IN THE RELEVANT MARKET

112.   The relevant geographic market for purposes of this action is the United States. The market injured by the Publisher Defendants' horizontal agreement (facilitated by Amazon) to fix the prices at which print trade books are sold by the Publisher Defendants to retailers is the U.S. wholesale market for print trade books. If the horizontal price-fixing claim is proved, proof of a relevant print trade book wholesale market will not be necessary as the agreement is *per se* illegal. If the *per se* rule is for some reason not applied to this horizontal agreement, the relevant market would be the U.S. wholesale market for the sale of print trade books by publishers to print trade book retailers. The relevant market for the claim that Amazon has entered into a series of vertical agreements with the print trade book Publisher Defendants that violates the Rule of Reason is the U.S. retail market for print trade books and the U.S. submarket for print trade books sold online. That is the relevant market and relevant submarket in which the Plaintiff and the class members compete against Amazon for the sale of print trade books to consumers and that is the relevant market and relevant submarket in which competition is injured by the series of vertical agreements entered into by Amazon and the Publisher Defendants. The U.S. submarket for print trade books sold online is the relevant market for purposes of the monopoly claim.

**A.**     **The market for print trade books is the relevant product market.**

**1.**     **Trade books are not interchangeable with other books.**

113.     Trade books represent a distinct product market from non-trade books, such as reference and academic books.[128] They also represent a distinct product market from self-published books. Whereas a self-published author fronts all costs and is responsible for the content and marketing, trade publishers receive the rights to sell an author's book in exchange for covering all aspects of editing, publication, marketing, and distribution.[129] Trade publishers are highly selective. They do not read 95% of the manuscripts they receive and publish only about 1% of the manuscripts they do review.[130] The selection, editing, and promotional process is an expensive undertaking, and trade books represent the publisher's considerable investment in that process.

**2.**     **Print books are not reasonably interchangeable with eBooks or audio books.**

114.     Within the trade book market, there is also a distinct product market for the retail sale of print trade books that is separate from retail distribution of trade eBooks and trade audio books.[131]

115.     Products' functional interchangeability typically depend on the products' physical characteristics.[132] Courts and economists typically define the boundaries of a market by reference to products' functional substitutability, and products' physical characteristics often determine

---

[128] *Apple*, 952 F. Supp. 2d at 648 n.4.

[129] Leigh Shine, *Calculating the Odds of Getting a Traditional Publisher*, Medium (Dec. 22, 2016), https://medium.com/publishizer/calculating-the-odds-of-getting-a-traditional-publisher-798b1c7b94b0.

[130] Odds Of Being Published - Fiction Writer's Mentor, http://www.fiction-writers-mentor.com/odds-of-being-published.

[131] *Apple*, 952 F. Supp. 2d at 694 n.60 (defining the relevant market as trade eBooks in the United States); 5.4.2017 DG Comp. Decision at 14.

[132] 2 Federal Antitrust Law § 10.2 (2020).

their functional substitutability.[133] Printed books are physical objects that can be read without any special devices. In comparison, eBooks are digital products that require a special device, such as Amazon's Kindle or Barnes & Noble's Nook, to read them. Printed books also different from audio books, which may be physical or digital but are made for listening, not reading. These distinguishing characteristics affect the substitutability of print books and audiobooks in the supply or demand for eBooks.[134]

116.     From both a demand side and a supply side analysis, trade eBooks and trade audiobooks are also not sufficiently strong substitutes to warrant their inclusion in the product market of which print trade books form a part.[135]

117.     The DG Comp found that, as regards demand-side substitutability, consumers are unlikely to switch from eBooks to print versions in case of a 5-10% increase in the retail price of eBooks because overall, even with a 5-10% increase of their retail price, eBooks would generally be priced significantly lower than print books.[136] Consumer preferences also play an important role in distinguishing the two formats. For example, the DG Comp's investigation of the eBooks market showed that important consumer considerations determine whether the consumers will purchase an eBook instead of a print version of a book.[137]

118.     To find significant supply-side substitutability, print book retailers and eBook retailers would have to be able to enter each other's markets quickly and easily. The DG Comp found that this was not the case. The distribution of print books entails important investments in

---

[133] Philip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 562 (5th Ed.).

[134] 5.4.2017 DG Comp. Decision at 14.

[135] *Id.*

[136] *Id.*

[137] *Id.*

the distribution, warehousing and logistics, whereas eBooks distribution requires mainly set-up and maintenance of an online distribution platform, which is a very different type of investment.[138] A traditional print bookstore cannot switch from selling print books to eBooks without acquiring significant tangible and intangible assets, incurring additional investments and making strategic decisions with the immediacy required to allow for a finding of significant supply-side substitutability, and the same holds true for an eBook retailer switching to print sales.[139]

119.    The DG Comp found that audio books are distinct from both print books and eBooks, notably in terms of (i) pricing at wholesale and retail level and (ii) their typical end consumer and mode of consumption.[140] Because print books and audio books are not reasonable substitutes, the retail eBook market is a distinct market.

**3.    Wholesale Market**

120.    Within the trade print book market, there are distinct wholesale and retail markets. In the wholesale market for trade print books, the publishers (including the Big Five, which sell 80% of all print trade books) compete to sell their trade print books to retailers like Amazon, Bookends, and members of the proposed class to resell to consumers.

121.    As in the retail market, and for the same reasons, eBooks and audiobooks are not reasonable substitutes for trade print books, and the wholesale market for trade print books is distinct from the wholesale market for trade eBooks.

---

[138] *Id.*

[139] *Id.*

[140] *Id.*

122.     As in the retail market, and for the same reasons, trade print books represent a distinct product market from non-trade print books (such as reference and academic books).[141] They also represent a distinct product market from self-published books.

123.     As addressed above, prices in the wholesale market are set as a fixed discount to the list prices for the trade print trade books.

### 4.     The online retail market for sale of print trade books is a well-defined submarket, representing a distinct group of competitors that do not overlap significantly with brick-and-mortar booksellers.

124.     Courts, government agencies, economists, customers, and retailers alike recognize the retail ecommerce market as a distinct market within the U.S. retail market. Industry recognition of a distinct ecommerce retail market is relevant because economic actors usually have accurate perceptions of economic realities and the parties active in the market understand its function and demarcation.

125.     Courts recognize that product availability alone does not determine the relevant product market, for example, "fact that a customer might buy a stick of gum at a supermarket or at a convenience store does not mean there is no definable groceries market."[142] A core group of particularly dedicated, "distinct customers," paying "distinct prices," may constitute a recognizable submarket.[143] A core group of customers may define the relevant submarket because their particular circumstances dictate that a product is the only realistic choice, or because they find a particular product uniquely attractive, *e.g.*, core customers dedicated to office supply superstores due to their unique combination of size, selection, depth, and breadth of

---

[141] *Apple*, 952 F. Supp. 2d at 648 n.4.

[142] *FTC v. Whole Foods Market*, 548 F.3d 1028, 1040 (2008).

[143] *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

inventory.[144] The ecommerce market provides the only realistic choice for consumers who cannot easily shop in physical stores, such as the disabled and elderly people, people without reliable transportation, people who live in remote areas where few physical stores are located, and people who purchase goods that are only available on the internet (*i.e.*, where the vast online inventories are no match for physical stores in their area). Many physical bookstores lack the actual or potential ability to deprive online stores of significant levels of business because brick and mortar stores typically serve customers within the immediate geographic area, while an online store typically operates over a broad region, nationally, or internationally.[145]

126.    Other consumers find online book shopping uniquely attractive because of the convenience, broad selection, and price, or because they hate shopping in-person. Local bookstores do not serve as reasonable substitutes for dedicated online shoppers because physical stores do not have the same type of electronic ordering efficiency and capability as an online store.[146] Typically, with a few clicks or a simple voice command, an ecommerce retailer will send the product directly to the consumers without any interaction with sales staff. Consumers can shop online 24/7 and locate hard-to-find items more easily than they could by searching physical stores.[147] And as Amazon itself recognized early on, rarely can brick and mortar

---

[144] *Whole Foods Market*, 548 F.3d at 1037.

[145] *Distance Learning Co. v. Maynard*, 2020 U.S. Dist. LEXIS 99256, at *20 (N.D. Cal. June 4, 2020).

[146] *Origami Owl LLC v. Mayo*, No. CV-15-00110-PHX-DGC, 2015 U.S. Dist. LEXIS 103755, at *8 (D. Ariz. Aug. 7, 2015).

[147] Susan Ward, *Brick and Mortar Stores vs Online Retail Sites*, Jun. 25, 2019, https://www.thebalancesmb.com/compare-brick-and-mortar-stores-vs-online-retail-sites-4571050; https://www.commerce.gov/news/fact-sheets/2017/07/new-insights-retail-e-commerce.

bookstores compete with the extensive inventory that an online bookseller can provide.[148] Online retail provides greater convenience to consumers who can order products from any location without having to find a brick-and-mortar store selling the specific product with the specific desired attributes and the desired quantity.[149] Demand side preferences also make online retailing unique in terms of certain factors such as convenience and price.[150] Online shoppers can also more easily put off purchases decisions until they are ready to buy because they have not invested in travel time and do not face the pressure from the salespeople that shoppers in brick and mortar stores experience.[151]

127.    The manner of distribution also supports a separate market.[152] "In the cases where the court has identified the method of sale as a peculiar characteristic of the market, that method of sale has been integral to the business of the defendant itself."[153] Here, too, the distinct "product" that online bookstores provide is the presentation and delivery of books, which

---

[148] George Packer, *Cheap Words*, New Yorker (Feb.17 & 24, 2014), https://www.new yorker.com/magazine/2014/02/17/cheap-words; *Thompson v. 1-800 Contacts, Inc.*, 2018 U.S. Dist. LEXIS 83806, at *21-23 (D. Utah May 17, 2018).

[149] *Thompson*, 2018 U.S. Dist. LEXIS 83806, at *21-23.

[150] Tracey Wallace, The 2018 Omni-Channel Retail Report: Generational Consumer Shopping Behavior Comes Into Focus, https://www.bigcommerce.co.uk/blog/omni-channel-retail/#developing-your-omni-channel-strategy; *see also* (examining the role of several consumers' cognitive and psychographic traits in their perception of retailers' deceptive practices (perceived deception) and the different effects on perceived deception associated with online vis-à-vis in-store shopping, indicating that they need to be considered as distinct experiences for the customer).

[151] *Id.*; *see also* Rose Leadem, *67 Fascinating Facts About Ecommerce vs. Brick and Mortar (Infographic)*, Dec. 30, 2017, https://www.entrepreneur.com/article/306678.

[152] *PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 254-55 (S.D.N.Y. 2000), *aff'd*, 315 F.3d 101 (2d Cir. 2002). *See, e.g., Henry v. Chloride*, 809 F.2d 1334, 1342 (8th Cir. 1987) (batteries sold by traveling salespersons present a distinct submarket from batteries sold from warehouses or stores).

[153] *Id.*

features, as alleged here, 24/7 access, easy search functions (often assisted by consumer data gathered online), vast inventory, quick checkout, and products that will be delivered in due course as opposed to immediately surrendered to the customer. These features are wholly distinguishable from physical stores, which typically are not open 24/7, rely on the layout of the store and the store personnel to help customers locate products, and rely on personnel to process customers' payment, requiring travel to the stores and wait times to be served.

128.    The Stigler Committee on Digital Platforms reports: "Traditional brick-and-mortar stores and online platforms differ greatly in their advertising and personalization capabilities."[154] Online retailers "almost always require account creation for purchasing, verify this information for each transaction, and have direct or easy access to detailed non-shopping information about their customers."[155] This account creates a digital identity, which incorporates select data on age, sex, address, email address, preferences, and, potentially more information.[156] FTC Chair, Lina M. Khan, adds: "The degree to which a firm can tailor and personalize an online shopping experience is different in kind from the methods available to a brick-and-mortar store – precisely because the type of behavior that online firms can track is far more detailed and nuanced."[157]

129.    Supply-side preferences also make online retailing unique. "Despite the relative inefficiency of delivering goods directly to the home," ecommerce leads to unique cost savings

---

[154] Stigler Committee on Digital Platforms (Sep. 16, 2019), https://research.chicagobooth .edu/-/media/research/stigler/pdfs/digital-platforms---committee-report---stigler-center.pdf, at 45.

[155] Stigler Committee on Digital Platforms at 45.

[156] *Id.* at 54.

[157] Lina M. Khan, *Amazon's Antitrust Paradox*, 126 Yale L.J. 710, 764 (2017).

because "supplying direct to the consumer is less expensive than doing so through a store."[158]

Ecommerce retail businesses can avoid the costs "of handling within the store (unpacking, stocking and maintaining shelves, and such), theft (which can easily account for 3 percent of the sales of a retailer), rent (low-cost distribution centers replace expensive urban or suburban real estate), and selling costs (automated and tele-sales replace relatively expensive in-store salespeople)."[159] The physical location of the business operating within ecommerce becomes less relevant because the ecommerce market "facilitates production and distribution across borders ... and can assist in opening markets that were previously closed."[160]

**B.** **The relevant geographic markets are the United States and the local and regional markets in which Amazon competes with Class members.**

130.    The relevant geographic markets are the United States, where Amazon competes with Bookends and other members nationally in the online sales of print trade books, and in the local and regional markets where Amazon's online sales compete with Bookends and the Class members' physical stores in the sale of print trade books.

131.    The Big Five sell their trade books throughout the United States.

132.    Book retailers located outside of the Unites States are unable to constrain book pricing in the United States.

---

[158] Severin Borenstein and Garth Saloner, *Economics and Electronic Commerce*, JOURNAL OF ECONOMIC PERSPECTIVES, Vol. 15, No.1 (Winter 2001) at 5, https://www.gsb.stanford.edu/sites/gsb/files/publication-pdf/Economics%20and%20Electronic%20Commerce.pdf; *see also* David VanHoose, ECOMMERCE ECONOMICS (Routledge 2nd Ed. 2011); http://cw.routledge.com/textbooks/vanhoose/.

[159] *Id.* at 5-6.

[160] Andrew D. Mitchel, *Towards Compatibility: The Future of Electronic Commerce within the Global Trading System*, J Int Economic Law (2001) 4 (4): 683.

**C.    The Big Five dominate the production and sale at wholesale of print trade books in the U.S. market.**

133.    A pattern of consolidation has dominated the publishing industry. Between November 1985 and November 1986 alone, there were fifty-seven major publishing acquisitions.[161] By 2006, the six largest U.S. trade book publishers (the current Big Five) accounted for ninety percent of total sales.[162] In 2013, Penguin merged with Random House, producing a combined group that now controls approximately twenty-five percent of the English-language publishing market.[163] Simon and Schuster was founded in 1924, and it has been variously owned by Marshall Field, Gulf + Western, Viacom, and CBS Corporation.[164]

134.    Together, the Big Five publish many of the biggest names in fiction and non-fiction, including the vast majority of the New York Times bestsellers.[165] They represent about 80% of the sales of print trade books, including 90% of bestsellers. Their dominance can be attributed to a long history of mergers and acquisitions that has led to five giant publishing houses, consisting of vast numbers of subsidiary publishers or "imprints." Smaller trade publishers continue to lose business and are unable to compete with the Big Five. For example, Houghton Mifflin Harcourt recently announced that it was exploring a sale of its trade publishing division, potentially with Macmillan or Hachette.[166]

---

[161] *Supra* Lee.

[162] *Id.*

[163] *Id.*; *supra* Alter & Lee.

[164] *Id.*; Alexandra Alter and Edmund Lee, *Penguin Random House to Buy Simon & Schuster*, NYT (Nov. 25, 2020), https://www.nytimes.com/2020/11/25/books/simon-schuster-penguin-random-house.html.

[165] *Apple*, 791 F.3d at 298.

[166] *Supra* Alter & Lee.

135.    On November 25, 2020, Penguin announced plans to acquire Simon & Schuster; the proposed merger would create a single publishing house with approximately a third of all trade books published.[167] News Corp Chief Executive Robert Thomson said in a statement. "This literary leviathan would have 70% of the U.S. literary and general fiction market."[168] On October 31, 2022, the District Court for the D.C. Circuit blocked the merger following a thirteen-day trial, ruling (among other things) that "the Big Five publishers have engaged in tacit coordination that is profitable for those involved" and that "coordinated conduct already appears to be rampant."[169]

**D.    Amazon dominates the retail market for print trade books.**

136.    A market share as large as Amazon's creates an inference of market power. Its market power is durable because barriers to entry make entry by new competitors difficult. Further, effective entry into or expansion in the print trade book market would require competing booksellers to be able to differentiate themselves by offering lower prices. As the allegations in this complaint make clear, Defendants' discriminatory pricing agreements make such competition impossible.

137.    Amazon dominates the retail print trade book market with 50% to 80% of the share of the sales of print trade books.

---

[167] AG Statement on Proposed Sale of Simon & Schuster and Its Ramifications for Authors, The Authors Guild, https://www.authorsguild.org/industry-advocacy/ag-statement-on-proposed-sale-of-simon-schuster-and-its-ramifications-for-authors/; Frank Jordans and Hillel Italie, *Penguin to buy Simon & Schuster, create publishing giant*, Associated Press (Nov. 25, 2020, https://apnews.com/article/stephen-king-publishing-john-irving-media-jonathan-karp-89ec475bd7783fea199a378c60261f8b.

[168] Jordans & Italie.

[169] *Bertelsmann*, 2022 WL 16748157, at *28.

138.     Amazon also dominates the submarket for the online retail sale of print trade books, where it accounts for around 90% of all sales.

## VIII.   CLASS ACTION ALLEGATIONS

139.     Bookends brings this action on behalf of itself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and injunctive relief against Defendants pursuant to federal antitrust law on behalf of the members of the following Bookseller and Online Bookseller Classes:

> All retail booksellers, which, on or after March 25, 2017, purchased print books at wholesale directly from the Big Five Publishers.

> All online retail booksellers, which, on or after March 25, 2017, purchased print books at wholesale directly from the Big Five Publishers.

140.     Excluded from the proposed Classes are the Defendants and their officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities.

141.     **Numerosity:** Members of the proposed Classes are so numerous that joinder is impracticable.  Bookends believes that there are several hundreds of members of the proposed Classes geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

142.     **Typicality:** Bookends' claims are typical of the claims of the other members of the proposed Classes. The factual and legal bases of Defendants' liability are the same and resulted in injury to Bookends and all other members of the proposed Classes.

143.     **Adequate representation:** Bookends will represent and protect the interests of the proposed Classes both fairly and adequately. Bookends has retained counsel competent and

experienced in complex class-action litigation. Bookends has no interests that are antagonistic to those of the proposed Classes, and their interests do not conflict with the interests of the proposed Class members they seek to represent.

144.   **Commonality:** Questions of law and fact common to the members of the proposed Classes predominate over questions that may affect only individual members of the Classes because Defendants have acted on grounds generally applicable to the Classes and because Class members share a common injury. Thus, determining damages with respect to the proposed Classes as a whole is appropriate. The common applicability of the relevant facts to claims of Bookends and the proposed Classes are inherent in Defendants' wrongful conduct, because the overcharge injuries incurred by Bookends and each member of the proposed Classes arose from the same anticompetitive conduct alleged herein.

145.   There are common questions of law and fact specific to the Classes that predominate over any questions affecting individual members, including:

    i.   Whether Defendants' discriminatory pricing violated the Robinson-Patman Act;

    ii.   Whether Defendants unlawfully contracted, combined, or conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act by agreeing to provide the same discriminatory pricing to Amazon and whether that agreement prevents bookseller rivals from competing on price and allows Defendants to increase the market price of print trade books;

    iii.   Whether Amazon has unlawfully monopolized the U.S. online retail market for the sale of print trade books, including by way of the contractual terms, policies, practices, mandates, and restraints described herein;

    iv.   Whether Defendants conspired to confer upon Amazon a monopoly in the U.S. online retail market for the sale of print trade books, including by way of the contractual terms, policies, practices, mandates, and restraints described herein;

    v.   Whether competition in the U.S. online retail market for the sale of print books has been restrained and harmed by Amazon's monopolization of this market;

    vi.   Whether Bookends and members of the proposed Classes have been damaged by Defendants' conduct;

- 60 -

vii.   The amount of any damages; and

viii.   The nature and scope of injunctive relief necessary to restore a competitive market.

146.   **Prevention of inconsistent or varying adjudications:** If prosecution of a myriad of individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for the Defendants. Certification of Bookends' proposed Classes would prevent these undesirable outcomes.

147.   **Injunctive relief:** By way of its conduct described in this complaint, Defendants have acted on grounds that apply generally to the proposed Classes. Accordingly, final injunctive relief is appropriate respecting the Classes as a whole.

148.   **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed Classes could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## IX.   ANTITRUST INJURY

149.   Defendants, through their unlawful conduct alleged herein, cause Plaintiff and members of the proposed Classes to pay higher wholesale prices for print trade books than they would have paid or would pay in the future in the absence of Defendants' unlawful acts. Further,

Defendants' unlawful conduct harms consumers by raising retail prices and driving Amazon's bookseller competitors out of business. Plaintiffs have also suffered a loss of sales which have been diverted to Amazon as a result of the substantial and sustained price discrimination at wholesale. Plaintiff and members of the proposed Bookseller and Online Bookseller Classes have sustained, and continue to sustain, significant losses from overcharges directly caused by Defendants' anticompetitive activity. The full amount of such overcharge damages will be calculated after discovery and upon proof at trial. Unless Defendants' anticompetitive conduct is stopped, Plaintiff and members of the proposed Classes will incur future overcharges in their purchase of print trade books.

## X.    CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**VIOLATION OF 15 U.S.C. § 13**
**(AGAINST PUBLISHER DEFENDANTS FOR PRICE AND**
**SERVICE DISCRIMINATION AND AGAINST AMAZON**
**FOR INDUCING PRICE DISCRIMINATION)**

150.    Bookends incorporates by reference the allegations in the preceding paragraphs.

151.    Bookends brings this claim on behalf of itself and on behalf of each member of both proposed Classes described above. Bookends seeks damages and injunctive relief.

152.    **Two or more contemporaneous sales by the same seller to the plaintiff and a competing buyer**: Bookends has purchased numerous books, often repeatedly, from each of the Big Five at its standard discount price of up to 46%, including:

| Publisher | Title | Format | List price | Date |
|---|---|---|---|---|
| Penguin | *Becoming* | hardback | $32.50 | Nov. 29, 2018 |
| Penguin | *Crazy Rich Asians* | paperback | $16.00 | May 4, 2018 |
| Macmillan | *A Higher Loyalty* | hardback | $29.99 | Mar. 22, 2018 |
| Macmillan | *Fire and Fury* | hardback | $30.00 | Jan. 12, 2018 |
| Simon & Schuster | *Fear* | hardback | $30.00 | Sep. 14, 2018 |
| Simon & Schuster | *Milk and Honey* | paperback | $14.99 | Sep. 24, 2018 |

| Hachette | *Lethal White* | hardback | $29.00 | Oct. 11, 2018 |
| Hachette | *Russian Roulette* | hardback | $30.00 | Mar. 22, 2018 |
| HarperCollins | *Sapiens* | paperback | $24.99 | Feb. 24, 2018 |
| HarperCollins | *The Woman in the Window* | hardback | $26.99 | Jun. 26, 2018 |

This is just an indicative list, Bookends purchased thousands of books in addition to the books identified above, including most New York Times bestsellers at the standard discount. Given its scale, Amazon contemporaneously purchased every book Bookends purchased at the standard discount at discriminatory prices during the relevant period. For example, Amazon competed concurrently with Bookends and Class members in the retail sales of these and many other Big Five books, from which Bookends reasonably infers that wholesale purchases of these books by Amazon from the Big Five were reasonably contemporaneous with wholesale purchases of the same books from the Big Five by Bookends and Class members.

153.   **At different prices**: Each Big Five Defendant engaged in contemporaneous sales of the same books to Amazon, Bookends, and members of the Proposed Classes at different prices. Amazon received a higher discount (*i.e.*, a lower price) and ██████████████████████ ██████████ from the Big Five that were not equally available to Bookends and Class members.

154.   **Of commodities of like grade and quality**: Each Big Five Defendant sells its own commodities of like grade and quality (like hardback copies of the same title). Each Big Five Defendant has sold and continues to sell such commodities to Amazon at a lower price than it sells to Bookends and members of the proposed Classes. The books the Big Five contemporaneously sold at different prices are the same titles in the same format (like hardback) and therefore are commodities of like grade and quality.

155.   **Where at least one of the sales was made in interstate commerce**: Each of the Big Five operates nationally and each sold their books to Bookends, Amazon, and Class

members across state lines. These sales have occurred and continue to occur therefore in interstate commerce.

156.    **The price discrimination had the requisite effect upon competition generally**: An injury to competition may be inferred from the fact that Bookends and Class members had to pay the Big Five substantially more for their goods over time than their competitor, Amazon, had to pay.[170] The price discrimination resulted in Amazon selling the same books at retail at lower prices than the Plaintiff and Class could match and caused sales to be diverted from the Plaintiff and the Class to Amazon.

157.    **The competing buyer knew the price discrimination was unlawful**: Amazon knew that the prices were discriminatory because it demanded that the discounts ████ ███████ it received would not be available to other booksellers and received assurances that the discriminatory prices would not be available to other retailers. Amazon knows that its discounts are higher and acquisition prices lower than the Publisher Defendants' published standard discounts and that ███████████████████████████████



158.    Amazon's knowledge that it has induced or received a discrimination in price which is prohibited by the RPA can also be inferred from Amazon's dominant position in the relevant markets with as much as 80% of the retail market for print trade book sales and 90% of

---

[170] *Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 559 (1990) (explaining the *Morton Salt* inference).

the online retail market for print trade book sales and the fact that it aggressively demands not only better discounts, not available to other retail booksellers but, in addition, ████████████ ████████████████

159.    **The price discrimination caused injury to the plaintiff**: Bookends and Class members lost sales to price-sensitive consumers or lost profits in attempting to match Amazon's sales price as a direct result of Defendants' discriminatory pricing.

160.    **The Functional Discount Defense is unavailable**: The significant difference between the discounts offered to Amazon versus Bookends and members of the proposed Classes exceeds any cost savings achieved by selling to Amazon. In fact, Amazon's ████████ ████████████ increase the cost of selling to Amazon as compared to other Booksellers.

161.    For example, █████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[171] Hachette, Amazon_Rev0000004, Sec. 4; HarperCollins, AMAZON_REV0000033, Sec. 2; Macmillan, AMAZON_REV0000065, Sec. 3; Penguin, AMAZON_REV0000094, Sec. 3; Simon & Schuster, AMAZON_REV0000142, Sec. 2.

[172] Macmillan, AMAZON_REV0000065, Sec. 5; Macmillan, AMAZON_REV0000160, Ex. A.

[173] Macmillan, AMAZON_REV0000185, Sec. 3.

[174] Simon & Schuster, AMAZON_REV0000131, Sec. 3.

010888-12/2077168 V1



162.    Likewise, the value of any distributional or marketing services Amazon provides

that the Big Five would otherwise undertake themselves ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮, the Big Five's discriminatory pricing does not fall within the

"functional discount" exceptions to the Robinson-Patman Act. Functional discounts are

permissible price differences only "to the extent that a buyer actually performs certain functions,

---

[175] AMAZON_REV0000131, Sec. 2 (Simon & Schuster).

[176] Hachette, AMAZON_REV0000004, Sec. 5; HarperCollins, AMAZON_REV0000042, Sec. 7; Simon & Schuster, AMAZON_REV0000142, Sec. 4 and Ex. 1.

[177] Simon & Schuster, AMAZON_REV0000142, Sec. 4.

[178] Hachette, AMAZON_REV0000004, Sec. 5; HarperCollins, AMAZON_REV0000042, Sec. 7; Simon & Schuster, AMAZON_REV0000142, Ex. 1.

[179] Hachette, AMAZON_REV0000004, Sec. 8; Macmillan, AMAZON_REV0000065, Sec. 4; Penguin, AMAZON_REV0000094, Sec. 8.

[180] Hachette, AMAZON_REV0000001, Sec. D; HarperCollins, AMAZON_REV0000033, Sec. 6; Macmillan, AMAZON_REV0000160, Sec. 1 & 2; Penguin, AMAZON_REV0000189, Sec. 1 & 2 & Appendix B.

[181] HarperCollins, AMAZON_REV0000033, Sec. 3.

[182] 15 U.S.C. §§ 13(d) & 13(e).

assuming all the risk, investment, and costs involved[.]"[183] If a seller separately compensates the buyer for a service, that service does not qualify as a basis for a functional discount.[184]

163.    **Meeting the Competition Defense is unavailable**: The Big Five Defendants may not rely on the "meeting competition" defense because their discriminatory pricing agreements do not qualify as a "good faith" meeting of an equally lawful price, as required by the Robinson-Patman Act. On the contrary, the Big Five Defendants jointly agreed to the discriminatory discounts, and ███████████████████████████████████████████████

███████████████████████████████

### SECOND CAUSE OF ACTION
### VIOLATION OF 15 U.S.C. § 1
### (AGAINST ALL DEFENDANTS)

164.    Bookends incorporates by reference the allegations in the preceding paragraphs.

165.    Bookends brings this claim on behalf of itself and on behalf of each member of both proposed Classes described above. Bookends seeks damages and injunctive relief.

166.    Defendants, by and through their officers, directors, employees, agents and other representatives, have entered into an unlawful agreement, combination and conspiracy in restraint of trade. Through price discrimination agreements, Defendants ensure that no rival bookseller can compete with Amazon on the price of print trade books.

167.    Defendants are liable for the creation, maintenance, and enforcement of the anticompetitive restraints regardless whether a *per se*, "quick look," or rule of reason standard applies.

---

[183] *Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 561-62 (1990).

[184] *Id.* at 562.

168.   *Per se*: All Defendants are publishers of print trade books. Amazon is a vertically integrated company that is active upstream as a print trade book publisher and downstream as a print trade book retailer. Defendants' agreement is a *per se* violation because it was formed for the purpose and with the effect of controlling and raising the wholesale prices for print trade books paid by retailers even if Defendants did not explicitly agree on the prices to be charged.

169.   Defendants share a common motive to collude. As print trade book publishers, each Defendant has a motive to control wholesale prices. Defendant Amazon also has a motive to dominate over its retail competitors, which it achieves by obtaining a substantially lower wholesale price and more favorable contractual terms than its rivals, thereby ensuring that they cannot compete with Amazon on retail price.

170.   Defendants did not act unilaterally or independently, or in their own individual economic self-interest, when entering into these anticompetitive agreements, which substantially, unreasonably, and unduly restrain trade in the relevant market, and thereby harmed Bookends and the proposed Classes. All Defendants have an interest in generating sales in the print trade book market, yet supracompetitive wholesale prices for the Big Five's books and a consolidation of power in the hands of a single bookseller have led to higher consumer prices and depressed sales in this market. Publicly, the Big Five Defendants are diametrically opposed to Amazon's consolidation of market power and their dependence on Amazon as their principal distributer of their books. But by agreeing to discriminatory pricing, the Big Five actively increased Amazon's market power.

171.   Defendants had opportunities to collude. For example, when they raised trade eBook prices marketwide, the Big Five colluded with each other and with Apple as they entered into substantially identical eBook distribution agreements in 2010 and 2011. And in 2014 and

2015, as each of the Big Five Defendants entered into new negotiations with Amazon regarding the distribution of their trade books, Defendants publicly signaled that Amazon had offered the same terms to each of the Big Five and that each of the Big Five had accepted those terms.

172.    And the Big Five Defendants relied on Amazon to convey information critical to the success of the conspiracy. For example, they relied on Amazon to communicate to each Publisher Defendant what terms were offered to the other Publisher Defendants and whether the others accepted Amazon's terms. And under the terms of their contracts, they relied on Amazon to convey to ███████████████████████████████████████████
████████████████████████████████

173.    Authorities in the United States and Europe have launched multiple investigations into Defendants' conduct in book sales. Here in the United States, the House Antitrust Commission found that Amazon had anticompetitive provisions in both the sale of print and eBooks, which harm consumers and competition in the retail sale of books. A few years earlier, regulators on both continents found that the Publisher Defendants engaged in horizontal price fixing in the sale of eBooks. And the District Court for the D.C. Circuit recently held that "the Big Five are already engaging in tacit collusion or parallel accommodating conduct when acquiring books," and that "coordinated conduct [] appears to be rampant."[185]

174.    Bookends alleges a hub-and-spoke conspiracy supporting a horizontal price fixing agreement. Defendant Amazon is the dominant retail bookseller, through which the Big Five sell their print trade books. Like Apple before it, Amazon serves as the central, common contractual party (*i.e.*, the hub) through which the Defendants carried out their common scheme to control

---

*Bertelsmann*, 2022 WL 16748157, at *28.

wholesale trade book prices and ensure that Amazon's retail competitors could not compete with Amazon on price.

175.    Defendant Amazon participated in and facilitated the horizontal agreement among the Big Five Defendants by coordinating a series of substantially identical agreements with the same anticompetitive terms and making clear to each of the Big Five Defendants that it was offering each of them the same deal.

176.    For purposes of Bookends' allegations of a *per se* violation, it is not necessary to prove a relevant market or adverse effects in such market.

177.    **Quick look/rule of reason**: To the extent Defendants' conduct is determined to be a vertical price restraint and the conduct at issue is not a *per se* violation, the relevant product market is the retail market for the sale of print trade books or alternatively the online submarket for the sale of print trade books. The relevant geographic market is the entire United States.

178.    Defendants possess market power within the relevant markets. The Big Five Defendants' sales account for 80% of the print trade publications sold at wholesale in the United States, including 90% of bestsellers. Amazon controls about 50% to 80% of the retail market for the sale of print trade books in the United States (inclusive of physical stores) and about 90% of the online retail submarket. That Defendants have market power in the relevant market is also evident from their power to raise wholesale prices above those that would be charged in a competitive market.

179.    Defendants' agreements have an open and obvious adverse effect on competition as they have raised the wholesale price paid by retailers above the competitive rate that would prevail in the absence of their agreements. Furthermore, an "injury to competition may be inferred" when "some purchasers had to pay their supplier substantially more for their goods

than their competitors had to pay."[186] Discriminatory pricing gives Amazon an unfair advantage over its rival booksellers, which limits the number of meaningful choices consumers have to purchase print trade books at retail. Raising prices through a price-fixing agreement at any level of the distribution chain harms competition.[187] And increased wholesale prices lead to higher consumer prices.

180.    Defendants' anticompetitive agreements have actual detrimental effects in the relevant markets, *i.e.*, less competitive pricing and a concentration of market power in the hands of one retailer.

181.    An observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on the sale of print trade books in the relevant markets.

182.    There is no legitimate, pro-competitive business justification for Defendants' anticompetitive agreements or any justification that outweighs their harmful effect. Even if there were conceivable justifications, the agreements are broader than necessary to achieve such a purpose.

183.    **Injury:** Bookends and the members of the proposed Classes have been injured and will continue to be injured in their businesses and property by paying higher wholesale prices for the Big Five's print trade books than they would have paid or would pay in the future in the absence of Defendants' unlawful acts. Bookends and members of the proposed Classes are entitled to an injunction that terminates the ongoing violations alleged in this Complaint and to

---

[186] *Hasbrouck*, 496 U.S. at 559 (quotation omitted).

[187] *See, e.g.*, *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977); *In re DDAVP Directo Purchaser Antitrust Litig.*, 585 F.3d 677 (2d Cir. 2009).

recover three times the amount of their overcharge damages directly caused by Defendants'

unreasonable restraint of trade.

### THIRD CAUSE OF ACTION
### VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION
### (15 U.S.C. § 2)
### (AGAINST AMAZON)

184.     Bookends incorporates by reference the allegations in the preceding paragraphs.

185.     Bookends brings this claim on its own behalf and on behalf of the proposed

Classes described above. Bookends seeks damages and injunctive relief.

186.     The relevant market is the U.S. online retail market for the sale of print trade

books. Amazon possesses market power in this  market, where it controls 90% of online sales of

trade print books. Amazon's "market power stems not only from Amazon's share of the market

for book distribution, but also from the astonishing level of data that it collects across its entire

platform," which gives Amazon an "incredible amount of information about individuals and how

to target them," so that " Amazon no longer competes on a level playing field when it comes to

book distribution, but, rather, owns and manipulates the playing field, leveraging practices from

across its platform that appear to be well outside of fair and transparent competition."[188]

187.     Through its anticompetitive agreements with the Big Five, Amazon has willfully

acquired and maintained its monopoly power in the relevant market by unlawful and improper

means, including Defendants' discriminatory pricing agreements and agreement to control the

wholesale prices of print trade books.

188.     Bookends and members of the proposed Online Bookseller Class have been

injured and will continue to be injured in their businesses and property by paying higher

---

[188] American Publisher Association Letter at 1-2.

wholesale prices for print trade books than they would have paid or would pay in the future in the absence of Defendants' anticompetitive and unlawful acts.

189.    Bookends and members of the proposed Online Bookseller Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF THE SHERMAN ACT – CONSPIRACY TO MONOPOLIZE**
**(15 U.S.C. § 2)**
**(AGAINST ALL DEFENDANTS)**

190.    Bookends incorporates by reference the allegations in the preceding paragraphs.

191.    Bookends bring this claim on its own behalf and on behalf of the proposed Online Bookseller Class described above. Bookends seeks damages and injunctive relief.

192.    The relevant market is the U.S. online retail market for the sale of print trade books.

193.    Amazon possesses market power in the relevant market. Amazon controls about 90% of all online print book sales. Amazon's "market power stems not only from Amazon's share of the market for book distribution, but also from the astonishing level of data that it collects across its entire platform," which gives Amazon an "incredible amount of information about individuals and how to target them," so that " Amazon no longer competes on a level playing field when it comes to book distribution, but, rather, owns and manipulates the playing field, leveraging practices from across its platform that appear to be well outside of fair and transparent competition."[189]

194.    Publisher Defendants demonstrated a specific intent to confer monopoly power upon Amazon by agreeing to immunize it from competition from any other online booksellers.

---

[189] American Publisher Association Letter at 1-2.

- 73 -

Publisher Defendants acted in concert and took steps in furtherance of their conspiracy by executing and adhering to contracts with discriminatory pricing. Amazon likewise demonstrated its specific intent by entering into discriminatory pricing agreements with each Publisher Defendant to ensure that Amazon faces no real retail competition in the relevant markets.

195.    Through Defendants' conspiracy, Amazon has acquired and maintained its monopoly power in the relevant market as the dominant online retailer for print trade books by unlawful and improper means, including preventing Amazon's bookseller rivals from gaining market share and dissuading potential rivals from entering the market.

196.    Bookends and members of the proposed Online Bookseller Class have been injured and will continue to be injured in their businesses and property by paying higher wholesale prices for print trade books than they would have paid or would pay in the future in the absence of Defendants' anticompetitive and unlawful acts.

197.    Bookends and members of the proposed Online Bookseller Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint

**JURY TRIAL DEMANDED**

198.    Bookends hereby demands a trial by jury of all the claims asserted in this Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, Bookends prays for judgment against Defendants as follows:

A.    The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Bookends as a Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes, once certified;

- 74 -

B.      Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C.      Adjudication that the acts alleged herein constitute monopolization and conspiracy to monopolize in violation of the Sherman Act, 15 U.S.C. § 2;

D.      Adjudication that the acts alleged herein violate the Robinson-Patman Act, 15 U.S.C. §13;

E.      Judgment against Defendants for the damages sustained by Bookends and the proposed Classes, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages;

F.      Pre-judgment and post-judgment interest on such monetary relief;

G.      Equitable relief requiring that Defendants cease their abusive, unlawful, and anti-competitive practices described and requested herein;

H.      The costs of bringing this suit, including reasonable attorneys' fees; and

I.      All other relief to which Bookends and members of the proposed Classes may be entitled at law or in equity.

DATED: November 21, 2022                 Respectfully submitted,


By /s/ Steve Berman
      Steve W. Berman (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
Barbara A. Mahoney (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
barbaram@hbsslaw.com

- 75 -

SPERLING & SLATER, P.C.
55 W. Monroe Street, Suite 3200
Chicago, IL 60603
Eamon P. Kelly (*pro hac vice*)
Joseph M. Vanek (*pro hac vice*)
Paul E. Slater (*pro hac vice*)
Alberto Rodriguez (*pro hac vice*)
Jeffery Bergman (*pro hac vice*)
ekelly@sperling-law.com
jvanek@sperling-law.com
pes@sperling-law.com
arodriguez@sperling-law.com
jbergman@sperling-law.com

*Attorneys for Bookends and the Proposed Classes*

- 76 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 21, 2022, I electronically transmitted the foregoing

document to the Court Clerk using the ECF System for filing. The Clerk of the Court will

transmit a Notice of Electronic Filing to all ECF registrants.

*/s/ Steve W. Berman*
STEVE W. BERMAN

010888-12/2077168 V1