UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
BOOKENDS & BEGINNINGS LLC, on behalf
of itself and all others similarly situated,

                                Plaintiff,

AMAZON.COM, INC.; HACHETTE BOOK
GROUP, INC., HARPERCOLLINS
PUBLISHERS L.L.C.; MACMILLAN
PUBLISHING GROUP, LLC; PENGUIN
RANDOM HOUSE LLC; SIMON &
SCHUSTER, INC.,

                                Defendants.
------------------------------------------------------X

**FILED UNDER SEAL: To be
viewed only by the Parties and the
Court**

**REPORT AND
RECOMMENDATION**

21-cv-02584 (GHW) (VF)

**VALERIE FIGUEREDO, United States Magistrate Judge**

**TO THE HONORABLE GREGORY H. WOODS, United States District Judge**

      Plaintiff, a bookseller that operates online and through a brick-and-mortar store,

commenced this antitrust, class-action suit on March 25, 2021, with allegations that Defendants

Amazon.com, Inc. ("Amazon) and the five largest book publishers in the United States—

Hachette Book Group, Inc., HarperCollins Publishers LLC, Macmillan Publishing Group, LLC,

Penguin Random House LLC, and Simon & Schuster, Inc. (collectively, the "Publishers")—had

conspired to artificially inflate the wholesale prices for print trade books. See, e.g., ECF No. 1 at

¶¶ 2-4, 22-23, 26. In a Report and Recommendation dated August 15, 2022, I recommended

dismissal of all claims against Defendants. See ECF No. 141 (the "R&R"). The R&R was

adopted by the Honorable Gregory H. Woods, and the Court dismissed without prejudice all of

Plaintiff's antitrust claims on September 29, 2022. <u>See</u> ECF No. 156 (order adopting R&R and overruling objections).

Plaintiff filed a Second Amended Class Action Complaint on November 21, 2022. <u>See</u> ECF No. 163 (the Second Amended Class Action Complaint ("SACAC")). Plaintiff asserts claims against all Defendants for discriminatory pricing in violation of the Robinson-Patman Act, 15 U.S.C. § 13; unlawful restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1; and conspiracy to monopolize under Section 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiff also asserts a claim against only Amazon for monopolization under Section 2 of the Sherman Act. As they did before, Amazon and the Publishers separately moved to dismiss the Second Amended Class Action Complaint under Federal Rule of Civil Procedure 12(b)(6). <u>See</u> ECF Nos. 179, 181. For the reasons that follow, I respectfully recommend that Amazon's and the Publishers' motions be **GRANTED.**

## BACKGROUND

### A. <u>Factual Background</u>[1]

Amazon is "the largest retail bookseller in the United States market for the sale of print trade books," accounting for "over half of all trade books purchased by consumers in the United States, including about 90% of all print books purchased online."[2] <u>See</u> SACAC ¶¶ 3, 68, 99, 138, 178, 193. Bookends is a bookseller that sells print trade books online and at its brick-and-mortar

---

[1] The factual allegations recounted herein are taken from the Second Amended Class Action Complaint. Given the procedural posture of the case, I accept the well-pled factual allegations in the complaint as true and draw all reasonable inferences in Plaintiff's favor. <u>ATSI Commc'n, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted).

[2] "Trade books" is a term of art referring to "general interest fiction and non-fiction books," distinguished from "non-trade books" like academic textbooks or reference materials. SACAC ¶ 1 n.2.

store in Evanston, Illinois. Id. ¶¶ 1, 28. The Publishers are the five largest publishers in the United States and together account for about "80% of the sales of print trade books" in the United States. Id. ¶¶ 1, 2, 134. Collectively, the Publishers are responsible for many of the biggest titles in fiction and non-fiction, including the vast majority of New York Times Bestsellers. Id. ¶ 134.

This lawsuit concerns the sale of print trade books (hardbacks, paperbacks, and mass-produced) in the U.S. wholesale market. Id. ¶¶ 1 n.1, 24, 112-14. The Publishers are "horizontal competitors" in the publication of print trade books and in the sale, at the wholesale level, of print trade books. Id. ¶ 2. The Publishers sell print trade books to retailers, like Plaintiff and Amazon, under a wholesale model—which is defined as a discount from a publisher's list price for a book. Id. ¶ 6. A publisher's "list price" is the suggested retail price for a book; it is the price at which "a substantial number of sellers sell trade books" to consumers. Id. ¶¶ 4-5, 107-08. The list price is also used to determine the wholesale price for a book. Id. ¶ 6. Higher list prices generally mean that booksellers, like Plaintiff, pay a higher wholesale price and consumers pay a higher "retail price[ ]" for print books. Id. ¶ 104; see also id. ¶ 72, 107. Higher wholesale prices also lead to "lower total market output of books." Id. ¶ 104; see also id. ¶ 109.

At retail, a bookseller like Plaintiff, sells the Publishers' trade books at the list price or at a discount from the list price. Id. ¶ 5; see also id. ¶¶ 107-08. Plaintiff purchases trade books from the Publishers at Plaintiff's "standard discount price of up to 46%" of the list price. Id. ¶¶ 6, 152.

██████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

████████████ Since 2015, Amazon has received "substantially higher discounts (i.e., lower

prices)" from the Publishers than the "prevailing rate paid by other print trade book retailers." Id. ¶ 7; see also id. ¶¶ 12-13.

The Second Amended Class Action Complaint alleges that the Publishers acted collectively to "control wholesale prices of print trade books" by "knowingly assenting to individual vertical agreements with Amazon," the "dominant retail bookseller" through which the Publishers "sell their print trade books," the effect of which was to "entrench Amazon's monopoly. Id. ¶¶ 44, 81-83, 174. In 2014 and 2015, the Publishers executed "book distribution agreements" with Amazon, wherein the Publishers collectively agreed to sell their books to Amazon at prices that were "steep[ly]" discounted and below the standard discounts available to other booksellers, like Plaintiff. Id. ¶¶ 8, 19, 44, 54-55, 171. ███████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

The Publishers' agreements with Amazon "jointly commit them to sell to Amazon at prices below the standard discounts available to other booksellers." Id. ¶ 11. The agreements committed the Publishers to ██████████████████████████████████████████

████████████████████████████████████████ Id.

In addition, the Publishers provide other "favorable terms" to Amazon that are not available to Plaintiff and members of the class on a proportional basis. Id. ¶12. For example, the ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████ "increase the cost of selling to

Amazon as compared to other Booksellers." Id. ¶¶ 12, 160. Consequently, Amazon is a "costly

and inefficient distributor" of the Publishers' books. Id. ¶¶ 14-16.

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ In

other words, each Publisher knew that the monetary and performance terms of its contract with

Amazon reflected the terms of its competitors, ███████████████████████████

███████████████████████████████████████████████████ Id. ¶¶ 10,

36, 39-40, 56, 83, 163. Thus, even the first Publisher to reach an agreement with Amazon ███████

████████ "agreed to the same discriminatory terms and knew" that the other Publishers had

done so as well. Id. ¶ 39. Knowing that each Publisher agreed to the same discriminatory terms,

gave each Publisher the "necessary assurance that their principal publishing rivals would not

gain a special advantage in a niche market or generate price wars at the wholesale level by

offering better terms to Amazon's rivals." Id. ¶ 55. Amazon "facilitated the conspiracy" by

offering each Publisher the same book distribution agreement. Id. ¶¶ 37, 174-75. In other words,

Amazon (the "hub") coordinated a horizontal conspiracy agreement among the Publishers (the

"spokes"), that provided "Amazon a discriminatory discount on print trade books" and raised the

list price and wholesale price paid to the Publishers by booksellers like Plaintiff. Id. ¶¶ 36, 174.

Publicly, the Publishers are "diametrically opposed to Amazon's consolidation of market

power and their dependence on Amazon as their principal distributor of their books." Id. ¶ 170.

Acting individually, none of the Publishers would have had an incentive to enter into

"discriminatory agreements" with Amazon that consolidated power in Amazon and ceded substantial control over the distribution of their books. Id. ¶¶ 42, 170. For example, if only one Publisher gave "discriminatorily lower prices to Amazon, it would suffer significant revenue loss as Amazon purchases a high percentage of its print trade books, and it would be unable to recoup that revenue loss by raising its list price." Id. ¶ 42. Acting alone, none of the Publishers could have raised the market price of print trade books. Id. ¶ 51. If a Publisher tried to raise its list price, it would lose sales and market share to competing publishers who would have no incentive to also raise their list price. Id. ¶ 42. For example, in 2010, each of the Publishers except Random House (which was then separate from Penguin) colluded to raise eBook prices; Random House, "the lone holdout," experienced a 41% increase in sale of eBooks while the other Publishers sold 12% fewer eBooks. Id. ¶ 52.

If, however, the other Publishers also agreed to give Amazon discriminatory discounts, then all the Publishers would have an incentive to raise list prices so as to recoup the lost revenue, and no one Publisher would lose market share to another Publisher. Id. ¶ 42. Further, all Publishers would increase their profit margin because their list price to Amazon's competitors would go up while the discount rate to those retailers would remain the same. Id.

The Publishers had "opportunities to collude," and have colluded in the past. Id. ¶ 171. From 2010 to 2012, the Publishers conspired with Apple to raise the prices of trade eBooks. Id. ¶¶ 54, 93, 171. That conduct led to an investigation by the European Commission's Directorate General for Competition. Id. ¶ 93; see also id. ¶ 95. The Publishers also paid substantial sums of money in settlement fees as a result of consumer class actions and an action commenced by the United States against the Publishers and Apple. Id. ¶¶ 54, 93-95, 173.

For its part, Amazon participated and facilitated the "horizontal agreement" among the Publishers by "coordinating a series of substantially identical agreements with the same anticompetitive terms and making clear to each [Publisher] that it was offering each of them the same deal." Id. ¶¶ 38, 174-75. Amazon knows that the discounts it receives are higher than the Publishers' "published standard discounts," and it also knows ███████████████████████ ███████████████████████████████████ Id. ¶ 157. Amazon knew the discounts were discriminatory "because it demanded that the discounts ████████████ it received would not be available to other booksellers and received assurances that the discriminatory prices would not be available to other retailers." Id. ████████████████████████ ████████████████████████████████████████████████████████ ████████████

Amazon's agreements with the Publishers eliminate Amazon's market rivals' ability "to gain any meaningful competitive advantage relative to Amazon" by "protecting Amazon from the price increases" of print trade books to which Plaintiff is subjected.  Id. ¶¶ 76-77, 169.  By securing a "substantially lower wholesale price and more favorable contractual terms than its rivals," Amazon "dominate[s] over its retail competitors" and "gain[s] market share," because regardless of the list price set by the Publishers, Amazon "faces no meaningful competition from any rival bookseller." Id. ¶¶ 20, 85, 168-69, 194. Amazon has thus "willfully acquired and maintained its monopoly power" in the online, retail-trade-book market by engineering and knowingly receiving the benefit of the Publishers' "price discrimination." Id. ¶¶ 157-58, 187.

Amazon has a "history" of using "anticompetitive agreements," and its "market dominance" gives it the "ability to promote or destroy a book in the national marketplace for any reason it chooses." Id. ¶¶ 96, 102. For example, "to extract more fees" from Hachette, during its

negotiations of a distribution agreement, Amazon "suspended pre-orders and delayed the shipping times of thousands of Hachette books by weeks, and modified its search and recommendation algorithms to direct shoppers to other books." Id. ¶ 103.

Defendants' price discrimination has caused Plaintiff to pay "higher wholesale prices for print trade books" than they otherwise would have paid. Id. ¶¶ 104, 149, 188. It has also resulted in higher retail prices paid by consumers and depressed book sales. Id. ¶¶ 47-50, 104, 109, 149, 179. The discriminatory pricing also lessens competition in the retail market for print trade books by allowing Amazon to draw significant sales or profits away from rival booksellers, even "driving" such competitors "out of business." Id. ¶¶ 20, 35, 149. Moreover, by giving Amazon "an unfair and increasing advantage over retail competitors," the "discriminatory pricing" agreements also tend to create or maintain Amazon's monopoly share of the market for print trade books and the submarket for online sales of print trade books. Id. ¶¶ 20, 170, 187.

**B. Procedural Background**

Plaintiff commenced this action on March 25, 2021. See ECF No. 1. On July 13, 2021, Plaintiff filed the First Amended Class Action Complaint.[3] See ECF No. 65 ("CAC"). The First Amended Class Action Complaint had four causes of action: (1) a claim under the Robinson-Patman Act, 15 U.S.C. § 13 ("RPA"), alleging that Defendants entered into discriminatory pricing agreements (CAC ¶¶ 92-104); (2) a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, alleging that Defendants conspired to raise the wholesale price of print trade books (CAC ¶¶ 105-23); (3) a claim against only Amazon under Section 2 of the Sherman Act, 15 U.S.C. § 2,

---

[3] Plaintiff's initial complaint alleged that the agreements between Amazon and the Publishers contained Most Favored Nation ("MFN") clauses. After Defendants made the agreements available to Plaintiff's counsel for review, Plaintiff discovered that the agreements contained no such clause and subsequently amended its allegations in a new complaint. See ECF No. 43 at 1; ECF No. 44 at 1-2 n.2.

alleging that, through its discriminatory pricing agreements with the Publishers, Amazon willfully acquired and maintained its monopoly power in the U.S. retail market for print trade books (CAC ¶¶ 124-30); and (4) a claim for conspiracy to monopolize, 15 U.S.C. § 2, alleging that Defendants conspired to confer a monopoly on Amazon (CAC ¶¶ 131-38).

On September 7, 2021, the Publishers and Amazon separately moved to dismiss the First Amended Class Action Complaint. See ECF Nos. 75, 77. Plaintiff opposed the motions (see ECF Nos. 94, 95), and the Publishers and Amazon submitted their replies on November 22, 2021 (see ECF Nos. 112, 114). The Court held oral argument on July 27, 2022 (see ECF No. 136) and issued an R&R on August 15, 2022, recommending that Defendants' motions be granted in their entirety. See ECF No. 141 (the R&R).

On September 15, 2022, Plaintiff filed objections to my R&R. See ECF No. 150. The Publishers and Amazon filed responses on September 27, 2022. See ECF Nos. 153-54. On September 29, 2022, the Honorable Gregory H. Woods adopted the R&R, granting the Publishers' and Amazon's motions to dismiss without prejudice and affording Plaintiff 30 days to file an amended complaint. See ECF No. 156.

On November 21, 2022, Plaintiff filed its Second Amended Class Action Complaint asserting the same claims, on behalf of itself and all other similarly situated retail and online booksellers (the putative class), previously raised in the First Amended Class Action Complaint. Specifically, Plaintiff asserts a claim in Count I against all Defendants for discriminatory pricing, in violation of the RPA, 15 U.S.C. § 13 (SACAC ¶¶ 150-63); a claim in Count II against all Defendants for restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (SACAC ¶¶ 164-83); a claim in Count III against Amazon for monopolization, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (SACAC ¶¶ 184-89); and a claim in Count IV

against all Defendants for conspiracy to monopolize, in violation of Section 2 of the Sherman Act (SACAC ¶¶ 190-97). On January 23, 2023, the Publishers and Amazon moved to dismiss the Second Amended Class Action Complaint under Federal Rule of Civil Procedure 12(b)(6). See ECF Nos. 179-82. Plaintiff submitted its opposition on March 6, 2023, see ECF No. 187, and the Publishers and Amazon submitted their replies on April 5, 2023, see ECF Nos. 198-99. The Court held argument on the motions on July 21, 2023. See ECF No. 201 ("7/21/23 Tr.").

## DISCUSSION

### A.  Motion to Dismiss

Rule 8 of the Federal Rules of Civil Procedure provides that a complaint seeking relief "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "This Rule does not countenance pleadings that are conclusory; it requires factual allegations that are sufficient to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Anderson News, LLC v. Am. Media, Inc., 680 F.3d 162, 182 (2d Cir. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Where the well-pleaded facts in a complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2) (alteration in original)).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "Asking for plausible grounds to infer an agreement

10

does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Twombly, 550 U.S. at 556.

In considering a motion to dismiss, a district court must "accept[ ] all factual claims in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." Lotes Co. v. Hon Hai Precision Indus. Co., 753 F.3d 395, 403 (2d Cir. 2014) (quoting Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108 (2d Cir. 2010)) (internal quotation marks omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Iqbal, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citation omitted). "[R]ather, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, i.e., enough to make the claim plausible." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 555, 570) (internal quotation marks, alteration, citation, and emphasis omitted).

## B. **Antitrust Standing**

To plead a claim under Section 1 or Section 2 of the Sherman Act, a plaintiff must sufficiently allege antitrust standing. See George Haug Co., Inc. v. Rolls Royce Motor Cars Inc., 148 F.3d 136, 139-40 (2d Cir. 1998) (addressing standing requirement for Section 1 and Section 2 claims under the Sherman Act); Gatt Commc'ns, Inc. v. PMC Assocs., 711 F.3d 68, 75-76 (2d Cir. 2013). "[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement" it must be dismissed "as a matter of law." Gatt, 711 F.3d at 75 (citation and internal quotation marks omitted).

To establish antitrust standing a private plaintiff must plausibly allege that it suffered an (1) injury-in-fact to its business or property caused by the antitrust violation; (2) that it suffered an antitrust injury; and (3) that it is an "efficient enforcer"—meaning, an acceptable plaintiff to assert a private antitrust claim.[4] In re Aluminum Warehousing Antitrust Litig., 833 F.3d 151, 157-58 (2d Cir. 2016); Arista Records LLC v. Lime Group LLC, 532 F. Supp. 2d 556, 567-68 (S.D.N.Y. 2007); see also Gatt, 711 F.3d at 76. An antitrust injury "is an injury attributable to the anticompetitive aspect of the practice under scrutiny." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 122 (2d Cir. 2007) (citation omitted).

Determining whether a plaintiff has suffered an antitrust injury involves a three-step process:

> (1) the plaintiff "must 'identify[ ] the practice complained of and the reasons such a practice is or might be anticompetitive'"; then (2) the court must "identify the 'actual injury the plaintiff alleges'" by "look[ing] to the ways in which the plaintiff claims it is in a 'worse position' as a consequence of defendant's conduct"; and finally, (3) the court compares the "'anticompetitive effect of the specific practice at issue' to 'the actual injury the plaintiff alleges.'"

Gatt, 711 F.3d at 76 (quoting Port Dock, 507 F.3d at 122 and Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 486, 489 (1977)). At the third step of the analysis, the "comparison requires more than an allegation that the practice and injury are 'causally linked.'" In re Inclusive Access Course Materials Antitrust Litig., 20-MDL-2946 (DLC), 2021 WL 2419528, at *7 (S.D.N.Y. June 14, 2021) (citation omitted). It requires a showing by the plaintiff that "its injury is of the type the antitrust laws were intended to prevent and that [it] flows from that which makes or might make defendants' acts unlawful." Id. (quoting Gatt, 711 F.3d at 76) (internal quotation marks omitted).

---

[4] The "efficient enforcer" prong is not challenged by Defendants here.

In its prior complaint, Plaintiff alleged that it had suffered lost sales to price-sensitive consumers who were diverted to Amazon by its lower retail prices for print trade books. See CAC ¶ 100; see also id. ¶ 53. The complaint also alleged that the anticompetitive practice engaged in by the Publishers was their conspiracy to raise and control the list price of print trade books. Id. ¶¶ 10-11. In comparing the alleged anticompetitive effects of the conduct with the alleged injury, I noted that Plaintiff was not constrained to sell trade books to consumers at the list price set by the Publishers, and Plaintiff purchased books from the Publishers at a discount from the list price. See R&R at 30-32. I thus reasoned that Plaintiff had not alleged an antitrust injury, because no conduct by Defendants prohibited Plaintiff from charging a lower retail price to consumers in order to better compete with Amazon in the retail market. Id. at 32-33.

Now, the Second Amended Class Action Complaint clarifies that Plaintiff's Sherman Act claims are not premised on injury in the retail market caused by Amazon's low retail prices. ECF No. 187 ("Pl.'s Br.") at 5.  Plaintiff instead complains that Defendants' conduct has harmed it by forcing it to pay higher wholesale prices. SACAC ¶¶ 20, 149, 183. Stated differently, Plaintiff alleges that it was overcharged in the wholesale prices of the books it bought from the Publishers, as compared to the wholesale prices paid by Amazon. Plaintiff has now adequately alleged an antitrust injury.

Plaintiff is a direct purchaser of the Publishers' print trade books, and it alleges that it was overcharged in the wholesale price of those books. SACAC ¶¶ 1, 24, 149. Plaintiff also alleges that Defendants' anticompetitive conduct—the distribution agreements between the Publishers and Amazon that facilitated the increase in list prices of print trade books by the Publishers—resulted in supracompetitive wholesale prices paid by Plaintiff. SACAC ¶¶ 7, 12,

18, 20, 72, 85. Specifically, Defendants' conduct caused Plaintiff to pay wholesale prices that

were ███████████████████████████████████████ Id. ¶ 20.

As other courts have concluded, a claim that a competitor suffered an overcharge injury,

of the kind alleged here, is sufficient to plead antitrust standing. See US Airways, Inc. v. Sabre

Holdings Corp., 105 F. Supp. 3d 265, 285 (S.D.N.Y. 2015) ("supracompetitive" booking fees

complained of by US Airways as a result of anticompetitive conduct by Sabre was an overcharge

injury sufficient to plead antitrust standing); In re DDAVP Direct Purchaser Antitrust Litig., 585

F.3d 677, 688-89 (2d Cir. 2009) (plaintiffs, who included wholesale "purchasers of the

defendants' products," and alleged "being forced to pay supra-competitive prices as a result of

the defendants' anticompetitive conduct," had antitrust standing to assert claim for overcharges).

Previously, I focused on the allegations that Plaintiff's injury was the sales it had lost to

Amazon as a result of Amazon's ability to charge consumers a lower retail price because it

received a lower wholesale price. See R&R at 30-32. In concluding that Plaintiff lacked antitrust

standing to complain about lost profits, I cited Atlantic Richfield Co. v. U.S.A. Petroleum Co.,

495 U.S. 328 (1990), and Arista, 532 F. Supp. 2d 556, for the proposition that Plaintiff could not

complain about lost business to Amazon because there were no allegations that the wholesale

price was set at predatory levels. See R&R at 31-32. As discussed, Plaintiff has now modified its

allegations and is not premising its Sherman Act claims on injury from having to compete with

low retail prices. See Pl.'s Br. at 5. Moreover, and as Plaintiff correctly points out (id.), Atlantic

Richfield and Arista are distinguishable because this case does not involve a vertical-maximum-

price-fixing scheme. See Atl. Richfield, 495 U.S. at 332, 335 (basing Sherman Act claim on

"vertical conspiracy to fix maximum prices" between defendant and retail gasoline dealers);

Arista, 532 F. Supp. 2d at 569 (basing Sherman Act claims on "vertical price-fixing arrangements" that allegedly "fixed prices for digital music licenses at the retail level").

In Atlantic Richfield, for instance, the plaintiff alleged that defendant Arco had conspired with retail-service stations selling its branded gasoline to "fix prices at below-market levels," such that the price of Arco-branded gasoline was fixed and maintained at "artificially low and uncompetitive levels." 495 U.S. at 332 (citation and internal quotation marks omitted). The Court concluded that "a vertical, maximum-price-fixing agreement" does not cause a competitor antitrust injury unless it results in "predatory pricing." Id. at 337-340. Although Amazon argues that Atlantic Richfield and Arista are applicable "because of their similarity to Plaintiff's alleged injury" (ECF No. 180 ("Amazon's Br.") at 7), Plaintiff has not alleged that Amazon or the Publishers engaged in predatory pricing.

In sum, Plaintiff has now adequately alleged antitrust standing based on allegations that it suffered an overcharge injury from having to pay higher wholesale prices for print trade books than its competitor, Amazon. See e.g., SACAC ¶¶ 7, 12, 18, 20, 24, 71, 87, 104.

## C. Price-Discrimination Claim under the Robinson-Patman Act

In Count I of the Second Amended Class Action Complaint, Plaintiff asserts a price-discrimination claim under Section 2(a) of the RPA against the Publishers and under section 2(f) against Amazon, alleging that the Publishers afforded Amazon a better wholesale price that was not equally available to Plaintiff and other booksellers. SACAC ¶¶ 150-63.

Previously, I recommended that Plaintiff's RPA claim be dismissed because Plaintiff had not adequately alleged injury to competition, as required to state a prima facie claim under Section 2(a). See R&R at 33-52. I also reasoned that dismissal was appropriate because Plaintiff had failed to allege facts from which it could plausibly be inferred that the lower wholesale price

offered to Amazon was not the result of a functional discount or materially different contract terms. Id. at 48-42. Further, I concluded that the allegations in Plaintiff's complaint plausibly suggested that Defendants could invoke the meeting-competition defense in Section 2(b) of the RPA.[5] Id. at 52-55. Lastly, I concluded that Plaintiff's claim under Section 2(f) of the RPA against Amazon must be dismissed because liability under that section is derivative of liability under Section 2(a) of the RPA, and thus a Section 2(f) claim against Amazon could not proceed if Plaintiff had not adequately pled a Section 2(a) claim. Id. at 56. Alternatively, I reasoned that dismissal of the Section 2(f) claim was warranted because Plaintiff had not alleged facts from which to plausibly infer that Amazon knew that it had induced or received a discriminatory price—an element of a Section 2(f) claim. Id. at 56-58.

The Publishers and Amazon argue that Plaintiff's Section 2(a) RPA claim should again be dismissed for several reasons: (1) Plaintiff fails to plausibly allege that any price differences are not the result of materially different contract terms or legitimate functional discounts provided to Amazon for services to the Publishers; (2) Plaintiff has not plausibly alleged that the conduct caused competitive injury, under either the Morton Salt inference or through allegations of lost sales to Amazon due to the alleged price differences; and (3) Plaintiff has failed to plausibly allege that the claim is not barred by the meeting competition defense in Section 2(b). See ECF No. 182 ("Publishers' Br.") at 14-20; Amazon's Br. at 6-11. Separately, the Publishers also contend that Plaintiff has not adequately pled contemporaneous sales, as is necessary for a Section 2(a) claim. See Publishers' Br. at 20-21. Amazon separately argues that Plaintiff has failed to allege facts from which to plausibly infer that Amazon knowingly received an illegal

---

[5] Under Section 2(b) of the RPA, a price reduction by the Publishers, made "in good faith" to meet "an equally low price of a competitor" does not violate the RPA. See Standard Oil Co. v. Fed. Trade Comm'n, 340 U.S. 231, 241, 250 (1951); see also 15 U.S.C. §13(b).

discriminatory price from any of the Publishers, as is required for a claim under Section 2(f). See Amazon's Br. at 5-6.

    1.  Plaintiff's RPA, Section 2(a) claim against Amazon and the Publishers

Section 2(a) of the Robinson–Patman Act provides, in pertinent part, as follows:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a). A claim for secondary-line price discrimination[6] under section 2(a) requires that a plaintiff plead four elements: (1) "a commodity was sold in interstate commerce to at least two buyers"; (2) "the commodity sold to the disfavored purchaser was of like grade and quality to that sold to the favored purchaser"; (3) "the seller discriminate[d] in price between the favored and disfavored purchaser"; and (4) "that discrimination had a prohibited effect on competition." Coalition For a Level Playing Field, L.L.C. v. Autozone, Inc., 737 F. Supp. 2d 194, 209 (S.D.N.Y. 2010) ("Coalition I") (quoting 15 U.S.C. § 13(a)) (internal quotation marks omitted and alteration in original); see also Texaco Inc. v. Hasbrouck, 496 U.S. 543, 556 (1990); Cash & Henderson Drugs, Inc. v. Johnson & Johnson, 799 F.3d 202, 209-10 (2d Cir. 2015) (discussing "secondary line injury").

---

[6] Price discrimination claims under Section 2(a) of the RPA generally fall into three categories: primary-line price discrimination, secondary-line price discrimination, and tertiary-line price discrimination. See George Haug Co., 148 F.3d at 141 n.2. Plaintiff alleges a secondary-line price discrimination claim, which can arise "when a seller's discrimination impacts competition among the seller's customers; i.e. the favored purchasers and disfavored purchasers." Id. (citing F.T.C. v. Sun Oil Co., 371 U.S. 505 (1963)).

Defendants attack Plaintiff's allegations only as they pertain to two of the four elements of a Section 2(a) claim. Both Amazon and the Publishers challenge the sufficiency of Plaintiff's allegations concerning competitive injury (the fourth element), and the Publishers separately argue that Plaintiff has not adequately pled reasonably contemporaneous sales (the first element). See Amazon's Br. at 10; Publishers' Br. 17-19, 20-21.

Beginning with the first element of a Section 2(a) claim, Plaintiff must allege reasonably contemporaneous sales in interstate commerce to at least two buyers. See Data Capture Sols.-Repair & Remarketing, Inc. v. Symbol Techs., Inc., 520 F. Supp. 2d 343, 349 (D. Conn. 2007) (to state a claim under the RPA "the plain language of the statute . . . requires that two sales take place at different prices to different purchasers"). The Second Amended Class Action Complaint satisfies that requirement. Plaintiff alleges that it "purchased numerous books, often repeatedly, from each of the [Publishers]," who, because they operate nationally, sell their books in interstate commerce. SACAC ¶¶ 152, 155. The complaint includes 10 examples of book titles that Plaintiff purchased from the Publishers between February 24, 2018, and November 29, 2018. Id. ¶ 152. This list, Plaintiff alleges, is only "indicative" because Plaintiff has "purchased thousands of books" from the Publishers, "including most New York Times bestsellers." Id. The complaint further states that "Amazon contemporaneously purchased every book [Plaintiff] purchased" and Plaintiff infers that the purchases were reasonably contemporaneous because "Amazon competed concurrently with [Plaintiff] and Class Members in the retail sales of these and many other [of the Publishers'] books." Id.

Plaintiff's allegations remain virtually unchanged from those in the prior complaint. Compare CAC ¶ 94 with SACAC ¶¶ 152, 155. And I previously found that those allegations were sufficient to satisfy the first element of an RPA claim. See R&R at 36-37. The Publishers

argue that Plaintiff was required to allege the specific dates on which Amazon and Plaintiff purchased the same book titles, in order for the allegation that the sales were contemporaneous to be plausible. Publishers' Br. at 20-21. The Publishers made this argument before (see ECF No. 76 at 20-21), and I previously rejected it (see R&R at 36). As I explained then, while the sales must be "reasonably contemporaneous in time," they do not need to be "made at precisely the same time or place." Reeder-Simco GMC Inc. v. Volvo GM Heavy Truck Corp., 374 F.3d 701, 710-11 (8th Cir. 2004)).

What's more, Amazon is alleged to "sell[ ] more books than any other single retail outlet in history," and it accounts for roughly 90% of online print book sales and sells 70 to 80% of the Publisher' inventory. SACAC ¶¶ 45, 99. And, the complaint alleges that Amazon purchased every book that Plaintiff purchased during the relevant time period. Id. ¶ 152. Amazon's significant retail volume for the Publishers and the allegation that Plaintiff purchased "thousands" of books from the Publishers, including most New York Times bestsellers (id. ¶ 152), permits the plausible inference that the Publishers made reasonably contemporaneous sales of the same book titles to Amazon and Plaintiff. The identification of the specific book tiles and the date Amazon and Plaintiff each purchased those book titles is a matter for discovery; it is not necessary to meet the requirement in Rule 8(a) that the complaint give fair notice to Defendants of the basis for Plaintiff's claim. See Nat'l Ass'n of College Bookstores, Inc. v. Cambridge University Press, 990 F. Supp. 245, 252-53 (S.D.N.Y. 1997) (reasoning that to plead this element, plaintiff was not required to "include allegations of particular transactions involving particular book titles").

Next, Defendants also attack the adequacy of Plaintiff's allegations that the discriminatory pricing affected competition (the fourth element of a Section 2(a) claim). See

Publishers' Br. at 17-19; Amazon's Br. at 10. A plaintiff attempting to plead competitive injury

has two options: the plaintiff can show "substantial discounts to a competitor over a significant

period of time, known as the Morton Salt inference, or proof of sales lost to favored purchasers."

Cash & Henderson Drugs, 799 F.3d at 210 (citation omitted); see also FTC v. Morton Salt Co.,

334 U.S. 37, 46, 50-51 (1983) (under Section 2(a), injury to competition is established prima

facie by proof of a substantial price discrimination between competing purchasers over time).

Plaintiff relies on both the Morton Salt inference and proof of lost sales. See SACAC ¶¶ 88-90,

156, 159; Pl.'s Br. at 22-23.

I previously concluded that Plaintiff had not alleged sufficient facts to support invocation

of the Morton Salt inference, because it had not specified the size of the Publishers' discount to

Amazon. R&R at 46. Without the size of Amazon's discount, the allegations in the complaint

that the discount was "substantial" or "steep" were factually unsupported and conclusory. Id.

Plaintiff has fixed that deficiency in the Second Amended Class Action Complaint. Now,

Plaintiff alleges that it had to pay the Publishers "substantially more for their goods over time

than" Amazon, and Plaintiff provides factual detail to adequately support that allegation.

SACAC ¶ 156; see also id. ¶¶ 7, 12, 13. The Second Amended Class Action Complaint alleges

that Plaintiff pays the Publishers "list price less a discount of up to 46%." Id. ¶ 6. Amazon, on

the other hand, ███████████████████████████████████████████████████████████

███████████████████████████████████████████████ Id. ¶ 7. Plaintiff also alleges

that the Publishers provide Amazon ████████████████████████████

████████████████████████████████ Id. ¶¶ 12, 90. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████ Id. ¶ 12.

Accepting Plaintiff's allegations as true, since 2015 (and for a period of 7 years), Amazon has received a discount that is between "███████████████ than the standard discounts available to [Plaintiff] and other retail booksellers." Id. ¶ 89; see also id. ¶¶ 7, 12, 20, 37. Plaintiff has now pled the time period for which Amazon received the discount and the amount of the discount it received. Those factual allegations are sufficient to invoke the Morton Salt inference and adequately plead the fourth element of a prima facie price-discrimination claim under the RPA. See Dayton Superior Corp. v. Marjam Supply Co., No. 07-CV-5215 (DRH) (WDW), 2011 WL 710450, at *9-10 (E.D.N.Y. Feb. 22, 2011) (allegations that a discount of more than $3.00 was granted to a third-party but not to the plaintiff over a four-year period sufficient to satisfy the fourth element of a Section 2(a) claim and plead competitive injury); Coal. For a Level Playing Field L.L.C. v. Autozone, Inc., No. 00-CV-0953, 2001 WL 1763440, at *5 (E.D.N.Y. Oct. 18, 2001) (allegations that goods were purchased at approximately 40% less than the price paid by plaintiffs sufficient to establish the inference of injury to competition and therefore satisfy the fourth element of a Section 2(a) claim); ; see also Mathias v. Daily News, L.P., 152 F. Supp. 2d 465, 476 (S.D.N.Y. 2001) (fourth prong satisfied by an allegation that defendant discriminated in price between resellers for an extended period of time); Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp., 312 F. Supp. 2d 379, 399 (E.D.N.Y. 2004) (allegations that for four years defendant "sold its product to wholesale distributors at a cheaper price than sold to plaintiffs," making "plaintiffs' cost for [defendant's] product significantly higher" than competitors were sufficient to withstand a motion to dismiss) (citations and internal quotation marks omitted).

Plaintiff has plausibly alleged the existence of discriminatory discounts. Whether the alleged discounts are in fact substantial is a question for the fact finder, and not a basis to dismiss the claim at the pleading stage. See ABC Distrib., Inc. v. Living Essentials LLC, No. 15-CV-

02064 (NC), 2017 WL 3838443, at *12 (N.D. Cal. Sept. 1, 2017) ("Once a definitive cognizable discount is established, it is still a factual question whether that difference is significant or de minimis.") (citations omitted).

In sum, Plaintiff has adequately pled a prima facie Section 2(a) claim.[7] However, there are two grounds upon which I recommend that Plaintiff's Section 2(a) claim be dismissed. First, Plaintiff has not plausibly alleged that Defendants would not be entitled to the meeting-competition defense in Section 2(b) of the RPA. And second, Plaintiff has not plausibly alleged facts from which to infer that the pricing differential offered to Amazon was not the result of materially different contract terms.

### a. The meeting-competition defense

Under the meeting-competition defense in Section 2(b) of the RPA, "a price reduction made [by a seller] to meet in good faith an equally low price of a competitor" does not violate the RPA.[8] Standard Oil v. Fed. Trade Comm'n, 340 U.S. 231, 241, 250 (1951); see also 15 U.S.C. §13(b). To invoke the defense, a seller need only hold a "good-faith belief, rather than absolute certainty, that a price concession is being offered to meet an equally low price offered by a competitor." United States v. U.S. Gypsum Co., 438 U.S. 422, 453 (1978); see also Great

---

[7] Because Plaintiff has plausibly alleged competitive injury through invocation of the Morton Salt inference, I do not address whether Plaintiff has also pled competitive injury based on lost sales to Amazon.

[8] The meeting-competition defense is not an element of a prima facie case for violation of Section 2(a) of the RPA. See Alan's of Atlanta, Inc. v. Minolta Corp., 903 F.2d 1414, 1420 (11th Cir. 1990) (explaining that meeting-competition defense "allows a seller to rebut a prima facie case of price discrimination") (citation omitted). However, to state a plausible claim of price discrimination under Twombly, a plaintiff must allege facts from which to infer that the discriminatory price was unlawful—i.e., not offered in good faith to meet a competitor's price—because "providing different prices to different purchasers is consistent with both unlawful price discrimination and lawful pricing justified by different terms or conditions of sale." Sw. Paper Co. v. Hansol Paper, No. 12-8721 (CAS)(RZX), 2013 WL 11238487, at *5 (C.D. Cal. Apr. 15, 2013).

Atl. & Pac. Tea Co. v. F.T.C., 440 U.S. 69, 83 (1979) (explaining that "a seller can assert the defense even if it has unknowingly made a bid that in fact not only met but beat his competition").



SACAC ¶ 10.

Id. ¶ 10.

In the prior complaint, Plaintiff alleged that the meeting-competition defense was unavailable for two reasons: (1) each Publisher sold distinct book titles so they were not competitors for application of the defense, and (2) Defendants jointly agreed to the discriminatory pricing and thus engaged in a price-fixing conspiracy. See CAC ¶¶ 6, 99, 104. Now, however, Plaintiff alleges that the meeting-competition defense is unavailable solely because the Publishers' "discriminatory pricing agreements do not qualify as 'good faith' meeting of an equally lawful price, as required by the [RPA]." SACAC ¶ 163. Plaintiff further alleges (as it did before) that the defense is unavailable because the Publishers "jointly agreed to the discriminatory discounts, and ▮▮▮▮▮▮▮▮▮ expressly conditioned that the discount applies only if the other accepted the same illegally discriminatory price." Compare SACAC ¶ 163 with CAC ¶ 104; see also SACAC ¶¶ 91, 157. In other words, Plaintiff again relies on the existence of a price-fixing conspiracy among the Publishers and Amazon to support its allegation that the use of the meeting-competition clause in certain of the Publishers' agreements with Amazon was pretextual and not in good faith. See Pl.'s Br. at 24 (arguing that the meeting-competition defense is unavailable because the pricing decision was not truly

responsive to a rival's competitive price). However, as discussed, see infra at 39-51, Plaintiff has

not plausibly alleged the existence of a conspiracy amongst the Publishers to fix the price of print

trade books. And without plausible allegations of a conspiracy, Plaintiff has failed to plausibly

allege that the inclusion of a lawful meeting-competition clause in the Publishers' contracts with

Amazon was pretextual.

Plaintiff contends that I erred in the prior R&R, because the meeting-competition defense

is an affirmative defense and yet I "required [Plaintiff] to rebut this defense" at the pleading

stage. Pl.'s Br. at 23-24. In the prior complaint, Plaintiff attempted to plead Amazon's

knowledge that it had received a discriminatory price by alleging that the inclusion of a meeting-

competition clause in the Publishers' agreements with Amazon was pretextual. See CAC ¶ 6

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

id. ¶ 99 ("That Amazon knowingly received the benefit of the Big Five's price discrimination is

also supported by Defendants' ████████████████████████████████████████

█████████████████████████████████████████████ the prior complaint

alleged, because the Publishers and Amazon had conspired to fix the wholesale price of print

trade books and prevent competition in the retail sale of print trade books. See, e.g., CAC ¶¶ 7-

11, 37, 40. In other words, Plaintiff itself argued that the use of the clause was not in good faith

because Amazon and the Publishers had conspired to fix the wholesale price of print trade books.

Plaintiff is thus mistaken in suggesting that I required it to have rebutted at the pleading stage

that Defendants had a meeting-competition defense. Instead, I merely reasoned that Plaintiff

could not rely solely on the fact that the agreements had a lawful meeting-competition clause to

plausibly infer Amazon's knowledge that it received a discriminatory price, absent plausible allegations of a conspiracy between Amazon and the Publishers. See R&R at 58.

### b.  *Materially different contract terms and functional discounts*

"[N]ot all price differentials are unlawful under the [RPA]." Coal. for a Level Playing Field, L.L.C. v. Autozone, Inc., 813 F. Supp. 2d 557, 566 (S.D.N.Y. 2011). That is because "Congress did not intend to outlaw prices differences that result from or further the forces of competition." Brooke Group Ltd v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 220 (1993). A seller is thus "not obligated to charge the same price for a commodity if its sales contracts with different buyers contain materially different terms." Coalition I, 737 F. Supp. 2d at 212. Likewise, a seller is permitted to afford a buyer a discounted price if the price reduction reflects a "bona fide functional discount—in essence, a set-off for the value of services the purchaser performs for the seller." Id. at 210 (citation and internal quotation marks omitted). "[W]here a price differential merely accords due recognition and reimbursement for functions actually performed by a downstream buyer," the price differential is not prohibited by the RPA. Id. at 211 (citing Hasbrouck, 496 U.S. at 562).

"Providing different prices to different purchasers is consistent with both unlawful price discrimination and lawful pricing justified by different terms and conditions of sale or functional discounts." Sw. Paper, 2013 WL 11238487, at *5. Consequently, a plaintiff "must allege the illegitimacy of any price differences by pleading facts that plausibly show that the discounts are either excessive or were given with the purpose of passing along a price advantage." Id.

Beginning with materially different contract terms, to survive a motion to dismiss, a plaintiff must allege facts from which to plausibly infer that the price differentials are not the result of materially different contract terms. Coalition I, 737 F. Supp. 2d at 215-17 (explaining that at pleading stage, "when complicated contracts . . . are alleged, such pleading must refute the

inference that parts are not sold subject to materially different contract terms or, separately, that differentials simply reflect non-price terms of sale"). Plaintiff previously alleged that the Publishers entered into distribution agreements with Amazon for the sale of print trade books that governed the parties' relationship for a period of several years. CAC ¶¶ 8-9. By contrast, the prior complaint contained no allegation that Plaintiff purchased books from the Publishers under any sort of contractual arrangement, let alone a multi-year contractual agreement. See CAC ¶ 94 (alleging that Plaintiff "purchased numerous books, often repeatedly"); see also id. ¶¶ 1, 26 (alleging that Plaintiff "purchases books at wholesale prices directly" from the Publishers). I previously concluded that absent any allegations about the type of buying arrangement Plaintiff had with the Publishers, Plaintiff had not alleged any facts from which to plausibly infer that the price differential offered to Amazon was not the result of a difference in the contractual relationship the Publishers had with Amazon, which spanned multiple years. R&R at 50; see also Coalition I, 737 F. Supp. 2d at 212 (recognizing that long term contracts reduce exposure to changes in market price of the commodity for both the buyer and seller).

The allegations in the Second Amended Class Action Complaint do not provide anything substantively new from which to conclude that the difference in the wholesale price charged to Plaintiff and the wholesale price charged to Amazon was not the result of materially different contractual arrangements between the parties. Again, the complaint alleges that the Publishers entered into long-term contracts with Amazon that governed their relationship for a period of several years. See SACAC ¶ 11. And again, the complaint does not contain any allegations that Plaintiff purchased books from the Publishers through a multi-year contractual arrangement, whether short or long-term. Although Plaintiff has added one allegation—that "the contracts through which [Plaintiff] purchase[s] books from" the Publishers is not "materially different"

from the contracts through which Amazon purchases books—the allegation is conclusory and lacks any factual support. SACAC ¶ 92. Further, Plaintiff alleges that it "purchased numerous books, often repeatedly, from each of the [Publishers] at its standard discount price of up to 46%." Id. ¶ 152. Stated differently, Plaintiff purchased book titles from the Publishers on a "terms of sale" basis with no contractual arrangement. See 7/21/23 Tr. at 42-43.

As I previously explained (see R&R at 50), "goods sold under a long-term contract are not 'of like grade or quality' to those sold on the sport market, even though the underlying goods are physically identical." Coalition I, 737 F. Supp. 2d at 212 (citation omitted); see also A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc., 881 F.2d 1396, 1408 (7th Cir. 1989) (reasoning that "a seat on the 6:00 a.m. flight from Chicago to New York is not the same as a seat on the 5:00 p.m. flight, and a seat on the 5:00 p.m. flight reserved two weeks in advance is not the same as a seat on the flight for which the passenger had to stand by"); see also Aerotec Int'l, Inc. v. Honeywell Int'l, Inc., 836 F.3d 1171, 1188 (9th Cir. 2016) (explaining that "a seller is not obligated to charge the same prices for a commodity if its sales contracts with different buyers contain materially different terms, as they do when a seller and purchaser choose the relative stability of a long-term contract over individual transactions in a spot market") (internal quotation marks and citations omitted). Because the complaint alleges that Amazon purchases books from the Publishers through multi-year agreements (SACAC ¶¶ 8-9), it is necessary for Plaintiff to include allegations from which to infer that it did not have a similar contractual arrangement with the Publishers. Otherwise, the allegations in the complaint that the Publishers provided Amazon a greater discount are as consistent with discriminatory pricing as they are with an inference that Amazon's greater discount results from its long-term contractual relationship with the Publishers. However, the allegations themselves demonstrate that Plaintiff

27

did not purchase from the Publishers under the same multi-year contractual arrangements as Amazon.

Plaintiff argues that the "materially different contract terms" exception cannot apply, because Amazon is not committed to purchasing a specific quantity of books from the Publishers. Pl.'s Br. at 3, 28-29. To be sure, there are no allegations in the Second Amended Class Action Complaint that the agreements between Amazon and the Publishers require Amazon to purchase a set quantity of books in exchange for its discounted wholesale price. See SACAC ¶¶ 8-9. But, the complaint does allege that the agreements with Amazon are multi-year. Id. ¶ 8 (stating that the Publishers and Amazon entered into contracts "in late 2014 and 2015" that "continu[e] to this day"). The complaint also alleges that Amazon "distributes 50% of all books sold in" the United States and is the "primary distributor" of the Publishers' books, "potentially distributing as much as 70 to 80% of their inventory." See SACAC ¶ 45; see also id. ¶ 68 (stating that Amazon makes "50% to 80% of the retail sales of print trade books and 90% of such sales in the online submarket"). And, the complaint further alleges that Amazon "purchased every book Bookends purchased at the standard discount" during the relevant period. Id. ¶ 152. In other words, Amazon is alleged to have bought every book Plaintiff purchased and distributes all but 20 to 30% of the Publishers' inventory. The complaint itself makes clear that Amazon was not cherry-picking certain book titles to purchase from the Publishers.[9] See 7/21/23

---

[9] For this reason, Plaintiff's attempt to distinguish Cleveland v. Viacom, Inc., 73 F. App'x 736 (5th Cir. 2003), on the basis that Blockbuster there was "buying the duds as well as the sought-after videos," falls flat. See 7/21/23 Tr. at 37. In Cleveland, the court reasoned that plaintiffs, independent video retailers, had not proven a price-discrimination claim against Blockbuster because the evidence showed that "the transactions at issue" were not "reasonably comparable," in part because "distributors servicing independents such as plaintiffs could select tapes title-by-title after box office results were known, while Blockbuster was committed to purchasing a studio's entire output." 73 F. App'x at 741. But Plaintiff's own allegations here suggest that Amazon, too, was purchasing the Publishers' entire output under multi-year

Tr. at 46-47. By contrast, Plaintiff purchases books from the Publishers on "the standard terms of sale" without a contractual arrangement. See 7/21/23 Tr. at 33, 42; see also SACAC ¶¶ 1, 2, 28.

Given the allegation that Amazon purchased every book Plaintiff purchased and the sizeable volume of books that Amazon alone distributes for the Publishers, the complaint makes clear that Amazon purchased a volume of books from the Publishers that far exceeds the volume purchased by other booksellers. Further, a multi-year agreement with Amazon provides value to the Publishers, by solidifying for a period of several years the terms of their distribution agreements with their largest distributor in the United States. See Coalition I, 737 F. Supp. 2d at 212. Accordingly, Plaintiff has not alleged sufficient facts from which to plausibly infer that the price differential Amazon received was not the result of materially different contract terms.

Turning to functional discounts, it is a plaintiff's burden to plead facts from which to infer that a claimed functional discount is not genuine because "functional pricing negates the probability of competitive injury, an element of a prima facie" Section 2(a) claim. Hasbrouck, 496 U.S. at 561 n.18 (citation omitted). To be a lawful functional discount, the discount must be reasonable and cannot be "completely untethered to either the supplier's savings or the wholesaler's costs." Id. at 561-63; Coalition I, 737 F. Supp. 2d at 211, 216 (concluding that plaintiff had failed to plausibly allege a claim because it had "offered no factual material to support a plausible inference that any discounts taken by the retailer defendants do not reflect bona fide functional discounts"); see also Sw. Paper, 2013 WL 11238487, at *4 ("[F]unctional discounts are not an affirmative defense that must be pled and proven by the defendant.") (citation omitted).

---

contractual arrangements, whereas Plaintiff was purchasing the book titles it wanted when it wanted on the spot market.

As it did before, Plaintiff alleges that ████████████████████ for the Publishers, ████████████████████████████████████████, SACAC ¶¶ 160-62. I previously concluded that Plaintiff had failed to plead sufficient facts from which to conclude that any price differential was not the result of a bona-fide functional discount. R&R at 51-52. Because Plaintiff failed to provide any factual detail concerning the amount of the fees paid to Amazon or the amount of the discount received by Amazon, Plaintiff had not plausibly alleged that the discount Amazon received was unreasonable or untethered to any cost savings to the Publishers. Id. Plaintiff has now specified that Amazon received a ████████████████████████████████████████████████████ ████████████████████ See SACAC ¶¶ 7, 12. Plaintiff thus alleges that the discriminatory pricing cannot be justified as a legitimate functional discount because it is more costly for the Publishers to distribute through Amazon, given the size of Amazon's discount ████████████ ██████████████████████████████████ SACAC ¶¶ 12, 90, 160-62; Pl.'s Br. at 27-28. Although Defendants contend that Plaintiff has failed to allege that the discount is unreasonable in light of the additional services Amazon performed for the Publishers (Publishers' Br. at 16; Amazon's Br. at 7 n.4), whether the discount and fees paid were in fact untethered to any cost savings to the Publishers from distributing through Amazon is a question of fact, not appropriate for determination on a motion to dismiss. George Haug Co., 148 F.3d at 142 (stating that whether any functional discounts offered to favored purchaser were "legitimate" or "subterfuges" to avoid Section 2(a) was a factual question); see also Hasbrouck, 496 U.S. at 211 (confirming that a functional discount may be established using any commercially reasonable measure).

In sum, Plaintiff has plausibly alleged a prima facie claim under Section 2(a). Nevertheless, I recommend that the Section 2(a) claim in Count I be dismissed because Plaintiff's allegations do not plausibly allege that Defendants could not avail themselves of the meeting-competition defense in Section 2(b), or that the price differential is not the result of materially different contract terms.[10]

2. Plaintiff's RPA, Section 2(f) claim against Amazon

Section 2(f) of the RPA makes it unlawful for a favored purchaser "knowingly to induce or receive a discrimination in price which is prohibited" by the Act. 15 U.S.C. § 13(f). To survive a motion to dismiss, a plaintiff must allege facts sufficient to establish: "(1) the price discrimination violates Section 2(a) of the Act; (2) the defendant is a buyer engaged in interstate commerce; and (3) the buyer has 'knowingly' induced or received the prohibited discrimination in price." Hygrade Milk & Cream Co. v. Tropicana Prod., Inc., No. 88-CV-2861 (KTD), 1994 WL 38549, at *2 (S.D.N.Y. Feb. 4, 1994). Liability under Section 2(f) is entirely derivative of Section 2(a)'s liability and thus a buyer may not be held liable under Section 2(f) if the seller is not liable for violating Section 2(a). See Great Atl. & Pac. Tea Co. v. Federal Trade Comm'n, 440 U.S. 69, 77-78 (1979); Cash & Henderson Drugs, 799 F.3d at 215 ("A buyer cannot be liable unless the seller of the goods is liable under another section of the Act.") (citation omitted). If Plaintiff fails to adequately plead a Section 2(a) claim, then the Section 2(f) claim against Amazon will necessarily fail. Nevertheless, for the sake of completeness, I address whether

---

[10] Because the meeting-competition defense in Section 2(b) applies to claims brought under Sections 2(d) and 2(e), to the extent Plaintiff again raises such claims (see SACAC ¶ 161), those claims would be dismissed as well. See George Haug Co., 148 F.3d at 145 (explaining that the Section 2(b) defense for meeting competition is also applicable to claims brought under Section 2(d) and 2(e)).

Plaintiff has adequately alleged that Amazon knowingly induced or received a discriminatory price from the Publishers.[11]

Plaintiff must plead sufficient facts from which to plausibly allege that Amazon knew it was receiving a discriminatory lower price than its competitors. See Automatic Canteen Co. of Am. v. Federal Trade Commission, 346 U.S. 61, 74 (1953). "The knowledge requirement has been construed to mean that the buyer must have either actual knowledge, i.e., he or she must have known that the price in question was illegal, or constructive knowledge, i.e., he or she must have been reasonably cognizant of its illegality." Hygrade Milk & Cream Co., 1994 WL 38549, at *3 (citation omitted); see also Am. News Co. v. Federal Trade Commission, 300 F.2d 104, 110 (2d Cir. 1962) ("Although knowledge must be proved, it need not be by direct evidence; circumstantial evidence, permitting the inference that petitioners knew, or in the exercise of normal care would have known, of the [statutory violation] is sufficient.") (citation omitted). There thus must be a plausible basis from which to infer that Amazon knew that it received a greater discount and also knew that the Publishers had no defense for providing that discount. Automatic Canteen, 346 U.S. at 74 (concluding that "a buyer is not liable under [§] 2(f) if the lower prices he induces are either within one of the seller's defenses such as the cost justification or not known by him not to be within one of those defenses").

Previously, Plaintiff alleged that Amazon knew it received higher discounts not equally available to other retailers because it "demand[ed]" that the Publishers ███████████ ████████████ CAC ¶¶ 6, 99; see also id. ¶ 19 (alleging that Amazon "knew that the prices were discriminatory because it demanded discounts ████████████ that it knew were not

---

[11] Amazon does not dispute that it is a buyer engaged in interstate commerce, as is required for the second element of a Section 2(f) claim.

available to other booksellers"). Plaintiff also alleged that Amazon knew it was receiving a better

wholesale price because of its dominant market position. See id. ¶¶ 2, 15, 46, 48. However, as I

explained previously (see R&R at 57-58), "[t]he receipt of better-than-published prices, without

more, does not satisfy section 2(f)'s knowledge requirement." Gorlick Distr. Ctrs. LLC v. Car

Sound Exhaust System, Inc., 723 F.3d 1019, 1022 (9th Cir. 2013) (explaining that liability under

Section 2(f) requires knowledge by the buyer that "the prices it received likely did not qualify

for" a defense under the RPA); accord Automatic Canteen, 346 U.S. at 71 (rejecting argument

that violation of Section 2(f) occurs "if the buyer knows *only* that the prices are lower than those

offered other buyers") (emphasis added). Therefore, I concluded that "even assuming that

Amazon knew the amount of the standard discount received by Plaintiff, that alone does not

establish liability under Section 2(f), because '"a buyer is not precluded from inducing a lower

price based on cost differences that would provide the seller with a defense."' R&R at 58

(quoting Automatic Canteen, 346 U.S. at 70; internal citation omitted). The complaint thus

needed to "contain some factual detail supporting a plausible inference that Amazon knew or

would have known that its discount was not justified by any cost savings to the Publishers." Id.

There were none of those allegations in the prior complaint.

Now, Plaintiff relies on substantially the same allegations to establish that Amazon knew

it received discriminatory pricing. Plaintiff alleges that Amazon knew that its discounts "are

higher and acquisition prices lower" than the standard discount offered by the Publishers, and

███████████████████████████████████████████████████████

SACAC ¶ 157. The basis for that knowledge, the complaint alleges, was the pretextual insertion

of the meeting-competition clause ████████████████████████████████

████████████████████████████████    Id. ¶¶ 157-58. First, Amazon's receipt of a

discount better than the Publishers' standard discount "without more, does not satisfy section 2(f)'s knowledge requirement." Gorlick Distr. Ctrs., 723 F.3d at 1022. Moreover, Plaintiff has not plausibly alleged the existence of a hub-and-spoke conspiracy involving Amazon. See infra at 39-51. Consequently, there are no factual allegations plausibly establishing that the meeting-competition clause in the agreements with the Publishers was pretextual. The existence of that clause therefore does not adequately plead that Amazon knowingly received a discriminatory lower price. See Automatic Canteen, 346 U.S. at 70-71("[A] buyer is not precluded from inducing a lower price based on cost differences that would provide the seller with a defense."). Finally, Amazon was not precluded from aggressively negotiating for a better discount, and such aggressive bargaining does not, by itself, plausibly allege Amazon's knowledge of discriminatory pricing.[12]

Plaintiff also relies on paragraph 16 of the Second Amended Class Action Complaint to supports its argument that Amazon knew that the discounted price it received was not justified by any cost savings to the Publishers. See Pl.'s Br. at 30-31. That paragraph, along with paragraphs 14 and 15, discuss complaints made publicly by the Association of American Publishers, the American Booksellers Association, and the Authors' Guild about Amazon's market power in a letter to the House Judiciary Committee. See SACAC ¶¶ 14-16 (citing Letter

---

[12] Plaintiff alleges that Amazon had knowledge of the discount's illegality because Amazon "demanded that the discounts ████████████ it received would not be available to other booksellers and received assurances that the discriminatory prices would not be available to other retailers." SACAC ¶ 157. Plaintiff, however, has reviewed the agreements between the Publishers and Amazon and it previously withdrew its initial complaint after it inspected those contracts and discovered that they did not contain a most favored nation clause. See R&R at 7. As such, Plaintiff's allegation that Amazon demanded that the discount it received would not be available to other booksellers is conclusory and contradicts Plaintiff's prior concession.

from Maria A. Pallante, et al., to Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary (Aug. 17, 2020) ("American Publishers Association Letter")). The letter complains about Amazon's concentrated power and influence in the publishing industry, and it provides various examples of conduct by Amazon that the writers contend is anticompetitive. See American Publishers Association Letter at 1-2. But, the letter does not explain how distributing through Amazon is more costly, and nor does it articulate any basis for inferring that the Publishers would have had no  cost savings from distributing through Amazon.[13] It is thus not plausible to infer from the statements made in the letter that Amazon would have known that the Publishers had no available defense for the discounted price they offered to Amazon. As the Supreme Court explained in Automatic Canteen, "a buyer who knows that he buys in the same quantities as his competitor and is served by the seller in the same manner . . . can fairly be charged with notice that a substantial price differential cannot be justified." 346 U.S. at 80. But the allegations in the complaint make plain that Amazon does not buy in the same manner or in the same quantities as other booksellers, like Plaintiff. See SACAC ¶¶ 3, 6, 8-9, 11, 152.

In short, because Plaintiff has not alleged sufficient facts from which to plausibly infer that Amazon knowingly accepted a discriminatory price, I recommend that Plaintiff's Section 2(f) claim in Count I be dismissed as well.

---

[13] At oral argument, counsel for Simon & Schuster argued that the comments made in the letter pertained only to the distribution of eBooks through Amazon, not print trade books. 7/21/23 Tr. at 32. The letter expressly discusses MFN and other parity provisions, which are a feature of the distribution agreements with Amazon for the sale of eBooks. See, e.g., In Re Amazon.Com, Inc. eBook Antitrust Litig., Dkt. No. 21-CV-351 at ECF No. 175 (Second Consolidated Amended Class Action Complaint). But no statement in the letter expressly limits the authors' complaints to Amazon's distribution of eBooks.

**D.  Plaintiff's Sherman Act, Section 1 Claims**

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce among the several states." 15 U.S.C. § 1. "Since all contracts necessarily restrain trade to some extent, this provision cannot be read literally: [O]nly 'unreasonable' restraints of trade are unlawful." In re Aluminum Warehousing Antitrust Litig., 95 F. Supp. 3d 419, 438 (S.D.N.Y. 2015) (quoting Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (1988)). And "[t]o run afoul of § 1, the unreasonable restraint must result from an agreement between two or more entities." Id. (citations omitted). Accordingly, to state a Section 1 claim, a plaintiff must make two showings: "(1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade." United States v. Am. Express Co., 838 F.3d 179, 193 (2d Cir. 2016) (internal quotation mark and citation omitted).

"Agreements that fall within the scope of Section 1 are characterized as either 'horizontal' or 'vertical.'" In re Zinc Antitrust Litig., 155 F. Supp. 3d 337, 376 (S.D.N.Y. 2016). Additionally, "courts have long recognized the existence of 'hub-and-spoke' conspiracies in which an entity at one level of the market structure, the 'hub,' coordinates an agreement among competitors at a different level, the 'spokes.'" United States v. Apple, Inc., 791 F.3d 290, 314 (2d Cir. 2015) (citation omitted). "These arrangements consist of both vertical agreements between the hub and each spoke and a horizontal agreement among the spokes to adhere to the [hub's] terms, often because the spokes would not have gone along with [the vertical agreements] except on the understanding that the other [spokes] were agreeing to the same thing." Id. (citation, internal quotation marks, and emphasis omitted). To support a Section 1 claim, a hub-and-spoke conspiracy requires "both vertical agreements between the hub and each

spoke, and also a horizontal agreement among the various spokes with each other." In re Zinc, 155 F. Supp. 3d at 376 (citing Apple, 791 F.3d at 314). Plaintiff alleges a horizontal price-fixing conspiracy among the Publishers, a hub-and-spoke conspiracy involving the Publishers and Amazon, and a vertical price-fixing conspiracy involving the Publishers and Amazon. SACAC ¶¶ 20, 70, 174-75, 177.

"The crucial question in a Section 1 case is . . . whether the challenged conduct stems from independent decision or from an agreement, tacit or express." Mayor & City Council of Baltimore, Md. v. Citigroup, Inc., 709 F.3d 129, 135 (2d Cir. 2013) (internal quotation marks omitted) (quoting Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010)). To establish a conspiracy in violation of Section 1, the circumstances of the alleged conspiracy "must reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764 (1984) (citation and internal quotation marks omitted). "No formal agreement is required to constitute an antitrust conspiracy." Ross v. Am. Express Co., 35 F. Supp. 3d 407, 437 (S.D.N.Y. 2014), aff'd sub nom. Ross v. Citigroup, Inc., 630 F. App'x 79 (2d Cir. 2015), as corrected (Nov. 24, 2015). Rather, the "essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words." Am. Tobacco Co. v. United States, 328 U.S. 781, 809-10 (1946) (citation omitted). Courts examine the existence of a conspiracy "as a whole" taking into consideration the totality of the evidence, as opposed to "dismembering it and viewing its separate parts." Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962) (citation omitted); see also In re Publ'n Paper Antitrust Litig., 690 F.3d 51, 65 (2d Cir. 2012).

An unlawful agreement may be proven through direct or circumstantial evidence. Monsanto, 465 U.S. at 764. Circumstantial evidence of a conspiracy is evidence "that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." Id. (citation and internal quotation marks omitted). Because conspiracies, by their nature, tend to form in secret, such unlawful agreements "nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." Anderson News, 680 F.3d at 183 (citation and internal quotation marks omitted).

"Under Twombly, parallel conduct, such as competitors adopting similar policies around the same time in response to similar market conditions, may constitute circumstantial evidence of anticompetitive behavior." In re Musical Instruments & Equip. Antitrust Litig., 798 F.3d 1186, 1193 (9th Cir. 2015) (citing Twombly, 550 U.S. at 553-54). But a complaint that merely alleges parallel conduct among defendants—even consciously parallel conduct—does not state a claim under Section 1. See Twombly, 550 U.S. at 553-54. That is because "parallel conduct or interdependence, without more," is behavior that is "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." Id. at 554; Mayor & City Council, 709 F.3d at 136 (explaining that "alleging parallel conduct alone is insufficient, even at the pleading stage" to state a Section 1 claim); In re Musical Instruments, 798 F.3d at 1193-94 ("Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a § 1 violation.") (internal quotation marks and citations omitted); Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, 985 F. Supp. 2d 612, 619 (S.D.N.Y. 2013). Instead, allegations of parallel conduct "gets the complaint close to

stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief." Twombly, 550 U.S. at 557 (international quotation marks, alteration, and citation omitted); see also Iqbal, 556 U.S. at 678.

At the pleading stage, "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement." Twombly, 550 U.S. at 557; Starr, 592 F.3d at 323; In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007). This standard does not require a plaintiff to show that the allegations suggesting agreement "are more likely than not true or that they rule out the possibility of independent action." Anderson News, 680 F.3d at 184. A court ruling on a motion to dismiss need not choose among plausible interpretations of the evidence. Id. at 189-90. But a statement of facts that is "merely consistent" with an agreement will not suffice. Twombly, 550 U.S. at 557. A complaint must contain "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Id. at 556.

1. Horizontal price-fixing conspiracy amongst the Publishers or a hub-and-spoke conspiracy involving Amazon

In Count II, Plaintiff asserts that the Publishers engaged in a horizontal price-fixing conspiracy and that Amazon and the Publishers participated in a hub-and-spoke conspiracy—all intended to control the wholesale price of print trade books. SAC ¶¶ 166-76. With respect to the concerted action prong of a Section 1 claim, I previously concluded that the allegations that each Publisher entered into the same distribution agreement with Amazon was merely parallel conduct that, absent some preceding agreement to act collectively, was not by itself direct evidence of a conspiracy amongst Defendants. R&R at 12-14. I further concluded that Plaintiff had not plausibly alleged the existence of a conspiracy through circumstantial evidence, such as actions against self-interest or motive to collude. Id. at 14-28. Accordingly, I recommended that

Plaintiff's claim based on allegations of a conspiracy amongst the Publishers and between the Publishers and Amazon be dismissed. Id. at 28. I again recommend dismissal of Plaintiff's Section 1 claim to the extent it relies on a horizontal or hub-and-spoke conspiracy between the Publishers and Amazon.

        *a. Concerted Action*

              *i. Direct evidence of a conspiracy*

In the prior complaint, Plaintiff pointed to the existence of the "same" vertical distribution agreements between each Publisher and Amazon as direct evidence of a conspiracy. See CAC ¶¶ 7-8, 40. Plaintiff argued that those contracts demonstrated that the Publishers agreed to sell their print trade books to Amazon at "highly discounted prices not available to other booksellers, and only on the condition that the other Publisher Defendants also participated in the pricing scheme." ECF No. 94 at 5. As I previously explained, because there was nothing inherently unlawful about a distribution agreement between a publisher and a retailer, the agreements could not, standing alone, be direct evidence that the Publishers had conspired to fix the price of print trade books. See R&R at 13-14 (citing PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy, 530 F. Supp. 3d 301, 333 (S.D.N.Y. 2021) ("Direct evidence of a conspiracy is explicit and requires no inferences to establish the proposition or conclusion being asserted.")). Instead, the execution of the agreements by each Publisher was merely parallel conduct which was not itself unlawful absent some preceding agreement by the Publishers to act collectively. Id. at 14.

Plaintiff again points to the vertical distribution agreements between each Publisher and Amazon as "direct evidence of the Publisher Defendants' horizontal conspiracy." SACAC ¶ 39. Plaintiff argues that the only issue at this stage is whether an agreement has been adequately

alleged, and a determination as to whether the agreement is unlawful is a separate issue. Pl.'s Br.

at 7. Whether the distribution agreements have an anticompetitive effect is not a determination to

be made at the pleading stage. But the vertical distribution agreements merely demonstrate

lawful parallel conduct by the Publishers. In other words, absent other evidence tending to show

collusion, the fact that the Publishers each separately agreed to distribute through Amazon is not,

by itself, direct evidence of a conspiracy among the Publishers. See R&R at 13-14 (concluding

that each Publisher acting alone to sign the same distribution agreement with Amazon is parallel

conduct which is not itself unlawful absent some preceding agreement to act collectively). In

short, because a lawful distribution agreement by itself is not direct evidence of a conspiracy, I

again conclude that Plaintiff has not alleged direct evidence of a conspiracy between the

Publishers and Amazon.

   *b.   Circumstantial evidence of a conspiracy*

   A conspiracy "may be inferred on the basis of conscious parallelism, when such

interdependent conduct is accompanied by circumstantial evidence and plus factors." Todd v.

Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001); see also Apex Oil Co. v. DiMauro, 822 F.2d

246, 253 (2d Cir. 1987) ("[A] plaintiff must show the existence of additional circumstances,

often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can

serve to allow a fact-finder to infer a conspiracy."). "These 'plus factors' may include: a

common motive to conspire, evidence that shows that the parallel acts were against the apparent

individual economic self-interest of the alleged conspirators, and evidence of a high level of

interfirm communications." Mayor & City Council, 709 F.3d at 136 (quoting Twombly v. Bell

Atl. Corp., 425 F.3d 99, 114 (2d Cir. 2005), rev'd on other grounds, Twombly, 550 U.S. 544).

Such plus factors are "neither exhaustive nor exclusive, but rather illustrative of the type of

circumstances which, when combined with parallel behavior, might [lead a court] to infer the existence of an agreement." Id. at 136, n.6.

Plaintiff previously relied on the following plus factors: (1) "none of the [Publishers] would have an incentive to enter into restrictive agreements that consolidate power in Amazon," without collective action (CAC ¶¶ 10, 16, 39-41, 111); (2) Defendants shared a common motive to collude (CAC ¶ 110); (3) Defendants "had opportunities to collude," including during the Publishers' conspiracy with Apple (CAC ¶¶ 40, 43, 112); and (4) Amazon has been the subject of prior government investigations (CAC ¶¶ 43-47). I explained that these plus factors did not support a plausible inference that the Publishers were acting collectively here and concluded that Plaintiff had not plausibly alleged the existence of concerted action, either among the Publishers or between the Publishers and Amazon. See R&R at 14-28.

To allege the existence of a conspiracy, Plaintiff again claims that the Publishers acted against their individual self-interest in entering into agreements with Amazon (SACAC ¶¶ 51-53, 170); the Publishers had a common motive to collude (SACAC ¶¶ 57, 169); and the Publishers previously colluded (SACAC ¶¶ 58, 59-67, 171, 173). Seemingly in response to my prior finding that the complaint contained no allegations of interfirm communications among the Publishers or with Amazon (see R&R at 24), Plaintiff now adds that the vertical distribution agreements of

█████████████████████████████████████████████████████████

████████████████  See SACAC ¶¶ 10, 56. Lastly, Plaintiff adds that the concentrated nature of the market makes collusion among the Publishers more likely. See id. ¶ 68.

   i.   *Action against self-interest*

The most important plus factor is evidence that the alleged conduct would "plausibly contravene each [horizontal] defendant's self-interest in the absence of similar behavior by

rivals." Starr, 592 F.3d at 327 (citation and internal quotation marks omitted). "An action that is contrary to a firm's apparent economic self-interest is one that is *implausible* if undertaken alone, without the guarantee of cooperation by competitors." SourceOne Dental, Inc. v. Patterson Companies, Inc., 310 F. Supp. 3d 346, 360 (E.D.N.Y. 2018) (emphasis added); accord PharmacyChecker.com, 530 F. Supp. 3d at 335.

Previously, Plaintiff alleged that without collective action, "none of the [Publishers] would have an incentive to enter into restrictive agreements that consolidate power in Amazon." See CAC ¶¶ 10, 16, 39-41, 111. The prior complaint alleged that it would have been in each Publisher's own self-interest "not to give Amazon disproportionate discounts or other advantages." Id. ¶¶ 15-16; see also id. ¶ 111. I found that the CAC provided "a natural explanation" for "why each Publisher would have independently decided to distribute print books through Amazon, even without a guarantee that the other Publishers would follow," because Amazon accounted for "90% of online print sales." R&R at 16-17, 19. The allegations in the Second Amended Class Action Complaint continue to provide a natural explanation for a single Publisher's decision to independently enter into an agreement with Amazon.

According to the allegations, the Publishers "have an interest in generating sales in the print trade book market." SACAC ¶ 170. Amazon, by itself, accounts for "50% or more of the US print book market" and "90% of online print sales." Id. ¶¶ 45, 68, 73-75, 99, 137-38. Amazon "dominates the book market," selling "more books than any other single retail outlet in history." Id. ¶¶ 99, 101, 136-38. And, Amazon's "market dominance" gives it the ability to "promote or destroy a book in the national marketplace." Id. ¶ 102. For instance, if Amazon removes the "buy-button from a particular title," overall sales of that book can drop by "50% or

more." Id. ¶ 103.[14] Collectively, these allegations demonstrate that the Publishers were dealing with a retailer who accounts for "over half of all trade books purchased by consumers in the United States" and is the "largest distributor of [the Publishers'] print trade books." Id. ¶ 3. Indeed, the letter from the Association of American Publishers relied on by Plaintiffs (SACAC ¶¶ 14-16), states that because of Amazon's share of the book-distribution market, "no publisher can afford to be absent from its online store." American Publisher Association Letter at 1. The Publishers themselves have thus acknowledged that Amazon is a crucial book-distribution partner that no Publisher could afford to lose. All of this demonstrates why any single Publisher would have sought an agreement with Amazon, even without an assurance that other Publishers would follow.

Plaintiff now also alleges that "it would be against the individual economic self-interest of any individual [Publisher] to raise its list prices (and therefore raise wholesale prices) unless it understood that the other Publishers would do the same." SACAC ¶ 51. In other words, collective action was required for the Publishers to have raised list prices. See 7/21/23 Tr. at 49-50. To support that allegation, Plaintiff points to what happened in the Apple case, when the conspiring publishers raised the price of eBooks and Random House, who did not join the conspiracy, gained market share as a result. SACAC ¶ 52. As an initial matter, however, the market circumstances in Apple, upon which Plaintiff relies, occurred with respect to the sale of eBooks (not print books as is the case here) and eBooks are distributed through Amazon under a different pricing model than used for the distribution of print books. It is thus not plausible to

---

[14] See also SACAC ¶ 54 n.59 (citing For the Big Five, Agency Now Holds Sway Across the Board, Author's Guild (Sep. 9, 2015), https://www.authorsguild.org/industryadvocacy/for-the-big-five-agency-now-holds-sway-across-the-board/ [https://perma.cc/7ZWF-CMK4] (explaining that Hachette sales plummeted when Amazon "disfavored" Hachette books in search results).

infer from what happened in Apple, when the Publishers raised the *retail* price of *eBooks*, that a Publisher's decision to raise the *wholesale* price of *print books* would be against that Publisher's self-interest absent collective action.

Moreover, as already explained, the circumstances in Apple that necessitated collective action are simply not present here. See R&R at 17-19. In Apple, because the Publishers had agreed to agency pricing with Apple, if they did not force Amazon to switch to agency pricing (which no individual Publisher could do alone), the agency agreements with Apple would "impose[] a severe financial penalty" on the Publishers. See 952 F. Supp. 2d at 647-48, 662-63. The Court there further found that because the revenue each Publisher "would receive per e-book sold through the Apple store was substantially less than what it was currently receiving under its wholesale arrangements, there was no financial incentive for a Publisher to sign an agency agreement with Apple" unless it suited their long-term goal of controlling eBook pricing. Id. at 665. In other words, no individual Publisher had an incentive to agree to agency pricing with Apple without an assurance that the other Publishers would follow suit.

The facts alleged in the Second Amended Class Action Complaint, however, do not present similar circumstances. As already discussed, (see R&R 18-19), at the time of the operative agreements with Amazon, the Publishers were not attempting to switch Amazon to a new pricing model and the allegations readily explain why a single Publisher would want Amazon as a retail partner. And because the Publishers compete in a concentrated market (see SACAC ¶ 61), each Publisher could have rationally expected that another Publisher would follow suit in raising its list prices, without any need for a preceding agreement to do so. See In re Musical Instruments, 798 F.3d at 1195 (explaining that "interdependent firms may engage in

consciously parallel conduct through observation of their competitors' decisions, even absent an agreement").

At bottom, the allegations in the Second Amended Class Action Complaint do not change my prior conclusion that each Publisher acted in their own self-interest in entering into a distribution agreement with Amazon and in subsequently raising their own list prices.

### ii.   _Common motive to collude_

Previously, Plaintiff alleged that the Publishers had an interest in controlling and raising the wholesale prices of their book titles. CAC ¶¶ 17, 110. Plaintiff further alleged that Amazon had "a motive to dominate over its retail competitors, which it achieves by obtaining a substantially lower wholesale price and more favorable contractual terms than its rivals." CAC ¶¶ 38, 110. In the Second Amended Class Action Complaint, Plaintiff again alleges that the Publishers shared "a common motive to raise print trade book prices." SACAC ¶ 57. But as I explained previously, any interest by the Publishers in controlling and raising the wholesale price of their book titles was, at bottom, "an interest in maximizing their potential profits," which is "an interest universally shared by all businesses." R&R at 20 (citing In re Musical Instruments, 798 F.3d at 1194-95 n.8). Moreover, although the complaint alleges that the Publishers and Amazon shared a common motive to collude (see SACAC ¶ 169), other allegations in the complaint make clear that the Publishers feared Amazon's market power. See id. ¶ 16 (citing to American Publishers Association Letter complaining about Amazon's anticompetitive conduct and its "outsized position of power"). As before (R&R at 21-22), the complaint provides no plausible explanation for why the Publishers would have colluded with Amazon, the result of which would have only further entrenched its market dominance.

Additionally, in the absence of new allegations, my prior conclusion about the inadequacy of these allegations remains the law of the case. See, e.g., Arizona v. California, 460 U.S. 605, 618 (1983) ("When a court decided upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"); see also Weslowski v. Zugibe, 96 F. Supp. 3d 308, 315–18 (S.D.N.Y.), aff'd, 626 F. App'x 20 (2d Cir. 2015) (explaining that where amended complaint "is in large part identical to Plaintiffs' first Complaint, the law of the case doctrine counsels against reconsideration of the [] dismissal of the first Complaint") (citing State Farm Mut. Auto. Ins. Co. v. Mallela, No. 00–CV–4923, 2002 WL 31946762, at *8 (E.D.N.Y. Nov. 21, 2002)).

In short, Plaintiff has not added any new allegations to support a plausible inference that the Publishers had a common motive to collude with Amazon.

### iii.     _The Publishers' past conduct_

Plaintiff again relies on instances of the Publishers' prior collusive behavior to support the existence of a conspiracy here. SACAC ¶¶ 58-67. The allegations in the Second Amended Class Action Complaint rely primarily on the conspiracies uncovered in Apple and Bertelsmann. Plaintiff argues that because "there is a direct, logical relationship" between the prior conspiracy in Apple and the allegations here, the Publishers' prior collusive behavior is probative of whether the Publishers again colluded to fix prices. Pl.'s Br. at 13.

In Apple, the Publishers colluded with Apple to force Amazon to abandon its pricing model and adopt agency pricing so that the Publishers could raise the retail price of eBooks. See Apple, 791 F.3d at 317; In re Elec. Books Antitrust Litig. ("eBooks"), 859 F. Supp. 2d 671, 662 (S.D.N.Y. 2012). I previously concluded that the conspiracy in Apple did not make the existence of a conspiracy here more plausible, because the complaint did not "allege the existence of the

47

same industry conditions that motivated the Publishers' conduct" in <u>Apple</u>. R&R at 17-19, 23. Again, the Second Amended Class Action Complaint points to the <u>Apple</u> conspiracy. SACAC ¶ 47. But, contrary to Plaintiff's argument (Pl.'s Br. at 13-14), the complaint does not plausibly allege a "direct, logical relationship" between the prior eBook pricing conspiracy facilitated by Apple and the current alleged print book conspiracy facilitated by Amazon, because the conditions that led to the conspiracy in <u>Apple</u> were unique to that case and not alleged to be present here. <u>See</u> R&R at 17-20.

Plaintiff now also points to an additional case, <u>United States v. Bertelsmann SE & Co.</u>, No. 21-CV-2886 (FYP), 2022 WL 16949715 (D.D.C. Nov. 7, 2022), to bolster the plus factor pertaining to prior collusive conduct. SACAC ¶¶ 168-78, 280. The observations by the court in <u>Bertelsmann</u> did not arise in the context of a Section 1, Sherman Act claim. Instead, the court was analyzing whether a proposed merger of two of the Publishers could lead to a "substantial lessening of competition" under Section 7 of the Clayton Act be. <u>See</u> 2022 WL 16748157, at *23, 27-28. And under the Clayton Act, the court was required to assess whether the merger increased the likelihood of "coordinated effects" resulting from "parallel accommodating conduct among competitors without a prior agreement." <u>Id.</u> at *27 (citation and internal quotation marks omitted). Further, the court in <u>Bertelsmann</u> was assessing a different relevant market—the market for acquiring rights to anticipated top-selling books. <u>Id.</u> at *12. Simply stated, the statements by the court in <u>Bertelsmann</u> do not make Plaintiff's allegations that the Publishers had to act collectively here any more plausible, particularly given the lack of any other plus factor.

Lastly, Plaintiff relies on allegations of instances where courts and enforcement agencies have found that Amazon engaged in anticompetitive conduct in the sale and distribution of trade

books. SACAC ¶¶ 93-98, 173. However, as I explained previously (see R&R at 27-28), the existence of government investigations into Amazon's conduct cannot raise a plausible inference that the Publishers colluded because the investigations concerned conduct by Amazon, not the Publishers. See Starr, 592 F.3d at 319, 324 (citing fact of government investigations as a plus factor, but where the investigations concerned all of the defendants).[15]

  *iv.* *Interfirm communications*

  Citing to paragraph 56 of the Second Amended Class Action Complaint, Plaintiff argues that the complaint clarifies that "the Publishers exchanged confidential pricing information via Amazon's contractual disclosure requirement." Pl.'s Br. at 10. In other words, Plaintiff points to the lawful meeting-competition clauses ███████████████████████████████ ███████ (SACAC ¶ 56) to argue that Amazon and the Publishers communicated "highly confidential, current contractual prices among their closest competitors" in furtherance of the conspiracy. Pl.'s Br. at 10-11. As an initial matter, the complaint does not allege any exchange by the Publishers of list prices for print books. Further, the provision of pricing information by a single Publisher to Amazon, as permitted pursuant to a lawful meeting-competition clause, does not plausibly suggest communications amongst the Publishers about such pricing information, as was present in Apple. See 952 F. Supp. 2d at 655 n.14, 704-05 (describing communications among the Publishers and between the Publishers and Apple, including discussions specific to raising eBook prices).

  Evidence of interfirm communications can serve to support an inference of a conspiracy, but there must be a "*high level*" of such communications. See Abbott Lab'ys v. Adelphia Supply

---

[15] See In re Digital Music Antitrust Litig., Dkt. No. 06-MD-1780 at ECF No. 69 (Second Consolidated Amended Complaint) ¶¶ 106-07 (complaint in Starr alleging existence of investigations into all defendants' conduct).

USA, No. 15-CV-5826 (CBA) (LB), 2017 WL 5992355, at *10 (E.D.N.Y. Aug. 10, 2017)

(citations omitted and emphasis added). For example, the district court in Apple found such a

high level of interfirm communications where the Publishers "kept in close communication,"

through their executives frequently calling one another, and exchanging information amongst

themselves "numerous" times. 791 F.3d at 302, 308; see also Apple, 952 F. Supp. 2d at 658

(describing how "[s]everal of the Publishers hashed over their meeting with Apple with one

another," where the specific information discussed included pricing). The court found that "in

the critical negotiation period, over three days [the Publishers' CEOs] called one another 34

times, with 27 calls exchanged on [one day] alone." Apple, 791 F.3d at 308 (citations, internal

quotation marks, and alterations omitted). The Second Amended Class Action Complaint does

not allege any exchange of list prices or other contractual information by the Publishers, or any

other facts that would support an inference that the Publishers kept in close communication

during their respective negotiations with Amazon.

     *i.*    *Market concentration*

     The Second Amended Class Action Complaint states that market concentration makes

collusion more likely. SACAC ¶ 68 ("The high concentration in the publishing market for print

trade books coupled with Amazon's dominant share of the retail distribution of the [Publishers']

books mean that both the publishing market and the retail market for print trade books are

susceptible to collusion."). But the fact that the relevant market is concentrated does not by itself

raise a suggestion of a preceding agreement by the Publishers. See Litovich v. Bank of Am.

Corp., 568 F. Supp. 3d 398, 432 (S.D.N.Y. 2021) (allegations that defendants control a large

share of the market does not make alleged parallel conduct suggestive of a conspiracy, but rather

is suggestive of mere interdependent conduct); see also Twombly, 550 U.S. at 553 ("Even

conscious parallelism, a common reaction of firms *in a concentrated market* that recognize their shared economic interests and their interdependence with respect to price and output decisions is not in and of itself unlawful.") (emphasis added and internal quotation marks, citation, and alterations omitted). Moreover, the allegations that "Amazon makes 50% to 80% of the retail sales of print trade books and 90% of such sales in the online submarket" (SACAC ¶ 68) readily explains why each Publisher would separately choose to enter into an agreement with Amazon. See R&R at 16-17, 19; see also In re Musical Instruments, 798 F.3d at 1196; In re Elevator Antitrust Litig., 502 F.3d at 51 ("Similar contract terms can reflect similar bargaining power and commercial goals.").

In sum, Plaintiff has not added any new allegations to support a plausible inference of a conspiracy between the Publishers, or between Amazon and the Publishers. The complaint therefore does not adequately allege the existence of a horizontal-price-fixing conspiracy, or a hub-and-spoke conspiracy involving Defendants.[16]

2. A vertical restraint of trade

Plaintiffs also alleges a "vertical" restraint in violation of Section 1, based on the individual agreements between each Publisher and Amazon. See SACAC ¶¶ 20, 70, 177. The agreements are sufficient to satisfy the first prong of a Section 1 claim. Tops Markets, Inc. v. Quality Mkts., 142 F.3d 90, 95-96 (2d Cir. 1998); see also Frame-Wilson v. Amazon.com, Inc., 591 F. Supp. 3d 975, 988 (establishing that "an agreement exists" is the first element of a Section

---

[16] "[A] hub-and-spoke theory is cognizable under Section 1 only if there are *both* vertical agreements between the hub and each spoke, and also a horizontal agreement among the various spokes with each other." In re Zinc, 155 F. Supp. at 376 (citing Apple, 791 F.3d at 314) (emphasis added).

1 claim); <u>Wellnx Life Sci. Inc. v. Iovate Health Sci. Rsch. Inc.</u>, 516 F. Supp. 2d 270, 288-89

(S.D.N.Y. 2007).

      A vertical restraint, like the agency agreements at issue here, is typically analyzed under

the rule of reason. <u>See</u> <u>eBooks</u>, 859 F. Supp. 2d at 682; <u>see also</u> <u>Pepsico, Inc. v. Coca-Cola Co.</u>,

315 F.3d 101, 110 (2d Cir. 2002) (holding that absent evidence of an agreement between

distributors, the conspiracy was vertical and applying the rule of reason). Under the rule of

reason, a plaintiff seeking to allege an antitrust violation must initially show that the challenged

action adversely effected competition as a whole in the relevant market. <u>Tops Mkts.</u>, 142 F.3d at

96; <u>see also</u> <u>Wellnx</u>, 516 F. Supp. 2d at 293 ("Under the rule of reason, the plaintiff must show

that defendants' challenged behavior had an *actual* adverse effect on competition as a whole in

the relevant market.") (internal quotation marks omitted, emphasis in the original) (quoting

<u>Geneva Pharm. Tech.</u>, 386 F.3d at 506-07). To show an adverse effect on competition, a plaintiff

"may offer direct evidence of harm to competition by proving higher prices, reduced output, or

lower quality in the market as a whole." <u>MacDermid Printing Sols. LLC v. Cortron Corp.</u>, 833

F.3d 172, 182 (2d Cir. 2016) (citation omitted). Alternatively, a plaintiff "may demonstrate an

adverse effect indirectly by establishing that the alleged conspirators had sufficient 'market

power' to cause an adverse effect, 'plus some other ground for believing that the challenged

behavior' has harmed competition." <u>Id.</u> (quoting <u>Tops Mkts.</u>, 142 F.3d at 97); <u>see also</u> <u>Ohio v.</u>

<u>Am. Express Co.</u>, 138 S. Ct. 2274, 2284 (2018); <u>In re Google Digital Advert. Antitrust Litig.</u>,

627 F. Supp. 3d 346, 376 (S.D.N.Y. 2022) (citations and internal quotation marks omitted).

Market power "is the ability to raise price significantly above the competitive level without

losing all of one's business and may be established by a showing of sufficient market share."

<u>Bookhouse</u>, 985 F. Supp. 2d at 620 (internal citations and quotation marks omitted); <u>see also</u>

<u>Virgin Atl. Airways Ltd. v. British Airways PLC</u>, 257 F.3d 256, 265 (2d Cir. 2001) ("Market power" is the "ability of a single seller to raise price[s] and restrict output.") (alteration in original and citation omitted).

As to direct evidence of harm to competition, the complaint alleges that Defendants conduct caused higher retail prices and higher wholesale prices. <u>See, e.g.</u>, SACAC ¶¶ 47-50, 104; <u>see also</u> Pl.'s Br. at 17-18. Plaintiff also contends that it has plausibly alleged an adverse effect on competition market wide through indirect evidence—specifically, proof of market power plus allegations that prices have increased to anticompetitive levels. Pl.'s Br. at 17; <u>see also</u> SACAC ¶¶ 68, 73.

With respect to retail prices, the complaint alleges that those prices are set by the bookseller, not the Publishers. <u>See</u> SACAC ¶¶ 5, 107. The Publishers control the wholesale (list) price of their own book titles. <u>Id.</u> ¶¶ 4, 6, 42. Additionally, booksellers are not constrained to sell a book at a retail price that equals the list price and, indeed, some booksellers sell at a discount from the list price. <u>Id.</u> ¶¶ 5, 107. Further, each Publisher has an estimated market share of the U.S. print-trade-book market of between 5% and 37%. <u>See id.</u> ¶¶ 30-34. The complaint thus does not include factual allegations from which to plausibly infer that the Publishers' conduct caused higher retail prices market wide. Moreover, the chart in the complaint used to support an allegation that the wholesale (list) price of print trade books rose during the relevant period shows instead a gradual decline in the average wholesale price between 2017 and 2019. <u>Id.</u> ¶ 47.

To support its argument that the Publishers had market power, Plaintiff aggregates the individual market share of each Publisher, because a market share of at most 37% is not sufficient to show market power on its own. <u>See</u> <u>Wellnx</u>, 516 F. Supp. 2d at 281, 294 (40% market share insufficient); <u>see also</u> SACAC ¶ 73 (stating that the Publishers have a "collective

80% share of the supply of trade books"). However, absent evidence of a conspiracy amongst the Publishers or between the Publishers and Amazon, aggregation of each Publisher's market share is inappropriate. Bookhouse, 985 F. Supp. 2d at 622. Relying on Standard Oil Co. v. United States, 337 U.S. 293 (1949) and Fortner Enters. v. U.S. Steel Corp., 394 U.S. 495 (1969), Plaintiff looks at the collective market share of each Publisher to argue that the anticompetitive effects of each vertical agreement should be viewed in the aggregate. Pl.'s Br. at 17. However, both of those cases concerned a type of exclusive dealing agreement. See Standard Oil, 337 U.S. at 313 (aggregating the effect of separate vertical exclusive dealing agreements); Fortner, 394 U.S. at 502 (evaluating the aggregate effect of a series of tying arrangements).[17]

Here, by contrast, there are no allegations that the vertical agreements between Amazon and the Publishers limit any Publisher from selling its book titles through retailers other than Amazon. Instead, the allegations make clear that the Publishers sold through other retailers, including Plaintiff. Plaintiff has pointed to no case that would indicate that aggregation of each Publisher's market share is permitted to assess market power or the market-wide effect of conduct where, as here, the vertical restraint is not alleged to be an exclusive dealing agreement.

In sum, whether viewed as a horizontal conspiracy or a vertical restraint, Plaintiff has not plausibly alleged a violation of Section 1 of the Sherman Act. I thus recommend that Count II be dismissed.

### E. Plaintiff's Sherman Act, Section 2 Monopolization and Conspiracy to Monopolize Claims

In Count III, Plaintiff alleges that Amazon monopolized the online retail market for the sale of print trade books in violation of Section 2 of the Sherman Act. SACAC ¶¶ 184-89. And in

---

[17] Plaintiff also relies on Todd v. Exxon Corporation (Pl.'s Br. at 18), but a horizontal conspiracy existed in that case. See Todd, 275 F.3d at 201, 214.

Count IV, Plaintiff alleges a Conspiracy to Monopolize claim against Amazon and the Publishers. See id. ¶¶ 190-97. The complaint alleges that Amazon willfully acquired and maintained its monopoly power through unlawful means, "including Defendants' discriminatory pricing agreements and agreement to control the wholesale prices of print trade books." Id. ¶ 187; see also id. ¶ 194. Amazon attacks the sufficiency of the allegations supporting Plaintiff's monopolization claims, arguing that Plaintiff has failed to allege a horizontal price-fixing conspiracy or an RPA violation and thus its monopolization claims premised on such conduct necessarily fail. Amazon's Br. at 11, 16.

I previously concluded that the Section 2 claims should be dismissed because the crux of those claims was that Amazon had used its market power to facilitate a horizontal price-fixing conspiracy among the Publishers and the complaint had failed to plausibly allege such a conspiracy. R&R at 28. Plaintiff counters that its monopoly claims have been amended so as to no longer require a finding of a horizontal conspiracy. See ECF No. 171 at 5. Instead, Plaintiff contends that Amazon "has market power in the online retail market for trade books and used its market power to extract discriminatory prices" from the Publishers. Id.; see also SACAC ¶¶ 77, 84. In other words, the Section 2 claim is now premised on Amazon having used its market power to extract discriminatory lower prices in violation of the RPA. See SACAC ¶ 187. As discussed, see supra at 15-35, the Second Amended Class Action Complaint does not plausibly allege an RPA claim against the Publishers or Amazon. I thus recommend that the Section 2 monopoly claim premised on such conduct be dismissed. Additionally, the conspiracy to monopolize claim against Defendants requires the existence of a conspiracy. See Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc., 129 F.3d 240, 246 (2d Cir. 1997).

Because I did not find that the allegations of a conspiracy between Amazon and the Publishers were plausible, I recommend dismissal of the Section 2 conspiracy claim as well.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that Defendants' Motions to Dismiss be **GRANTED**. This report and recommendation will be temporarily filed under seal and viewing levels are restricted to Plaintiff, Defendants, and the Court. The parties shall submit proposed redactions to this report by August 14, 2023. The Court will review those redactions and subsequently file a redacted copy of the report on the public docket.

Date: August 3, 2023
     New York, New York

Respectfully submitted,

VALERIE FIGUEREDO
United States Magistrate Judge

## <u>NOTICE</u>

**Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. <u>See also</u> Fed. R. Civ. P. 6(a), (b), (d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court. Any request for an extension of time to file objections or responses must be directed to the Honorable Gregory H. Woods. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.</u>, 596 F.3d 84, 92 (2d Cir. 2010).**